IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------

SHELDON G. ADELSON,

Plaintiff,

v.

DAVID A. HARRIS, MARC R. STANLEY, and
NATIONAL JEWISH DEMOCRATIC COUNCIL,

Defendants.

------------------------------------------------------------------------

**JURY TRIAL DEMANDED**

Civil Action No. _____

ECF Case

## COMPLAINT

Plaintiff Sheldon G. Adelson ("Mr. Adelson"), by his attorneys Olasov + Hollander LLP and Wood, Hernacki & Evans, LLC, alleges for his complaint against David A. Harris ("Harris"), Marc R. Stanley ("Stanley"), and the National Jewish Democratic Council ("NJDC") (collectively, "Defendants") as follows:

### PRELIMINARY STATEMENT

1.      Mr. Adelson brings this complaint to seek redress for Defendants' maliciously false and defamatory statements that conveyed to the public that Mr. Adelson personally approved of and profited from prostitution in integrated resorts owned and operated by Sands China Limited, a subsidiary of Las Vegas Sands Corp., of which Mr. Adelson is a major shareholder, Chairman and CEO.

2.      Defendants' goal was to advance their perceived political interests by assassinating Mr. Adelson's character, punishing him for exercising his right to make

monetary contributions to political causes and candidates of his choice, and demeaning him within the Jewish community.

3.      While Mr. Adelson supports open debate on issues of political concern, Defendants' false and defamatory accusations, made with actual malice, crossed the threshold from constitutionally-protected speech to defamation of a public figure designed to suppress speech for which they should be held accountable.

THE PARTIES

4.      Mr. Adelson is a resident of Nevada, a successful, self-made entrepreneur and philanthropist, a prominent member of the Jewish community, and major shareholder, Chairman and CEO of Las Vegas Sands Corp. ("LVSC"), a Nevada corporation with its principal place of business in Las Vegas, Nevada.

5.      NJDC is a District of Columbia non-profit corporation with an office in this district, located at 445 Park Avenue, Ninth Floor, New York, New York 10022.

6.      NJDC regularly transacts business in this district.

7.      Harris is a resident of the District of Columbia who, on information and belief, regularly transacts business in this district.

8.      Stanley is a resident of the State of Texas who, on information and belief, regularly transacts business in this district.

JURISDICTION AND VENUE

9.      Mr. Adelson is a citizen of the State of Nevada for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

10.     NJDC is a citizen of the District of Columbia for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

11.     Harris is a citizen of the District of Columbia for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

12.     Stanley is a citizen of the State of Texas for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as there exists complete diversity of citizenship between Mr. Adelson and Defendants and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

14.     Defendants are subject to the jurisdiction of this Court pursuant to 28 U.S.C. § 1332.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c).

FACTUAL BACKGROUND

16.     As noted above, Mr. Adelson is a highly successful businessman and major shareholder, Chairman and CEO of LVSC, which, through subsidiaries, owns and operates integrated resorts in Las Vegas, Nevada, Pennsylvania, Macau, and Singapore.

17.     Mr. Adelson is also a philanthropist, donating significant funds to charitable causes in the United States and abroad.  One such philanthropic endeavor is the Dr. Miriam and Sheldon G. Adelson Clinic for Drug Abuse Treatment & Research in Tel Aviv, Israel, which Mr. Adelson established more than twenty years ago along with his wife, Dr. Miriam Adelson.

18.     The Adelsons have also established similar clinics in Las Vegas and Macau (in cooperation with the Macau Ministry of Health) (collectively, the "Adelson Clinics").

19.     The Adelson Clinics are dedicated to treating narcotic drug addiction and

to providing treatment and counseling services to members of their local communities.

20.     Many of the hundreds of patients seen by the Adelson Clinics are women whose addiction has forced them into prostitution.

21.     The Adelson Clinics work to support these women, provide them with drug abuse treatment, and end their involvement in prostitution.  Through the Dr. Miriam and Sheldon G. Adelson Medical Research Foundation, Dr. and Mr. Adelson also support medical research into the biology of addictive diseases and the consequential impact on addiction treatment, among other fields.

