UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------

SHELDON G. ADELSON,

                       Plaintiff,

v.

DAVID A. HARRIS,  MARC R. STANLEY, and
NATIONAL JEWISH DEMOCRATIC COUNCIL,

                       Defendants.

:
:
:
:
:
:
:
:
:
:
:

Case No. 12-Civ-6052-JPO

ECF Case

------------------------------------------------------------------------


**COMBINED MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
SPECIAL MOTION TO DISMISS PURSUANT TO THE D.C. ANTI-SLAPP STATUTE
AND MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)**

Lee Levine (*pro hac vice* application pending)
Gayle Sproul
Seth D. Berlin
Rachel F. Strom
LEVINE SULLIVAN KOCH & SCHULZ, LLP
321 West 44th Street, Suite 510
New York, New York 10036
Telephone: 212-850-6100
llevine@lskslaw.com
gsproul@lskslaw.com
sberlin@lskslaw.com
rstrom@lskslaw.com

*Counsel for Defendants*
*David A. Harris, Marc R. Stanley,*
*and National Jewish Democratic Council*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................. 1

STATEMENT OF FACTS ...................................................................................................... 5

I.      Sheldon Adelson and His "Weapon of Choice" ...................................................... 5

II.     Adelson and the 2012 Presidential Campaign ........................................................ 8

III.    Adelson's "Foreign Money," His Macau Casinos and the *Jacobs* Litigation ................. 10

        A.      The Jacobs Declaration ........................................................................ 13

        B.      The Sanctions Proceedings ................................................................... 14

IV.     Defendants' Petition and Statement ...................................................................... 17

V.      Adelson's Response ............................................................................................ 20

ARGUMENT ......................................................................................................................... 22

I.      DISTRICT OF COLUMBIA LAW GOVERNS THIS ACTION ................................... 23

II.     ADELSON'S COMPLAINT SHOULD BE DISMISSED UNDER THE
        DISTRICT OF COLUMBIA'S ANTI-SLAPP STATUTE ............................................ 25

        A.      The Anti-SLAPP Act's Immunity Applies To This Action ................................ 26

        B.      Adelson's Complaint Triggers The Anti-SLAPP Act's Immunity ...................... 28

        C.      To Overcome the Statutory Immunity and Avoid Dismissal,
                Adelson Must Demonstrate that He is Likely to Succeed on the
                Merits of His Claims ........................................................................... 29

III.    ADELSON CANNOT CARRY HIS BURDEN OF DEMONSTRATING
        HE IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS ........................... 30

        A.      The Petition's Recounting that Reports Had Surfaced that Adelson
                Personally Approved of Prostitution in his Macau Casinos
                Constitutes a Privileged Report of a Judicial Proceeding ............................... 31

        B.      The Remaining Portions of the Petition that Adelson Challenges
                Are Protected Expressions of Opinion and Privileged "Fair
                Comment" ....................................................................................... 36

i

       1.       The Constitutional Protection for Expressions of Opinion ........................36

       2.       The District of Columbia "Fair Comment" Privilege ...............................40

IV.    IN THE ALTERNATIVE, BECAUSE CORE EVIDENCE ESSENTIAL
       TO HIS ACTION APPEARS TO HAVE BEEN CONCEALED AND/OR
       DESTROYED, IT SHOULD BE STAYED UNTIL THAT ISSUE IS
       RESOLVED ..................................................................................................................42

## TABLE OF AUTHORITIES

Page(s)

CASES

*3M Co. v. Boulter*,
   842 F. Supp. 2d 85 (D.D.C. Feb. 2, 2012) ..........................................................................27

*Adelson v. Adelson*,
   13 Mass. L. Rptr. 171, 2001 WL 736739 (Mass. Super. 2001) ...............................................8

*Adelson v. Anderson*,
   [2011] EWHC (QB) 2497, 2011 WL 4529292 (Eng.) ...........................................................6

*Adelson v. Hananel*,
   428 F. App'x 717 (9th Cir. 2011) ...........................................................................................7

*Agora, Inc. v. Axxess, Inc.*,
   90 F. Supp. 2d 697 (D. Md. 2000) ..................................................................................34, 39

*Aronson v. Dog Eat Dog Films, Inc.*,
   738 F. Supp. 2d 1104 (W.D. Wash. 2010) ...........................................................................27

*Balestra-Leigh v. Balestra*,
   2010 WL 4280424 (D. Nev. Oct. 19, 2010) .........................................................................27

*Beers v. General Motors Corp.*,
   1999 WL 325378 (N.D.N.Y. May 17, 1999) ........................................................................43

*Berwick v. New World Network Int'l, Ltd.*,
   2007 WL 949767 (S.D.N.Y. Mar. 28, 2007) ........................................................................23

*Bible & Gospel Trust v. Twinam*,
   2008 WL 5245644 (D. Vt. Dec. 12, 2008) ...........................................................................27

*Bieter v. Fetzer*,
   2005 WL 89484 (Minn. App. Jan. 18, 2005) .......................................................................39

*Biro v. Condé Nast*,
   2012 WL 3264059 (S.D.N.Y. Aug. 9, 2012) ............................................................. *passim*

*Blumenthal v. Drudge*,
   2001 WL 587860 (D.D.C. Feb. 13, 2001) ...........................................................................28

*Brown v. Wimberly*,
   2012 WL 1759956 (5th Cir. May 18, 2012) .........................................................................27

iii

*Buckley v. DIRECTV, Inc.*,
 276 F. Supp. 2d 1271 (N.D. Ga. 2003) ..................................................................27

*Chandok v. Klessig*,
 632 F.3d 803 (2d Cir. 2011) ................................................................................27

*Chapin v. Knight-Ridder, Inc.*,
 993 F.2d 1087 (4th Cir. 1993) .............................................................................38

*Coles v. Washington Free Weekly, Inc.*,
 881 F. Supp. 26 (D.D.C. 1995) .............................................................30, 31, 32, 41

*Collins v. Flynn*,
 2008 WL 3851842 (W.D.N.Y. Apr. 15, 2008) .......................................................23

*Containment Techs. Group Inc. v. Am. Soc. of Health Sys. Pharmacists*,
 2009 WL 838549 (S.D. Ind. Mar. 26, 2009) .........................................................27

*Cox Broad. Corp. v. Cohn*,
 420 U.S. 469 (1975) ...........................................................................................31

*Dall v. Pearson*,
 246 F. Supp. 812 (D.D.C. 1963) ..........................................................................41

*Dameron v. Washington Magazine, Inc.*,
 779 F.2d 736 (D.C. Cir. 1985) .............................................................................31

*Doe v. City of New York*,
 2010 WL 286643 (S.D.N.Y. Jan. 19, 2010) ..........................................................44

*Dorsey v. Nat'l Enquirer, Inc.*,
 973 F.2d 1431, 1435 (9th Cir.1992) .....................................................................32

*Eckhaus v. Alfa-Laval, Inc.*
 764 F. Supp. 34 (S.D.N.Y. 1991) .........................................................................43

*Farah v. Esquire Magazine, Inc.*,
 2012 WL 1970897 (D.D.C. June 4, 2012) ...........................................5, 27, 28, 29

*Fisher v. Washington Post Co.*,
 212 A.2d 335 (D.C. 1965) ...................................................................................41

*Fitzgerald v. Penthouse Int'l Ltd.*,
 776 F.2d 1236 (4th Cir. 1985) .............................................................................44

*Fried v. Lehman Bros. Real Estate Assoc. III*,
 2012 WL 252139 (S.D.N.Y. Jan. 25, 2012) ..........................................................44

*Gardner v. Martino,*
    563 F.3d 981 (9th Cir. 2009) ..................................................................27

*Global Relief Found. v. New York Times Co.,*
    2002 WL 31045394 (N.D. Ill. Sept. 11, 2002) .....................................28

*Godin v. Schencks,*
    629 F.3d 79 (1st Cir. 2010).....................................................................27

*Goldstein v. Time Warner N.Y. City Cable Group,*
    3 F. Supp. 2d 423 (S.D.N.Y. 1998).......................................................44

*Grass v. News Grp. Publ'ns, Inc.,*
    570 F. Supp. 178 (S.D.N.Y. 1983).........................................................23

*Hatfill v. New York Times Co.,*
    427 F.3d 253, 255 (4th Cir. 2005) .........................................................31

*H&R Indus., Inc. v. Kirshner,*
    899 F. Supp. 995 (E.D.N.Y. 1995) ........................................................37

*Herbert v. Lando,*
    441 U.S. 153 (1979) ...............................................................................45

*Hotchner v. Castillo-Puche,*
    551 F.2d 910, 913 (2d Cir. 1977)...........................................................37

*In re Payroll Express Corp.,*
    2005 WL 2438444 (Bankr. S.D.N.Y. Mar. 30, 2005) ...........................24

*In re Smith,*
    389 B.R. 902 (Bankr. Nev. 2008) ........................................................6, 7

*Jankovic v. Int'l Crisis Grp,*
    593 F.3d 22 (D.C. Cir. 2010) ...........................................................33, 34

*Jewell v. NYP Holdings, Inc.,*
    23 F. Supp. 2d 348 (S.D.N.Y. 1998)..................................................23, 25

*Landis v. North Am. Co.,*
    299 U.S. 248 (1936)................................................................................44

*Lane v. Random House, Inc.,*
    985 F. Supp. 141 (D.D.C. 1995) .......................................................40, 41

*Law Firm of Daniel P. Foster, P.C. v. Turner Broad. Sys., Inc.,*
    844 F.2d 955 (2d Cir. 1988)....................................................................37

*Lee v. Bankers Trust Co.*,
   166 F.3d 540 (2d Cir. 1999)................................................................23

*Letter Carriers v. Austin*,
   418 U.S. 264 (1974)........................................................................38

*Levin v. McPhee*,
   119 F.3d 189 (2d Cir. 1997)....................................................23, 37, 38

*Levin v. McPhee*,
   917 F. Supp. 230 (S.D.N.Y. 1996)....................................................23

*Liberty Lobby, Inc. v. Dow Jones & Co.*,
   838 F.2d 1287 (D.C. Cir. 1988).........................................................35

*Lynch v. New Jersey Educ. Ass'n*,
   735 A.2d 1129 (N.J. 1999).................................................................38

*Lyons v. News Group Boston*,
   612 N.E.2d 1168 (Mass. 1993)..........................................................38

*Maritima de Ecologia, S.A. v. Sealion Shipping Ltd.*,
   2011 WL 1465744 (S.D.N.Y. Apr. 15, 2011).....................................44

*Masson v. New Yorker Magazine*,
   501 U.S. 496 (1991).........................................................................43

*Medico v. Time, Inc.*,
   643 F.2d 134 (3d Cir. 1981)..............................................................32

*Mero v. U.S. Figure Skating Ass'n*,
   2006 WL 163529 (E.D. Mich. Jan. 20, 2006).....................................27

*Milkovich v. Lorain Journal Co.*,
   497 U.S. 1 (1990) ............................................................................37

*Mintz v. FDIC*,
   729 F. Supp. 2d 276 (D.D.C. 2010) ....................................................5

*Moldea v. New York Times Co.*,
   15 F.3d 1137, 1144 (D.C. Cir. 1994))................................................41

*Monaco Entm't Grp. v. City of El Paso*,
   No. EP-11-CV-561-DB (W.D. Tex. Apr. 3, 2012)...............................27

*Myers v. Plan Takoma, Inc.*,
   472 A.2d 44 (D.C. 1983) ..................................................................30

*New York Times Co. v. Sullivan,*
   376 U.S. 254 (1964) ...................................................................................1

*Ollman v. Evans,*
   750 F.2d 970 (D.C. Cir. 1984) ...............................................................40

*Partington v. Bugliosi,*
   56 F.3d 1147 (9th Cir. 1995) .................................................................38

*Philadelphia Newspapers, Inc. v. Hepps,*
   475 U.S. 767 (1986) ..........................................................................37, 42

*Price v. Stossel,*
   2008 WL 2434137 (S.D.N.Y. June 4, 2008) .........................................28

*Qureshi v. St. Barnabas Hosp. Ctr.,*
   430 F. Supp. 2d 279 (S.D.N.Y. 2006) ...................................................23

*Redmond v. Gawker Media, LLC,*
   2012 WL 3243507 (Cal. App. Aug. 10, 2012) ......................................39

*Reeves v. ABC, Inc.,*
   719 F.2d 602 (2d Cir. 1983)......................................................23, 32, 35

*Rothman v. Gregor,*
   220 F.3d 81 (2d Cir. 2000)........................................................................5

*Russell v. Krowne,*
   2010 WL 2765268 (D. Md. July 12, 2010)............................................27

*Sabratek Corp. v. Keyser,*
   2000 WL 423529 (S.D.N.Y. Apr. 19, 2000)..........................................38

*Sandals Resorts Int'l v. Google,*
   925 N.Y.S.2d 407 (1st Dep't 2011) ........................................................39

*Schatz v. Republican State Leadership Comm.,*
   669 F.3d 50 (1st Cir. 2012)........................................................................1

*Serafino v. Hasbro, Inc.,*
   82 F.3d 515 (1st Cir. 1996)......................................................................43

*Shangold v. Walt Disney Co.,*
   2006 WL 71672 (S.D.N.Y. 2006) ...........................................................43

*Sherrod v. Breitbart,*
   843 F. Supp. 2d 83 (D.D.C. 2012) ..........................................................27

*Shine v. Loomis*,
    836 N.E.2d 952 (Ind. App. 2005) ........................................................39

*Synanon Church v. United States*,
    820 F.2d 421 (D.C. Cir. 1987) ...........................................................43

*Tennenbaum v. Arizona City Sanitary Dist.*,
    2011 WL 3235828 (D. Ariz. July 29, 2011) .......................................27

*Trulock v. Lee*,
    66 F. App'x 472 (4th Cir. 2003) .........................................................44

*United Chi v. Loyola Univ. Med. Ctr.*,
    787 F. Supp. 2d 797 (N.D. Ill. 2011) .................................................27

*United States ex rel. Newsham v. Lockheed Missiles & Space Co.*,
    190 F.3d 963 (9th Cir. 1999) .............................................................27

*USANA Health Sciences, Inc. v. Minkow*,
    2008 WL 619287 (D. Utah Mar. 4, 2008) ..........................................27

