IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------
SHELDON G. ADELSON,


                              Plaintiff,                    Case No. 12-Civ-6052-JPO

                                                           ECF Case

        v.


DAVID A. HARRIS, MARC R. STANLEY, and
NATIONAL JEWISH DEMOCRATIC COUNCIL,


                              Defendants.
------------------------------------------------------------------------

### COMBINED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO DISMISS PURSUANT TO THE D.C. ANTI-SLAPP STATUTE AND MOTION TO DISMISS PURSUANT TO RULE 12(B)(6)

L. Lin Wood
lwood@whetriallaw.com
Georgia Bar No. 774588
(admitted *pro hac vice*)
Amy M. Stewart
astewart@whetriallaw.com
Georgia Bar No. 141481
(admitted *pro hac vice*)
**Wood, Hernacki & Evans, LLC**
1180 West Peachtree Street N.W.
Suite 2400
Atlanta, Georgia 30309

David M. Olasov
dolasov@olasov.com
**Olasov + Hollander LLP**
27th Floor
1325 Avenue of the Americas
New York, NY 10019

*Attorneys for Plaintiff Sheldon G. Adelson*

### TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF FACTS...........................................................................................2

    I.    Mr. Adelson's Philanthropic Work ........................................................2

    II.    Mr. Adelson's Political Contributions....................................................3

    III.    The NJDC, Harris, and the Defamatory Petition.............................4

    IV.    The AP Article, the *Jacobs* Proceeding, and Mr. Adelson's Policy Against Prostitution 5

    V.    When Presented with Evidence of the Falsity of the Prostitution Accusation, Defendants Responded by Confirming the Petition's Purported Truthfulness................................................7

    VI.    Defendants' Subsequent Opportunity to Follow the DCCC's Lead and Apologize and Retract 8

    VII.    Procedural Posture ..........................................................................9

ARGUMENT...........................................................................................................10

    I.    THE COURT SHOULD CHOOSE NEVADA LAW......................................11

        A.    The Nine-Factor Test Requires the Application of Nevada Law .................12

        B.    The Restatement of Conflicts Approach Requires the Application of Nevada Law.....15

        C.    Ad-Hoc Approach Does Not Weigh in Favor of District of Columbia Law................17

        D.    Defendants' Choice of Law Arguments are Unavailing .............................18

    II.    EVEN IF DISTRICT OF COLUMBIA LAW APPLIES, THIS COURT CANNOT APPLY THE D.C. ANTI-SLAPP STATUTE BECAUSE IT IS UNCONSTITUTIONAL UNDER THE SEVENTH AMENDMENT ...........................................................21

    III.    EVEN IF DISTRICT OF COLUMBIA LAW APPLIES, THIS COURT CANNOT APPLY THE D.C. ANTI-SLAPP STATUTE BECAUSE IT IS IN DIRECT CONFLICT WITH THE FEDERAL RULES OF CIVIL PROCEDURE...................................22

        A.    The Federal Rules of Civil Procedure Answer the Question in Dispute .......................23

        B.    Federal Rules of Civil Procedure 12, 41, and 56 Do Not Violate the REA .................26

        C.    Defendants Have Not Shown that the D.C. Act Can Be Applied Here.........................27

i

IV.   STANDARD OF REVIEW: 12(b)(6) MOTION TO DISMISS AND ANTI-SLAPP
SPECIAL MOTION TO DISMISS .......................................................................28

   A.   12(b)(6) Standard of Review ..................................................................29

   B.   D.C. Act Standard of Review .................................................................29

V.   DEFENDANTS PUBLISHED THE PETITION AND REPUBLICATION WITHOUT
PRIVILEGE...............................................................................................................30

   A.   The Petition and Republication Are Not Privileged Reports of Judicial Proceedings ..31

     1.   Defendants Do Not Satisfy the First Hurdle: They Failed to Attribute Their
     Statements to a Judicial Proceeding .................................................................31

     2.   Defendants Do Not Satisfy the Second Hurdle: They Failed to Give a Fair and
     Accurate Report of the *Jacobs* Proceeding or the Jacobs Declaration .............................33

     3.   Hyperlinked Material Cannot Be Considered to Determine Privilege .....................34

   B.   The Petition and Republication Are Not Protected Opinion or Fair Comment.............37

     1.   The Petition Is Not an Opinion Protected by the First Amendment.........................37

     2.   Defendants' Opinion that Mr. Adelson's Money Is Tainted Is Not Protected by the
     Fair Comment Privilege...................................................................41

     3.   The Republication Is Neither Protected Opinion Nor Privileged Fair Comment......42

VI.   THE ACTION SHOULD NOT BE STAYED .........................................................42

CONCLUSION ...................................................................................................................44

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*3M Co. v. Boulter*, 842 F. Supp. 2d 85 (D.D.C. 2012)............................................................passim

*3M Co. v. Boutler*, No. 11-cv-1527, 2012 WL 5245458 (D.D.C. October 24, 2012)..................22

*Agora, Inc. v. Axxess, Inc.*, 90 F. Supp. 2d 697 (D. Md. 2000), *aff'd*, 11 F. App'x 99 (4th Cir. 2001)......................................................................................................................35, 36, 39

*Ahlers v. Rabinowitz*, 684 F.3d 53 (2d Cir. 2012) ........................................................................29

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986)............25

*Ashcroft v. Iqbal,* 556 U.S. 662, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009).................................29

*Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959)..............21

*Berwick v. New World Network Int'l, Ltd.*, No. 06-CV-2641-JGK, 2007 WL 949767 (S.D.N.Y. Mar. 28, 2007) .............................................................................................................................19

*Best v. Kelly*, 39 F.3d 328 (D.C. Cir. 1994)...................................................................................25

*Bieter v. Fetzer*, No. A04-1034, 2005 WL 89484 (Minn. Ct. App. Jan. 18, 2005).......................40

*Biro v. Conde Nast*, No. 11-Civ.-4442-JPO, 2012 WL 3234106 (S.D.N.Y. August 9, 2012)29, 31

*Bobby v. Bies*, 556 U.S. 825, 129 S. Ct. 2145, 173 L. Ed. 2d 1173 (2009)..................................43

*Burlington N.R.R. Co. v. Woods*, 480 U.S. 1, 107 S. Ct. 967, 94 L. Ed. 2d 1 (1987) ..................22

*Coles v. Wash. Free Weekly, Inc.*, 881 F. Supp. 26 (D.D.C. 1995), *aff'd*, 88 F.3d 1278 (D.C. Cir. 1996).............................................................................................................................................41

*Collins v. Flynn*, 08-CV-59S, 2008 WL 3851842 (W.D.N.Y. Aug. 15, 2008)............................18

*Condit v. Dunne*, 317 F. Supp. 2d 344 (S.D.N.Y. 2004).........................................................passim

*Dameron v. Wash. Magazine, Inc.*, 779 F.2d 736 (D.C. Cir. 1985).............................................32

*Davis v. Costa-Gavras*, 580 F. Supp. 1082 (S.D.N.Y. 1984).....................................12, 14, 16, 17

*Erie v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938) .........................................28

*Farah v. Esquire Magazine, Inc.*, No. 11-CV-1179 RMC, 2012 WL 1970897 (D.D.C. June 4, 2012)..................................................................................................................................27, 28

*Gargiulo v. Forster & Garbus Esqs.*, 651 F. Supp. 2d 188 (S.D.N.Y. 2009) ..............................29

*Gertz v. Robert Welch, In*c., 418 U.S. 323 (1974)...................................................................28, 41

*Grass v. News Group Publ'ns, Inc.*, 570 F. Supp. 178 (S.D.N.Y. 1983) ......................................18

*Gristede's Foods, Inc. v. Poospatuck (Unkechauge) Nation,* No. 06-Civ.-1260, 2009 WL 4547792 (E.D.N.Y. Dec. 1, 2009)..................................................................................................29

*GTFM, LLC v. TKN Sales, Inc.*, 257 F.3d 235 (2d Cir. 2001) ......................................................21

*Hanna v. Plumer*, 380 U.S. 460, 85 S. Ct. 1136, 14 L.Ed.2d 8 (1965) ............................22, 24, 26

*Herbert v. Lando*, 441 U.S. 153 (1979)........................................................................................28

*In re Payroll Exp. Corp.*, No. 92-B-43150-CB, 2005 WL 2438444 (Bankr. S.D.N.Y. Mar. 30, 2005)...........................................................................................................................................19

*Jankovic v. Int'l Crisis Group*, 593 F.3d 22 (D.C. Cir. 2010)..........................................31, 35, 41

*Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348 (S.D.N.Y. 1998) ......................................13, 17

*La Luna Enters., Inc. v. CBS Corp.*, 74 F. Supp. 2d 384 (S.D.N.Y. 1999) ..............................12, 19

*Lee v. Bankers Trust Co.*, 166 F.3d 540 (2d Cir. 1999) ................................................................11

*Levin v. McPhee*, 917 F. Supp. 230 (S.D.N.Y. 1996) ...................................................................17

*Lubin v. Kunin*, 117 Nev. 107 (2001) ....................................................................................33, 34

*Machleder v. Diaz*, 538 F. Supp. 1364 (S.D.N.Y. 1982).........................................................12, 14

*McCulloch v. Maryland*, 4 Wheat. 316, 4 L.Ed. 579 (1819).........................................................21

*Medico v. Time, Inc.*, 643 F.2d 134 (3d Cir. 1981) ......................................................................31

*Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832 (9th Cir. 2001) ..................................................25

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S. Ct. 2695, 2706, 111 L. Ed. 2d 1 (1990)....37, 38

*National Federation of Independent Business v. Sebelius*, 132 S.Ct. 2566 (June 28, 2012) ........21

*Nevada Indep. Broad. Corp. v. Allen*, 99 Nev. 404, n.6 (1983) ...................................................41

*Nguyen v. Cnty. of Clark*, 732 F. Supp. 2d 1190 (W.D. Wash. 2010).........................................25

*Nixon v. Haag*, No. 1:08-CV-00648-LJM-JMS, 2009 WL 2026343 (S.D. Ind. July 7, 2009) .....25

*Oparaugo v. Watts*, 884 A.2d 63 (D.C. 2005)..............................................................................33

iv

*Potts v. Dies*, 132 F.2d 734 (D.C. Cir. 1942) ............................................................41

*Qureshi v. St. Barnabas Hosp. Ctr.*, 430 F. Supp. 2d 279 (S.D.N.Y. 2006) ................19

*Rebel Commc'ns, LLC v. Virgin Valley Water Dist.*, 2:10-CV-0513-LRH-PAL, 2011 WL 3841340 (D. Nev. Aug. 25, 2011) ............................................................25

*Redmond v. Gawker Media, LLC*, No. A132785, 2012 WL 3243507 (Cal. Ct. App. Aug. 10, 2012)........................................................................................................39, 40

*Reeves v. ABC, Inc.*, 719 F.2d 602 (2d Cir. 1983).......................................................31

*Reeves v. Am. Broad. Cos., Inc.*, 719 F.2d 602 (2d Cir. 1983)....................................11

*Rosenblatt v. Baer*, 383 U.S. 75 (1966).......................................................................28

*Sahara Gaming Corp. v. Culinary Workers Union Local 226*, 115 Nev. 212 (1999)................32

*Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431, 176 L. Ed. 2d 311 (2010)........................................................................................22, 24, 26, 28

*Sherrod v. Breitbart*, 843 F. Supp. 2d 83 (D.D.C. 2012) ............................................28

*Shine v. Loomis*, 836 N.E.2d 952 (Ind. Ct. App. 2005)...............................................40

*Sibbach v. Wilson & Co.*, 312 U.S. 1, 61 S. Ct. 422, 426, 85 L. Ed. 479 (1941) .........26

*Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 108 S. Ct. 2239, 2242, 101 L. Ed. 2d 22 (1988) ........................................................................................................23, 24

*Stuborn Ltd. P'ship v. Bernstein*, 245 F. Supp. 2d 312 (D. Mass. 2003) ....................26

*Thai v. Cayre Group, Ltd.,* 726 F. Supp. 2d 323 (S.D.N.Y. 2010)...............................29

*Von Kahl v. Bureau of Nat'l Affairs, Inc.*, 810 F. Supp. 2d 138 (D.D.C. 2011)............34