22.     In addition to the above described philanthropic works, Mr. Adelson has also lawfully contributed to political candidates and Political Action Committees (PACs) supporting candidates running for political office in 2012, including Republican Party Presidential candidates Newt Gingrich and Mitt Romney.

23.     On or about July 3, 2012, NJDC published an article authored by Harris on its website (the "July 3 Article") demanding that Mitt Romney, and the rest of the Republican Party, cease accepting monetary donations from Mr. Adelson.

24.     As part of the July 3 Article, Harris and NJDC asked readers to sign a petition supporting their demand that the Republican Party cease accepting monetary donations from Mr. Adelson.

25.     The July 3 Article published by NJDC and the statements contained therein are false and defamatory and convey the unmistakable message that Mr. Adelson engaged in the exploitation of prostitutes and is worthy of public scorn and contempt.

26.     The false statements published by the NJDC in the July 3 Article are defamatory *per se* so that injury to the reputation of Mr. Adelson is presumed as a matter of law.

27.     On or about July 11, 2012, NJDC issued a "Statement Regarding NJDC's Sheldon Adelson Petition" (the "July 11 Article").

28.     The July 11 Article republished the NJDC July 3 Article, supported the July 3 Article, and repeated the false and defamatory gist of the July 3 Article, asserting that the contents of the July 3 Article were true and substantiated.

29.     The false statements published by Defendants in the July 11 Article are defamatory *per se* and injury to the reputation of Mr. Adelson is presumed as a matter of law.

## CAUSE OF ACTION FOR LIBEL

30.     Mr. Adelson incorporates by reference paragraphs 1 - 29 of this Complaint as though set forth herein in their entirety.

31.     As set forth above, on or about July 3, 2012, NJDC published the July 3 Article demanding that Romney, and the rest of the Republican party, cease accepting monetary donations from Mr. Adelson.  The July 3rd Article was published at http://Mr. Adelson.njdc.org/forms/sign/adelson and was accessible to the public from the time of publication on or about July 3, 2012, until July 11, 2012 when the July 3 Article was removed by Defendants.

32.     According to various news organizations, including, but not limited to, the JTA, President and CEO of NJDC, David A. Harris, authored the July 3 Article and has acted as the public spokesperson for NJDC regarding the Articles.

5

33.    A true and correct copy of the July 3 Article as it appeared on the NJDC website as of July 6, 2012 is attached hereto as Exhibit A and incorporated herein as if set forth in full.

34.    The July 3 Article was headlined with the following false and defamatory bold-faced accusation: "**Tell Romney to Reject Adelson's Dirty Money**."

35.    The July 3 Article went on to boldly state, in all-capital letters, and in a large graphic illustration containing juxtaposed photos of Adelson and Romney, the following false and defamatory accusation:

IF ONE OF YOUR
BIGGEST DONORS
WAS ACCUSED OF PUTTING
"FOREIGN MONEY" FROM CHINA
IN OUR ELECTIONS
& REPORTEDLY APPROVED
OF PROSTITUTION,
WOULD YOU
TAKE HIS MONEY?
SIGN THE PETITION:
TELL MITT ROMNEY TO STOP TAKING MONEY FROM SHELDON ADELSON.

36.    Beneath the graphic illustration, the NJDC went on to publish the following false and defamatory statements:

- "… perhaps the most alarming aspect of Adelson's potentially unlimited contributions is where the money comes from."

- "[T]his week, reports surfaced that in addition to his anti-union and allegedly corrupt business practices, **Adelson 'personally approved' of prostitution in his Macau casinos.**"

- "Given these reports, **Romney and the rest of the Republican Party must cease accepting Adelson's tainted money immediately**."

- "… enlist your family and friends in the effort to stop the influence of Adelson's tainted money and protect our democracy."

37.    The gist of the July 3 Article is that the political contributions made by Adelson were "tainted," "dirty" money obtained from Mr. Adelson's having "personally approved of prostitution in his Macau casinos."

38.    The gist of the July 3 Article and the accusations outlined above are false and defamatory.

39.    The gist of the July 3 Article and the statements outlined above are libelous *per se* in that they impute unlawful activity to Mr. Adelson, disparage him in his business or profession on their face, and can be so understood without reference to any additional or extrinsic facts.