*Washington Post Co. v. Keogh*,
    365 F.2d 965 (D.C. Cir. 1966) ...........................................................30

*Wehling v. CBS*,
    608 F.2d 1084 (5th Cir. 1979) ...........................................................43

*Welch v. Am. Publ'g Co.*,
    3 S.W.3d 724 (Ky. 1999) ...................................................................38

*West v. Goodyear Tire & Rubber Co.*,
    167 F.3d 776 (2d Cir. 1999) ..............................................................43

*White v. Fraternal Order of Police*,
    707 F. Supp. 579 (D.D.C. 1989) ........................................................32

*White v. Fraternal Order of Police*,
    909 F.2d 512 (D.C. Cir. 1990) ...........................................31, 32, 35

*Whiting v. AARP*,
    637 F.3d 355 (D.C. Cir. 2011) .............................................................5

*WorldCrisa v. Armstrong*,
    129 F.3d 71 (2d Cir. 1997) .................................................................44

*Zuck v. Interstate Publ'g Corp.*,
    317 F.2d 727 (2d Cir. 1963) ..............................................................23

*Zuckerbraun v. General Dynamics Corp.*,
   935 F.2d 544 (2d Cir. 1991)...................................................................................44

STATUTES

D.C. Code § 16-5501 ...........................................................................................2, 26 29

D.C. Code § 16-5502 ..........................................................................................6, 26, 28,30

Federal Rule of Civil Procedure 12(b)(6) ............................................................... *passim*

Fed. Rule of Evidence 201 ............................................................................................5

OTHER AUTHORITIES

Committee Report on Bill 18-893 (Nov. 18, 2010) ................................................2, 27

Kathleen Hall Jamieson, Paul Waldman & Susan Sherr, *Eliminate the Negative?*
   *Categories of Analysis for Political Advertisements, in Crowded Airwaves:*
   *Campaign Advertising in Elections* 44 (James A. Thurber, Candice J. Nelson & David
   A. Dulio, eds., 2000)...............................................................................................1

Sheryl L. Katz, *Forensic Collections in E-Discovery*, 25-MAR Orange County Law 18,
   March 2010 ...........................................................................................................15

RESTATEMENT (SECOND) OF TORTS § 566..................................................................38

RESTATEMENT (SECOND) OF TORTS § 611...............................................................31, 35, 36

Robert D. Sack, *Sack on Defamation:  Libel, Slander & Related Problems*, § 7:3.5...................38

## PRELIMINARY STATEMENT

"If Jefferson is elected, the Bible will be burned, the French 'Marseillaise' will be sung in Christian churches, [and] we will see our wives and daughters the victims of legal prostitution; soberly dishonored; [and] speciously polluted."[1]

This defamation action arises in the context of a presidential election, this one hundreds of years after Jefferson. Although much time has passed since then, and many things about presidential elections have surely changed, one constant is the "uninhibited, robust and wide-open" nature of political campaigns and the advocacy that accompanies them. *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964); *see Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 52 (1st Cir. 2012) ("Campaigning for public office sometimes has the feel of a contact sport, with candidates, political organizations, and others trading rhetorical jabs and sound-bite attacks in hopes of landing a knockout blow at the polls. It is not for the thin-skinned or the faint-hearted, to use two apropos clichés."). Sheldon Adelson, the plaintiff here, is a major player in this "contact sport": he is a high-profile international casino magnate, a self-described "multibillionaire" and, of particular importance here, the source of tens of millions of dollars in funding for the so-called "Super-PACs" supporting Republican candidates in the current presidential election with hard-hitting attacks on their political opponents.

Adelson seeks to punish defendants, the National Jewish Democratic Counsel ("NJDC") and two of its senior leaders, David Harris and Marc Stanley, for political advocacy contained in a petition posted by NJDC urging the Republican presidential candidate and his supporters to stop accepting money donated by Adelson because, they had come to believe, it was "tainted" or "dirty." Thus, this case is not simply about significant public dialogue in the context of a

---

[1] Rev. Timothy Dwight, then-President of Yale College, 1800, *quoted in* Kathleen Hall Jamieson, Paul Waldman & Susan Sherr, *Eliminate the Negative? Categories of Analysis for Political Advertisements*, *in* Crowded Airwaves: Campaign Advertising in Elections 44 (James A. Thurber, Candice J. Nelson & David A. Dulio eds. 2000).

presidential election, it is also about an attempt by one of the country's wealthiest men and influential political partisans to intimidate his less well-heeled critics into silence.  As a result, this case is a SLAPP (Strategic Lawsuit Against Public Participation) barred by the District of Columbia's Anti-SLAPP Act of 2010, D.C. Code § 16-5501 *et seq.*[2]

      The Anti-SLAPP Act was adopted to ensure that those who criticize public figures, as defendants did here, are not punished through burdensome litigation by plaintiffs like Adelson, who has a long history of attempting to stifle critics by imposing on them enormous litigation costs, rather than to recover fair compensation for some actual injury.  Indeed, as the D.C. Council's Committee on Public Safety and the Judiciary explained in reporting the bill, the Anti-SLAPP Act exists to put a swift end to lawsuits such as this one, "the goal of [which] is not to win . . . but punish the opponent and intimidate them into silence," in other words, cases in which "'*litigation itself* is the plaintiff's weapon of choice.'"  Declaration of Rachel F. Strom ("Strom Dec.") Ex. 116 (committee report) (emphasis in original).

      The Anti-SLAPP Act immunizes from liability speech about public figures or otherwise addressing matters of public concern, such as the political advocacy about Adelson at issue here.  Precisely in order to prevent plaintiffs like Adelson from inflicting "revenge" in the form of crippling defense costs and onerous discovery, the Act stays all discovery, provides for prompt dismissal of a SLAPP suit such as this one, and mandates recovery by defendants of their attorneys' fees and costs.  Only if Adelson were able to carry the heavy burden of demonstrating

---

[2] As explained *infra* in Part I of the Argument, D.C. law applies in this case because it is the place with the most significant connection to the events at issue.  If the Court were instead to decide to apply the law of any of the other potentially applicable jurisdictions – New York, where the action was filed; Nevada, where plaintiff has one of his many residences; or Texas, where one of the defendants resides – they all have also enacted anti-SLAPP statutes, and defendants reserve the right to invoke the protections of each of those statutes pursuant to its terms.

to this Court that he is "*likely* to succeed on the merits" of his defamation claim can this case be permitted to proceed.  Because he cannot do so, his Complaint must be dismissed with prejudice.

Adelson complains about a Petition posted by NJDC on the Internet that called upon Mitt Romney and the Republican Party to decline further funding from Adelson which, in its view, is "tainted" for a variety of reasons.  In the Petition, each of these enumerated reasons was hyperlinked to a widely circulated news article setting forth its basis.  In his Complaint, Adelson does not challenge the Petition's contentions that his money is "dirty" because (a) his companies are currently the subject of ongoing federal investigations for violations of the Foreign Corrupt Practices Act, (b) he is "anti-union," or (c) Senator John McCain had condemned the flow of money from foreign sources in the presidential election campaign, expressly including money earned by Adelson from his casinos in the Chinese administrative district of Macau.  Adelson does complain, however, about the Petition's statement that his money is "tainted" in part because of news "reports" that had recently "surfaced" containing allegations that he "personally approved" of prostitution in those Macau casinos.  Like the other statements contained in the Petition, this one was hyperlinked to an Associated Press ("AP") article describing a Nevada lawsuit filed against Adelson's companies by Steven Jacobs, the former head of his Macau casino operations.  The AP article reported that a sworn declaration submitted by Jacobs in that action averred that Adelson had personally approved a policy of permitting prostitution in the casinos, and also included statements by Adelson's representatives that he had not done so.[3]

This statement in the Petition is not actionable in defamation for at least two reasons. First, the portion of it stating that "reports" had "surfaced" that Adelson "personally approved"

_____

[3] As explained *infra*, NJDC subsequently removed the Petition from its website and issued a "Statement" explaining that, although it stood by the Petition's content, it had decided to withdraw it in an effort to preserve peace within the Jewish community.

of prostitution in his Macau casinos is a privileged account of the contents of a pleading filed in the Nevada action.  Second, the portion of it that contends that Adelson's money is "tainted" and should be rejected by the Romney campaign in the wake of those reports, along with the others referenced in the Petition, is a constitutionally protected expression of opinion.  For these reasons, which are explained more fully *infra*, this case should be dismissed pursuant to the Anti-SLAPP Act or, in the alternative, Federal Rule of Civil Procedure 12(b)(6).

Finally, should the Court conclude that the statement at issue is neither privileged nor otherwise protected expression, adjudication of the anti-SLAPP motion should be stayed pending further developments in the Nevada action.  Specifically, the court in the Nevada action last week entered a detailed Order documenting the efforts of Adelson's agents to obstruct access to evidence on which his claim of falsity in this case necessarily rests.  As a result, that court imposed, *sua sponte*, significant sanctions on Adelson's companies, concluding that his numerous lawyers had committed a fraud on the court by falsely representing that electronically stored information ("ESI") contained on the hard drives of Jacobs' computers could not lawfully leave Macau, when they in fact had been brought to the United States a year earlier.  In addition, during the course of the evidentiary hearing and related proceedings that preceded those sanctions, the court learned that much of that ESI could no longer be located at all.  Further sanctions proceedings are expected to commence shortly, this time focusing on the evidence that has gone missing.  If, as it now appears, the missing ESI goes to the core of Adelson's allegation of falsity in this case, he should properly be precluded from making such an allegation at all.  In the wake of the sworn admissions made in the Nevada action to date by Adelson's agents, who have already been implicated in a deliberate scheme to conceal what evidence remains from the court there, this Court should, if this action is not otherwise dismissed, stay adjudication of

4

defendants' anti-SLAPP motion until (1) the Nevada sanctions proceedings have run their course

and (2) the defendants in this action have had an opportunity, based on a fully developed record,

to seek dismissal here on this basis.

## STATEMENT OF FACTS

### I.     Sheldon Adelson and His "Weapon of Choice"

Sheldon Adelson is a man of enormous wealth, power and influence, who purposefully

operates on a worldwide stage.  (Strom Dec. ¶¶ 1-2.)[4]  He owns casino properties in Nevada,

Pennsylvania, Singapore and Macau and soon, Madrid.  (*Id.* ¶ 2.)  Adelson is reported by Forbes

to be the country's seventh richest man, worth nearly $25 billion dollars, who reportedly became

"a multibillionaire, overnight" when he took the Las Vegas Sands public in 2004.  (*Id.* ¶ 2.)

According to press reports, since he opened the Venetian in Macau in 2007, "his personal wealth

---

[4] For purposes of evaluating a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court may consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference . . . and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor*, 220 F.3d 81, 88-89 (2d Cir. 2000); *Biro v. Condé Nast*, -- F. Supp. 2d ---, 2012 WL 3264059, at *8 (S.D.N.Y. Aug. 9, 2012) ("'court may take judicial notice of a document filed in another court . . . in order to determine what statements they contained'") (citing *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006); Fed. R. Evid. 901(a)).  In addition, as the court explained in *Farah v. Esquire Magazine, Inc.*, -- F. Supp. ---, 2012 WL 1970897, *5 (D.D.C. June 4, 2012), applying the D.C. Anti-SLAPP Act and Federal Rule of Civil Procedure 12(b)(6) in a federal diversity case:

> Federal Rule of Evidence 201 provides that a court may judicially notice a fact that is not subject to "reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  A court may take judicial notice at any stage in a case.  Fed. R. Evid. 201(d).  Specifically, a court may take judicial notice of historical, political, or statistical facts, or any other facts that are verifiable with certainty.  *Mintz v. FDIC*, 729 F. Supp. 2d 276, 278 n.2 (D.D.C. 2010).  The matter to be noticed must be relevant.  *See Whiting v. AARP*, 637 F.3d 355, 364 (D.C. Cir. 2011).

In addition, insofar as this motion is governed by the D.C. Anti-SLAPP Act, defendants are entitled to submit evidence either to make a prima facie showing that "the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest," or to rebut the plaintiff's attempt to demonstrate a likelihood of success on the merits, without restriction to evidence of record or evidence of which the Court can take judicial notice.  *See* D.C. Code § 16-5502.

has multiplied more than fourteen times," and, "in the two years after his company went public he earned roughly a million dollars an hour." (*Id.*)

Adelson is also well known as a prolific litigant who, even when he does not resort to the courts, invokes the threat that he will do so to intimidate his critics. He has instituted several defamation actions, both in this country and abroad,[5] in which he has attempted to use his virtually unlimited financial resources to secure the same kinds of apologies and retractions he has demanded in this case. (*Id.* ¶ 3.) In one such action in California, Adelson instituted defamation litigation in an effort to punish and intimidate *Las Vegas Review-Journal* columnist John L. Smith, who had written a book about him entitled *Sharks in the Desert*. (Strom Dec. ¶ 8.) After two years of litigation, both Smith and his publisher had been forced to file for bankruptcy; Adelson nevertheless pursued the libel case as an adversary proceeding in bankruptcy court. (*Id.* ¶ 9; *In re Smith*, 389 B.R. 902 (Bankr. Nev. 2008)). Ultimately, already in bankruptcy and under the ongoing burden of onerous defense costs, the publisher settled. (*Id.*) It paid a relatively modest sum ($10,000 on an agreed judgment of $250,000), but was also obliged to agree, as part of Adelson's price for allowing it to emerge from bankruptcy, to publish an abject apology and retraction. (*Id.*)

---

[5] For a time, Adelson sought to take advantage of Britain's notoriously restrictive defamation laws, which do not require a plaintiff to prove falsity and, until recently, did not require a plaintiff to prove fault of any kind. (Strom Dec. ¶ 4.) In one such case, he sued London's *Daily Mail*, extracting in settlement a lengthy and abject apology. (*Id.* ¶ 5.) Thereafter, he sought to invoke the jurisdiction of the London courts in a defamation action against an American labor union and an official of that union. (*See id.* ¶ 6; *Adelson v. Anderson*, [2011] EWHC (QB) 2497, 2011 WL 4529292 (Eng.)) In 2011, however, by which time there had been significant reforms of British libel law, Adelson not only lost that case but was obliged to pay the Union £175,000 in costs. (*Id.* at ¶ 62 ("Strong words published by trade union leaders about an employer are part of common discourse in public life in England and Wales. A reasonable reader will recognise the interests of the speaker, and make allowance for that.")). Also in 2011, according to published reports, journalists filed a formal protest with the Israeli Press Council when an Israeli TV station was apparently pressured by Adelson into apologizing for airing an uncomplimentary report about his business dealings. (*Id.* ¶ 7.)