*Walker v. Armco Steel Corp.*, 446 U.S. 740, 100 S. Ct. 1978, 1985, 64 L. Ed. 2d 659 (1980).....24

*White v. Fraternal Order of Police*, 909 F.2d 512 (D.C. Cir. 1990).............................32

*White v. Fraternal Order*, 707 F. Supp. 579 (D.D.C. 1989), *aff'd*, 909 F.2d 512 (D.C. Cir. 1990) ........................................................................................................31

*WorldCrisa v. Armstrong*, 129 F.3d 71 (2d Cir. 1997) ................................................43

*Zuck v. Interstate Publ'g Corp.*, 317 F.2d 727 (2d Cir. 1963) ....................................12

**Statutes**

District of Columbia Code § 16-502 ....................................................................passim

Rules Enabling Act, 28 U.S.C. § 2072 ..............................................................25, 26

**Other Authorities**

Restatement (Second) of Conflict of Laws § 150 (1971)...........................11, 15, 16, 18

Restatement (Second) of Judgments § 27 (1980).........................................................43

Restatement (Second) of Torts § 563 ..........................................................................32

**Rules**

California Rules of Court 8.1115(a) .............................................................................39

Federal Rule of  Civil Procedure 8 ..............................................................................28

Federal Rule of Civil Procedure 12 ...............................................................23, 24, 25, 26

Federal Rule of Civil Procedure 38(a)..........................................................................21

Federal Rule of Civil Procedure 41 ...............................................................23, 25, 26

Federal Rule of Civil Procedure 56 ...............................................................23, 24, 25, 26

**Constitutional Provisions**

U.S. Const. amend. VII.................................................................................................21

## PRELIMINARY STATEMENT

Plaintiff, Sheldon Adelson, respectfully submits this Memorandum of Law in opposition to Defendants' special motion to dismiss the Complaint pursuant to the D.C. Anti-SLAPP statute and Defendants' motion to dismiss the Complaint pursuant to F.R.C.P. 12(b)(6).  Mr. Adelson's Complaint asserts a single cause of action, one for libel.  On July 3rd and July 11th of this year, Defendants published two articles falsely accusing Mr. Adelson of "personally approv[ing] of prostitution" and concluding his money was "dirty" and "tainted" as a result. Defendants knew prior to publishing these false and defamatory allegations that the only source was a biased, disgruntled, former employee who was fired for cause and who retaliated by attempting to extort his previous employer through unreasonable, baseless demands and a wrongful discharge lawsuit.  Moreover, Defendants knew that the source himself even doubted the truth of the accusations when they were made to him.  Instead of conveying these facts to the reader, however, Defendants cloaked these allegations with the fabric of truth and credibility—calling their source "reports" and "credible news accounts."  When confronted with proof of the falsity of their source's allegations, Defendants refused to retract or apologize for their egregious actions and instead republished their libel.

Essentially conceding that their republication presents a basis for proceeding with the case, Defendants seek to divert the Court through a series of ad hominem attacks vilifying Mr. Adelson while minimizing and covering up the facts.  The Court should see past this "defense-by-disparagement" and recognize the facts for what they create: a well-pled complaint sufficient to satisfy both Rule 12(b)(6) and D.C.'s Anti-SLAPP statute.  Mr. Adelson is entitled to proceed with his litigation and Defendants' motion to dismiss pursuant to Rule 12(b)(6) and special motion to dismiss pursuant to D.C.'s Anti-SLAPP statute should be denied.

## STATEMENT OF FACTS

Sheldon Adelson is a successful, self-made entrepreneur and philanthropist, a prominent member of the Jewish community, and major shareholder, Chairman and CEO of Las Vegas Sands Corp. ("LVSC"), a Nevada Corporation with its principal place of business in Las Vegas Nevada, where Mr. Adelson resides.  (Compl. ¶ 4.)  On or about July 3, 2012, Defendant National Jewish Democratic Council ("NJDC") published a false and defamatory petition, authored by Defendant David A. Harris ("Harris"), on its website (the "Petition").  (Compl. ¶¶ 23, 31.)  The Petition, which declared that Mr. Adelson had "**'personally approved' of prostitution in his Macau casinos**," implored the recipients to "**Tell Romney to Reject Adelson's Dirty Money**."  (Compl. ¶ 34-36, Ex. A.)  This false and defamatory Petition was read by third parties both nationally and internationally.  (Compl. ¶ 40.)  Even after Professor Alan Dershowitz spoke with Harris and the NJDC, relaying documentary evidence of the falsity of their defamatory statement, they refused to retract or apologize to Mr. Adelson.  (Compl. ¶ 64.)  Instead, on July 11, the NJDC removed the Petition and posted yet another defamatory statement authored by Harris and Defendant Marc R. Stanley ("Stanley"), proclaiming that they "did not engage in character assassination," and they "stand by everything [they] said [in the Petition], which was sourced from current, credible news accounts." (Compl. ¶¶ 41, 44.)  As a result of Defendants' repeated defamatory conduct, Mr. Adelson's personal and business reputation has been permanently damaged, and he has suffered public hatred, contempt, scorn, and ridicule.  (Compl. ¶¶ 83-84.)

## I.      Mr. Adelson's Philanthropic Work

Prior to the publication of the Petition, it was well known in the Jewish community and beyond that Mr. Adelson had a long-standing dedication to helping the kind of women that Defendants have accused him of exploiting.   Among Mr. Adelson's many philanthropic

endeavors are the drug-abuse treatment and research centers that he and his wife established in

Las Vegas, Nevada, Israel, and Macau (collectively, the "Adelson Clinics").  (Compl. ¶¶ 17-18.)

Many of the hundreds of patients seen by the Adelson Clinics are women whose addiction

had forced them into prostitution.  (Compl. ¶ 20.)  The Adelson Clinics strive to support these

women, provide them with drug-abuse treatment, and end their involvement in prostitution.

(Compl. ¶ 21.)    Through the Dr. Miriam and Sheldon G. Adelson Medical Research

Foundation, the Adelsons also support medical research into the biology of addictive diseases

and the consequential impact on addiction treatment, among other fields. *Id*. That Defendants

would repeatedly publish and affirm that Mr. Adelson personally supported prostitution, when it

is well-known that he has strived for years to help women escape prostitution and better their

lives, evidences Defendants' reckless disregard for truth or falsity.

## II.    Mr. Adelson's Political Contributions

In addition to Mr. Adelson's numerous and extensive charitable contributions, his

creation of multiple charitable organizations, and his investment in and creation of the Adelson

Clinics, Mr. Adelson also lawfully contributes to political candidates and Political Action

Committees ("PACs") supporting candidates running for political office, including 2012

Republican Party candidates Newt Gingrich and Mitt Romney. (Compl. ¶ 22.)  Despite Mr.

Adelson's extensive charitable endeavors, and use of his earned-income to support indisputably

worthy causes, the NJDC targeted Mr. Adelson and his lawful political contributions, defaming

and disparaging him in his business and community, apparently in a misguided attempt to gain

support for the Democratic Party and itself.[1]

---

[1] A political motivation for publishing and confirming a knowingly false and defamatory statement does not enhance
or elevate any claimed First Amendment defenses proffered by Defendants.

**III.    The NJDC, Harris, and the Defamatory Petition**

Harris, a resident of the District of Columbia ("D.C."), is the President and CEO of the

NJDC, a D.C. non-profit corporation with offices in New York, New York.  On or about July 3,

2012, Defendants Harris and the NJDC posted the following Petition, appearing below in its

entirety:

## Tell Romney to Reject Adelson's Dirty Money



As you saw during the Republican primaries, GOP mega-donor Sheldon Adelson
dumped millions of dollars into supporting Newt Gingrich's feckless campaign.
**Now he's doing the same for Mitt Romney – with no plans to stop**. But
perhaps the most alarming aspect of Adelson's potentially unlimited contributions
is where the money comes from.

It's well known that Adelson makes tremendous sums of money through his
casinos in China which – according to 2008 Republican presidential candidate
Senator John McCain (AZ) -- means that Chinese **"foreign money" (to quote
McCain) is flooding our political system**. But this week, reports surfaced that in

addition to his anti-union and allegedly <u>corrupt business practices</u>, **Adelson "<u>personally approved</u>" of prostitution in his Macau casinos**.

Given these reports, **Romney and the rest of the Republican Party must cease accepting Adelson's tainted money immediately**. Sign NJDC's petition below, and click here to share the image above on Facebook to help spread the word.

Already signed? Click here to enlist your family and friends in the effort to stop the influence of Adelson's tainted money and protect our democracy.

(Hereinafter, the "Petition"). (Compl. ¶¶ 34-36, Ex. A.)   Defendants never contacted Mr. Adelson or any of his representatives regarding the truth or veracity of their allegations prior to publishing the Petition, nor did Defendants conduct even a cursory investigation regarding the veracity of the accusations.  (Compl. ¶ 73.)

**IV.    The AP Article, the *Jacobs* Proceeding, and Mr. Adelson's Policy Against Prostitution**

At the underlined phrase "**<u>personally approved</u>**" in the Petition, Defendants provide a hyperlink to an Associated Press ("AP") article titled "Sheldon Adelson Approved 'Prostitution Strategy': Fired Former Sands Executive" (the "AP Article").   The AP Article reported on accusations made in a lawsuit by a former Sands China Limited ("SCL")[2] executive, Steven Jacobs ("Jacobs"), who worked with the company's Macau properties.   Jacobs was fired for cause in 2010.  (Compl. ¶ 52.)  He responded by threatening to go public with baseless Foreign Corrupt Practices Act allegations against Mr. Adelson unless LVSC paid him millions of dollars. LVSC did not cave to Jacob's extortionate demand.  (Compl. ¶¶ 53-54.)  Jacobs subsequently filed a Nevada state court action for wrongful discharge, naming Mr. Adelson, LVSC, SCL, and various unnamed individuals: *Steven C. Jacobs v. Las Vegas Sands Corp., et al.,* No. A627691-B ("the *Jacobs* Proceeding").  (Compl. ¶ 55.)

---

[2] SCL is a subsidiary of LVSC.

Aware that he could not prevail on the merits of his claims, Jacobs made good on his threats and lobbed incendiary accusations aimed to embarrass and pressure the defendants in his lawsuit into paying him millions of dollars. (Compl. ¶ 56.)  In keeping with this strategy, on June 27, 2012, Jacobs filed an unrequested and irrelevant declaration to address a before unknown alleged gap in production (the "Jacobs Declaration"). (Compl. ¶ 57.)   The unrequested declaration included the unequivocally false statements by Jacobs concerning prostitution in SCL's Macau integrated resorts which appeared in the AP Article.  Specifically, Jacobs stated, "LVSC Senior Executives informed me that the prior prostitution strategy had been personally approved by Adelson." (Compl. ¶ 60.)  This statement by Jacobs is unequivocally false and was known by Jacobs to be false at the time it was made by him.  (Compl. ¶ 61.)

As the AP Article of which Defendants were obviously aware explains, Brad Brian, an attorney for LVSC and Sands China, Ltd., "called the allegations false and 'scurrilous' and claimed they had been included in the civil lawsuit brought by former Sands executive Steven Jacobs only to sensationalize the case."  (Harris Decl. Ex. E, p. 1).  The AP Article went on to note:

> Las Vegas Sands spokesman Ron Reese said in a statement that allegations of misconduct and wrongdoing by Jacobs against the company and senior managers are baseless.
>
> "Mr. Adelson has always objected to and maintained a strong policy against prostitution on our properties and any accusation to the contrary represents a blatant and reprehensible personal attack on Mr. Adelson's character," the statement said.
>
> In court, Brian told Clark County District Court Judge Elizabeth Gonzalez that if Jacobs "truly believed that Mr. Adelson had approved prostitution, he would have resigned." Instead, Brian said, Jacobs was fired.

*Id*.  The AP Article's coverage of the Jacobs Declaration disclosed that Jacobs had been fired, and included statements on behalf of LVSC and SCL setting forth Mr. Adelson's "strong policy

against prostitution," denying Jacob's accusations, and describing Jacob's malicious motive.  In short, the AP Article contained significant information alerting Defendants to the falsity of their accusations and to the bias and untrustworthiness of Jacobs, information that was utterly absent from Defendants' Petition.