40.    The false and defamatory accusations against Mr. Adelson published by Defendants were subsequently republished in New York and worldwide on other Internet websites.  A true and correct copy of an article dated July 6, 2012 published by The Jewish Press, a New York publication, discussing Defendants' false and defamatory accusations is attached hereto as Exhibit B and incorporated herein as if set forth in full.

41.    On or about July 11, 2012, NJDC published the July 11 Article, and removed the July 3 Article from its website.  The July 11 Article was published at http://Mr._Adelson.njdc.org/media/entry/adelson071112 and remains accessible to the public at this web address as of the date of filing this Complaint.

42.    Harris and Stanley co-authored the July 11 Article.

43.    A true and correct copy of the July 11 Article as it appeared on the NJDC website as of July 19, 2012 is attached hereto as Exhibit C and incorporated herein as if

set forth in full.

44.     In relevant part, the July 11 Article published by the NJDC and authored by Harris and Stanley contained the following false and defamatory accusation: "Regarding our recent campaign surrounding Sheldon Adelson, we don't believe we engaged in character assassination; we stand by everything we said, which was sourced from current, credible news accounts."

45.     By stating unequivocally that the Defendants "stand by everything we said" in the July 3 Article and that the false and defamatory accusations made in the July 3 Article were "sourced from current, credible news accounts," Defendants affirmed and republished the libelous accusations contained in the July 3 Article.

46.     The gist of the July 11 Article is that the libelous accusations made by Harris and the NJDC in the July 3 Article were true, accurate and based on credible, independent news sources.

47.     The gist of the July 11 Article is false and defamatory because the accusations contained in the July 3 Article are false and defamatory.

48.     The gist of the July 11 Article is false and defamatory because it "stands by" the "credible news accounts" of the July 3 Article which asserted that the political contributions made by Mr. Adelson were "tainted," "dirty" money obtained as a result of Mr. Adelson's having "personally approved of prostitution in his Macau casinos."

49.     The July 11 Article is libelous *per se* in that it imputes criminal activity to Mr. Adelson, disparages him in his business or profession on its face, and can be so understood without reference to any additional or extrinsic facts.

50.    Defendants published the July 3 and July 11 false and defamatory accusations against Mr. Adelson without any privilege.

51.    The July 3 and July 11 false and defamatory accusations against Mr. Adelson published by Defendants were subsequently republished in New York and worldwide on other Internet websites.  A true and correct copy of an article dated July 12, 2012 published by The Jewish Week, a New York publication, discussing Defendants' false and defamatory accusations is attached hereto as Exhibit D and incorporated herein as if set forth in full.

52.    The only source for Defendants' false and defamatory accusations that Mr. Adelson approved of prostitution in the Macau integrated resorts is Steven C. Jacobs ("Jacobs"), a disgruntled former employee of Sands China Limited ("SCL"), who was terminated for cause from employment with SCL in 2010.

53.    When first informed of his termination, Jacobs threatened to go public with baseless Foreign Corrupt Practices Act allegations against Mr. Adelson unless LVSC paid him millions of dollars.

54.    LVSC refused to pay Jacobs a dime in response to his extortionate demand.

55.    Carrying out his threat, Jacobs filed a lawsuit in the District Court for Clark County, Nevada, captioned *Steven C. Jacobs v. Las Vegas Sands Corp., et al.*, No. A627691-B (the "Nevada Court Action").

56.    Aware that he could not prevail on the merits of his claims, Jacobs made good on his threats and calculated that his allegations in his meritless lawsuit would embarrass and pressure the defendants in that case into paying him millions of dollars

that he does not deserve in an effort to avoid the publicity that would be generated by his false accusations that were solely intended to extort monies from them.

57.    In keeping with this strategy, on June 27, 2012, the afternoon before a status conference in the Nevada Court Action, Jacobs filed an unrequested declaration ostensibly to identify gaps in the defendants' production of documents regarding the issue of personal jurisdiction.

58.    Jacobs had never before raised the issue of any such alleged production gaps.

59.    The unrequested declaration included the unequivocally false statements by Jacobs concerned prostitution in SCL's Macau integrated resorts.