Smith, however, refused to settle or apologize, reportedly even rejecting Adelson's offer to make a secret donation to a medical fund for Smith's ill daughter if Smith would do so.  (*Id.* ¶ 10.)  Indeed, in an effort to vindicate the accuracy of his reporting, Smith opposed Adelson's efforts to dismiss the case against him voluntarily.  (*Id.*)  In the end, Smith was declared the prevailing party by the Bankruptcy Court and Adelson was ordered to pay his costs.  (*Id.*)  One of Smith's editors later said:  "This whole series of events is nothing more or less than trying to coerce everyone in journalism not to write anything [Adelson] doesn't like."  (*Id.* ¶ 11.)[6]

As Adelson has discovered, and as courts presiding over cases in which he is a party have expressly found, the burden and expense attendant to the litigation process can be a powerful weapon.  In one notorious instance, in which Adelson and his own children became embroiled in a multi-year litigation against each other in Massachusetts, the court described Adelson's litigation strategy as follows:

> Defendant Adelson has requested taxing Plaintiffs for costs associated with assorted depositions conducted during the bitterly-fought pre-trial phase of this rancid and unseemly dispute.
>
> This case contains several parties whose means and disposition perfectly illustrate the remark attributed to H.L. Mencken that the best client is a frightened millionaire.  They cried "Havoc," i.e., no quarter, and did indeed let loose the dogs of war.  Cases like this give Discovery a bad name.
>
> Thus the award Defendant Adelson here seeks is, in the context of this litigation, quite inappropriate.  Although he prevailed, his hands, in the metaphoric, if not Equity, sense, were far from pristine, as the Discovery Master has made abundantly clear.  Any attempt to unearth the merits would certainly

---

[6] Occasionally, some of Adelson's litigation targets, like Smith, refuse to be intimidated into submission.  For example, Adelson instituted a defamation lawsuit against a former employee, Moshe Hananel, in Las Vegas in 2006, for allegedly stating that he had taken advantage of a blind man.  (Strom Dec. ¶ 12.)  Adelson disputed that the man was blind.  (*Id.*)  After three years of burdensome and costly litigation, a jury rendered a verdict for Hananel, which was affirmed on appeal.  (*Id.*; *see also Adelson v. Hananel*, 428 F. App'x 717 (9th Cir. 2011)).  Most recently, as discussed more fully *infra*, Adelson has sued Jacobs, the former head of his Macau casinos, for defamation in Florida, alleging that the privileged statements in his declaration submitted in the Nevada action were actionable.  (Strom Dec. ¶ 13.)

engender another outbreak of forensic saturation bombing, demanding additional court resources while not ensuring even a rough approach to justice.

As a matter of discretion, I decline to award deposition costs.

*Adelson v. Adelson*, 2001 WL 736739, at *1 (Mass. Super. 2001), *aff'd*, 806 N.E.2d 108 (Mass. App. 2004) (*see also* Strom Dec. ¶ 14.)  Or, as Nevada Congresswoman Shelley Berkley who, like many of Adelson's other perceived adversaries was once his employee, explained in a column she published in a Nevada newspaper:  "Over time, I observed Mr. Adelson plot vendettas against anyone whom he believed stood in his way.  However miniscule the perceived affront, he was certain to go ballistic, using his money and position to bully any 'opponent' – great or small – into submission."  (Strom Dec. ¶ 15 (full text of column).)[7]

## II.    Adelson and the 2012 Presidential Campaign

Adelson is deeply involved in politics in the United States.  He is a major political contributor, making unprecedented contributions to Republican candidates, or PACs associated with them, in the ongoing presidential election campaign.  (*Id.* ¶ 18)  According to a news report included as an exhibit to his Complaint, Adelson and his wife "have given tens of millions of dollar this year to political committees supporting Republicans in general and Romney, the presumptive GOP presidential nominee, in particular."  (Compl.,  Ex. B; *see also* Strom Dec. ¶ 19) (FEC records and news reports describing 2012 contributions by Adelson and his wife of

---

[7] Indeed, following her refusal to change her party affiliation at his request, Berkley reported, Adelson "funneled hundreds of thousands of dollars to the Republican Party to support his handpicked candidate by attacking me on TV."  (Strom Dec. ¶ 16.)  Adelson apparently has embraced the same tactic in Israel, where his dissatisfaction with former Israeli prime minister Ehud Olmert reportedly caused him to launch and fund a newspaper of his own, which hounded Olmert, who the newspaper accused of campaign finance irregularities, with headlines such as "The Ass-Covering of the Government."  (*Id.* ¶ 17.)  Adelson's newspaper is widely credited with playing a crucial role in the election of Olmert's successor, after Olmert himself was forced to leave public office.  (*Id.*)

more than $30 million to Super-PACs supporting Newt Gingrich and then Mitt Romney).  As

Adelson himself has explained:

> I'm against very wealthy people attempting to or influencing elections. . . . But as
> long as it's doable I'm going to do it.  Because I know that guys like Soros have
> been doing it for years, if not decades.  And they stay below the radar by creating
> a network of corporations to funnel their money.  I have my own philosophy and
> I'm not ashamed of it.  I gave the money because there is no other legal way to do
> it.  I don't want to go through ten different corporations to hide my name.  I'm
> proud of what I do and I'm not looking to escape recognition.

(*Id.*)

Presidential campaigns are, as one writer has put it, "nasty, brutish and long," and one

particularly nasty feature of them is the so-called "attack ad."  (*Id.* ¶ 20 & Exs. 38-42 (attaching

examples)).  The PACs to which Adelson has donated multiple millions of dollars have produced

many such ads; several of those created by "Winning Our Future" ("WOF"), the PAC that

Adelson reportedly "almost single-handedly bankrolled" in support of the candidacy of Newt

Gingrich, have been deemed particularly unfair, misleading and inaccurate.  (*Id.* ¶ 21.)  For

example, WOF was severely criticized earlier this year for an ad that so distorted facts regarding

Romney's positions that even Gingrich reportedly called for its withdrawal, albeit to no avail.

(*Id.* ¶ 22& Ex. 38-42 (DVD of ads).)  As Factcheck.org explained in its critique of the ad,

entitled "Blood Money":  "The [WOF] ad strains to imply falsely that Romney was guilty of

criminal conduct.  At one point the words 'illegal activity' appear superimposed over Romney's

face.  But the truth is that Romney was never implicated in any illegal activity."  (*Id.* ¶ 23.)

The money necessary to create and broadcast campaign advocacy such as this is the life

blood of political campaigns.  It is, therefore, commonplace for candidates and their supporters

(as well as the news media) to subject the sources of their opponents' funding to intense scrutiny.

Nearly a hundred years ago, a *New York Times* article recounted charges leveled by an opponent

of William Jennings Bryan, who was "made the object of a violent attack" for failing to "return the 'tainted' money'" contributed to his campaign many years earlier.  *See BRYAN'S FUND FROM RYAN; Didn't Return 'Tainted' Money, Says Maher -- Renews Chautauqua Contract*, The New York Times, May 31, 1914 (Strom Dec. ¶ 24).[8]  Today, candidates frequently yield to public opinion, returning campaign contributions when their source is similarly characterized as "tainted."  (Strom Dec. ¶ 25 (describing, *inter alia*, return of questioned campaign contributions by President Obama, Senator John McCain, members of Congress, and Nevada lawmakers).)

Indeed, on June 14, 2012, just weeks before the Petition at issue was circulated, Senator McCain asserted in an interview on PBS' *News Hour* that the unlimited flow of money to candidates of all parties would cause "scandals."  (*Id.* ¶ 26.)  The one donor he identified by name was Adelson, as he lamented the flow of "foreign money" from Adelson's casinos in Macau, a Chinese administrative district, into the U.S. campaign.  (*Id.*)  Senator McCain's charge – aimed directly at Adelson, a donor to his own party, suggesting his money was tainted – was the subject of multiple news reports in the days and weeks that followed.  (*Id.* ¶ 27.)

## III.    Adelson's "Foreign Money," His Macau Casinos and the *Jacobs* Litigation

The "foreign money" Senator McCain alleged that Adelson has injected in political campaigns reportedly emanates from his casino operations in two Macau hotels.  (Strom Dec. ¶ 28.)  Adelson's operations in Macau are now the subject of at least two federal criminal investigations and one significant civil action in the United States.  (*Id.* ¶ 29.)  Indeed, Adelson's

---

[8] *See also* "*ONE GIFT ENOUGH FROM ROCKEFELLER; Disciples of Christ, While Keeping the $25,000 Given, Will Accept No More. OBJECTED TO AS TAINTED Ex-Congressman Phillipe Fails to Have It Returned, but Wins a Partial Victory*, The New York Times, Oct. 12, 1907 (Strom Dec. ¶ 24); *CAPPER CALLS ON HIS PARTY TO PURGE ITSELF OF OIL TAINT, WORST IN AMERICAN HISTORY, "TRAIL SLIMY, ODOROUS" -- Senator Says Republicans Must Face Music and Reform Leadership. PLANS ACTION IN SENATE Will Try to Strengthen Corrupt Practices Act and Force Inquiry on 1928 Campaign*, The New York Times, Mar. 19, 1928 (Strom Dec. ¶ 24)

company has publicly conceded that the criminal investigations were instituted as a result of the civil lawsuit filed against it in Nevada by the former head of his operations in Macau, Steven Jacobs (the "*Jacobs* Action").  (*Id.*)   In addition, in December 2010, news media around the world reported that Chinese authorities had conducted a sweep of the Venetian Macau, Adelson's flagship hotel there, rounding up more than 100 prostitutes and 22 pimps operating unlawfully in the hotel's casino.  (Compl. Ex. F; Strom Dec. ¶ 30.)

In the *Jacobs* Action, the conduct of Adelson and his companies has been placed in issue by Jacobs, who sued (and was countersued by) those entities (the "Sands Defendants") in Las Vegas in 2010.  He claims that he was fired from his position overseeing all of Adelson's operations in Macau for resisting Adelson's demands that he engage in the unlawful conduct that forms the basis of the ongoing federal investigations and was the subject of the 2010 prostitution sting by Chinese officials.  (Compl., Ex. F; Strom Dec. ¶ 31.)  In his complaint, Jacobs explains that, as President of Macau Operations, he was given significant responsibility for overseeing "the financial and operational aspects of the Macau assets."  (Strom Dec. ¶ 32.)  According to Jacobs, he had a lucrative three-year agreement, earning $1.3 million per year plus a 50% bonus and stock options, for the achievement of certain goals, which Jacobs claims were met.  (*Id.*)

In his complaint, Jacobs contends that, despite his exemplary job performance, he was terminated for his failure to comply with Adelson's "outrageous" and "illegal demands."  (*Id.* ¶ 33.)  Specifically, his complaint describes demands by Adelson that Jacobs "use improper 'leverage' against senior government officials of Macau"; "withhold Sands China business from prominent Chinese banks unless they agreed to use influence with newly-elected senior government officials of Macau"; perform "secret investigations [into] the business and financial affairs of various high-ranking members of the Macau government"; "use the legal services of

11

Macau attorney Leonel Alves despite concerns that Mr. Alves' retention posed serious risks

under the criminal provisions of the . . . Foreign Corrupt Practices Act ("FCPA")"; and "refrain

from disclosing truthful and material information to the Board of Directors of Sands China."

(*Id.*)  The complaint further alleges that Jacobs sought to resist "Adelson's desire to aggressively

grow the junket business within Macau" in light of recent investigations "alleging [the Sands']

involvement with Chinese organized crime groups, known as Triads, connected to the junket

business," which are often connected to prostitution.  (*Id.*)[9]

    As noted *supra*, the *Jacobs* Action has spawned at least two ongoing federal criminal

investigations, one by the Justice Department, the other by the Securities and Exchange

Commission.  Specifically, as the company has reported to its shareholders:

> On February 9, 2011, LVSC [Las Vegas Sands Corp.] received a subpoena from
> the Securities and Exchange Commission requesting that the Company produce
> documents relating to its compliance with the Foreign Corrupt Practices Act (the
> "FCPA").  The Company has also been advised by the Department of Justice that
> it is conducting a similar investigation.  It is the Company's belief that the
> subpoena may have emanated from allegations contained in the lawsuit filed by
> Steven C. Jacobs described above.  The Company is cooperating with the
> investigations.

(*Id.* ¶ 36.)  At the time the Petition at issue in this case was posted, these criminal investigations

were (and they continue to be) the subject of a number of detailed news reports.  (*Id.* ¶ 37.)

---

[9] On March 16, 2011, Jacobs filed an amended complaint, which included a cause of action
against Adelson himself for defamation.  The defamation claim was based on an email Adelson sent to a
*Wall Street Journal* reporter, which was subsequently quoted in a *Journal* article headlined "Setback for
Sands in Macau Suit."  (Strom Dec. ¶ 34.)  According to the article, Adelson wrote in the email:  "We
have a substantial list of reasons why Steve Jacobs was fired for cause and interesting he has not refuted a
single one of them.  Instead, he has attempted to explain his termination by using outright lies and
fabrications which seem to have their origins in delusion."  (*Id.*)  Adelson filed a motion to dismiss the
defamation claim, which the Court later granted, in which he argued that his email contained privileged
statements made in connection with judicial proceedings and protected expressions of opinion.  (*Id.* ¶ 35
& Ex. 81 at 12-13 (transcript of hearing) (Adelson's counsel:  "Mr. Adelson was expressing his God-
given and legally supported opinion that Mr. Jacobs was simply dead wrong in accusing him of
misconduct and criminal offenses that led to his termination as an employee in Macau."); *id.* at 50-51
(granting motion); *id.* Exs. 79-80 (Adelson's motion papers claiming protection under opinion doctrine).)