Moreover, the actual events referred to in the Jacobs Declaration reveal Mr. Adelson's strong policy against prostitution in all his casinos, including those in Macau.  On Monday May 11, 2009, over three years before the Jacobs Declaration, Jacobs emailed Michael Leven, LVSC's President and COO, asking  if Mr. Adelson or anyone else at  LVSC "supported the decision" to "allow prostitution" in the Macau casinos despite the fact that it was  "seem[ingly] at odds with what I know to be Sheldon's 'no  tolerance' policy." (Compl. ¶ 62.)  Mr. Leven's response came the very next day: "I have investigated the alleged comments. . . . [T]here is no evidence that can be found that anyone here supported in anyway a different policy than we have in las vegas [sic] on these matters," i.e., the "no tolerance" policy. (Compl. ¶ 63.)

## V.     When Presented with Evidence of the Falsity of the Prostitution Accusation, Defendants Responded by Confirming the Petition's Purported Truthfulness

Only days after the defamatory Petition was published, Professor Dershowitz confronted Harris with documentary evidence of the falsity of Jacobs' prostitution accusations, including proof that Jacobs knew his accusations were false when he made them. (Compl. ¶¶ 64-65.) Professor Dershowitz's statements confirmed what Harris already knew from reading the AP Article: Jacobs was an unreliable, biased witness whose personal agenda was to harm Mr. Adelson, and whose allegations were so outrageous and improbable on their face as to raise serious doubts about their truth.  Harris's knowledge of falsity and of Jacobs' infirmities is fairly imputed to Stanley and the NJDC, and the NJDC is responsible for the malicious and reckless acts of its employee, Harris.

7

Despite their knowledge, Harris and Stanley authored the following article, which was posted on the NJDC's website when the Petition was removed on July 11, 2012 (hereinafter, the "Republication"). Although the Republication masqueraded as a retraction, it actually endorsed, republished, and affirmed the prior defamatory statements:

# Statement Regarding NJDC's Sheldon Adelson Petition

. . .

Regarding our recent campaign surrounding Sheldon Adelson, we don't believe we engaged in character assassination; *we stand by everything we said*, which was sourced from current, credible news accounts. Accusations against Mr. Adelson were made not by us, but by others, including Senator John McCain (R- AZ). Nonetheless, we regret the concern that this campaign has caused. And in the interest of shalom bayit (peace in our home/community), we are going to take down our petition today.  Moving forward, we'll continue to work hard to fight against the unique threat posed by the outsized influence of certain individual megadonors, which rightly concerns most Americans and most American Jews.

(Compl. Ex. C (italics added).)

## VI.   Defendants' Subsequent Opportunity to Follow the DCCC's Lead and Apologize and Retract

After publishing the Republication, Defendants were repeatedly presented with evidence of the falsity of their accusations, yet have to date refused to retract a single word.  On July 17, 2012, an attorney representing Mr. Adelson sent a letter to Defendants detailing the false and defamatory nature of the statements in the Petition and Republication and demanding a retraction and apology.   (Compl. ¶ 68.)   The next day, LVSC and SCL publicly filed in the *Jacobs* Proceeding the proof that Jacobs' allegation concerning Mr. Adelson was false and known by Jacobs to be false, which fact was reported by various news outlets, including the Wall Street Journal, on July 19, 2012.  (Compl. ¶ 69.)  Still, Defendants remained intransigent.

On August 2, 2012, the Democratic Congressional Campaign Committee ("DCCC")—

which had published statements substantially similar to the Petition's—publicly issued the

following retraction:

> In statements issued on June 29 and July 2, 2012, the DCCC made
> unsubstantiated allegations that attacked Sheldon Adelson, a supporter of the
> opposing party.  This was wrong.  The statements were untrue and unfair and we
> retract them.   The DCCC extends its sincere apology to Mr. Adelson and his
> family for any injury we have caused.

(Compl. ¶ 71.)   The following day, counsel for Mr. Adelson again contacted Defendants,

presented them with the DCCC retraction and apology and offered them yet another opportunity

to retract and apologize to Mr. Adelson.   Notwithstanding the fact that Defendants had every

reason to rely on the DCCC's judgment, which had concluded that substantially similar

statements based on the Jacobs Declaration were "unfair and untrue," Defendants again refused

to correct the public record and mitigate the damage they had inflicted with their false and

defamatory accusations.   (Compl. ¶ 72.)   Instead, Defendants left the Republication on their

website, thereby consistently republishing their reckless and knowingly false and defamatory

statements.

## VII.   Procedural Posture

Mr. Adelson filed his Complaint in this matter on August 8, 2012.   On September 21,

2012, Defendants filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), and a

special motion to dismiss under the District of Columbia's Anti-SLAPP statute.[3]   In their

---

[3] Per this Court's order of November 5, 2012, the briefing regarding Defendants' motions has been bifurcated.  With
this Response, Plaintiff is addressing: (1) choice of law; (2) applicability of the D.C. Act in a federal diversity
action; (3) the 12(b)(6) Motion to Dismiss; (4) to the extent the D.C. Act is found to apply, the Anti-SLAPP Motion,
including (a) whether Defendants have made a prima facie showing that the claim at issue arises from an act in
furtherance of the right of advocacy on issues of public interest, and (b) whether Mr. Adelson can demonstrate a
likelihood of success on the merits with respect to the three legal issues briefed in Defendants' moving papers; and
(5) the stay pending resolution of evidentiary issues in an ancillary Nevada state-court action.  Thus, Mr. Adelson
need not address his likelihood of success on the merits on the entirety of his claim, but only his likelihood of
successfully rebutting Defendants' arguments on the following three issues: (1) whether the defamatory statements

combined memorandum of law in support of both motions, Defendants argue that Mr. Adelson's Complaint should be dismissed for three reasons: (1) the defamatory statements are a privileged report of a judicial proceeding; (2) the defamatory statements are protected expressions of opinion; and (3) the defamatory statements are privileged "fair comment."  Defendants do not challenge the falsity of the defamatory statements or whether they are capable of a defamatory meaning.  Nor do Defendants offer any cognizable justification for their republication of the false statements, which republication is separately pled and actionable.   Pursuant to the briefing schedule applicable in this matter, Mr. Adelson's bifurcated response is due November 9, 2012, and Defendant's reply is due December 7, 2012.

## ARGUMENT

With 1,500 pages of proffered exhibits, an inadmissible hearsay affidavit of counsel, and a 45 page memorandum that is more vitriol than legal argument,[4] Defendants leave unchallenged the sufficiency of Mr. Adelson's complaint, or the false and defamatory nature of the statements at issue.   Indeed, the facts alleged are not in dispute: Defendants published the false and defamatory Petition; Defendants were told of its falsity by a credible and prominent member of their community, who then provided proof of the falsity, and questioned their exaggeration of their source's credibility; Defendants witnessed a tremendous apology for a similar libel by a political arm of the Democratic Party; and then Defendants maliciously republished their damaging lies in the Republication.

Despite Defendants' cursory analysis regarding choice of law and the application of D.C.'s Anti-SLAPP Statute to this matter, these threshold issues are determinative. Nevada law,

---

are a privileged report of a judicial proceeding; (2) whether the defamatory statements are protected expressions of opinion; and (3) whether the defamatory statements are privileged "fair comment."
[4] The irrelevant, inadmissible, and inappropriate "facts" submitted by Defendants in support of their motions to dismiss is the subject of a separate Motion to Strike being filed contemporaneously herewith.

not D.C law, applies to this action.  Moreover, if D.C. law were to apply, the D.C. Anti-SLAPP statute does not apply in Federal Court and cannot, consistent with the Seventh Amendment, be applied to the matter here in the manner urged by Defendants.  Even if this Court determines that D.C. law and the Anti-SLAPP statute apply, Mr. Adelson can show a likelihood of success on the merits regarding the three legal issues raised by Defendants in their brief sufficient to meet D.C.'s Anti-SLAPP statute requirements.

## I.    THE COURT SHOULD CHOOSE NEVADA LAW

This Court faces a single threshold question: Should Mr. Adelson be subjected to the laws of the District of Columbia even though he has no relationship with the jurisdiction, or should Defendants, who affirmatively defamed Mr. Adelson in Nevada, where he lives and works, be held accountable under Nevada law?  Based on the law of the Second Circuit and the State of New York, the law to be applied to this case is not, as Defendants argue, that of the District of Columbia, but the law of Nevada—the domicile of Mr. Adelson.

In a diversity case, the district court uses the choice of law rules of the forum state.  *Lee v. Bankers Trust Co.*, 166 F.3d 540, 545 (2d Cir. 1999).  For defamation cases, New York "applies the law of the state with the most significant interest in the litigation."  *Id.*  When the defamatory statement has been published in multiple states, "the state of the plaintiff's domicile will *usually* have the most significant relationship to the case," particularly when publication occurred in that state.  *Reeves v. Am. Broad. Cos., Inc.*, 719 F.2d 602, 605 (2d Cir. 1983) (emphasis added); *see* Restatement (Second) of Conflict of Laws § 150 (1971) [hereinafter Restatement of Conflicts].

"[P]erhaps because the choice of law issue in defamation cases arises less frequently in state court than in federal court," the New York Court of Appeals has not adopted a definitive test for assessing choice of law.  *Condit v. Dunne*, 317 F. Supp. 2d 344, 354 n.2 (S.D.N.Y. 2004).

11

As Defendants acknowledge in a footnote, New York courts have used a nine-factor test for determining which state's law applies in a multi-state defamation action.  *Zuck v. Interstate Publ'g Corp.*, 317 F.2d 727, 734 n.12 (2d Cir. 1963); *Davis v. Costa-Gavras*, 580 F. Supp. 1082, 1091 (S.D.N.Y. 1984). The nine-factor test provides "guidance consonant with the body of New York law on multistate defamation cases."  *Condit*, 317 F. Supp. 2d at 354.  Some New York federal courts have also sought guidance from the Restatement of Conflicts and performed ad hoc analyses of the litigants' contacts with various states.[5]  *See, e.g.*, *Davis*, 580 F. Supp. at 1091-93 (applying the nine-factor test, but also taking an ad hoc approach that incorporated the Restatement of Conflicts).

No matter the test applied, in multistate defamation actions with the same confluence of factors present here, <u>virtually no courts</u> have subjected a plaintiff to the law of the defendant's domicile. *See, e.g.*, *Condit*, 317 F. Supp. 2d at 355; *La Luna Enters., Inc. v. CBS Corp.*, 74 F. Supp. 2d 384, 389 (S.D.N.Y. 1999) (choosing Florida law when plaintiff's Florida restaurant business had no connection with New York, the defendant's domicile); *Machleder v. Diaz*, 538 F. Supp. 1364, 1369 (S.D.N.Y. 1982) (opting for New Jersey law when defamatory news report related to plaintiff's alleged connection to New Jersey toxic waste, rather than defendants' New York domicile).  Accordingly, under the nine-factor test, the Restatement approach, or an ad hoc approach, Mr. Adelson should not be subjected to the law of the District of Columbia merely because two of the three Defendants reside there and Defendants may have launched their national attack from there.

### A.     The Nine-Factor Test Requires the Application of Nevada Law

The nine-factor test requires courts to weigh the following factors:

---

[5] The danger of departing from the nine-factor test, however, is that a court may ignore factors that focus on a plaintiff's relationships, and thereby give undue wait to the factors that delve into a defendant's connections to a given state.

> (1) the state of plaintiff's domicile; (2) the state of plaintiff's principal activity to
> which the alleged defamation relates; (3) the state where plaintiff in fact suffered
> the greatest harm; (4) the state of the publisher's domicile or incorporation; (5)
> the state where defendant's main publishing office is located; (6) the state of
> principal circulation; (7) the place of emanation; (8) the state where the libel was
> first seen; and (9) the law of the forum.

*Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 360 (S.D.N.Y. 1998). As can be seen in the
analysis below, the nine-factor test weighs in favor of applying the law of Nevada.

It is undisputed that the first three factors favor choosing Nevada law in this instance.
First, Nevada is the state of Plaintiff's domicile.  Second, Nevada has the closest relationship
with the principal activity of Mr. Adelson to which the defamation relates.  Although Defendants
wish to define the principal activity as Plaintiff's campaign contributions, the actual activity
discussed by the defamatory statements at issue is Mr. Adelson's policy on prostitution in his
casinos and how his business practices affect his personal funds.  Mr. Adelson promulgates these
policies in Nevada and conducts his business from Nevada—the state in which he manages his
personal funds.  Third, Plaintiff has suffered greatest harm in Nevada.  Plaintiff may have an
international reputation as a philanthropist, businessman, and political donor, but Plaintiff's
business reputation is at the root of his ability to earn a living.  Indeed, the defamatory statements
attack Mr. Adelson's casino business, which he unquestionably oversees from his residence in
Nevada.