60.    Specifically, Jacobs stated, "LVSC Senior Executives informed me that the prior prostitution strategy had been personally approved by Adelson."

61.    This statement by Jacobs is unequivocally false and was known by Jacobs to be false at the time it was made by him.

62.    On Monday May 11, 2009, over three years prior to Jacobs' false averments in his declaration, Jacobs emailed Michael Leven, LVSC's President and Chief Operating Officer, asking if Mr. Adelson or anyone else at LVSC "supported the decision" to "allow prostitution" in the Macau casinos despite it "seem[ing] at odds with what I know to be Sheldon's 'no tolerance' policy."

63.    Mr. Leven responded the very next day on Tuesday May 12, 2009: "I have investigated the alleged comments…. [T]here is no evidence that can be found that anyone here supported in anyway a different policy than we have in las vegas [sic] on these matters," i.e., the "no tolerance" policy.

64.     Shortly after the publication of the July 3 Article, Harris, individually and for NJDC, was informed that the libelous accusations in the July 3 Article were false, and that written evidence existed as described above establishing that Jacobs knew his accusations were false prior to submitting his declaration to the Nevada District Court.

65.     No later than the time of that conversation, Harris knew that Jacobs was an unreliable, biased witness with his own personal agenda to harm Mr. Adelson, and that written evidence established that his accusations against Mr. Adelson concerning prostitution were false.  That knowledge is fairly imputed to Stanley and the NJDC, which is responsible for the malicious and reckless acts of its employee, Harris.

66.     Several days later, on July 11, 2012, Defendants withdrew the July 3 Article and published the July 11 Article.

67.     Despite having the undisputed information of falsity that had been provided to them, Defendants nonetheless published the July 11 Article "stand[ing] by everything we said, which was sourced from current, credible news accounts."

68.     On July 17, 2012, an attorney representing Mr. Adelson sent a letter to Defendants detailing that the statements made in the July 3 Article and republished in the July 11 Article were false and defamatory and demanding a retraction and apology.  No such retraction or apology has been made by Defendants.  A true and correct copy of the attorney's July 17, 2012 letter is attached hereto as Exhibit E and incorporated herein as if set forth in full.

69.     On July 18, 2012, LVSC and SCL publicly filed in the Nevada Court Action the proof that Jacobs' allegation concerning Mr. Adelson was false and known by Jacobs to be false, which fact was reported by various news outlets, including the Wall

Street Journal, on June 19, 2012.  A true and correct copy of the Wall Street Journal article dated June 19, 2012 is attached hereto as Exhibit F and incorporated herein as if set forth in full.

70.    On June 29, 2012 and July 2, 2012 the Democratic Congressional Campaign Committee ("DCCC") published statements making substantially similar allegations to those at issue here against Mr. Adelson.

71.    On August 2, 2012, the DCCC issued the following public retraction:

**"In press statements issued on June 29 and July 2, 2012, the DCCC made unsubstantiated allegations that attacked Sheldon Adelson, a supporter of the opposing party.  This was wrong.  The statements were untrue and unfair and we retract them.  The DCCC extends its sincere apology to Mr. Adelson and his family for any injury we have caused."**

A true and correct copy of the DCCC retraction and apology is attached hereto as Exhibit G and incorporated herein as if set forth in full.

72.    On August 3, 2012, counsel for Mr. Adelson again contacted Defendants, presented them with the DCCC retraction and apology and offered them yet another opportunity to retract and apologize to Mr. Adelson to correct the public record and mitigate the damage they had inflicted with their false accusations.  Notwithstanding the fact that the Defendants had every reason to rely on the judgment of the DCCC, which had concluded that the statements were "unfair and untrue", Defendants refused not only to retract and apologize but left their statement on their website, thereby consistently republishing their reckless and, at that point, knowingly false statements.

73.     Evidencing a reckless disregard for truth or falsity, prior to the publication of the July 3 and July 11 Articles, Defendants failed and refused to provide Mr. Adelson with an opportunity to respond to the accusations made against him in the Articles, and failed to conduct any independent review of the allegations made by Jacobs.

74.     Defendants knowingly and purposely avoided and ignored evidence establishing the falsity of the Articles prior to publishing them.