A.      **The Jacobs Declaration**

Since its filing in 2010, the *Jacobs* Action has focused on the contention by the

defendants that the Nevada courts do not have jurisdiction over Sands China.  (*Id.* ¶ 38.)  As a

result, the case was stayed and Jacobs was afforded leave to pursue jurisdictional discovery to

assist him in demonstrating that the conduct of Sands China was in fact directed by Adelson and

other officials of Las Vegas Sands, his American company.  (*Id.*)  In support of that contention,

Jacobs filed a memorandum and supporting declaration (the "Jacobs Declaration"), dated June

27, 2010 (Strom Ex. 29), in which he asserted that the Sands Defendants had failed to produce

documents he knew to be in their possession that would demonstrate that Adelson and Las Vegas

Sands Chief Operating Officer Michael Leven directed the activities of the Macau properties.

Specifically, Jacobs averred, in a declaration made under penalty of perjury, that he had

reviewed all of the documents that the Sands Defendants had produced to him in discovery, but

> [b]ased upon that review, there are a number of responsive documents that I know
> to have existed from my tenure with LVSC that have not been produced. . . .  Via
> this declaration, I provide only a few examples of some documents that do exist
> and/or that I have reason to believe based upon my experience with the
> Defendants but have not been produced.

(*Id.* ¶ 3.)  The Declaration then proceeded to enumerate a number of activities, allegedly illegal

and improper, that were directed by Adelson and other Sands management from Las Vegas, but

for which no documents had been produced.  These included:

> ***LVSC Prostitution Strategy for Macau***.  E-mails and documents missing from
> Defendants' production demonstrate LVSC's Executive Management's control
> and direction from Las Vegas over acts of prostitution on Sands China's
> properties.  As background, shortly after my arrival to Macau in May 2009, I
> launched "Operation Clean Sweep" designed to rid the casino floor of loan sharks
> and prostitution.  This project was met with concern as LVSC Senior Executives
> informed me that the prior prostitution strategy had been personally approved by
> Adelson.  Missing documents include but are not limited to e-mails and notes
> between myself and Mike Leven concerning Adelson's direct involvement, e-
> mails between Mark Brown and Senior LVSC Executives/Board members

13

confirming the implementation of the strategy and highlighting its "success." Hard copies of these files were kept in my office drawer in a folder labeled "Outrageous."  Again, these documents and e-mails will demonstrate control by LVSC executives from Las Vegas on matters of great import.

(*Id.* ¶ 5.)

The Jacobs Declaration, including its allegations regarding prostitution,[10] received widespread news coverage throughout the world, beginning the next day (June 28).  (*Id.* ¶ 41.)[11] In one of those news reports, published by *Forbes*, Adelson is quoted as promising that, "[w]hen the time comes I'll extract what's due."  (*Id.*; *see also id.* Ex. 89).

### B.     The Sanctions Proceedings

For their part, the Sands Defendants asserted that they did not otherwise have access to and could not lawfully produce documents located in Macau either to Jacobs or to the court due to restrictions on removal of data from that country contained in Macau's data privacy laws. (Strom Dec. ¶ 45.)  Although they maintained this position for over a year in an effort to resist Jacobs' efforts to locate the documents referenced in his declaration, "[f]or the first time on June 27, 2012, in a written status report, Las Vegas Sands and Sands China advised the Court that Las

---

[10] This was hardly surprising since the issue of prostitution in Asia generally, and in Macau specifically, has been the subject of investigations by, among others, the U.S. Department of State as recently as June 2012, (Strom Dec. ¶ 42), and visitors staying at Adelson's Macau casinos have publicly reported the presence of prostitutes in the hotel and/or casino. (*Id.* & Ex. 99 (Trip Advisor reviews).)

[11] In addition, on June 29, the Democratic Congressional Campaign Committee ("DCCC"), "the official campaign arm of the Democrats in the House," *see* http://dccc.org/pages/about, circulated an email to potential donors stating that Adelson "personally approved of prostitution and knew of other improper activity at his company's properties in the Chinese enclave of Macau, China."  (Strom Dec. ¶ 43.)  In that same email, which was directed at a number of specific House races, the DCCC asked: "What will Speaker Boehner, Leader Cantor, and House Republicans do with their Chinese prostitution money?" and "'What will [a Republican congressman] do when his Chinese prostitution money comes from billionaire Sheldon Adelson? House Republicans . . . are fighting tirelessly to protect billionaires like Sheldon Adelson who make fortunes overseas and Adelson is now the largest single donor to [the] Congressman['s] . . . Republican Majority.  It's past time for [the Congressman] to reject the support of these groups funded by foreign money from a Chinese prostitution strategy."  (*Id.*)  In a statement published on August 1, Politifact.com concluded that the DCCC charge "could arguably fall into the realm of standard political hyperbole," except to the extent it charged a specific congressman with the use of "his Chinese prostitution money."  (*Id.* ¶ 44.)

Vegas Sands was in possession of over 100,000 emails and other ESI that had been transferred 'in error'" to the United States.  (*Id.*; *see id.* Ex. 104 at ¶ 19 (Decision and Order in *Jacobs* Action) (the "Sept. 14 Order"); *id.* Ex. 105 at 5 n.1 (Sands Defendants' Aug. 27, 2012 Statement).)

In the wake of this revelation, the Sands Defendants further disclosed, again for the first time, that they had made "ghost"[12] copies of the hard drives of the two laptops and one desktop computer that Jacobs had used in Macau, but that one of the desktop hard drives, the one "that Mr. Jacobs was using at the time of his termination," may have since been "recycled."  (Strom Dec. ¶ 46; *id.* Exs. 105 at 5 (Sands Defendants Statement Regarding Data Transfers); *id.* Ex.106 at 16:3-23 (Aug. 23, 2012 hearing transcript).)  Thus, the court learned, to the extent that any material was deleted from Jacobs' hard drives after he was terminated but before the "ghost copies" were made, no record of them remains, at least for the desktop computer he last used. (*Id.* ¶ 47& Ex.107 at 112-13 (testimony of M. Singh, Sands Chief Information Officer).)

On September 10, the Nevada court commenced a three-day evidentiary hearing, scheduled *sua sponte* by the court itself, to assess the extent of the misconduct by counsel for the Sands Defendants in that action with respect to the representations – or, more accurately, misrepresentations – they had made to the court regarding document production.  (*Id.* ¶ 49.)  At

---

[12] Ghost copies, unlike forensic copies, would not have copied any data – such as email – that had been erased by any individual who had access to Jacobs's computers after he was fired but before the copy was made.  (Strom Dec. ¶ 48.)  *See* Sheryl L. Katz, *Forensic Collections in E-Discovery*, Orange Cnty. Lawyer, March 2010, at 18-19 (Strom Ex. 108) ("[i] any case where there is a question of the completeness of data collected from an individual or issues that the data might be altered, forensic collection is virtually essential.  Certainly any case where a copy of the entire hard drive is required, as in employment cases, forensic collection is fundamental to the case.  We have had experience on more than one occasion in our practice where the IT department of a company made a Ghost image of a departing employee's hard drive and when they did so they ruined the evidentiary value of the drive. . . .");  *id.* (Forensic copies are "not the same as a Ghost image or an Acronis image, or the images from various software that the IT department might use to copy drives. While the forensic software is copying the image, it is also verifying that the copy is accurate, and marking the files with a hash to ensure the integrity of copies.").

that hearing, former and current counsel for the Sands Defendants again admitted that, although they had represented to the court that they were unable to access or produce any electronic data maintained in Macau in the context of litigation outside that country, attorneys for the Sands Defendants had long before transported huge amounts of such data, including "a ghost image of hard drives of computers used by Steve Jacobs in Macau and copies of his outlook emails," from Macau and made it available, on a shared server, to other lawyers representing the company in litigation throughout the United States.  (*Id.* & Ex. 104 (Sept. 14 Order, ¶¶ 1, 12 ("At the time of the representation made on June 9, 2012, the transferred data had already been copied; the copy removed from Macau; and reviewed in Las Vegas by representatives of Las Vegas Sands.")).)

Following the hearing, on September 14, the Nevada court issued its findings of fact and conclusions of law.  (Strom Dec. ¶ 50 & Ex. 104 (Sept. 14 Order).)  It concluded that the Sands Defendants, acting with "varying degrees of willfulness," had "concealed the existence of the transferred data" from the court, had acted with "the intention to deceive the court," and "with an intent to prevent the Court from ruling on the discoverability for purposes of the jurisdictional proceedings," and that "the conduct was repetitive and abusive."  (*Id.*)  As a result, the court precluded the Sands Defendants from continuing to raise Macau data privacy laws as a bar to the production of documents, ordered them to pay Jacobs' attorneys' fees incurred in connection with the many unnecessary hearings held on this issue and, finally, required them to make a $25,000 contribution to the Legal Aid Center of Southern Nevada.  (*Id.* ¶ 51.)  In its September 14 Order, the court did not rule on the issue of the destroyed or lost data, noting specifically that issues related to the "current location" of computers and hard drives would not

be addressed in this ruling.  (*Id.* ¶ 52 & Ex. 104 at 2 n.2, 8 n.11 (Sept. 14 Order).)  Rather, the

court authorized Jacobs' counsel to bring a further sanctions motion addressing that issue.  (*Id.*)[13]

## IV.    Defendants' Petition and Statement

The NJDC is a not-for-profit organization created in 1990 "to maximize Jewish support

for Democrats at the federal and state levels of government and to educate Democratic elected

officials and candidates to increase support for Jewish domestic and foreign policy priorities."

(Declaration of David Harris ("Harris Dec.") ¶ 4.)  On July 5, 2012, in the wake of the multiple

press reports recounting, *inter alia*, (a) the federal criminal investigations concerning Adelson's

Macau operations, (b) Senator McCain's comments about the use of the proceeds from those

operations to fund political campaigns in the United States, and (c) the filing of the Jacobs

Declaration in Nevada, the NJDC posted on its website a Petition.  (Compl. Ex. A; Harris Dec.

¶ A.)  The Petition is reproduced, in its entirety, here:

---

[13] There will, therefore, shortly be further proceedings in the *Jacobs* Action regarding the
destruction issue.  (*See, e.g.*, Strom Dec. ¶ 53 & Ex. 109 at 5 (Sept. 10, 2012 Transcript) (The Court: "I
have previously informed all counsel that I anticipate a separate motion will be filed by Mr. Jacobs's
counsel.  For that reason, if Mr. Jacobs's counsel appears to exceed the scope of the hearing that has been
scheduled, I may limit that examination as it may be more appropriate for the anticipated hearing on the
Rule 37 motion which will be scheduled in conjunction with your Rule 37 motion."); *id.* Ex. 110 at
64 (Sept. 11, 2012 Transcript) (The Court, discussing the presentation of evidence at the hearing:  " I
think it is more appropriate for the Rule 37 issue.  I think focusing on the representations that were made
to me in pleadings and in Court prior to the June 28th hearing is a more appropriate way to for us to go
[today]  . . . But I certainly will welcome hearing about this issue at the time we schedule your Rule 37
evidentiary hearing.").)

**Tell Romney to Reject Adelson's Dirty Money**



As you saw during the Republican primaries, GOP mega-donor Sheldon Adelson dumped millions of dollars into supporting Newt Gingrich's feckless campaign. **Now he's doing the same for Mitt Romney – with no plans to stop.**  But perhaps the most alarming aspect of Adelson's potentially unlimited contributions is where the money comes from.

It's well known that Adelson makes tremendous sums of money through his casinos in China which – according to 2008 Republican presidential candidate Senator John McCain (AZ) -- means that Chinese **"foreign money" (to quote McCain) is flooding our political system**.  But this week, reports surfaced that in addition to his anti-union and allegedly corrupt business practices, **Adelson "personally approved"** of prostitution in his Macau casinos.

Given these reports, **Romney and the rest of the Republican Party must cease accepting Adelson's tainted money immediately**.  Sign NJDC's petition below, and click here to share the image above on Facebook to help spread the word.

Already signed?  Click here to enlist your family and friends in the effort to stop the influence of Adelson's tainted money and protect our democracy.

(Compl. Ex. A (emphasis in original).)  The hyperlinks in the Petition (and incorporated in the text above) brought readers to news reports containing more detailed information about each statement.  (Harris Dec. ¶ 9.)  For the Court's convenience, the accompanying Harris Declaration includes the full text of each news report and attaches copies as Exhibits B-E.

18

Of particular relevance here, the Petition's reference to "reports" that had "surfaced" that "Adelson '*personally approved*' of prostitution in his Macau casinos," hyperlinked to an article disseminated by the AP on June 28 and republished in newspapers and on websites throughout the world.  (Harris Dec. ¶ 9(d) & Ex. E)  Specifically, that news story reported:  "The fired former chief executive of Las Vegas Sands Corp.'s Macau casinos alleges in court documents revealed Thursday that billionaire Sheldon Adelson personally approved of prostitution and knew of other improper activity at his company's properties in the Chinese enclave."  (*Id.*)  The linked article further reported that Adelson is "a billionaire philanthropist and casino mogul" who has donated extensively to the Gingrich and Romney campaigns, and that Jacobs made the allegations in the lawsuit just months after his firing.  (*Id.*)  It refers to and quotes from Jacobs' "seven-page declaration," in which he "describes an effort he launched after arriving in Macau in May 2009 to rid the casino floor of 'loan sharks and prostitution.' . . .'This project was met with concern as (company) senior executives informed me that the prior prostitution strategy had been personally approved by Adelson,' Jacobs said in the documents."  (*Id.*)[14]

Less than a week after it was first posted, on July 11, NJDC took the Petition down from its website and issued the following statement ("the Statement"):

> National Jewish Democratic Council (NJDC) Chair Marc R. Stanley and President and CEO David A. Harris today jointly released the following statement regarding NJDC's petition campaign concerning Sheldon Adelson:
>
> Regarding our recent campaign surrounding Sheldon Adelson, we don't believe we engaged in character assassination; we stand by everything we said, which was sourced from current, credible news accounts.  Accusations against Mr. Adelson were made not by us, but by others, including Senator John McCain (R-

---

[14] The AP article also reports the Sands Defendants' response to this charge, stating in its second paragraph that a Sands' lawyer called the allegations false and "scurrilous" and claimed "they had been included in the civil lawsuit brought by former Sands executive . . . only to sensationalize the case." (Strom ¶ 60.)  A spokesman is also quoted stating the allegations were "baseless" and that "Adelson has always objected to and maintained a strong policy against prostitution on our properties."  (*Id.*)

AZ). Nonetheless, we regret the concern that this campaign has caused.  And in the interest of *shalom bayit* (peace in our home / community), we are going to take down our petition today.  Moving forward, we'll continue to work hard to fight against the unique threat posed by the outsized influence of certain individual megadonors, which rightly concerns most Americans and most American Jews.