Defendants tacitly concede that factors six, eight, and nine do not favor District of
Columbia law, and are at a minimum neutral.  The Petition, which was circulated internationally
on the World Wide Web, invites recipients to "spread the word" via Facebook; thus, there is no
single state of principal circulation. The libel was first read internationally by countless
individuals at virtually the same time.  And New York—the forum state—has little to no interest
in applying its own law.

13

Although the fourth, fifth, and seventh factors point to the District of Columbia—two of the three Defendants, Mr. Harris and the NJDC, are domiciled in the District of Columbia, the NJDC has one of its offices there, and the defamatory statements may have emanated from this office—these three limited factors alone do not require a finding that District of Columbia law applies. *See, e.g.*, *Machleder*, 538 F. Supp. at 1369-1370 (applying New Jersey law even though defendants were domiciled in New York, "where the news report was conceived, edited and broadcast"). In fact, a plaintiff has never been subjected to the law of the defendant's domicile based on only these factors alone, likely because these factors do not speak to a plaintiff's relationship with a given state.

Taken as a whole, the nine factors show that Nevada is the only state that has a significant relationship with all the parties, coinciding with the general rule that the law of the plaintiff's domicile applies in a multistate defamation action. "Justice in conflicts rules, as in jurisdiction, requires minimal contacts with another forum before subjecting the nondomiciliary to its laws." *Davis*, 580 F. Supp. at 1093. Unlike Mr. Adelson's lack of connection to D.C., the nine-factor analysis shows that Defendants have forged a relationship with Nevada. Not only have Defendants thrust themselves into Nevada by making affirmative statements about the policies Mr. Adelson allegedly promulgates from Nevada, but Defendants' defamatory remarks were published via the Internet in Nevada, and undoubtedly widely read and discussed in Nevada, causing Mr. Adelson to suffer reputational harm in Nevada.

The requirements of justice would be offended if Mr. Adelson were subjected to the laws of the District of Columbia despite the other six factors revealing that he has no relationship to that forum. Defendants have forged a relationship with Nevada by making affirmative statements about a Nevada businessman and by publishing statements intended to be read nationwide,

14

including in Nevada.[6]  In short, because Plaintiff has been harmed in his home state of Nevada, which is the only state that has a relationship with all the parties, Nevada has the most significant relationship to this case.  Accordingly, this Court should enforce the default rule and apply the law of Plaintiff's domicile—Nevada.

## B.   The Restatement of Conflicts Approach Requires the Application of Nevada Law

The result is the same under the Restatement of Conflicts approach.  Section 150 of the Restatement of Conflicts specifically addresses choice of law for multistate defamation cases. Restatement of Conflicts § 150.  This section provides that  when a "person claims that he has been defamed by an aggregate communication, the state of most significant relationship will usually be the state where the person was domiciled at the time, if the matter complained of was published in that state."  *Id.* at § 150(2).  This default choice must <u>not</u> be disturbed "unless, with respect to the particular issue, some other state has a more significant relationship to the occurrence *and* the parties."  *Id.* at § 150 cmts. b, e (emphasis added).  Thus, the Restatement of Conflicts strongly counsels against departing from the law of a plaintiff's domicile.  The only instance in which such departure is appropriate is if another state has a more significant relationship with both the occurrence *and the parties*, not just one or the other. *See, e.g.*, *Condit*, 317 F. Supp. 2d at 355 (using a mixed approach to choice of law, which included the Restatement of Conflicts, and refusing to depart from the law of the state in which the plaintiff was domiciled because plaintiff had no specific connection to defendant's home state).

Section 150 also references other parts of the Restatement, such as section 145, which courts have turned to when taking an issue-based approach that focuses on the policy interests of

---

[6] Moreover, one of the purposes of Defendants' defamation was to deter Mr. Adelson from making a monetary contribution to Mr. Romney's campaign from Nevada, and deter Mr. Romney from accepting a campaign contribution from Nevada.

a forum state. *See, e.g., Davis,* 580 F. Supp. at 1091-93.[7]  Even if this court employs an issue-based analysis regarding the relative policy interests of Nevada and the District of Columbia in having the respective anti-SLAPP statutes apply, there is no reason to favor one jurisdiction's interest other another.  For example, in *Condit,* a media defendant advocated for New York law, which "extends greater protection to the media"; whereas, the plaintiff argued that California's protective defamation law applied.  *Condit,* 317 F. Supp. 2d at 355.  The court found that California and New York's policy interests offset, as each jurisdiction had a valid interest in protecting its citizens.  *Id.*  Ultimately, the *Condit* court chose the law of the plaintiff's domicile based, *inter alia*, on the following:

> [N]one of the conduct about which defendant spoke took place in New York, and plaintiff ha[d] no specific connection to New York.  Moreover, defendant's comments also had no specific connection to New York, except that defendant happened to be physically present in New York when he uttered the statements that were broadcast nationwide.

*Id.*  As in *Condit,* both Nevada law and District of Columbia law speak to the given issue—ostensible SLAPP suits—and the interests of both jurisdictions offset.  Just like *Condit,* Mr. Adelson has no specific connection to the foreign jurisdiction (the District of Columbia) as it relates to the activity for which he was defamed, and the Defendants' defamatory comments have no specific connection to the District of Columbia, except that Defendants may have been there when they attacked Mr. Adelson.  As was the case in *Condit,* the policy issues here should

---

[7] Although the *Davis* court, relying in part on section 150, subjected the plaintiffs to the law of the forum with which they had no relationship, it did so by misapplying and misquoting the Restatement.  *Davis,* 580 F. Supp. at 1091-93. Misquoting section 150, the *Davis* court wrote that the presumption that the law of the plaintiff's domicile applies "does not hold true, however, if 'with respect to the particular issue, some other state has a more significant relationship to the issue *or* the parties.'" *Id.*  (misquoting the Restatement of Conflicts § 150 cmt. e) (emphasis added).  The Restatement actually requires a relationship with both the "occurrence *and* the parties."  Restatement of Conflicts § 150 cmts. b, e (emphasis added).  The *Davis* court, in fact, made additional alterations to section 150 by changing the word "occurrence" to "issue." *Davis,* 580 F. Supp. at 1091 (misquoting the Restatement of Conflicts § 150 cmt. e).  The court then relied on section 145, framing the issue in terms of the rules for distributing liability among the defendants, most of whom had strong relationships with the forum state. *Id.* at 1092-93.  By making these alterations to section 150, and framing the issue in terms of the forum's interests, the court provided a rationale for subjecting the plaintiffs to the laws of the forum state with which they had no relationship. *Id.* at 1091-93.  The actual language of the section 150 does not allow for such an outcome.

not disturb the default preference for the law of the plaintiff's domicile.  Nevada is the only state that has a relationship with all the parties, whereas the District of Columbia does not have a relevant relationship to Mr. Adelson; therefore, the court should not depart from Nevada law.

   **C.    Ad-Hoc Approach Does Not Weigh in Favor of District of Columbia Law**

   In the few New York cases in which a plaintiff has been subjected to the law of a state to which he had no relationship, the court opted for the law of the forum state, rather than some other foreign jurisdiction.  In these cases, at least one of the following conditions was present: the plaintiff acquiesced to the choice of law, the forum state had overriding policy interests, or at least five factors from the nine-factor test tilted towards the forum state, which was also the defendant's domicile.  *See, e.g.*, *Jewell*, 23 F. Supp. 2d at 359-60 (choosing the law of defendants' New York domicile—absent any contest from plaintiff—based on finding that factors four through nine favored New York); *Levin v. McPhee*, 917 F. Supp. 230, 236 n.3 (S.D.N.Y. 1996) ("The parties have assumed for the most part that New York law applies and have expressed the opinion that New York and District of Columbia law may not differ in ways relevant to this case."); *Davis*, 580 F. Supp. at 1091 (selecting the law of New York—the forum state—when six factors favored New York, most of the defendants were domiciled in New York, and New York, as the forum state, had a strong interest in regulating the intrastate relationship among the defendants).

   Here, Defendants are not advocating for the law of the forum state—New York—but that of an entirely unrelated jurisdiction—the District of Columbia.  Based on the applicable law outlined above, whether this Court looks to the nine-factor test, the Restatement (Second) of Conflict of Laws, or some other ad hoc approach, the overwhelming weight of case law counsels against subjecting Mr. Adelson to the laws of the District of Columbia.  Only three of the nine factors in the nine-factor test point to the District of Columbia, and New York, as the forum state

has no policy interests weighing in favor of applying any law other than Nevada.  Neither Mr. Adelson nor the subject of the defamatory statements (Mr. Adelson's business policies) have any connection to the District of Columbia.  Nevada is the only jurisdiction that has a relationship, significant or otherwise, with Mr. Adelson, the Defendants, and the occurrence; thus, Nevada law must be applied to Mr. Adelson's defamation claim.

### D.    Defendants' Choice of Law Arguments are Unavailing

In dismissing the correct choice of law analysis, Defendants misstate the frequency with which courts depart from the default presumption favoring the law of a plaintiff's domicile, take a simplistic and incorrect ad hoc approach to assessing choice of law, and incorrectly apply the nine-factor test.

First, Defendants failed in their attempt to undercut the default presumption that, in a multistate defamation action, a court "usually" applies the law of the plaintiff's domicile.  *Grass v. News Group Publ'ns, Inc.*, 570 F. Supp. 178, 185 (S.D.N.Y. 1983) (citing Restatement of Conflicts § 150(2), cmt. e).  Defendants argue that courts "often apply the law of the state where the allegedly defamatory statements were drafted and published[8] rather than of the state where the plaintiff resides."  (Defs.' Br. 23 (citing *Grass*, 570 F. Supp. at 185; *Collins v. Flynn*, 08-CV-59S, 2008 WL 3851842, at *3 (W.D.N.Y. Aug. 15, 2008)).)  Neither case cited by Defendants in support of this argument addresses the frequency with which courts depart from the default presumption regarding plaintiff's domicile; indeed, many of the cases cited by Defendants explicitly recognize that the law of the plaintiff's domicile "usually" applies.  (*See* Defs.' Br. 23 & n.17 (citing *Grass*, 570 F. Supp. at 185;  *Berwick v. New World Network Int'l, Ltd.*, No. 06-

---

[8] The term "published" has an idiosyncratic meaning in the context of defamation.  A statement is published once a third party reads it.  Because Nevada is among the states where Defendants published their defamatory statements, Defendants' statement of law does little to assist their defense.  Perhaps Defendants intended to use the term "emanated."

CV-2641-JGK, 2007 WL 949767, at *7 (S.D.N.Y. Mar. 28, 2007); *Qureshi v. St. Barnabas Hosp. Ctr.*, 430 F. Supp. 2d 279, 286 (S.D.N.Y. 2006)).)

Second, Defendants creative ad hoc approach to assess which jurisdiction has the most significant relationship to this case is a simplistic, unprincipled analysis of facts, devoid of relevant case law or principled legal analysis.  (*See* Defs.' Br. 24-25.)  Defendants begin by claiming that because Mr. Adelson has an international reputation and he opted against litigating in Nevada, "any assumption that his claimed reputational injury is focused in Nevada, or that Nevada law should apply, is inapplicable here." (Defs.' Br. 24 (citing *In re Payroll Exp. Corp.*, No. 92-B-43150-CB, 2005 WL 2438444, at *13 (Bankr. S.D.N.Y. Mar. 30, 2005)).)  The case Defendants use to support this argument is an inapplicable bankruptcy proceeding addressing choice of law for a contract claim, and the strong statement of law quoted by Defendants is wholly unsupported in that case. *In re Payroll Exp. Corp.*, 2005 WL 2438444, at *13.

Defendants, however, did not need to venture outside the realm of multistate defamation in order to glean the law.  In *La Luna Enterprises*, the court chose Florida law when a Florida plaintiff filed a defamation suit in New York against New York defendants.  74 F. Supp. 2d at 389.  The court did not find that the plaintiff opted against Florida law by suing in New York, or that the plaintiff's injury was not centered in Florida by virtue of the New York forum.  *Id.*; *see also Condit*, 317 F. Supp. 2d at 354-55 (choosing California law when a California citizen with a national reputation sued a New York citizen in a New York court). Defendants' argument to the contrary is inapplicable and irrelevant.