75.     Evidencing a reckless disregard for truth or falsity, Defendants published accusations against Mr. Adelson that were so inherently improbable on their face as to raise serious doubts about their truth.

76.     Evidencing a reckless disregard for truth or falsity, Defendants published accusations against Mr. Adelson that were so outrageous on their face as to raise serious doubts about their truth.

77.     Evidencing a reckless disregard for truth or falsity, Defendants published accusations against Mr. Adelson that clearly contradicted known facts.

78.     Evidencing a reckless disregard for truth or falsity, Defendants published accusations against Mr. Adelson based solely on a source that was unreliable, known to be biased against Mr. Adelson, and known to lack credibility, and thereby falsely represented that such accusations were based on "credible news accounts."

79.     Evidencing a reckless disregard for truth or falsity, Defendants published accusations against Mr. Adelson based solely on a source that was known to have a history of engaging in vicious personal attacks against Mr. Adelson.

80.    Evidencing a reckless disregard for truth or falsity, Defendants published accusations against Mr. Adelson without conducting even a cursory investigation, which failure constitutes gross negligence.

81.    Evidencing malicious intent, Defendants refused to retract their false accusations against Mr. Adelson despite repeated informal and formal requests to do so.

82.    The false and defamatory Articles were published to third parties and were, in fact, read by third parties nationally and internationally.

83.    As a direct and proximate result of the false and defamatory Articles published by Defendants, Mr. Adelson's reputation as a person and businessman has been permanently damaged.

84.    As a direct and proximate result of the false and defamatory Articles published by Defendants, Mr. Adelson has suffered public hatred, contempt, scorn, and ridicule.

85.    As set forth above, the false and defamatory Articles published by Defendants are libelous *per se* in that they impute unlawful activity to Mr. Adelson and injure his business reputation, entitling Mr. Adelson to presumed damages.

86.    Despite having received repeated written notices informing Defendants that the accusations they published in the Articles were false and defamatory and demanding that the statements be retracted and corrected, Defendants failed to retract or correct their false and defamatory statements.

87.    The conduct of Defendants demonstrates willful misconduct and an entire want of care that raises a conscious indifference to consequences.

88.   The false and defamatory accusations were published with Constitutional actual malice, thus entitling Mr. Adelson to an award of punitive damages against Defendants.

89.   The above-detailed actions of Defendants were undertaken with the specific intent to cause harm to Mr. Adelson, and showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, thus entitling Mr. Adelson to an award of punitive damages against Defendants.

90.   The above-detailed actions of Defendants were undertaken, not just to harm Mr. Adelson, but were part of a pattern of similar conduct aimed at the public generally to disparage Mr. Adelson in the minds of the public, to distort and chill the political process, and improperly influence political contributions.

WHEREFORE, Mr. Adelson demands:

(a) Trial by jury;

(b) That judgment be entered against Defendants for compensatory damages in an amount not less than Ten Million Dollars ($10,000,000.00);

(c) That judgment be entered against Defendants for punitive damages in an amount not less than Fifty Million Dollars ($50,000,000.00) to punish and penalize Defendants and deter Defendants from repeating their unlawful conduct;

(d) That Defendants publish a retraction of the Articles;

(e) That all costs of this action be assessed against Defendants; and

(f)  That this Court award such other relief as it deems equitable, just, and proper.

Dated: New York, New York
        August 8, 2012

David M. Olasov
**Olasov + Hollander LLP**
27th Floor
1325 Avenue of the Americas
New York, NY 10019
dolasov@olasov.com

-and-

L. Lin Wood
lwood@whetriallaw.com
Georgia Bar No. 774588
(*pro hac vice* application pending)
Amy M. Stewart
astewart@whetriallaw.com
Georgia Bar No. 141481
(*pro hac vice* application pending)
**Wood, Hernacki & Evans, LLC**
1180 West Peachtree Street N.W.
Suite 2400
Atlanta, Georgia 30309

## JURY DEMAND

Plaintiff demands a trial by jury on all issues triable of right by a jury.

David M. Olasov
**Olasov + Hollander LLP**
27th Floor
1325 Avenue of the Americas
New York, NY 10019
dolasov@olasov.com

16