Compl., Ex. C; Harris Dec. ¶ F .

## V.    Adelson's Response

As his Complaint alleges, on July 17, Adelson's counsel sent a letter to defendants demanding that they (1) remove the Petition, (2) agree not to republish it and (3) prominently retract and apologize for it, (Compl. Ex. E), even though defendants had in fact removed the Petition one week earlier.[15]  That same day, the Sands Defendants filed in the *Jacobs* Action what they represented was an email chain conclusively rebutting Jacobs' allegation.

The first email in the chain purported to be from Jacobs to Michael Leven at Las Vegas Sands inquiring whether Adelson had authorized the decision to allow prostitution in the Macau casinos as Jacobs had been told.  (Compl. ¶ 62 & Ex. F; Strom Dec. ¶ 63.)  The response, which came the next day, was carefully phrased:  "there is no evidence that can be found that anyone here supported in any way a different policy than we have in Las Vegas on these matters."  (*Id.*)  No other substantive emails were produced.  (*Id.*)

On July 20, Adelson sued Jacobs in Florida state court for defamation based on the statements in the Jacobs' Declaration regarding Adelson's approval of prostitution in his Macau hotels, contending that they "were made as part of Defendant's continuing effort to smear Mr.

---

[15] Given events in the *Jacobs* Action addressing the preservation and disclosure of documents, the letter somewhat ironically also demanded that defendants "preserve for evidentiary use all documents, memoranda, sources, e-mails, drafts, notes or other materials of any kind, in paper, electronic or other form" concerning the Petition and/or the Statement.  (Compl. Ex. E at 2.)

Adelson and his companies through the filing of false declarations intended for republication by the media." (*Id.* ¶ 64.) In his Answer, (*see* Strom Dec. ¶ 65), Jacobs alleges, *inter alia*, that:

- Jacobs . . . previously was led to believe that Adelson had a 'no tolerance policy' with respect to prostitution, until he was told by an LVSC senior executive that the opposite was the case (*id.* Ex. 112 ¶ 10);

- Other documents exist (and are being concealed from the Nevada Court) that show so many prostitutes on the LVSC Macau properties that an LVSC executive noted that the approved 'prostitution strategy' appeared to be working all too well (*id.* ¶ 12);

- Leven's email was contrived as a cover up because Leven specifically admonished Jacobs about putting such damaging information in writing which might later be discovered by others (*id.* ¶ 13);

- Following this email, Michael Leven orally reprimanded Jacobs during an in-person meeting for putting his statements in writing and stated that both he and LVSC's Board of Directors were aware of the prostitution and that it was a customary and expected part of the business in Macau. Furthermore, LVSC executive Mark Brown had commented in an email to LVSC's COO that it appeared that LVSC's prostitution strategy was 'too successful' as there was a large number of prostitutes within LVSC's Macau properties, and he had attached a photograph of prostitutes in the Venetian Macau as published by a local newspaper (*id.* Affirmative Defenses ¶ 2).

On August 8, Adelson filed this lawsuit, selectively parsing the Petition and purporting to base his claims solely on the ground that the Petition contained an allegation that Adelson approved prostitution in his Macau properties and that such an allegation (and only that allegation) is false, "inherently improbable on [its] face," and based "solely" on "a source that was unreliable and known to be biased against Adelson." (Compl. ¶¶ 75-80.) Defendants are not aware of any other lawsuits filed by Adelson against the numerous publications that had previously reported on the allegations contained in the Jacobs Declaration.

The filing of this lawsuit, as well as the events that preceded it, have been the subject of extensive press coverage and commentary. (Strom Dec. ¶ 67.) Invariably, these reports have included statements by Adelson and his supporters denying the truth of the statements made about prostitution in the Jacobs Declaration, impugning Jacobs' credibility (typically by

reference to the email chain discussed *supra*), and chastising and even vilifying the defendants for referencing the issue in the Petition.  (*Id.* ¶ 68.)  For example, Harvard professor Alan Dershowitz, who is described in the Complaint itself as Adelson's "representative," publicly expressed his hope that Harris would "lose his job," and called Harris and the NJDC "a bunch of liars."  (*Id.*)  Congressional candidate Rabbi Schmuley Boteach, a recent recipient of $500,000 in campaign contributions from Adelson and his wife, compared Harris to Republican "hatemongers" for his "below-the-belt attack" on Adelson.  (*Id.*)

## ARGUMENT

Defendants demonstrate below that (a) the substantive law of the District of Columbia governs this lawsuit, (b) as a result, the substantive immunity from suit conferred by D.C.'s Anti-SLAPP statute applies to this action, requiring dismissal unless Adelson can demonstrate a "likelihood of success on the merits," (c) the statement that "reports surfaced" that Adelson "personally approved" of allowing prostitution in his Macau casinos is a privileged report of a judicial proceeding, namely, the *Jacobs* Action, and (d) the other portions of the Petition that Adelson challenges are both constitutionally protected expressions of opinion and protected from defamation liability by D.C.'s "fair comment" privilege.  For these reasons, the Court should dismiss Adelson's Complaint because he cannot satisfy his burden under the D.C. Anti-SLAPP statute of demonstrating a likelihood of success on the merits and because he otherwise fails to state a claim on which relief can be granted.  If it is not dismissed entirely, this litigation should be stayed pending the outcome of further sanctions proceedings in the *Jacobs* Action, which will establish whether Adelson and his agents have lost or destroyed material evidence going to the alleged falsity of the purportedly defamatory statement at issue here.

I.      **DISTRICT OF COLUMBIA LAW GOVERNS THIS ACTION.**

"A federal court sitting in diversity applies the choice of law rules of the forum state.  In

tort cases like this [defamation case], New York applies the law of the state with the most

significant interest in the litigation." *Lee v. Bankers Trust Co.*, 166 F.3d 540, 545 (2d Cir. 1999)

(citations omitted).  In conducting this analysis, courts properly consider the "significant contacts

in a defamation case [which] are, almost exclusively, the parties' domiciles and the locus of the

tort." *Id.* at 545 (citations omitted).[16]  Courts in this Circuit often apply the law of the state

where the allegedly defamatory statements were drafted and published rather than of the state

where the plaintiff resides, especially where the alleged defamation is circulated nationwide and

the plaintiff is a nationally known public figure.  *See, e.g., Grass v. News Grp. Publ'ns, Inc.*, 570

F. Supp. 178, 185 (S.D.N.Y. 1983) (applying New York law to Pennsylvania plaintiff's

defamation claim); *Collins v. Flynn*, 2008 WL 3851842, at *3 (W.D.N.Y. Apr. 15, 2008)

(applying Massachusetts law to New York plaintiff's defamation claim).[17]

In this action, the District of Columbia has the most significant relationship to the case,

and its substantive law should therefore apply.  As an initial matter, New York has no discernible

relationship to this case.  None of the parties is from New York, the allegedly defamatory

---

[16] Courts often give weight to plaintiff's domicile, assuming that is where the plaintiff suffered the greatest damage to his or her reputation and therefore has the most significant interest. *See Reeves v. ABC, Inc.*, 719 F.2d 602, 605 (2d Cir. 1983); *Zuck v. Interstate Publ'g Corp.*, 317 F.2d 727, 734 n.12 (2d Cir. 1963).  Because this assumption is often incorrect, however, courts have cautioned that "the plaintiff's domicile should not be transferred into a rigid rule for determining choice of law issues in libel actions."  *Grass*, 570 F. Supp. at 185 (internal quotation marks and citations omitted).

[17] *See also Berwick v. New World Network Int'l, Ltd.*, 2007 WL 949767, at *7 (S.D.N.Y. Mar. 28, 2007) (applying New York law to Pennsylvania plaintiff's defamation claim); *Qureshi v. St. Barnabas Hosp. Ctr.*, 430 F. Supp. 2d 279, 286 n.3 (S.D.N.Y. 2006) (applying New York law to Illinois plaintiff's defamation claim); *Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 360 (S.D.N.Y. 1998) (applying New York law to Georgia plaintiff's defamation claim); *Levin v. McPhee*, 917 F. Supp. 230, 235-36 (S.D.N.Y. 1996) (applying New York law because "publication of the allegedly libelous statements took place in New York, where the author resides and where both publishers are headquartered"), *aff'd*, 119 F.3d 189 (2d Cir. 1997).

statements were not drafted in or disseminated from New York, and they do not concern any events that took place in New York.  (Harris Decl. ¶¶ 2, 3, 5.)[18]  Thus, the only states with a conceivable interest in having their laws applied here are Nevada, where plaintiff maintains his primary residence, or D.C., where all of the relevant acts took place.

For his part, although Adelson claims to be a resident of Nevada, (Compl. ¶ 4), he also acknowledges that he has a national – indeed, international – reputation, (*id.* ¶¶ 4, 16-18, 22), that he controls companies that operate casinos in multiple jurisdictions, (*id.* ¶ 16), and that he maintains residences in a number of other jurisdictions as well, (Strom Decl. Ex. 11 at 20). Thus, especially since Adelson chose the forum in which to litigate his case and purposefully opted against Nevada (presumably because of his litigation history there including, most recently, the ongoing *Jacobs* Action), any assumption that his claimed reputational injury is focused in Nevada, or that Nevada law should apply, is not applicable here.  *See, e.g.*, *In re Payroll Express Corp.*, 2005 WL 2438444, at *13 (Bankr. S.D.N.Y. Mar. 30, 2005) (in contract case, plaintiff's "multi-state licensing and claims of a national reputation defeat any argument for limiting choice of law to [its] New York headquarters.").

In contrast, both NJDC and Mr. Harris are domiciled in D.C.  (Harris Decl. ¶¶ 2-3.)  Mr. Stanley, a Texas resident, is connected to this case only through his activities as board chairman of a D.C. entity and his activities in D.C. – specifically, his role, while physically present in NJDC's D.C. offices, in drafting the Statement that in part forms the basis of Adelson's Complaint.  (*Id.* ¶¶14-15.)  Indeed, all of the allegedly defamatory statements were drafted in D.C. and distributed from there.  (*Id.* ¶¶ 10-15.)  At bottom, moreover, the Petition and Statement

---

[18] The New York address cited in the Complaint for defendant NJDC is not an office owned, leased or otherwise maintained by NJDC, but that of an independent consultant it has sometimes engaged in New York to assist with fundraising events.  (Harris Dec. ¶ 7.)

concern Adelson's business dealings as they relate to financial contributions in connection with his efforts to influence the 2012 presidential election, as well as statements by Senator McCain in connection with federal legislative efforts, investigations by the United States Department of Justice and Securities and Exchange Commission, and contributions regulated, if at all, by the Federal Elections Commission – all of which center on the District of Columbia.[19]

In light of all of the foregoing, D.C. has the most significant relationship to this lawsuit, and its substantive law therefore properly governs this case.

## II.   ADELSON'S COMPLAINT SHOULD BE DISMISSED UNDER THE DISTRICT OF COLUMBIA'S ANTI-SLAPP STATUTE.

The District of Columbia's Anti-SLAPP statute, D.C. Code § 16-5501 *et seq*. ("the Act"), provides a substantive immunity from defamation lawsuits, such as this one, arising out of "acts in furtherance of the right of advocacy on issues of public interest," which Adelson can overcome only by satisfying the heavy burden of demonstrating to this Court that he is "*likely* to succeed on the merits" of his claims.  Because Adelson is unable to meet his burden, the Act requires his Complaint be dismissed, promptly and with prejudice.

---

[19] Some federal courts in this Circuit have applied a test based on nine factors:

(1) the state of the plaintiff's domicile; (2) the state of plaintiff's principal activity to which the alleged defamation relates; (3) the state where the plaintiff in fact suffered greatest harm; (4) the state of the publisher's domicile or incorporation; (5) the state where the defendant's main publishing office is located; (6) the state of principal circulation; (7) the place of emanation; (8) the state where the libel was first seen; and (9) the law of the forum.

*Jewell*, 23 F. Supp. 2d at 360 (citations omitted).  Because, as demonstrated *supra*, factors 2, 4, 5 and 7 favor application of D.C. law, and only factor 1 favors application of Nevada law, under this test as well, this Court should apply D.C. law.  *Id.* (applying New York law to Georgia plaintiff's defamation claim).

A.       **The Anti-SLAPP Act's Immunity Applies To This Action.**

The terms of the immunity conferred by the Anti-SLAPP Act are unambiguous, and their

application to the facts of this case is straightforward.  The operative provisions of the Act

insofar as they relate to this motion are set forth in Section 16-5502, which provides:

> (a) A party may file a special motion to dismiss any claim arising from an act in
> furtherance of the right of advocacy on issues of public interest within 45 days after
> service of the claim.
>
> (b) If a party filing a special motion to dismiss under this section makes a prima
> facie showing that the claim at issue arises from an act in furtherance of the right of
> advocacy on issues of public interest, *then the motion shall be granted* unless the
> responding party demonstrates that the claim is likely to succeed on the merits, in
> which case the motion shall be denied.

D.C. Code § 16-5502 (emphasis added).  The Act further provides that, "[i]f the special motion

to dismiss is granted, dismissal shall be with prejudice."  D.C. Code § 16-5502(d).  In other

words, defendants bear the burden on this motion of showing only that Adelson's claims arise

from the type of advocacy protected by the Act.  If so, then the Act *requires* that the Complaint

be dismissed with *prejudice*.  The only exception to the immunity thus conferred is in the

circumstance in which a plaintiff such as Adelson meets the heavy burden imposed by the Act of

proving that he is *likely* to succeed on the merits of his claims.

There can, moreover, be no question that D.C.'s Anti-SLAPP Act applies to Adelson's

claims.  Indeed, the Act's legislative history confirms that the legislation is designed to put an

end to just such lawsuits aimed at stifling speech about matters of public concern:

> Such lawsuits, often referred to as strategic lawsuits against public participation –
> or SLAPPs – have been increasingly utilized over the past two decades as a means
> to muzzle speech or efforts to petition the government on issues of public interest.
> Such cases are often without merit, but achieve their filer's intention of punishing
> or preventing opposing points of view, resulting in a chilling effect on the exercise
> of constitutionally protected rights.