Defendants then focus on their own connections with the District of Columbia and strain to link Mr. Adelson with their home jurisdiction.  Defendants argue that the District of Columbia has the most significant relationship because the defamatory statements relate to the money that

Mr. Adelson donated "to influence the 2012 presidential election," and because the election is allegedly centered in the District of Columbia. (Defs.' Br. 25.)  Not only is a nationwide election for President of the United States not centered in the District of Columbia, where little to no campaigning, campaign headquarters, or campaign activities occur, but the defamatory statements at issue here relate to Mr. Adelson's business decisions—specifically whether he approves of prostitution—not the Presidential election.  Mr. Adelson's business decisions are made in Nevada, and his personal funds are managed from Nevada.  Indeed, Mr. Adelson has not alleged that he was defamed by the statements that he donated money in support of Republican candidates.  Instead, Mr. Adelson alleges he was defamed by Defendants' repeatedly affirmed and republished accusations that he "**'personally approved' of prostitution**" in his casinos.

In a similar vein, Defendants attempt to drag Mr. Adelson into the District of Columbia by pointing to additional irrelevant "facts" that are ostensibly related to the District.  Defendants argue that the Petition concerns remarks by Senator McCain about foreign money, the Foreign Corrupt Practices Act, and contributions that might be regulated by the Federal Elections Commission.  These concerns, however, are wholly irrelevant to the defamatory statements about Mr. Adelson's policies regarding prostitution.  When analyzing choice of law, the focus is whether a jurisdiction has a relationship to the parties as it pertains to the defamatory statements; the focus is not upon the locus of the irrelevant actions of third parties.

Defendants' arguments fail to illustrate how the District of Columbia has the most significant relationship to the parties and the case.  Therefore, this Court should enforce the laws of the state of the Nevada—the state with the most significant relationship.

20

II.   **EVEN IF DISTRICT OF COLUMBIA LAW APPLIES, THIS COURT CANNOT APPLY THE D.C. ANTI-SLAPP STATUTE BECAUSE IT IS UNCONSTITUTIONAL UNDER THE SEVENTH AMENDMENT**

The Seventh Amendment to the United States Constitution provides: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."  U.S. Const. amend. VII.  The Federal Rules of Civil Procedure, governing cases in the federal courts, provide that "[t]he right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States shall be preserved to the parties inviolate." Fed. R. Civ. P. 38(a). The right to a jury trial "is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." *GTFM, LLC v. TKN Sales, Inc.*, 257 F.3d 235, 238 (2d Cir. 2001) (quoting *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 501, 79 S. Ct. 948, 3 L. Ed. 2d 988 (1959) (internal quotation and citation omitted)).

To be constitutional, the D.C. Act must be "consist[ent] with the letter and spirit of the constitution" and, specifically, the Seventh Amendment.  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2579 (June 28, 2012) (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 405, 4 L. Ed. 579 (1819)).  Even a cursory examination of the D.C. Act demonstrates its direct and egregious curtailment of the right to a jury trial, and its direct conflict with the above-quoted language and spirit of the Seventh Amendment.

Per the D.C. Act, if "a party filing a special motion to dismiss . . . makes a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest, then the motion shall be granted unless the responding party

demonstrates that the claim is likely to succeed on the merits. . . ."  D.C. Code § 16-502.  In other words, the Court must make determinations of disputed issues of material fact, weigh evidence, and determine whether a plaintiff's claims are "likely to succeed on the merits."  If, after weighing the evidence, the Court determines a plaintiff cannot meet this burden, the Court must grant the motion to dismiss.  Such detailed and extensive fact-finding, and determination of disputed issues of fact, without the involvement of the jury, is in direct conflict with the language and spirit of the Seventh Amendment.  "The Supreme Court has made it quite clear that Rule 56 sets the outer boundary for dismissing claims on the merits based upon a pretrial evaluation of the evidence; to go further infringes upon the Seventh Amendment right to a jury trial."  *3M Co. v. Boutler*, No. 11-cv-1527, 2012 WL 5245458, * 1 (D.D.C. October 24, 2012).  The D.C. Act is unconstitutional and should not be applied to the matter here.

## III.   EVEN IF DISTRICT OF COLUMBIA LAW APPLIES, THIS COURT CANNOT APPLY THE D.C. ANTI-SLAPP STATUTE BECAUSE IT IS IN DIRECT CONFLICT WITH THE FEDERAL RULES OF CIVIL PROCEDURE

The D.C. Act cannot be applied by a federal district court sitting in diversity because it treads upon multiple valid Federal Rules of Civil Procedure.  *3M Co. v. Boutler*, 842 F. Supp. 2d 85, 111 (D.D.C. 2012).  The Supreme Court has set forth a "familiar framework" for assessing the supremacy of a federal rule of civil procedure. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431, 1437, 176 L. Ed. 2d 311 (2010). First, a court must determine whether the federal rule "answers the question in dispute." *Id.* (citing *Burlington N.R.R. Co. v. Woods*, 480 U.S. 1, 4–5, 107 S. Ct. 967, 94 L. Ed. 2d 1 (1987)). Second, if the federal rule provides the answer, then it governs, unless it "exceeds statutory authorization or Congress's rulemaking power." *Id.* (citing *Burlington N.*, 480 U.S. at 5, 107 S. Ct. 967; *Hanna v. Plumer*, 380 U.S. 460, 463–464, 85 S. Ct. 1136, 14 L.Ed.2d 8 (1965)).  A court need "not wade into

Erie's murky waters unless the federal rule is inapplicable or invalid." *Id.* (citing *Hanna*, 380 U.S. at 469–471, 85 S. Ct. 1136).

The D.C. Act allows a "party to file a special motion to dismiss any claim arising from an act in furtherance of the right of advocacy on issues of public interest within 45 days after service of the claim." D.C. Code § 16-5502(a). If the movant meets its burdens under the D.C. Act, "then the motion shall be granted [with prejudice] unless the responding party demonstrates that [its] claim is likely to succeed on the merits, in which case the motion shall be denied." *Id.* at (b), (d). The special motion triggers a stay of discovery, unless "it appears likely that targeted discovery will enable the plaintiff to defeat the motion and that the discovery will not be unduly burdensome." *Id.* at (c). In which case, "the court may order that specified discovery be conducted, which might "be conditioned upon the plaintiff paying any expenses incurred by the defendant in responding to such discovery." *Id.* Because the D.C. ACT directly collides with Rule 12, Rule 26, and Rule 56 of the Federal Rules of Civil Procedure, and those rules were adopted in accordance with Congress's rule making authority, the D.C. Act cannot be applied in federal court.

### A.     The Federal Rules of Civil Procedure Answer the Question in Dispute

The D.C. Act directly collides with Rules 12, 41, and 56. When deciding if a federal rule answers the question in dispute, courts have asked whether there is a "direct collision" between the federal rule and state law. *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 27-28 & n.4, 108 S. Ct. 2239, 2242, 101 L. Ed. 2d 22 (1988). The federal law and state law need not be "perfectly coextensive and equally applicable to the issue at hand; rather, the 'direct collision' language, at least where the applicability of a federal [law] is at issue, expresses the requirement that the

federal [law] be sufficiently broad to cover the point in dispute."[9]  *Id.* at 27 n.4.  A federal rule

cannot "be narrowly construed in order to avoid a 'direct collision' with state law."  *Walker v.*

*Armco Steel Corp.*, 446 U.S. 740, 750, 100 S. Ct. 1978, 1985, 64 L. Ed. 2d 659 (1980); *see*

*also Shady Grove,* 130 S. Ct. at 1442 (recognizing that a court must not "contort" a federal rule,

"even to avert a collision with state law . . . ").

> Regarding Rules 12 and 56, the United States District Court for the District of Columbia

explained that:

> the text and structure of Rules 12 and 56 were intended to create a system of
> federal civil procedure requiring notice pleading by plaintiffs, whereby a federal
> court may dismiss a case when the plaintiff fails to plead sufficiently detailed and
> plausible facts to state a valid claim, but a federal court may not dismiss a case
> without a trial based upon its view of the merits of the case after considering
> matters outside of the pleadings, except in those instances where summary
> judgment under Rule 56 is appropriate.

*3M Co.*, 842 F. Supp. 2d at 107.  Not only are Rule 12 and Rule 56 broad enough to cover the

point in dispute—the sufficiency of a defamation claim—these rules "govern all categories of

cases and provide the exclusive means by which a motion may challenge the sufficiency of a

claim." *3M Co.*, 842 F. Supp. 2d at 107 (internal quotation marks omitted).  Neither Rule 12 nor

Rule 56 allow a court to displace the fact-finder and adjudicate a claim by weighing conflicting

evidence and determining which party is likely to succeed.  *3M Co.*, 842 F. Supp. 2d at 106-08

(citing Fed. R. Civ. P. 12(b), (d), & 56).  "[B]ecause the D.C. Act requires the court to undertake

a fact-finding role, even where there is a genuine issue of material fact, the statute directly

collides with the prohibition of Rules 12(d) and 56." *3M Co.*, 842 F. Supp. 2d at 108.

---

[9] Part II.B of *Shady Grove*—which was joined by a majority of the justices—appeared to move away from the established "direct collision" standard in favor of an inquiry as to whether the federal rule answered the question in dispute.  Nevertheless, Part II.B discussed the "direct collision" between the federal and state rules at issue, citing to both *Walker* and *Hanna*.  *Shady Grove*, 130 S. Ct. at 1442 & n.8, 176 L. Ed. 2d 311.

Moreover, the D.C. Act directly collides with Rule 56 by subjecting plaintiffs to the rigors of evidence-based adjudication, yet depriving them of the right to discovery. While Rule 56(d) gives courts discretion "to disallow discovery when the non-moving party cannot yet submit evidence supporting its opposition, the Supreme Court has restated the rule as requiring, rather than merely permitting, discovery 'where the nonmoving party has not had the opportunity to discover information that is essential to its opposition.'" *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).[10]   In contrast, the D.C. Act makes discovery the exception, not the rule. When faced with this conflict, courts have refused to enforce the discovery limitations imposed by anti-SLAPP statutes. *See, e.g.*, *Metabolife*, 264 F.3d at 846; *Rebel Commc'ns, LLC v. Virgin Valley Water Dist.*, 2:10-CV-0513-LRH-PAL, 2011 WL 3841340, at *1-2 (D. Nev. Aug. 25, 2011); *Nguyen v. Cnty. of Clark*, 732 F. Supp. 2d 1190, 1194 (W.D. Wash. 2010); *Nixon v. Haag*, No. 1:08-CV-00648-LJM-JMS, 2009 WL 2026343, at *3-4 (S.D. Ind. July 7, 2009).

The D.C. Act also robs district courts of their discretion under Rules 12(b) and 41 by mandating dismissal with prejudice. *See* D.C. Code § 16-5502(d). "This is a direct conflict with the Federal Rules, which do not mandate dismissal with prejudice in every circumstance, and which in fact vest a district court with discretion to determine whether a dismissal under Rule 12(b) would operate as an adjudication on the merits." *3M Co.*, 842 F. Supp. 2d at 104 (citing Fed. R. Civ. P. 41(b); *Best v. Kelly*, 39 F.3d 328, 331 (D.C. Cir. 1994)).

---

[10] The former Rule 56(f)—discussed in *Metabolife*—has been carried forward in 56(d), without substantial change. Fed. R. Civ. P. 56(d); Advisory Committee's Note, 2010 Amendments.