26

(Strom Dec. Ex. 116 at 1 (committee report).)  To combat this phenomenon, the Anti-SLAPP

Act "incorporates substantive rights with regard to a defendant's ability to fend off lawsuits filed

by one side of a political or public policy debate aimed to punish or prevent the expression of

opposing points of view."  *Id.  See also id.* at 4 (statute "provides a defendant to a SLAPP with

*substantive* rights to expeditiously and economically dispense of litigation aimed to prevent their

engaging in constitutionally protected actions on matters of public interest") (emphasis added).

Because D.C.'s Anti-SLAPP statute confers a substantive immunity under District of

Columbia tort law, it applies in federal court.  *See Farah*, 2012 WL 1970897, at *6 n.10

(invoking decisions of the First, Fifth and Ninth Circuits applying anti-SLAPP statutes as

substantive protections of state law and applying the Act as a substantive bar to plaintiff's claims

for defamation and related torts); *Sherrod v. Breitbart*, 843 F. Supp. 2d 83, 85 (D.D.C. 2012)

("the legislative history make[s] clear that the D.C. Anti-SLAPP Act is substantive").[20]

---

[20] Although one district court has held that the Act does not apply in federal court, *see 3M Co. v. Boulter*, 842 F. Supp. 2d 85 (D.D.C. 2012), and the D.C. Circuit has not yet addressed the issue (and is not expected to until later this year or early next), the overwhelming majority of federal courts – including every federal court of appeal to consider the issue – has applied more than a dozen different anti-SLAPP statutes like the Act as substantive protections of state law.  *See Godin v. Schencks*, 629 F.3d 79, 91-92 (1st Cir. 2010) (Maine statute); *Chandok v. Klessig*, 632 F.3d 803 (2d Cir. 2011) (if satisfied, New York statute would apply); *Brown v. Wimberly*, 2012 WL 1759956, at *1 (5th Cir. May 18, 2012) (Fifth Circuit "has adopted the use of the [anti-SLAPP] statute in federal court") (Louisiana statute); *Gardner v. Martino*, 563 F.3d 981, 991 (9th Cir. 2009) (Oregon statute); *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 970 (9th Cir. 1999) (California statute); *Tennenbaum v. Arizona City Sanitary Dist.*, 2011 WL 3235828 (D. Ariz. July 29, 2011) (Arizona statute); *Buckley v. DIRECTV, Inc.*, 276 F. Supp. 2d 1271 (N.D. Ga. 2003) (Georgia statute); *United Chi v. Loyola Univ. Med. Ctr.*, 787 F. Supp. 2d 797, 803 (N.D. Ill. 2011) (Illinois statute); *Containment Techs. Group Inc. v. Am. Soc. of Health Sys. Pharmacists*, 2009 WL 838549 (S.D. Ind. Mar. 26, 2009) (Indiana statute); *Russell v. Krowne*, 2010 WL 2765268 (D. Md. July 12, 2010) (Maryland statute); *Balestra-Leigh v. Balestra*, 2010 WL 4280424 (D. Nev. Oct. 19, 2010), *aff'd on other grounds*, 471 F. App'x 636 (9th Cir. 2012) (Nevada statute); *Monaco Entm't Grp. v. City of El Paso*, No. EP-11-CV-561-DB (W.D. Tex. Apr. 3, 2012) (Texas statute); *Bible & Gospel Trust v. Twinam*, 2008 WL 5245644 (D. Vt. Dec. 12, 2008) (Vermont statute); *Aronson v. Dog Eat Dog Films, Inc.*, 738 F. Supp. 2d 1104 (W.D. Wash. 2010) (Washington statute).  Moreover, federal courts have not hesitated to apply the anti-SLAPP statutes of states other than the forum's where mandated under applicable choice of law principles.  *See, e.g.*, *USANA Health Sciences, Inc. v. Minkow*, 2008 WL 619287, at *3 (D. Utah Mar. 4, 2008); *Mero v. U.S. Figure Skating Ass'n*, 2006 WL 163529, at *6 (E.D. Mich. Jan. 20, 2006); *Global Relief Found. v. New York Times Co.*, 2002 WL 31045394, at *11

**B.     Adelson's Complaint Triggers The Anti-SLAPP Act's Immunity.**

To invoke the immunity afforded by the Act, defendants need only make "a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest." D.C. Code § 16-5502(b). This statutory formulation contemplates a two-part judicial inquiry: the Court must decide whether the suit is based on an "act in furtherance of the right of advocacy," and, if so, whether that act addresses "an issue of public interest." It would be surprising, if not frivolous, were Adelson actually to contend that the Petition and Statement somehow fail to qualify as "an act in furtherance of the right of advocacy on issues of public interest." *See Farah*, 2012 WL 1970897, at *6-8 (applying Act to blog post critical of group questioning "whether President Obama qualifies by birthright to be President").

**First**, the statute defines an "[a]ct in furtherance of the right of advocacy on issues of public interest" to include (a) a "written or oral statement made" in "a place open to the public or a public forum" and/or "expression or expressive conduct that involves . . . communicating views to members of the public," provided they are "in connection with an issue of public interest." D.C. Code § 16-5501(1)(A)&(B); *see also Farah*, 2012 WL 1970897, at *8 (Internet blog post satisfies both prongs of the definition independently). Simply put, if circulating a petition on a website about the source of major presidential campaign contributions is not a statement "in a place open to the public" or "expressive conduct that involves communicating views to members of the public" in connection with an issue of public interest, it is difficult to imagine what would be.

---

(N.D. Ill. Sept. 11, 2002); *Blumenthal v. Drudge*, 2001 WL 587860 (D.D.C. Feb. 13, 2001); *see also Price v. Stossel*, 2008 WL 2434137 (S.D.N.Y. June 4, 2008) (finding application of California statute was factor in transferring case).

**Second**, the Act defines "[i]ssue of public interest" to include, *inter alia,* "an issue related to . . . a public figure." D.C. Code § 16-5501(3). In his Complaint, Adelson expressly concedes the obvious – *i.e.,* that he "is a public figure." (Compl. ¶ 3.; *see also id.* ¶¶ 16-22.)[21] All of the statements in the Petition and Statement on which Adelson's claims are based are, by definition, about him, and it requires no further analysis for the Court to conclude that this prong of the defendants' prima facie burden is satisfied as well. *See Farah*, 2012 WL 1970897, at *7 ("[h]aving become such well-known proponents of one position on the issue, Plaintiffs cannot complain that the very intensity of their advocacy also became part of the public debate. Those who speak with loud voices cannot be surprised if they become part of the story.").

### C.  To Overcome the Statutory Immunity and Avoid Dismissal, Adelson Must Demonstrate that He is Likely to Succeed on the Merits of His Claims.

Having satisfied their burden of showing that Adelson's claims "arise from an act in furtherance of the right of advocacy on issues of public interest," the Act unambiguously provides that defendants' special motion to dismiss "shall be granted," and with prejudice. D.C. Code §§ 16-5502(b) & (d). Defendants need do nothing more to obtain the requested relief. *Adelson* may avoid that result only by carrying the heavy burden imposed on him by the Act of successfully demonstrating that his claims are "*likely* to succeed on the merits." *Id.* (emphasis added); *see Farah*, 2012 WL 1970897, at *8 (granting anti-SLAPP motion where defendants "made a prima facie showing that the [claims] arose from speech in furtherance of the right of advocacy on issues of public interest" and Plaintiffs have failed to demonstrate that their claims

---

[21] Because the Act applies to communications related to a "public figure," and Adelson concededly is one, this Court need venture no further. The Act, however, further defines "issues of public interest" to include issues "related to health or safety; environmental, economic or community well-being; . . . or a good, product or service in the market place." D.C. Code § 16-5501(3). Because the alleged libel upon which Adelson has brought suit relates to one or more of these specific issues, the second prong of the prima facie showing required of defendants is satisfied for this additional reason as well.

are likely to succeed on the merits"). Because, as demonstrated *infra*, Adelson is unable to carry his burden under the Act, defendants are fully entitled to shelter under the immunity it confers.

## III. ADELSON CANNOT CARRY HIS BURDEN OF DEMONSTRATING HE IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS.

"To prevail in a defamation suit, Plaintiff must prove that the statements complained of are i) defamatory; ii) capable of being proven true or false; iii) 'of and concerning' the Plaintiff; iv) false and v) made with the requisite degree of intent or fault." *Coles v. Washington Free Weekly, Inc.*, 881 F. Supp. 26, 30 (D.D.C. 1995), *aff'd*, 88 F.3d 1278 (D.C. Cir. 1996). In addition, where privileges or other "common law and constitutional protections" shield speech about "issues of public interest," the plaintiff cannot establish his claim. *Id.* (dismissing claim based on, *inter alia*, privilege for reports of judicial proceeding, opinion and fair comment). Under the Act, it is Adelson's burden to prove that he is likely to succeed on *each* of these elements, including that the publication about which he complains is not otherwise privileged. Because he is unable to do so, his Complaint must be dismissed.[22]

_____

[22] In addition, the Complaint should be dismissed under Rule 12(b)(6) for failure to state a claim on which relief can be granted. Wholly apart from the Act, District of Columbia courts – like the courts in this Circuit – have long favored early disposition of defamation actions. *See, e.g.*, *Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966) (recognizing importance of summary procedures because "the stake here" is "free debate. . . . The threat of being put the defense of a lawsuit . . . may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself"); *Myers v. Plan Takoma, Inc.*, 472 A.2d 44, 50 (D.C. 1983) (because the values "reflected in the First Amendment and the significant risk that even a non-meritorious defamation action may stifle open and robust debate on issues of public importance," court recognized that, "[i]n this area, perhaps more than any other, the early sifting of groundless allegations from meritorious claims made possible by a Rule 12(b)(6) motion is an altogether appropriate and necessary judicial function"); *see also Biro*, 2012 WL 3234106, at *10 n.5 ("there is 'particular value' in resolving defamation claims at the pleading stage" because the heavy costs of litigation "'means all but the most fearless will pull their punches even where robust comment might . . . serve the community'") (quoting, *inter alia*, *Hatfill v. New York Times Co.*, 427 F.3d 253, 255 (4th Cir. 2005) (Wilkinson, J., dissenting)).

A.   **The Petition's Recounting that Reports Had Surfaced that Adelson Personally Approved of Prostitution in his Macau Casinos Constitutes a Privileged Report of a Judicial Proceeding.**

Adelson is unable to satisfy his burden of demonstrating a likelihood of success on the merits because, among other reasons, the only statement of fact he purports to challenge – that "reports" had "surfaced" that he "'personally approved' of prostitution in his Macau casinos" – constitutes a privileged report of judicial proceedings – namely, the filing of the Jacobs Declaration in the *Jacobs* Action, which was itself described in detail in the Associated Press article hyperlinked to the Petition.  At common law and as a matter of constitutional principle, citizens are privileged to speak about and report to others accurate accounts of judicial proceedings, even if those accounts relate information ultimately proven to be false.  *See, e.g.*, *White v. Fraternal Order of Police*, 909 F.2d 512, 527 (D.C. Cir. 1990); *Dameron v. Washington Magazine, Inc.*, 779 F.2d 736, 739 (D.C. Cir. 1985); *see also Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 493 (1975); RESTATEMENT (SECOND) OF TORTS § 611, cmt. b ("If the report of a public official proceeding is accurate or a fair abridgment, an action cannot *constitutionally* be maintained, either for defamation or for invasion of the right of privacy.") (emphasis added).

In the District of Columbia, the privilege protecting reports about judicial and other governmental proceedings "extends broadly to the report 'of any official proceeding,'" *White*, 909 F.2d at 527 (quoting RESTATEMENT (SECOND) OF TORTS § 611, cmt. d), so long as (1) the report is a "fair and accurate" account of the proceeding or action it purports to describe, and (2) it is "apparent either from specific attribution or from the overall context that the article is quoting, paraphrasing, or otherwise drawing upon official documents or proceedings," *Dameron*, 779 F.2d at 739.  For purposes of the privilege, moreover, "[t]he accuracy requirement relates to the accuracy of the reporting, not to the truth of the alleged defamatory statement itself." *Coles*,

881 F. Supp. at 31 n.3.  The question of whether a published account is "fair and accurate"

within the meaning of the privilege is an issue of law.  *See, e.g.*, *id.* at 31 n.4 (citing *Dorsey v.