### B.      Federal Rules of Civil Procedure 12, 41, and 56 Do Not Violate the REA

Turning to the second step of the analysis, Rules 12, 41, and 56 "will govern unless they were adopted in violation of the Rules Enabling Act ("REA"), 28 U.S.C. § 2072." *3M Co.*, 842 F. Supp. 2d at 100 (citing *Shady Grove*, 130 S. Ct. at 1442, 176 L. Ed. 2d 311). Compliance with the REA is solely a function of the Federal Rule in question, without regard the conflicting state law. *Shady Grove*, 130 S. Ct. at 1444, 176 L. Ed. 2d 311 (citing *Hanna*, 380 U.S. at 471, 85 S. Ct. 1136; *Sibbach v. Wilson & Co.*, 312 U.S. 1, 13-14, 61 S. Ct. 422, 426, 85 L. Ed. 479 (1941)). "The test [is] . . . whether a rule really regulates procedure—the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them." *Sibbach*, 312 U.S. at 14, 61 S. Ct. at 426, 85 L. Ed. 479. Thus, "it is not the substantive or procedural nature or purpose of the affected state law that matters, but the substantive or procedural nature of the Federal Rule." *Shady Grove*, 130 S. Ct. at 1444. [11]

Rules 12, 41, and 56 are quintessentially procedural rules.  Rules 12 and 56 regulate the judicial process for pre-trial adjudication of a claim.  *3M Co.*, 842 F. Supp. 2d at 110 (citing Fed. R. Civ. P. 12 & 56).  And Rule 41 governs the procedure for determining the nature of a dismissal.  Fed. R. Civ. P. 41.  Accordingly, the D.C. Act cannot be applied in the federal courts because it directly collides with Rules 12, 41, and 56—all of which answer the issue in dispute— and these rules are valid under the REA.  *3M Co.*, 842 F. Supp. 2d at 96, 102, 106, 111; s*ee also Stuborn Ltd. P'ship v. Bernstein*, 245 F. Supp. 2d 312, 316 (D. Mass. 2003) (citing *Hanna*, 380 U.S. at 463–465, 85 S.Ct. 1136, 14 L.Ed.2d) (supplanting anti-SLAPP statute's discovery

---

[11] In *Shady Grove*, Justice Stevens' concurrence, which proposed an alternate approach to the REA analysis, is not the law in the District of Columbia as it was not joined by other justices.  *See King v. Palmer*, 950 F.2d 771, 782 (D.C. Cir. 1991) ("When eight of nine Justices do not subscribe to a given approach to a legal question, it surely cannot be proper to endow that approach with controlling force, no matter how persuasive it may be.").

procedures with those of the Federal Rules of Civil Procedure because of the direct collision between the two).

The D.C. Act cannot be applied by this Court because the Act answers the same questions as Federal Rules of Civil Procedure 12, 41, and 56, and these federal rules comply with the REA.  *3M Co.*, 842 F. Supp. 2d at 111.  As a result, this Court must deny Defendants' Special Motion to Dismiss in its entirety.

### C.    Defendants Have Not Shown that the D.C. Act Can Be Applied Here

Defendants' arguments about the applicability of the D.C. Act in this action are ill-supported and incorrect.  "The D.C. Act is a summary dismissal procedure that the Defendants … seek to clothe in the costume of the substantive right of immunity—but this is largely a masquerade."  *3M Co.*, 842 F. Supp. 2d at 111.  The D.C. Council could have simply granted immunity from SLAPP suits that could be invoked via Rule 12 or 56 motions, similar to existing substantive immunities, but chose not to do so.  *Id.* at 108.  "Instead, the Council mandated a dismissal procedure that directly conflicts with the operation of the federal rules as required" by the Federal Rules of Civil Procedure, and is not primarily substantive.  *Id.*

Defendants cite a string of cases to support their argument that the D.C. Act applies, only two of which even discuss the D.C. Act.  Of those two, one is *3M Co.*, in which, after an exhaustive eighteen-page analysis, the court concluded that the D.C. Act cannot be applied in a diversity action, 842 F. Supp. 2d at 94-111; the other, *Farah v. Esquire Magazine, Inc.*, No. 11-CV-1179 RMC, 2012 WL 1970897 (D.D.C. June 4, 2012), is an unpublished order that comes to the opposite conclusion via a three-sentence footnote, *id.* at *6 n.10.  The court's reasoning in *Farah* is not wholly evident, and it appears the court did not apply the correct standard, decreeing that state laws with substantive consequences must be applied by federal courts.  *Farah*, 2012 WL 1970897, at *6 n.10 (citing *Erie v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L.

Ed. 1188 (1938)).  This is not the test.  A court must first decide if a federal rule answers the question in dispute, and if it does, the substantive consequences of a state rule are irrelevant.[12] *Shady Grove*, 130 S. Ct. at 1437, 1442, 176 L. Ed. 2d 311.  The purported substantive consequences of the D.C. Act have little, if any, relevance to whether Rules 12, 41, and 56 answer the question in dispute, or whether these rules were adopted in violation of the REA. Defendants' arguments to the contrary are without merit and the D.C. Act should not apply in this instance.

## IV.   STANDARD OF REVIEW: 12(b)(6) MOTION TO DISMISS AND ANTI-SLAPP SPECIAL MOTION TO DISMISS

An individual's interest in his reputation is a basic concern.  *Herbert v. Lando*, 441 U.S. 153, 169 (1979).  The right to the protection of one's "own good name 'reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty.'" *Gertz v. Robert Welch, In*c., 418 U.S. 323, 341 (1974) (quoting *Rosenblatt v. Baer*, 383 U.S. 75, 92 (1966)) (concurring opinion).  Mr. Adelson has brought suit against Defendants in order to protect his good name and protect his fundamental interest in his reputation.  Under either a Federal Rule of Civil Procedure 12(b)(6) standard, or the D.C. Act's standard, Mr. Adelson has adequately pled his claims in his Complaint, and Defendants' motions should be denied.[13]

---

[12] *Farah* also relied on a D.C. district court case not directly on point.  *Farah*, 2012 WL 1970897, at *6 n.10 (citing *Sherrod v. Breitbart*, 843 F. Supp. 2d 83 (D.D.C. 2012)).  The issue before the court in *Sherrod* was whether the D.C. Act applied retroactively, which is a function of whether the law is substantive or procedural.  The court held the D.C. Act, at the very least, had substantive consequences, thus deciding against applying it retroactively.

[13] Although Plaintiff is providing the following analysis under both the 12(b)(6) standard and the D.C. Act standard, as explained above, the D.C. Act should not be applied and Plaintiff should be required to only satisfy the lesser burden of 12(b)(6).

### A.     12(b)(6) Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' . . . The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ahlers v. Rabinowitz*, 684 F.3d 53, 60 (2d Cir. 2012) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)). Rule 8 of the Federal Rules of Civil Procedure "requires that each pleading be specific enough to afford defendant sufficient notice of the communications complained of to enable him to defend himself." *Biro v. Conde Nast*, No. 11-Civ.-4442-JPO, 2012 WL 3234106, at *9 (S.D.N.Y. Aug. 9, 2012) (quoting *Gristede's Foods, Inc. v. Poospatuck (Unkechauge) Nation,* No. 06-Civ.-1260, 2009 WL 4547792, at *8–9 (E.D.N.Y. Dec. 1, 2009) (citations omitted)); *see also Thai v. Cayre Group, Ltd.,* 726 F. Supp. 2d 323, 329 (S.D.N.Y. 2010) ("A defamation claim is only sufficient if it adequately identifies the purported communication, and an indication of who made the communication, when it was made, and to whom it was communicated.") (quoting *Gargiulo v. Forster & Garbus Esqs.*, 651 F. Supp. 2d 188, 192 (S.D.N.Y. 2009) (internal quotation marks omitted)).   Mr. Adelson's Complaint adequately pleads a claim for defamation against Defendants, and Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) should be denied.

### B.     D.C. Act Standard of Review

Per the D.C. Act,

> If a party filing a special motion to dismiss under this section makes a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest, then the motion shall be granted unless the responding party demonstrates that the claim is likely to succeed on the merits, in which case the motion shall be denied.

D.C. Code § 16-5502.  In other words, a plaintiff is required under the D.C. Act to demonstrate a likelihood of success on the merits of his defamation claim before he is allowed to proceed with pursing his case. As will be shown below, Mr. Adelson can meet this burden regarding the specific legal arguments raised by Defendants in their special motion to dismiss, and Defendants' special motion to dismiss pursuant to the D.C. Act should be denied.

## V.    DEFENDANTS PUBLISHED THE PETITION AND REPUBLICATION WITHOUT PRIVILEGE

Defendants argue in their combined memorandum of law in support of both their motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and their special motion to dismiss pursuant to the D.C. Act, that Mr. Adelson's Complaint should be dismissed on three legal grounds: (1) the Petition and Republication are privileged reports of a judicial proceeding; (2) the Petition and Republication are protected expressions of opinion; and (3) the Petition and Republication are privileged "fair comment." Tellingly, Defendants do not challenge the sufficiency of Mr. Adelson's well-pled Complaint, whether the complained of statements are false, or whether they are capable of a defamatory meaning.  And they virtually concede the validity of the claim regarding the Republication, relegating any discussion to a single footnote in their 45-page memorandum of law. Their lone footnote notwithstanding, nothing in Defendants' brief supports the dismissal of the Republication claim or the Petition claim. Moreover, the Republication was published with actual knowledge of the falsity of the underlying statement and in the face of an actual apology by a Congressional political arm. The Republication was little more than an arrogant display of contempt for the reputation of Mr. Adelson cloaked in a misguided attempt to justify the refusal to apologize.

Contrary to Defendants' arguments, Defendants' publications of the Petition and Republication were not privileged: Defendants were not reporting on a judicial proceeding when

they accused Mr. Adelson of approving of prostitution, nor were Defendants' statements that Mr. Adelson's money was dirty and tainted protected opinion or fair comment.   Moreover, the Republication was done with actual knowledge of the falsity of the underlying statement and in the face of an actual apology by the DCCC.   Notwithstanding the seemingly undisputed facts of the Republication—virtually ignored by Defendants in their motion—they ask the Court to sweep out the entire Complaint based on untenable legal arguments and their continued character assassination.

**A.      The Petition and Republication Are Not Privileged Reports of Judicial Proceedings**

Defendants contend that their statements regarding Mr. Adelson's alleged prostitution policy are privileged reports of a judicial proceeding.   In doing so, Defendants turn the fair report privilege on its head and create a new rule of law out of whole cloth.   Under District of Columbia law, "a defendant must clear two major hurdles to qualify for the fair report privilege": (1) adequate attribution to the source, and (2) "fair and accurate" reporting of the source.   *Jankovic v. Int'l Crisis Group*, 593 F.3d 22, 26 (D.C. Cir. 2010) (internal quotation marks omitted). Defendants cannot clear either hurdle here.[14]

1.      Defendants Do Not Satisfy the First Hurdle: They Failed to Attribute Their Statements to a Judicial Proceeding

Defendants did not properly attribute the prostitution statement to the *Jacobs* Proceeding. "It must be apparent either from specific attribution or from the overall context that the article is quoting, paraphrasing, or otherwise drawing upon official documents or proceedings."  *Dameron*

---

[14] In a footnote, Defendants argue that "[t]he privilege applies not only to reports of governmental proceedings themselves, but also to news reports recounting the 'allegations' that 'prompted' the governmental action or proceeding 'in the first place.'"  (Defs.' Mem. 32 n.23 (quoting *White v. Fraternal Order*, 707 F. Supp. 579, 597 (D.D.C. 1989), *aff'd*, 909 F.2d 512 (D.C. Cir. 1990)) (citing *Reeves v. ABC, Inc.*, 719 F.2d 602, 603-04 (2d Cir. 1983); *Medico v. Time, Inc.*, 643 F.2d 134, 139 (3d Cir. 1981); *Biro*, 2012 WL 3264059, at *29).  The actual proposition that the cited cases stand for is that a news report of a governmental action or proceeding remains privileged, even when the report delves into the allegations that gave rise to the proceeding.  This rule is irrelevant here.  The text of the Petition and Republication make no mention of a governmental action or proceeding.

31

*v. Wash. Magazine, Inc.*, 779 F.2d 736, 739 (D.C. Cir. 1985); *Sahara Gaming Corp. v. Culinary Workers Union Local 226*, 115 Nev. 212, 215 (1999) (holding that the fair report privilege is a "special immunity from defamation given to the news media and the general public to report newsworthy events in judicial proceedings").  The Petition and Republication never mention the *Jacobs* Proceeding, let alone that the Jacobs Declaration was the true source of the prostitution accusations.  Instead, in the Petition, Defendants characterized the source in a generic fashion, explicitly using the term "reports," and in the Republication explicitly credited "news accounts"; thus, neither publication attributes the defamatory statements to a judicial proceeding. For this reason alone, the privilege is unavailable to Defendants. *See White*, 909 F.2d at 528 (holding that the privilege was unavailable because the defendant failed to state that "the statements were intended as a summary of an official document"); *Dameron*, 779 F.2d at 740 (refusing to apply the privilege when the publication made no mention of the official report that was the purported source of the defamatory statement); *Sahara Gaming*, 115 Nev. at 215 (holding that "the privilege is usually directed toward the news media and others engaged in reporting news to the public," and it "extends to any person who makes a republication of a judicial proceeding").