Nat'l Enquirer, Inc.*, 973 F.2d 1431, 1435 (9th Cir.1992)).[23]

　　In this case, Adelson asserts he was defamed by the statement in the Petition that his

campaign contributions should be viewed as "'tainted'" because "*reports [had] surfaced*" that he

"'personally approved'" of prostitution in his casinos in Macau.  (Compl. ¶ 36 (quoting Petition)

(emphasis added).)  It is, however, undisputed that (a) Jacobs submitted a sworn declaration in

the *Jacobs* Action describing how he was told not to eliminate prostitution from the Macau

casinos because Adelson "personally approved" of permitting it; (b) the Jacobs Declaration was

in turn the subject of a host of news reports, including the AP story disseminated throughout the

world well before defendants published the Petition; and (c) the Petition hyperlinked directly to

that AP story.  In addition, the AP story itself reported that "[t]he fired former chief executive of

Las Vegas Sands Corp.'s Macau casinos alleges in court documents revealed Thursday that

billionaire Sheldon Adelson personally approved of prostitution and knew of other improper

activity at his company's properties in the Chinese enclave."  (Harris Dec. Ex. E.)  Indeed, the

story quotes the "sworn seven-page declaration that Jacobs submitted along with a summary

from his attorneys," as stating that his efforts to "rid the casino floor of 'loan sharks and

---

[23] The privilege applies not only to reports of governmental proceedings themselves, but also to news reports recounting the "allegations" that "prompted" the governmental action or proceeding "in the first place."  *White v. Fraternal Order of Police*, 707 F. Supp. 579, 597 (D.D.C. 1989), *aff'd*, 909 F.2d 512 (D.C. Cir. 1990) (privilege protects report of police union's letters submitted to committee investigating police captain's alleged drug use, even before it made any findings because, "reports were fair summaries of the contents of the letters" and "summarized the gist of the [letters'] allegations" such that defendant "met all of the requirements for invoking" privilege).  *See also Reeves v. ABC*, 719 F.2d at 603-04 (California's codification of privilege extends to television report of "charges made to a grand jury," even though "[n]o formal charges were ever filed against" plaintiff); *Medico v. Time, Inc.*, 643 F.2d 134, 139 (3d Cir. 1981) (privilege extends to magazine's report based on FBI documents that "express only tentative and preliminary conclusions that the FBI has never adopted as accurate"); *Biro*, 2012 WL 3234106, at *29 ("[c]omments that essentially summarize or restate the *allegations* of a pleading filed in an action are the type of statements that fall within [the] privilege") (emphasis added).

prostitution'" was "met with concern as (company) senior executives informed me that the prior

prostitution strategy had been personally approved by Adelson."  (*Id.*)  And, the story reported

(a) that these allegations had "drawn interest" from both the Justice Department and SEC for

possible violation of the Foreign Corrupt Practices Act, and (b) that the court in the *Jacobs*

Action had scheduled a hearing "on possible sanctions against the company and its lawyers for

failure to disclose to the other side and to her that some documents sought by Jacobs' legal team

had been brought from Macau to the U.S. more than a year ago."  (*Id.*)[24]

Given the now-ubiquitous practice of hyperlinking to source material such as the AP

story, (*see* Strom Decl. Exs. 5, 35, 44, 45, 54, 56, 57, 58, 61, 64, 69),[25] courts recognize that such

linked material is part and parcel of the publication itself and must properly be considered by a

court deciding, *inter alia*, whether a challenged statement in that publication constitutes a

privileged report of a judicial or other official proceeding.  In *Jankovic v. International Crisis

Group*, 593 F.3d 22, 26 (D.C. Cir. 2010), for example, the D.C. Circuit evaluated the availability

of the privilege after conducting a detailed analysis of two Government reports hyperlinked to

---

[24] Moreover, the AP story included statements by both Sands' counsel and its spokesman, contending that the allegations were "'scurrilous,'" "designed only to sensationalize the case," and "baseless," including that "'Mr. Adelson has always objected to and maintained a strong policy against prostitution on our properties and any accusation to the contrary represents a blatant and reprehensible personal attack on Mr. Adelson's character.'"  (Harris Decl. Ex. E.)  In this regard, Adelson's in-court response to the Jacobs Declaration, including the submission of emails purporting to contradict those statements, was not filed until approximately two weeks *after* the Petition was circulated and a week *after* it was taken down and the Statement published on NJDC's website.  (Strom Decl. ¶ 63.)

[25] The Petition also linked to similar news reports related to its statements that Senator McCain had characterized Adelson's donations as  "Chinese foreign money," that Adelson and his company had engaged in "anti-union" practices, and that they had engaged in "allegedly corrupt business practices." (Harris Decl. ¶¶ 9 and Exs. B-D.)  Indeed, although Adelson focuses only on the Petition's reference to reports that he had personally approved prostitution in his Macau casinos, it is undisputed that the Petition also accurately recounted these other reports.

the defendants' statement, *even though* the links were defunct.[26]  *See also Agora, Inc. v. Axxess, Inc.*, 90 F. Supp. 2d 697, 704-05 (D. Md. 2000) (dismissing defamation claim based on facts disclosed through hyperlinks to underlying documents), *aff'd*, 11 F. App'x 99 (4th Cir. 2001).[27]

In light of the foregoing, each of the requirements for invoking the privilege has been satisfied.  First, Adelson concedes, as he must, that "[t]he only source" for defendants "accusations" is Jacobs, who had stated in a sworn declaration filed in the Nevada proceeding that "'LVSC Senior Executives informed [Jacobs] that the prior prostitution strategy had been personally approved by Adelson.'"  (Compl. ¶¶ 52-60; *See also id.* ¶¶ 79, 80; Strom Decl. Ex. 16 (complaint in Florida defamation action filed by Adelson against Jacobs contending Jacobs Declaration was basis of widespread news coverage).)  Second, the Petition expressly attributes the allegations to the Jacobs Declaration both through its references to the fact that "this week,

---

[26] In *Jankovic*, the D.C. Circuit ultimately concluded that the privilege did not protect defendants' publication because it was not an accurate report of the governmental document to which it hyperlinked. *See, e.g.*, 593 F.3d at 26-27.  Nevertheless, both the court of appeals and the district court recognized that the hyperlinked official report was properly and necessarily considered part of the publication itself for purposes of applying the privilege. *See, e.g., Jankovic v. Int'l Crisis Grp.*, No. 1:04-cv-01198, ECF #68, at 5-6 (D.D.C. Mar. 27, 2009), *aff'd in part and rev'd in part on other grounds*, 593 F.3d 22 (D.C. Cir. 2010) (Strom Ex. 118) (considering fact that "defendants' publication references the United States agency Web site upon which it relied" in evaluating fair report privilege); *see also* 429 F. Supp. 2d 165, 177 n.8 (D.D.C. 2006), *aff'd in part and rev'd in part*, 494 F.3d 1080 (D.C. Cir. 2007) (noting that "the sentence ends with a footnote that lists Internet links," and "[t]hese links make clear that this sentence was based on publicly available government information"); pp. 34 *infra* (citing additional cases considering hyperlinked materials in determining whether publication constitutes nonactionable expression of opinion based on facts disclosed in such materials).

[27] Adelson also alleges that that the Statement announcing that the Petition would be removed from NJDC's website is independently actionable.  Although the Statement does not itself include any assertion of fact that Adelson contends is false, he avers that its "gist" is that the "accusations made by Harris and the NJDC in the [Petition] were true, accurate and based on credible, independent news sources." (Compl. ¶ 46.)  According to Adelson, this, in turn, renders the Statement "false and defamatory because the accusations contained in the [Petition] are false and defamatory," including specifically the report of the statements in the Jacobs Declaration that Adelson had "'personally approved of prostitution in his Macau casinos." (Compl. ¶¶ 47-48.)  Applying Adelson's own logic, therefore, any privilege that applies to the Petition necessarily protects the Statement as well.  Indeed, the Statement itself explained that the Petition had been based on "current, credible news accounts" and stressed that the "[a]ccusations against Mr. Adelson were made not by us but by others."  (Compl. ¶¶ 44-45 & Ex. C.)

reports surfaced" and by linking to those reports, which included a detailed account of proceedings in the *Jacobs* Action.  (Compl. Ex. A; Harris Dec. Ex. E).  Third, the Petition contains a "fair and accurate" summary of the "gist of the allegations" made by Jacobs in his declaration.  *White*, 909 F.2d at 527-28; *see also, e.g.*, *Reeves*, 719 F.2d at 606-07 ("The 'fair and true' standard 'does not require the reporter to resolve the merits of the charges, nor does it require that he present the [plaintiff's] version of the facts.'") (citation omitted).[28]

Finally, defendants have not "abused" the privilege or otherwise forfeited its protections. In the District of Columbia, courts have variously characterized the privilege as "qualified" or "conditional," or as "absolute."  *See, e.g.*, *White*, 909 F.2d at 528 (whether official report privilege is absolute is unsettled).  Nevertheless, however characterized, the privilege is only forfeited "when the publisher does not give a fair and accurate report of the proceedings." RESTATEMENT (SECOND) OF TORTS § 611, cmt. a; *see Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1302 (D.C. Cir. 1988) (the "column's reference to this action is absolutely privileged as an accurate report of a judicial proceeding.  The mental state of its author is irrelevant to this issue.").  As a result, the availability of the privilege is necessarily unaffected by the allegations of "constitutional malice" in the Complaint, which contends that the defendants published despite knowledge of the falsity of the contents of the Jacobs Declaration or in "reckless disregard" of the truth of those allegations.  *See, e.g.*, Compl. ¶¶ 73-80.  Indeed, the privilege exists for the precise purpose of permitting "a person to publish a report of an

---

[28] In this regard, Adelson does not suggest, nor could he, that there is anything exculpatory in the Jacobs Declaration that should have been included in the Petition in order to render it a fair and accurate summary of its contents.  In any event, the linked AP account also contained out-of-court denials by Adelson's representatives – at a time when nothing of the sort had been filed in court.

official action or proceeding . . . even though the report contains what he knows to be a false and defamatory statement."  RESTATEMENT (SECOND) OF TORTS § 611, cmt. b.[29]

Because the single, allegedly defamatory statement of fact that Adelson purports to place at issue is a privileged account of a judicial proceeding, he cannot show he is "likely to succeed on the merits," as required by the Act, and has failed to state a claim under Rule 12(b)(6).

### B. The Remaining Portions of the Petition that Adelson Challenges Are Protected Expressions of Opinion and Privileged "Fair Comment."

In addition to the Petition's reference to the allegations made in the *Jacobs* Action, Adelson purports to challenge other statements in the Petition – namely, that "'perhaps the most alarming aspect of Adelson's potentially unlimited contributions is where the money comes from'" and that "'Romney and the rest of the Republican Party must cease accepting Adelson's tainted money immediately,'" and urging the reader to "'enlist your family and friends in the effort to stop the influence of Adelson's tainted money and protect our democracy.'"  Compl. ¶¶ 35-36 (quoting Petition).  Taken together, Adelson contends, the actionable "gist" of these statements "is that the political contributions made by Adelson were 'tainted,' 'dirty' money." *Id.* ¶ 37.  These statements, however, are not actionable in defamation because they constitute both constitutionally protected expressions of opinion and "fair comment" under D.C. law.

### 1. The Constitutional Protection for Expressions of Opinion.

The First Amendment requires that "a statement on matters of public concern must be provable as false before there can be liability under state defamation law" and further forbids the

---

[29] As Judge Sack has explained, defeating the privilege with a showing of "'actual malice' in the constitutional sense of knowing or reckless falsity" makes "little sense":  "The privilege is designed to enable the public to know what is being said in its courts and in other public forums, irrespective of whether the person who conveys the statements believes they are true or is confident that he or she can establish that belief in court."  Robert D. Sack, *Sack on Defamation: Libel, Slander & Related Problems* § 7:3.5[B][1].

imposition of liability for "statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19- 21 (1990); *see also Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776-77 (1986) (while at common law truth was a defense, as a matter of constitutional law, *plaintiff* bears the burden of proving falsity of statements about matters of public concern). In light of these principles, it is now well settled that expressions of opinion are protected from defamation liability as a matter of constitutional law. "This is because a statement of opinion is not an assertion of fact that can be proved false, and '[a]n assertion that cannot be proved false cannot be held libelous.'" *Biro*, 2012 WL 3234106, at *11 (quoting *Hotchner v. Castillo-Puche*, 551 F.2d 910, 913 (2d Cir. 1977)).[30] Such an expression of opinion is protected "however unreasonable the opinion or vituperous the expressing of it may be." *Id.* at 913; *see also* Strom Dec. Exs. 79-80 (Adelson's briefs successfully arguing his statements that Jacobs was "fired for cause" and guilty of disseminating "lies and fabrications" were protected opinion). Whether a particular statement constitutes fact or opinion is a threshold question of law for the court. *H&R Indus., Inc. v. Kirshner*, 899 F. Supp. 995, 1009 (E.D.N.Y. 1995).

To make this determination, courts "look to the immediate context and the broader social context of the statement" to determine whether, when read in such context, it "signals the reader that what is said is opinion, and not fact." *Levin v. McPhee*, 119 F.3d 189, 197 (2d Cir. 1997) (statement that it was "a possibility" plaintiff killed someone held to be non-actionable opinion);

---

[30] As indicated in Part I *supra*, the substantive statutory and common law of the District of Columbia – including, as discussed in the next section, the common law privilege for "fair comment" – governs defendants' defamation claim. In applying the constitutional protection for expressions of opinion, however, the Court applies the law of the Circuit in which it sits. *See, e.g.*, *Law Firm of Daniel P. Foster, P.C. v. Turner Broad. Sys., Inc.*, 844 F.2d 955, 961 n.12 (2d Cir. 1988). Accordingly, even though there appears to be little if any difference between D.C. and Second Circuit precedent with respect to the so-called "opinion doctrine" under the First Amendment, defendants cite to primarily to the latter.

*see also Sabratek Corp. v. Keyser*, 2000 WL 423529, at *6 (S.D.N.Y. Apr. 19, 2000) (calling

plaintiff "pathological liar" held to constitute opinion in context).  In this case, both the language

of the Petition itself and the context in which it was disseminated signal to readers that it is not a

dispassionate news report, but rather political advocacy issued in the context of a heated

campaign.  *See, e.g.*, *Letter Carriers v. Austin*, 418 U.S. 264, 284-86 (1974) (in finding charge

that non-union worker was "traitor" to be protected, it was significant that it was leveled in the

context of a "labor dispute").[31]

Moreover, the factual basis for the defendants' conclusion that Adelson's money should

be considered "tainted," and should therefore be rejected by Governor Romney and the

Republican Party, was fully disclosed.  *See, e.g.*, *Levin*, 119 F.3d at 197; RESTATEMENT

(SECOND) OF TORTS § 566, cmt. b (protection for opinion where "the maker of the comment

states the facts on which he bases his opinion of the plaintiff and then expresses a comment as to

the plaintiff's conduct, qualifications or character.").[32]  Indeed, the underlying allegations on

which the defendants' opinion is based are themselves set forth in the Petition.  Simply put, the

---

[31] Courts have uniformly recognized that "[r]eaders know that statements by one side in a political contest are often exaggerated, emotional and even misleading" and that the kind of "name-calling emanating from a rough-and-tumble political campaign" constitutes the expression of opinion. *See, e.g.*, *Lynch v. New Jersey Educ. Ass'n*, 735 A.2d 1129, 1136-40 (N.J. 1999) ("statement made in the heat of an election contest supplies the paradigm for [the country's] commitment to free debate" and finding non-actionable statements that plaintiff had "been under federal investigation for corruption"); *Lyons v. News Group Boston*, 612 N.E.2d 1168, 1169 (Mass. 1993) ("[T]he challenged statements were uttered in the midst of a political controversy, an occasion where readers expect heated debate and self-serving assertions."); *Welch v. Am. Publ'g Co.*, 3 S.W.3d 724, 730 (Ky. 1999) (statements that mayor "squandered" money and that city is "broke" as a result were protected expressions of opinion, because statement "bandied about in a political campaign is not language upon which a defamation lawsuit should be based, but is instead political opinion solidly protected under the First Amendment").