Defendants argue that the Petition's statements were properly attributed because the Petition stated that "reports" had "surfaced," and it hyperlinked "to those reports, which included a detailed account of the proceedings in the *Jacobs* Action."  (Defs. Mem. 35.)  To be clear, the Petition explicitly attributes the prostitution statement to "*reports*" and then hyperlinks to a news *report*, all of which indicates that the source of the statement (as communicated by the Petition) is the hyperlinked *report*, rather than the Jacobs Declaration or *Jacobs* Proceeding.  Indeed, the headline of the linked AP Article also failed to reference a judicial proceeding or document.[15]

---

[15] The Restatement (Second) of Torts comments that readers frequently read only the headlines of an article; thus, a headline that is defamatory on its face cannot be saved by reference to the text of the article.  Restatement (Second)

Only after a reader peels back several layers—if the reader even bothers—is the purported judicial proceeding source of the Petition revealed.  Indeed, the Republication even admits that the Petition and the Republication were "sourced from . . . news accounts."  Defendants cannot point to a single case in which such an attenuated chain of attribution satisfied the first hurdle, and cannot avail themselves of the judicial reporting privilege as a matter of law.

> 2. Defendants Do Not Satisfy the Second Hurdle: They Failed to Give a Fair and Accurate Report of the *Jacobs* Proceeding or the Jacobs Declaration

Even if the Petition and Republication are somehow construed as a report of the *Jacobs* Proceeding or the Jacobs Declaration, Defendants failed to meet the "fair and accurate" hurdle because their statements were neither "accurate and complete" nor "a fair abridgement of what ha[d] occurred."  *Oparaugo v. Watts*, 884 A.2d 63, 81 (D.C. 2005); *Lubin v. Kunin*, 117 Nev. 107, 114-115 (2001) (holding a party may report on a judicial proceedings if such a report is "fair, accurate, and impartial").

The Petition's statements that Mr. Adelson "REPORTEDLY APPROVED OF PROSTITUTION and that "reports surfaced that . . . **Adelson 'personally approved' of prostitution in his Macau casinos**" are far from accurate or complete accounts of the *Jacobs* Proceeding or the Jacobs Declaration. (Defs. Mem. 18 (emphasis and de-emphasis in original). The words "REPORTEDLY" and "reports" impart an imprimatur of legitimacy, allowing a reader to believe the Petition was sourced from a impartial, detailed account or judicial opinion. In no way do the words "REPORTEDLY" and "reports" accurately or completely describe the true source—a declaration by a disgruntled former employee who brought a multi-million dollar

---

of Torts § 563 cmt. d. The Court should assume that like the readers of headlines who frequently fail to read the text of an article, the readers of the Petition will not follow the hyperlink to the AP Article.  And even if the Petition readers did click the hyperlink, they would be confronted with a headline that makes no mention of a judicial proceeding. Defendants cannot rely on the text in the body of the AP Article as a means of communicating the judicial source to the Petition's readers.  *See id.*

lawsuit against Mr. Adelson.  *See Von Kahl v. Bureau of Nat'l Affairs, Inc.*, 810 F. Supp. 2d 138, 145 (D.D.C. 2011) (finding a report was neither fair nor accurate when, *inter alia*, defendant failed to reveal the biased source of the defamatory statement); *Lubin*, 115 Nev. at 115 (holding a party may "report preliminary judicial proceedings from a fair and neutral stance, [but] a party may not don itself with the judge's mantle, crack the gavel, and publish a verdict through its 'fair report.'")

For this same reason, the Petition also failed to provide a fair abridgement of the *Jacobs* Proceeding or the Jacobs Declaration, and the Petition is not protected under the judicial reporting privilege.  The above applies with equal force to the Republication, which republished the defamatory gist of the Petition, without adding any details about the *Jacobs* Proceeding or the Jacobs Declaration.[16]

3.  Hyperlinked Material Cannot Be Considered to Determine Privilege

The Petition states that Adelson "REPORTEDLY APPROVED OF **PROSTITUTION**" and that "reports surfaced that . . . **Adelson 'personally approved' of prostitution in his Macau casinos**."  (Defs. Mem. at 18 (emphasis and de-emphasis in original).)  In the narrative portion of the Petition, the phrase "**personally approved**" was hyperlinked to an AP article entitled "**Sheldon Adelson Approved 'Prostitution' Strategy: Fired Former Sands Executive**."  (Defs.' Mem. 33 n.24 & Ex. E.)

Realizing their perilous position on the judicial proceedings privilege as outlined above, Defendants concoct a rule whereby the question is no longer whether the text of the Petition

---

[16] Defendants argue that Mr. Adelson "concedes . . . that 'the only source' for defendants [sic] 'accusations' is Jacobs."  (Defs. Mem. 34 (quoting Compl. ¶ 52).)  Presumably, Defendants believe this is an admission that the Petition sufficiently attributed its defamatory statement to Mr. Jacobs.  It is not.  The Complaint simply alleges that Mr. Jacobs was the only ultimate source (i.e., origin) of the false accusations about Mr. Adelson.  The Petition did not properly attribute the accusation to the only true source, but instead hyperlinked to the AP Article.

overcomes the two judicial proceeding hurdles, but whether the Petition hyperlinked to a document that does.  In support of this incredible argument, Defendants boldly proclaim: "courts recognize that linked material is part and parcel of the publication itself and must properly be considered by a court deciding, *inter alia*, whether a challenged statement in that publication constitutes a privileged report of a judicial or other official proceeding."  (Defs. Mem. 33.)

Defendants cite two cases to support their legal leap, only one of which, *Jankovic*, deals with the privilege to report judicial proceedings.  (Defs. Mem. at 33-34 (citing *Jankovic*, 593 F.3d 22 (D.C. Cir. 2010); *Agora, Inc. v. Axxess, Inc.*, 90 F. Supp. 2d 697 (D. Md. 2000), *aff'd*, 11 F. App'x 99 (4th Cir. 2001)).)  However, the appellate court in *Jankovic* in no way held that "linked material is part and parcel" of a defendant's publication.  593 F.3d *passim*.  Rather, the *Jankovic* court compared the defendants' publication with the hyperlinked material that was the source for the defamatory statements, ultimately concluding "that the privilege did not protect defendants' publication because [the publication] was not an accurate report of the governmental document to which it hyperlinked." (Defs.' Mem. 34 n.26 (citing *Jankovic,* 93 F.3d at 26-27).)  If, as Defendants contend, the hyperlinked source material was "part and parcel" of the publication, then the *Jankovic* court actually held that the defendants' publication (which incorporated the hyperlinked government document) failed to accurately report on itself.  This is utterly nonsensical.  Or put another way, if *Jankovic* actually followed the rule proposed by Defendants, the court should have held that by hyperlinking to the governmental document, defendants' publication accurately reported the governmental document; the *Jankovic* court clearly applied a different rule as it determined that the privilege did not apply.  *See* 593 F.3d at 26-27.

The other case cited by Defendants—*Agora, Inc.*—is also inapposite.  *Agora* simply held that hyperlinked material could serve as proof that an alleged defamatory statement was "confirmable."  *Id.* at 705.  But, when the court analyzed the fairness and accuracy of the defendant's publication, the court focused on actual text of the defendant's publication.  *Id.* Accordingly, Defendants' ability to clear the two hurdles and take refuge in the privilege is contingent upon the Petition's text, rather than the hyperlinked AP Article.

Were Defendants' unprecedented rule the actual law, circular analyses leading to absurd consequences would result.  For example, consider an email whose subject line reads, "Harris is a lying snake and a junkie," and whose body states, "Mr. David Harris is a **liar**, a **snake**, and a **junkie**."  Per Defendants' reasoning, these three opinions or facts would not be defamatory if "**liar**" links to an article in which Mr. Harris says he told his pregnant wife she looked skinny although he thought she looked fat, if "**snake**" links to a picture of him in a snake costume, and "**junkie**" links to an article about Mr. Harris being addicted to M&Ms.  Or even more absurd, the sources could directly contradict the words to which they are linked: e.g., "**liar**" links to first-hand accounts of Mr. Harris's unfailing honesty.  Under Defendants' misguided view, the email would not be defamatory because readers could click on the links and form their own conclusions about Mr. Harris's character.  This is not the law, nor should it be.

Defendants cannot cover their false and defamatory accusations against Mr. Adelson under the cloak of the privilege for a fair report of a judicial proceeding, despite their misguided and absurd arguments to the contrary.  Defendants' motions based on the judicial proceeding privilege should be denied.

**B.      The Petition and Republication Are Not Protected Opinion or Fair Comment**

Defendants' repeated statements contained in the Petition conveying to the average reader that Mr. Adelson's money is dirty and tainted because he personally approved prostitution are neither protected opinion nor fair comment.

1.      The Petition Is Not an Opinion Protected by the First Amendment

Throughout the Petition, Defendants bootstrap onto their defamatory allegations that Mr. Adelson personally approved of prostitution the conclusion that, as a result, his money is dirty and tainted.  Specifically, the Petition, titled "**Tell Romney to Reject Adelson's Dirty Money**," states that "perhaps the most alarming aspect of Adelson's potentially unlimited contributions is where the money comes from," "**Romney and the rest of the Republican Party must cease accepting Adelson's tainted money immediately**," and "enlist your family and friends in the effort to stop the influence of Adelson's tainted money and protect our democracy." (Defs.' Mem. 18 (emphasis in original).).  Taken together, the "gist" of these statements "is that the political contributions made by Adelson were 'tainted,' 'dirty' money." Compl. ¶ 37.

In their Memorandum, Defendants argue that their references to Mr. Adelson's money being dirty and tainted amount to constitutionally protected opinion because the factual basis was disclosed to the reader.[17]  But, the First Amendment does not allow a party to hide behind incomplete or incorrect facts or facts which are themselves false and defamatory. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-19, 110 S. Ct. 2695, 2706, 111 L. Ed. 2d 1 (1990) ("Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, . . . the statement may still imply a false assertion of fact.").

---

[17] Because Mr. Adelson assumes, *arguendo*, that the tainted money statements are opinion, Mr. Adelson need not discuss Defendants' arguments that the political context shows that the statements are opinion.

Among the "factual" bases for Defendants' opinion is that "reports surfaced that . . . **Adelson 'personally approved' of prostitution in his Macau casinos**." In other words, Defendants argue their statements concerning Mr. Adelson's (purportedly) dirty, tainted money are protected opinion because they rely on other false and defamatory statements of which Mr. Adelson complains.  As alleged in the Complaint, the gist of Defendants' asserted factual basis— Mr. Adelson "**'personally approved' of prostitution**"—is false and defamatory. Because Defendants cannot shield their alleged opinion regarding Mr. Adelson's personal wealth under the protection of the First Amendment when the underlying facts upon which their opinion is based are false and defamatory, the statement that Mr. Adelson "**'personally approved' of prostitution**" cannot be the basis for First Amendment protection for Defendants' statements of opinion. *See Milkovich*, 497 U.S. at 18-19, 110 S. Ct. at 2706, 111 L. Ed. 2d 1.

Even if Defendants' statements of opinion were not based on their other false and defamatory accusations, Defendants would still not be entitled to protection under the First Amendment. "If the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, . . . the statement may still imply a false assertion of fact" and be actionable defamation. *Milkovich*, 497 U.S. at 18-19. In this instance, Defendants repeatedly failed to disclose a multitude of facts upon which they based their opinion.

Rather than providing the reader with the information that one of their relied-upon "facts" was a single news article describing an accusation by a disgruntled former employee and the response by his former employer, Defendants merely inform the reader they relied upon "reports." As explained above, the AP Article upon which Defendants allegedly relied explained that: (1) a disgruntled former employee fired for-cause, Jacobs, is suing Mr. Adelson; (2) Jacobs is the source of the accusation that Mr. Adelson "approved of prostitution"; (3) Mr. Adelson's

representatives asserted that he has "maintained a strong policy against prostitution" in his casinos; and (4) Mr. Adelson's representatives denied Jacobs' accusation, characterizing it as a "baseless" and "scurrilous" personal attack designed to sensationalize the case.  By omitting these facts and merely saying "reports," Defendants implied a false assertion of fact that Mr. Adelson's money is "tainted" and this statement cannot receive constitutional protection.