[32] *See also Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1093 (4th Cir. 1993) ("Because the bases for the . . . conclusion are fully disclosed, no reasonable reader would consider the term anything but the opinion of the author drawn from the circumstances related."); *Partington v. Bugliosi*, 56 F.3d 1147, 1156-57 (9th Cir. 1995) ("[W]hen an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment.").

Petition expressed the defendants' view that, because the sources of Adelson's unprecedented campaign contributions were then the subject of the widespread and decidedly unfavorable scrutiny detailed in the four news reports to which the Petition itself linked, those contributions had become sufficiently "tainted" that a responsible candidate for public office should not continue to accept them.[33] *See, e.g.*, *Agora*, 90 F. Supp. 2d at 704-05 (dismissing defamation claim as arising from protected opinion based on facts disclosed through hyperlinks to underlying documents); *Redmond v. Gawker Media, LLC*, 2012 WL 3243507, at *6 (Cal. App. Aug. 10, 2012) (unpublished) (article was protected opinion based on disclosed facts where "the article incorporates active links to many of the original sources"); *Sandals Resorts Int'l v. Google*, 925 N.Y.S.2d 407, 409, 416 (1st Dep't 2011) (where body of challenged email "intersperses comments by the writer with links to various Web sites that presumably contained information that prompted or support the writer's remarks," court concluded that "[f]ar from suggesting that the writer knows certain facts that his or her audience does not know, the e-mail is supported by links to the writer's sources").

 Adelson does not allege, nor could he, that the Petition implies the existence of facts known to the defendants, but not disclosed to the reader. Indeed, it would strain credulity for a reasonable reader to conclude that NJDC possessed additional information, beyond that reported in the AP story, about whether Mr. Adelson had "personally approved" prostitution at his Macau casinos – or, for that matter, knew of undisclosed facts, beyond the linked news reports,

---

[33] In this context, it is of no legal consequence that the underlying "facts" upon which the defendants' opinion is based are themselves allegations (especially where, as in the Petition, they are presented to the reader as "reports"). *See, e.g.*, *Bieter v. Fetzer*, 2005 WL 89484 (Minn. App. Jan. 18, 2005) (in debate over whether Senator Paul Wellstone's plane had been sabotaged, allegation that opponent had been *charged* with sexual harassment was held non actionable, even though charge was dismissed); *Shine v. Loomis*, 836 N.E.2d 952, 960 (Ind. App. 2005) (accusation by candidate for prosecutor about incumbent's misconduct was based on "information he received as 'allegations'" which served as the "'basis of fact'" for his comments).

concerning his companies' alleged violations the Foreign Corrupt Practices Act.  *See Biro*, 2012 WL 3234106, at *14 ("there is no suggestion that [the writer] was relying on any other undisclosed facts in reaching his opinion") (citation omitted).

The view of the law necessarily embraced by Adelson in this case – that citizens may not express their opinions concerning what they have read in the press about those public figures at the center of a presidential election campaign – is anathema to the First Amendment.  Without robust protection for political speech such as the Petition at issue here, courts will face "a stream of libel actions," which are "as much designed to punish writers and publications as to recover damages for real injuries" and which will "threaten the public and constitutional interest in free, and frequently rough, discussion."  *Ollman v. Evans*, 750 F.2d 970, 993 (D.C. Cir. 1984) (Bork, J., concurring).  As Judge Bork has explained, under the First Amendment, "[t]hose who step into areas of public dispute, who choose the pleasures and distractions of controversy, must be willing to bear criticism, disparagement, and even wounding assessments."  *Id.*

## 2.    The District of Columbia "Fair Comment" Privilege

The Petition's contentions that Adelson's money is "tainted" and that his contributions should therefore be rejected by Governor Romney and his party are also protected from defamation liability by the common law "fair comment" privilege.  In the District of Columbia, "[t]he common law privilege of fair comment applies where the reader is aware of the factual foundation for a comment and can therefore judge independently whether the comment is reasonable."  *Lane v. Random House, Inc.*, 985 F. Supp. 141, 150 (D.D.C. 1995).  "Fair comments are not actionable in defamation '[b]ecause the reader understands that such supported opinions represent the writer's interpretation of the facts presented, and because the reader is free to draw his or her own conclusions based upon those facts.'"  *Id.* (quoting *Moldea v. New York*

*Times Co.*, 15 F.3d 1137, 1144 (D.C. Cir. 1994)).  Whether the statement "in question is [a] fair

comment and criticism on a matter of public interest is a question of law" to be decided by the

Court.  *Fisher v. Washington Post Co.*, 212 A.2d 335, 338 (D.C. 1965).

The "fair comment" privilege "'afford[s] legal immunity for the honest expression of

opinion on matters of legitimate public interest when based upon a true or privileged statement

of fact.'"  *Coles*, 881 F. Supp. at 32 (citation omitted) (statement that plaintiff was "guilty of

misleading the American public" was protected under the "fair comment" privilege).  The

privilege recognizes that a speaker who has made an otherwise privileged statement about a

judicial proceeding must be permitted to offer his opinion or commentary about the import of

that proceeding.  *See, e.g.*, *Dall v. Pearson*, 246 F. Supp. 812, 813-14 (D.D.C. 1963) (after

reporter described congressional hearing, his opinion that plaintiff's testimony constituted an

"anti-Semitic diatribe" was protected by fair comment privilege ).  Moreover, "the fair comment

privilege is applicable 'even if the facts upon which [the opinion] is based are not included along

with the opinion.'" *Coles*, 881 F. Supp. at 32 (quoting *Fisher*, 212 A.2d at 338); *see also Lane*,

985 F. Supp. at 150 ("In the District of Columbia, the fair comment privilege can be invoked

even if the underlying facts are not included with the comment.").[34]

In this case, of course, the factual basis for defendants' opinion *was* set forth in the

Petition, with hyperlinked articles describing the factual basis for the views expressed.  In the

final analysis, therefore, defendants' expressed opinion that the very existence of and widespread

prior publicity afforded to these allegations, in combination, were sufficient to deem Adelson's

---

[34] In *Coles*, the Court considered the defendant's negative evaluation of a lawyer's courtroom performance, including that he "'had neglected to pursue key lines of questioning.'"  881 F. Supp. at 31 (citation omitted).  The Court held "the transcript of the hearing is readily available to the public," even though it was not included in the allegedly defamatory report itself, and therefore a "reader whose interest was sparked can read copies of the transcript of the proceedings and determine whether he agrees with the reporter's" comment.  *Id.* at 32.

campaign contributions "tainted," and to call upon Governor Romney to reject them, is protected

"fair comment" under District of Columbia law.

## IV.   IN THE ALTERNATIVE, BECAUSE CORE EVIDENCE ESSENTIAL TO HIS ACTION APPEARS TO HAVE BEEN CONCEALED AND/OR DESTROYED, IT SHOULD BE STAYED UNTIL THAT ISSUE IS RESOLVED.

If this Court should determine that it cannot dismiss this case for the substantive reasons

set forth *supra*, it should properly stay adjudication of defendants' anti-SLAPP motion until the

court in the *Jacobs* Action determines the extent to which evidence central to this litigation –

specifically, the email and other electronic documents that Jacobs has sworn support his

contention that Adelson condoned prostitution at his Macau casinos – has been concealed and/or

destroyed by his agents.  In the wake of the sworn testimony of several of his lawyers in the

*Jacobs* Action, as well as his Chief Information Officer, it appears that Adelson and his

companies failed to preserve the originals of at least one and possibly two of Jacobson's four

computer drives.  (Strom Dec. ¶¶ 45-52.)  It also appears that they may have failed to retain even

a "ghost" copy of one or more of those drives and that, even with respect to the "ghost" copies

that do exist, files deleted before the copy was made are not recoverable.  (*Id.*)  And, it appears

that they did so despite (a) a legal duty to preserve such evidence and (b) having lied about the

existence and location of those electronic documents to the Nevada court.  (*Id.*)

If, as it now appears, significant portions of the evidence that Jacobs has sworn

corroborates his statements about prostitution (the very statements that defendants stand accused

of reporting) has in fact gone missing, Adelson will be unable, as a matter of law, to carry his

burden in this action of proving that those statements are false.  *See, e.g.*, *Hepps*, 475 U.S. at

776-77.  Put differently, in that event, defendants would be deprived of their ability to establish

the substantial truth of the challenged statements through the contemporaneous evidence that

Adelson and his agents have concealed or destroyed.  *See, e.g.*, *Masson v. New Yorker Magazine*, 501 U.S. 496, 516-17 (1991).  Because such evidence is undoubtedly "central to [the] defendants' defense" and "there [is] no effective substitute" for it, Adelson's case would necessarily have to be dismissed.  *Serafino v. Hasbro, Inc.*, 82 F.3d 515, 518 (1st Cir. 1996) (dismissing case based on plaintiff's assertion of Fifth Amendment privilege on key issues); *see also Eckhaus v. Alfa-Laval, Inc.* 764 F. Supp. 34 (S.D.N.Y. 1991) (attorney could not maintain defamation claim where he could not do so without revealing attorney-client privileged communications); *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) (where there has been an admitted failure to preserve key evidence, it "has long been the rule that spoliators should not benefit from their wrongdoing," and the "court has broad discretion in crafting a proper sanction," including dismissal).  Indeed, where a party – or its agents – commits a fraud upon a court, *see Shangold v. Walt Disney Co.*, 2006 WL 71672 (S.D.N.Y. Jan. 12, 2006), *aff'd*, 275 F. App'x 72 (2d Cir. 2008), or mishandles crucial evidence, *see Beers v. General Motors Corp.*, 1999 WL 325378 (N.D.N.Y. May 17, 1999), a court can and properly should dismiss the action.  *See also Synanon Church v. United States*, 820 F.2d 421 (D.C. Cir. 1987) (dismissing case because plaintiff had willfully destroyed relevant evidence in different court in different case).

Where, as here, there remain open questions about whether the evidence at issue still exists, staying adjudication of defendants' anti-SLAPP motion is appropriate while those questions are resolved.  *See, e.g.*, *Wehling v. CBS*, 608 F.2d 1084, 1088 (5th Cir. 1979) (approving of three-year stay before dismissing defamation claim, where evidence was currently

unavailable because of assertion of Fifth Amendment privilege).[35]   The "power to stay

proceedings is incidental to the power inherent in every court to control the disposition of the

cases on its own docket with economy of time and effort for itself, for counsel, and for litigants."

*Landis v. North Am. Co.*, 299 U.S. 248, 254 (1936); *WorldCrisa v. Armstrong*, 129 F.3d 71, 76

(2d Cir. 1997).   A stay is particularly appropriate where, as here, proceedings in another action

"will have a significant bearing on" the disposition of the stayed litigation.   *Maritima de

Ecologia, S.A. v. Sealion Shipping Ltd.*, 2011 WL 1465744, at *5 (S.D.N.Y. Apr. 15, 2011); *see

also Fried v. Lehman Bros. Real Estate Assoc. III*, 2012 WL 252139 (S.D.N.Y. Jan. 25, 2012)

(staying action where related case "may affect the progress and disposition of this lawsuit").   The

other proceeding need not be a parallel action.   *See Goldstein v. Time Warner N.Y. City Cable

Group*, 3 F. Supp. 2d 423, 437-38 (S.D.N.Y. 1998) (entering stay "'does not require that the

issues in such proceedings are necessarily controlling of the action before the court'") (citation

omitted).   Indeed, "[d]istrict courts routinely exercise their inherent power and discretionary

authority to stay a case when confronted with the concurrent pendency of civil and criminal

proceedings involving the same or related subject matter."   *Doe v. City of New York*, 2010 WL

286643, at *1 (S.D.N.Y. Jan. 19, 2010); *see also Goldstein*, 3 F. Supp. 2d at 438 (noting that

"[c]onsiderations of judicial efficiency" support stay where issue being litigated in other

proceeding "bears directly on this litigation").

---

[35] In analgous contexts, such as where key evidence is unavailable to the defendant because it is
subject to the state secrets privilege, appellate courts have recognized that the case must be dismissed.
*See, e.g., Trulock v. Lee*, 66 F. App'x 472 (4th Cir. 2003) (dismissing claim where invocation of state
secret privilege would prohibit discovery into issues "critical to the resolution of core factual questions in
the case"); *Zuckerbraun v. General Dynamics Corp.*, 935 F.2d 544, 547 (2d Cir. 1991) (same, noting that
"if the court determines that the privilege so hampers the defendant in establishing a valid defense that the
trier is likely to reach an erroneous conclusion, then dismissal is also proper"); *Fitzgerald v. Penthouse
Int'l Ltd.*, 776 F.2d 1236 (4th Cir. 1985) (dismissing defamation action on same basis).

The plaintiff in this case not only has a well-chronicled history of employing the litigation process for improper purposes, (*see* Strom Decl. ¶¶ 3-13), there is now significant evidence that his litigation strategy includes the concealment and destruction of evidence.  Under such circumstances, the defendants in this defamation action should not be put to the burden and expense of further litigation until the extent of the misconduct revealed in the *Jacobs* Action is revealed and its relevance to this litigation can be properly assessed.   *See, e.g.*, *Herbert v. Lando*, 441 U.S. 153, 178-79 (1979) (Powell, J., concurring) (in supervising proceedings in defamation action, "district court has a duty to consider First Amendment interests").  Accordingly, if this case is not dismissed in its entirety for the reasons set forth herein, adjudication of this motion should be stayed pending the conclusion of further sanctions proceedings in the *Jacobs* Action.

Dated:    September 21, 2012          Respectfully submitted,

                                      LEVINE SULLIVAN KOCH & SCHULZ, LLP


                                      By:   /s/ Rachel F. Strom
                                          Lee Levine (*pro hac vice* application pending)
                                          Seth D. Berlin
                                          Gayle Sproul
                                          Rachel F. Strom

                                      321 West 44th Street, Suite 510
                                      New York, New York 10036
                                      Telephone: 212-850-6100
                                      llevine@lskslaw.com
                                      gsproul@lskslaw.com
                                      sberlin@lskslaw.com
                                      rstrom@lskslaw.com

                                      *Counsel for Defendants*
                                      *David A. Harris, Marc R. Stanley,*
                                      *and National Jewish Democratic Council*