Defendants argue that even if they failed to include relied-upon facts in the Petition itself, all is forgiven because they hyperlinked to the AP Report of the Jacobs Declaration.[18] Defendants' shaky support for this untenable proposition is two cases: *Agora, Inc. v. Axxess, Inc.*, 90 F. Supp. 2d 697 (D. Md. 2000), *aff'd*, 11 F. App'x 99 (4th Cir. 2001); and *Redmond v. Gawker Media, LLC*, No. A132785, 2012 WL 3243507 (Cal. Ct. App. Aug. 10, 2012).  Neither case stands for the proposition that by linking to a news article, a false and defamatory statement is non-actionable.

In *Agora*, the court found that an opinion was protected because it appeared on the same webpage as its detailed factual basis, and the court further noted that the factual basis was "confirmable" by following a hyperlink on the same page. *Agora*, 90 F. Supp. at 704-05.  While the *Agora* court may have used the hyperlink as a thumb on the scale, the court did not take the dangerous step of using hyperlinked content to render an otherwise defamatory opinion non-defamatory. *Id.*

In *Redmond*, the court came to a similar conclusion stating that the "article is completely transparent.  The sources upon which the authors rely for their conclusions are specified, and the article incorporates active links to many of the original sources—mainly Web sites and promotional material created and maintained by Redmond [the plaintiff himself] and his ventures." *Redmond*, 2012 WL 3243507 at * 12.  In other words, by specifically listing in the

---

[18] As explained above, if hyperlinking to the alleged "factual basis" would be enough, absurdity would result.

39

allegedly defamatory article itself the sources for the opinion, and then linking to these original sources, many of which were authored by the plaintiff himself and were not mere news reports, the court found that the statements complained of were protected opinion. *Id*. Even if one could argue the *Redmond* court came closer to taking the dangerous leap Defendants are proposing, the court refused to let other courts and parties cite to or rely on its decision.[19] Furthermore, the *Redmond* court did not address the consequences of inconsistencies between a phrase in the article itself and the information to which the phrase is hyperlinked (as is the case here).

Defendants also argue that "it is of no legal consequence that the underlying 'facts' upon which the defendants' opinion is based are themselves allegations (especially where, as in the Petition, they are presented to the reader as 'reports')." (Defs. Mem. 39 (citing *Shine v. Loomis*, 836 N.E.2d 952 (Ind. Ct. App. 2005); *Bieter v. Fetzer*, No. A04-1034, 2005 WL 89484 (Minn. Ct. App. Jan. 18, 2005)).)   Although an allegation or a charge can be the factual basis for a protected opinion, the publication must disclose that the factual basis is merely an allegation or a charge.  *Shine v. Loomis*, 836 N.E.2d at 960; *Bieter*, 2005 WL 89484, at *4.  Defendants have not met that bar.

Instead, Defendants presented their factual basis as having been garnered from "reports" rather than "allegations."  The word "reports" has an air of legitimacy that is totally absent from the term "allegation": whereas a "report" could be the result of a detailed account, a judicial opinion, or a formal record, an "allegation" is an unproven statement. The word "allegedly" was in Defendants' lexicon when they drafted the Petition: they pointed to Mr. Adelson's "allegedly corrupt business practices."  Defendants chose a different word, however, when describing their

---

[19] Under the California Rules of Court, "an opinion of a California Court of Appeal or superior court appellate division that is not certified for publication or ordered published must not be cited or relied on by a court or a party in any other action." Cal. R. Ct. 8.1115(a).  *Redmond* was not certified for publication.  2012 WL 3243507, at *1. And though the California Rules of Court do not bind the Southern District of New York, there is little reason for this Court to abide by an opinion that the issuing court deemed unworthy of such treatment.

source for their claim that Mr. Adelson "**'personally approved' of prostitution**."  They chose "reports" and thereby conjured an air of certitude where none existed.  Defendants' opinion that Mr. Adelson's money is tainted cannot be protected by the First Amendment because the disclosed factual basis is incorrect, incomplete, and part and parcel of the defamation alleged in Mr. Adelson's Complaint.

> 2.   Defendants' Opinion that Mr. Adelson's Money Is Tainted Is Not Protected by the Fair Comment Privilege

Nevada does not apply the fair comment privilege to allegedly defamatory statements of opinion.  *Nev. Indep. Broad. Corp. v. Allen*, 99 Nev. 404, 413, n.6 (1983) ("The fair comment doctrine arose to protect statements of opinion on newsworthy material.  Since *Gertz* now gives first amendment protection to opinion remarks, the fair comment doctrine is no longer necessary.").  If the Court determines that Nevada law applies, Defendants' arguments regarding the fair comment privilege are inapplicable.

Under D.C. law, the common-law fair-comment privilege provides no refuge for Defendants' allegations concerning Mr. Adelson's "dirty," "tainted money." The fair comment privilege provides "legal immunity for the honest expression of opinion on matters of legitimate public interest when based upon a true or privileged statement of fact."  *Coles v. Wash. Free Weekly, Inc.*, 881 F. Supp. 26, 32 (D.D.C. 1995), *aff'd*, 88 F.3d 1278 (D.C. Cir. 1996) (internal quotation marks omitted).  "But a conclusion based on a misstatement of fact is not protected by the privilege."  *Jankovic v. Int'l Crisis Group*, 593 F.3d 22, 29 (D.C. Cir. 2010). Furthermore, the privilege is lost when a defendant acts with common law malice—i.e., bad faith or bad motive.  *Potts v. Dies*, 132 F.2d 734, 735 (D.C. Cir. 1942).

As described above in detail, Defendants' tainted-money opinion is based on misstatements about: (1) the Jacobs Declaration; and (2) Mr. Adelson's personal policy

regarding prostitution in his casinos.  It is far from a "true fact" that reports surfaced that Mr.

Adelson personally approved of prostitution, and as previously discussed, Defendants'

statements regarding Mr. Adelson's prostitution policy are not privileged reports of a judicial

proceeding.  Defendants cannot rely on the First Amendment or any alleged privileges to shield

their alleged opinions in this instance and Defendants' motion to dismiss on this basis should be

denied.

3.     The Republication Is Neither Protected Opinion Nor Privileged Fair
       Comment

Because the Republication incorporated and republished the false and defamatory

Petition, Defendants argue that any protections and privileges afforded to the Petition also apply

to the Republication.   Thus, Defendants' arguments regarding protected opinion and fair

comment are equally unavailing when applied to the Republication.  Indeed, Defendants devote

no more than a single footnote comprising 171 words to challenging the validity of Mr.

Adelson's claims regarding the false and defamatory Republication.  Incredibly, in this footnote,

Defendants ignore the plain statements of the Complaint wherein Mr. Adelson repeatedly alleges

the falsity of the Republication.  (*See* Compl. ¶¶ 46-52.)  Defendants' cursory reference to the

Republication fails to provide any reasonable basis upon which to grant their motions to dismiss.

The Court should deny Defendants' motions in this regard.

**VI.     THE ACTION SHOULD NOT BE STAYED**

Defendants' request for a stay is predicated on flawed assumptions that significant

evidence regarding Mr. Adelson's prostitution policies will be unavailable, and that the *Jacobs'*

court's determination regarding that evidence will be binding on this Court.   The alleged

"missing," "destroyed," or "concealed" evidence that Defendants point to includes "the originals

of at least one and possibly two of Jacobson's [sic] four computer drives."  However, in response

42

to the Jacobs Declaration and the accompanying memorandum, the *Jacobs* court determined that it did "not appear that any evidence has been irreparably lost," including the material on Jacobs' computer drives. (Strom. Decl. Ex. 104, p. 8.)  Indeed, the emails between Jacobs and Mr. Leven that supposedly revealed Adelson's approval of prostitution have been filed in that action, and actually confirmed that Mr. Adelson's prostitution policy for Macau was consistent with the policy for Las Vegas, i.e., zero tolerance. (Strom Decl. Ex. 111, pp. 11, 13.)  Moreover, there is no indication that Mr. Leven's or Mr. Brown's emails regarding the prostitution policy—to the extent such emails ever existed—have been destroyed or concealed.

Even if the *Jacobs* court finds that the *Jacobs* defendants spoliated evidence regarding Mr. Adelson's prostitution strategy, that determination would not have preclusive effect in this Court.  As the Supreme Court has determined, "issue preclusion bars successive litigation of 'an issue of fact or law' that 'is actually litigated and determined by a valid and final judgment, and . . . is essential to the judgment.'" *Bobby v. Bies*, 556 U.S. 825, 834, 129 S. Ct. 2145, 2152, 173 L. Ed. 2d 1173 (2009) (quoting Restatement (Second) of Judgments § 27 (1980)).  The Court continues, "[i]f a judgment does not depend on a given determination, relitigation of that determination is not precluded."  *Id.*  The *Jacobs* complaint makes no mention of prostitution policies; thus, it strains credulity to suggest that the prostitution-evidence issue will be "essential" to some presumptive final judgment in the *Jacobs* Proceeding. (*See* Strom Decl. Ex. 28 *passim*.)

Ultimately, Defendants bear the burden of showing that a stay should be issued and that the prejudice of justice delayed is warranted. *See WorldCrisa v. Armstrong*, 129 F.3d 71, 76 (2d Cir. 1997) (noting that the movant bears the burden and that prejudice to the non-movant is to be avoided).  Given that the evidence necessary to this action is readily available, and the low

probability that the *Jacobs* Proceeding could bind this Court on the relevant issues, there is no need to prejudice Mr. Adelson by staying this action.

<u>**CONCLUSION**</u>

Defendants falsely accused Mr. Adelson of "personally approving of prostitution" in his casinos when it was common knowledge in the Jewish community that Mr. Adelson's charities sought to end the cycle of prostitution and drug abuse, the sole source for the allegations was a biased and obviously hostile fired employee, and representatives of Mr. Adelson had branded the allegations as baseless and scurrilous. When confronted with the falsity of their allegations and a retraction of similar statements by the DCCC, Defendants affirmed, endorsed, and essentially republished their defamation. This action concerns not, as Defendants argue, the District of Columbia, the Presidential election, or even political campaign contributions. This action concerns the ability of a national organization to publish incendiary, false, and defamatory allegations against a Nevada businessman in reckless disregard of the truth and then republish them with actual knowledge and reason to believe those allegations to be false. Nevada law applies to this action, the D.C. Act does not apply, and Mr. Adelson has met the pleading requirements of Rule 12(b)(6). Mr. Adelson respectfully requests that Defendants' motions be denied.

Dated: New York, New York
      November 9, 2012

                                    /s/ David M. Olasov

                                    L. Lin Wood
                                    lwood@whetriallaw.com
                                    Georgia Bar No. 774588
                                    (admitted *pro hac vice*)
                                    Amy M. Stewart
                                    astewart@whetriallaw.com
                                    Georgia Bar No. 141481

(admitted *pro hac vice*)
**Wood, Hernacki & Evans, LLC**
1180 West Peachtree Street N.W.
Suite 2400
Atlanta, Georgia 30309

- and -

David M. Olasov
dolasov@olasov.com
**Olasov + Hollander LLP**
27th Floor
1325 Avenue of the Americas
New York, NY 10019

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of November, 2012, a true and correct copy of the foregoing **Combined Memorandum Of Law In Opposition To Defendants' Special Motion To Dismiss Pursuant To The D.C. Anti-SLAPP Statute And Motion To Dismiss Pursuant To Rule 12(B)(6)** was filed with the Court through the ECF-CM electronic filing system, which will automatically serve electronic notice of the same on the following counsel of record:

> Lee Levine
> Gayle Sproul
> Seth D. Berlin
> Rachel F. Strom
> **LEVINE SULLIVAN KOCH & SCHULZ, LLP**
> 321 West 44th Street, Suite 510
> New York, New York 10036
> Telephone: 212-850-6100
>  llevine@lskslaw.com
> gsproul@lskslaw.com
> sberlin@lskslaw.com
> rstrom@lskslaw.com

> /s/ David M. Olasov