CCHTADEA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SHELDON G. ADELSON,

             Plaintiff,

         v.                          12 CV 6052 (JPO)

DAVID A. HARRIS, MARC R.
STANLEY and NATIONAL JEWISH
DEMOCRATIC COUNCIL,

             Defendants.

------------------------------x

                              New York, N.Y.
                              December 17, 2012
                              2:30 p.m.

Before:

                    HON. J. PAUL OETKEN,

                              District Judge

                     APPEARANCES

WOOD, HERNACKI & EVANS
     Attorneys for Plaintiff
BY:  L. LIN WOOD
     JONATHAN GRUNBERG
     AMY M. STEWART

OLASOV & HOLLANDER
     Attorneys for Plaintiff
BY:  DAVID M. OLASOV

LEVINE, SULLIVAN, KOCH & SCHULZ
     Attorneys for Defendants
BY:  LEE LEVINE
     SETH BERLIN
     GAYLE C. SPROUL
     RACHEL F. STROM

CCHTADEA

1          (Case called)

2          THE COURT:  Good afternoon, everyone.  We're here for

3   argument in this case on defendants' motion to dismiss.  I

4   realize I didn't give you all much guidance about the focus of

5   the argument.  I will give you a little more now, but not too

6   much more.  I don't think I need to hear much about the motion

7   to strike, that's going to be -- well, I think there's a good

8   chunk of that that may become irrelevant depending on what are

9   the bases for my ruling, what law applies, et cetera, but I

10  don't think that I need to you focus on that today.  I think I

11  will end up probably taking judicial notice insofar as I reach

12  the issue of the fair and accurate part of a judicial

13  proceeding, take judicial notice of filings in the court, but I

14  think a lot of other stuff will probably be extraneous and

15  ultimately irrelevant for the purpose of the motion.  So I

16  don't think that I need you to talk much about the motion to

17  strike.

18          I am interested in the choice of law issues, and I'm

19  interested in -- I have some questions about the D.C.

20  Anti-SLAPP law, but I don't want you to -- I have read Judge

21  Wilkins' opinion in the district court in D.C., and I don't

22  want you to get into all the Erie issues and Hanna issues.  I

23  realize those issues percolating, and in fact the only real

24  question I have about that, which I will ask you now, is when

25  is the argument in the D.C. Circuit in the Sherrod case, if you

CCHTADEA

1    all know?

2          MR. LEVINE:  March 15, your Honor.

3          THE COURT:  All right.  And one thing I will ask each

4    side to address -- there are so many levels of analysis here,

5    starting with choice of law, before I get to the applicability

6    or not of the D.C. Anti-SLAPP law, but one question on that is

7    whether it makes sense to stay the case pending the D.C.

8    Circuit decision, if I am inclined to think D.C. law applies.

9    I realize in some ways that's strange because the D.C. Circuit

10    doesn't control the Southern District of New York, but given

11    that it involves the application of D.C. statute and

12    interrelationship with federal rules, I think the D.C.

13    Circuit's opinion on the subject might be particularly

14    relevant, but that's only if D.C. law applies.  So that's my

15    thought on that.  I don't want you to get into any of the nuts

16    and bolts of the issues raised in those cases, but if you have

17    any thoughts about those issues I raised, the kind of

18    procedural issues, you can address them.

19          The other things I'm interested in are the fair and

20    accurate judicial proceeding doctrine privilege, and the

21    opinion and fair comment issues.  Then sort of related to all

22    of those latter three issues, the issue of hyperlinking, which

23    I was surprised to see how little case law had been cited by

24    the parties on the issue of hyperlinking, but my initial sense

25    is that turns out to be a very important issue in this

CCHTADEA

1   particular case.

2           So those are my kind of initial guiding thoughts.  And

3   with that having been said, I will turn it over to Mr. Berlin,

4   or Mr. Levine, since you're the movant I will let you go first.

5           MR. LEVINE:  All right, your Honor.  I have to say

6   that it is with some mixed emotion that I hear you do not want

7   to hear argument on the Shady Grove issue, because that made

8   all of our heads hurt.

9           THE COURT:  You said you're happy or not happy?

10          MR. LEVINE:  I have mixed emotions.

11          THE COURT:  I feel bad.  I should have told you that

12  about a week ago, but I spent more time going over the stuff

13  the past weekend than before a week ago.  So I wish I could

14  have given you more guidance earlier, but that's the way it

15  goes sometimes.

16          So if you want to highlight any particular issues that

17  aren't in your briefs, of course, you are welcome to do that,

18  but you otherwise you should assume I read everything your

19  briefs.

20          MR. LEVINE:  If it's all right with your Honor, I

21  thought I would start with the 12(b)(6) portion of the motion

22  first and then move to the choice of law and anti—SLAPP Act

23  issue.  And the reason I think I can do that is because on the

24  two substantive issues that your Honor mentioned, the official

25  report of judicial proceeding privilege and the opinion

CCHTADEA

1    doctrine, the latter, of course, is governed by the First

2    Amendment, so a choice of law doesn't really get involved

3    there, and the official report of judicial privileges

4    privilege, as I read it, doesn't differ between Nevada and D.C.

5    So I thought I would start there and segue back into choice of

6    law.

7              THE COURT:  OK.

8              MR. LEVINE:  As your Honor knows, there are two issues

9    on the report of judicial proceedings privilege, and that is

10   the attribution requirement and whether the report is a fair

11   and accurate report of the judicial proceeding.  I will start

12   with the fair and accurate prong.  The petition itself, the

13   operative document that contains the allegedly defamatory

14   statement, says in so many words that:  This week reports

15   surface that Adelson "personally approved of prostitution," and

16   the words "personally approved" are quoted and the hyperlink is

17   under the words "personally approved."

18             Your Honor, that is an entirely fair and accurate

19   quotation and paraphrase from the declaration that Mr. Jacobs

20   submitted in the Nevada litigation.  It is very similar, I

21   think, to the affidavit submitted by Mr. DeRoche in the <u>Biro</u>

22   case that your Honor held was accurately paraphrased in the New

23   Yorker article at in the <u>Biro</u> case.  I don't think there's any

24   difference between the two, and I can't see how you can argue

25   that that sentence that contains the allegedly defamatory

CCHTADEA

1    statement isn't a fair and accurate rendition, including the

2    quote itself, of what's in the Jacobs declaration.

3           THE COURT:  Let me ask you about that.  I think in the

4    Biro case, part of what allowed the conclusion, I think, that

5    the fair and accurate report privilege applied was that it was

6    self-consciously cited as part of a judicial proceeding, that

7    the article said in a judicial proceeding so-and-so said

8    whatever.  Some of them were a little less clear about how

9    specific the reference to the judicial proceeding was, but in

10   this case it seems that the plaintiff is arguing that part of

11   the problem is in the challenged article it's just referred to

12   as a report.  When you get to the hyperlink, you get more

13   detail about the fact that it's referring to a judicial

14   proceeding.  And I guess my assumption is that as the doctrine

15   generally applies, if there's a declaration in a litigation

16   that says "John Smith has a loathsome disease" in the judicial

17   proceeding and the article says nothing about a judicial

18   proceeding but simply says "John Smith has a loathsome

19   disease," that's not enough to get you the privilege because

20   there has to be some reference -- maybe I'm wrong about this,

21   but I assumed there had to be some sort of reference to that

22   being an allegation or a statement or somehow connected to a

23   judicial proceeding.  Is that accurate?

24          MR. LEVINE:  I think that is accurate.  That goes to

25   the second prong, which is the attribution requirement.  It's

CCHTADEA

1    got to be attributed or fairly implied.  The <u>Dameron</u> case in

2    the D.C. Circuit has some good language on that score that what

3    you're doing is quoting or paraphrasing or referring to

4    something that took place in a judicial proceeding.  And it is

5    quite right that our petition does not say "according to the

6    declaration."  It doesn't say that in so many words.

7            Our argument is that it does the 21st Century

8    equivalent of that by taking the words in quotes, "personally

9    approved," and hyperlinking to where that language comes from.

10   And if you click on the hyperlink, you get to the AP article

11   which explains in great detail that that language "personally

12   approved," closed quote, comes from the declaration that

13   Mr. Jacobs submitted in the Nevada litigation.  And it explains

14   the context of the litigation and explains what the litigation

15   is about.  It even includes language from Mr. Adelson's counsel

16   and spokesperson telling the other side of the story.

17           So I think your Honor was quite right at the

18   beginning, the real question in this case is what's the law

19   with respect to the hyperlinks, and can the hyperlink satisfy

20   the attribution requirement.  And you're quite right that the

21   law is very sparse on that specific issue.  The only case that

22   we have been able to find that deals with it is the <u>Jankovic</u>

23   case, which happens to be in the D.C. Circuit.  And if you are

24   to read that carefully, there's no question that the Court held

25   that it would consider the attribution requirement satisfied by

CCHTADEA

1   the hyperlink.

2          THE COURT:  But in that case I think it was one step

3   removed because the hyperlink was to the government source

4   itself, is that right?

5          MR. LEVINE:  That is correct.

6          THE COURT:  And your opponent says that that shows the

7   absurdity of your position because it's like linking to

8   yourself to get the privilege.

9          MR. LEVINE:  But if you look at the <u>Jankovic</u> case and

10  you look at the actual report that was cited to, that's not

11  right.  The alleged defamation in the <u>Jankovic</u> case was that

12  the plaintiff had supported Milosevic, and because of that, he

13  was put on this watch list and his bank's assets were frozen.

14  The link was to a list of companies and individuals that had

15  their assets frozen in the former Yugoslavia.  There was no

16  statement in that attached link that that had anything to do

17  with anybody's support for or non-support for the Milosevic

18  regime.  And in fact, as the Court held in the Court of Appeals

19  decision there was no necessary connection between supporting

20  the Milosevic regime and having your company's assets frozen.

21  But the problem there, it wasn't circular, as the plaintiff

22  claims it is here, the problem here was that this statement

23  that they alleged was privileged was nowhere contained in the

24  government report, not even vaguely, it had nothing to do with

25  it.  That's what makes a difference.

CCHTADEA

1          THE COURT:  That argument makes the hyperlink holding

2     victim, doesn't it?

3          MR. LEVINE:  Well, it's the best we have on that.  But

4     we do have a number of decisions in what I argue is the closely

5     analogous area of the opinion doctrine, cases in which the

6     argument being made is the opinion is based on disclosed facts,

7     albeit facts disclosed in the hyperlink.

8          We cited a number of cases, both in our opening brief

9     and in our reply brief, in which courts say there's now a

10    fairly substantial body of law holding that you can disclose

11    the facts on which an opinion is based in a hyperlink.  I call

12    the Court's attention specifically to the Silvercorp case we

13    cite in our reply brief which was handed down a couple months

14    ago in New York Supreme Court, very analogous kind of

15    situation, albeit it in the opinion context where an internet

16    publication stated some very forceful opinions about a

17    company's stock trading proclivities, and it did so by

18    hyperlinking to a bunch of government reports and other raw

19    data from which those opinions were drawn.  And the Court quite

20    rightly, I think, held those were the disclosed facts upon

21    which the opinion was based.

22         There's also law in other areas.  There are a number

23    of cases dealing with the issue of click through and browse

24    through licenses where courts basically hold that it's

25    hyperlinking to something that contains terms of use that are

CCHTADEA

1   enforceable and are basically the functional equivalent of

2   turning over a ticket when you go on a cruise ship.  So I think

3   the body of law is starting to develop that people know what

4   hyperlinks are and they understand they provide the attribution

5   or they provide the information upon which the linked

6   statements are based.

7            THE COURT:  The challenged article existed only on the

8   internet?

9            MR. LEVINE:  Only on the internet.  And I think that

10  is a significant point.  This is an internet-only publication.

11           And the other point I make, if you look at the

12  traditional notions of defamation law, this is equivalent to

13  the law that says that you read a headline in conjunction with

14  the body of article, you don't read it in isolation.  There's a

15  hyperlink.  You divine the meaning of what the statement is

16  from the totality of the publication, which in this case

17  includes the hyperlink.  So you're quite right that there is no

18  case specifically on point.  The Jankovic case probably

19  technically is dicta, but I think that's the logical

20  application of the attribution requirement in the 21st Century.

21           Let me just say a quick word about the opinion

22  doctrine.  I don't understand the other side to be saying that

23  the rest of the challenged statements that Mr. Adelson's money

24  is tainted and dirty and those sorts of things are not opinion.

25  I think their argument boils down to the suggestion that

CCHTADEA

1    because the "personally approved" language cannot be considered

2    in conjunction with the hyperlink then it's an opinion based on

3    undisclosed or omitted facts.  I think that's wrong for the

4    same reasons we talked about with respect to the ability to use

5    the hyperlink to find out what that opinion is based on.

6          THE COURT:  I'm trying to understand how -- they cite

7    Milkovich v. Lorain Journal for the proposition that an opinion

8    based on false facts is not protected, essentially.  Is that

9    right?

10         MR. LEVINE:  I don't think that's quite Milkovich.

11   Milkovich says that, but Milkovich also says with specific

12   reference to the fair comment, from which the opinion doctrine

13   kind of flows, specifically says that the underlying facts can

14   either be true or privileged.  So if the underlying facts are

15   privileged, as they are here, that's our whole argument.

16         THE COURT:  But if I didn't agree with you on --

17   admittedly the main challenge of the petition, the main

18   challenged writing here, the initial challenged writing

19   references a couple of things, McCain's comments about source

20   of overseas money and the prostitution -- the personally

21   approved prostitution language, and then there's a couple other

22   sort of offhand references about unions and one other one, and

23   then sort of, put together, talks about tainted money.  It

24   seems to me a fair reading really focused on the two issues of

25   the source of the money and the prostitution as being the

CCHTADEA

1   tainted source.  Now if I agree with plaintiff that the

2   personally approved prostitution is not protected, does it

3   follow that the tainted -- does your argument as to your

4   opinion fall within that?

5          MR. LEVINE:  I would suggest, your Honor, that doesn't

6   for the very reason that you just mentioned.  Given the

7   importance of protecting expressions of opinion, you have a

8   petition here or a publication here that relies on four

9   separate things for the overall conclusion or opinion that the

10  money is tainted.

11         THE COURT:  And you say the stool still stands with

12  the other three legs, basically?

13         MR. LEVINE:  I think --

14         THE COURT:  With two leg, maybe not.

15         MR. LEVINE:  I don't know.  I think it's a continuum

16  somewhere along the line, but if you say I have eight reasons

17  why I think this money is tainted and one or two turn out not

18  to be accurate, I think you would be hard pressed to hold the

19  opinion doctrine doesn't protect that.

20         THE COURT:  But if it were just one, you would agree

21  that the opinion would be based on something that I decided is

22  not privileged, and it's for another day whether that's

23  protected.

24         MR. LEVINE:  I think that's right, your Honor.

25         Now let me just say one word about the fair comment

CCHTADEA

1    privilege, because that will get us into choice of law.  The

2    only difference between the fair comment -- and that's the one

3    area that does depend on D.C. law versus Nevada law because

4    Nevada held there is no fair comment privilege, that it's

5    unnecessary given the advent of the opinion doctrine.

6          The one difference between the fair comment privilege

7    in D.C. and the opinion doctrine is that in D.C. the law is

8    that the underlying facts on which the opinion is based don't

9    have to be set out in the publication if they're otherwise

10   generally available to the reader.  So if you look at the Lane

11   v. Random House case or the Coles v. Washington Free Weekly

12   case, you will see in both of those cases the underlying facts

13   on which the opinion was based were not set forth fully in the

14   publications themselves.

15         The Court in the Coles case said anybody who wants to

16   know more about this can get the transcript of the hearing that

17   the opinion was being expressed about.  In the Random House

18   case there was a list of books, and anybody who wanted to could

19   go look at the books to see what Mark Lane actually said about

20   the Kennedy assassination.  So if D.C. law applies and the D.C.

21   fair comment privilege applies, the hyperlink issue to some

22   extent goes away if people could go and look -- on the opinion

23   side could go and look at the actual declaration in the Jacobs

24   litigation.

25         THE COURT:  But the fair comment and opinion arguments

CCHTADEA

1   apply to the same -- are they alternative arguments or do you

2   need them both?

3          MR. LEVINE:  No, I only need one or the other.

4          Let me say a word about the second publication, which

5   they call the republication and we call the statement.  You're

6   familiar with what I'm talking about?

7          THE COURT:  Yes, it's Exhibit F.

8          MR. LEVINE:  Now they call it a republication, but I

9   think it's important to point out it's not a republication.

10          THE COURT:  The one question I have about it, and I

11   think this is clear, but at the moment this went up on July 11

12   on the Web site, the petition was no longer available through

13   hyperlink or otherwise.

14          MR. LEVINE:  That is correct, it had been taken down

15   prior to that.

16          So it is not a republication.  We cited in our brief

17   the Goforth case out of the Fourth Circuit that specifically

18   holds that simply referring to a previous publication in a

19   subsequent publication is not a republication for purposes of

20   defamation law.  So that should take care of the statement in

21   its entirety because standing alone it has no defamatory

22   content.  Even if it was a republication and you look back to

23   the original petition in order to pour defamatory meaning into

24   it, I think the analysis with respect to the petition

25   necessarily governs the statement.  If the allegations in the

CCHTADEA

petition are opinions based on privileged facts, then the

reference in the statement back to it would similarly be

privileged.

I understand why Mr. Wood included it in the complaint

because he think he has better arguments with respect to

constitutional malice when you get to the statement, but it has

nothing to do with the issue of the original petition.  If it's

an opinion based on a privileged statement of fact, that is,

the fair reporting privilege, then the statement goes the way

the petition goes.

THE COURT:  Do they have some argument that even

though as a technical matter the original petition went away,

by that point it was so much in the public eye and was being

talked about by so many people that there their republishing

language to the effect of "We stand by everything we said," at

that point in the context of this article, because it got so

much notoriety that the analysis is different, in other words,

they didn't have to republish the first thing because it was so

ubiquitous at that point.

MR. LEVINE:  It seems to me it's not a separate

publication.  The point is it's not a separate defamatory

publication.  If we ever get down the road that far we can have

some lively debate about whether or not our state of mind with

respect to the statement is relevant to actual malice with

respect to the case as a whole, but it seems to me pretty clear

CCHTADEA

1    that the statement standing on its own two feet is not itself

2    defamatory.  And that even if it is, if we win on the petition

3    for the grounds I argued, we have to necessarily win on the

4    statement as well.

5          I think it's now time to talk about the choice of law.

6          THE COURT:  Yes.  And I want to start the choice of

7    law discussion with a quote which I think you'll all enjoy --

8    you all probably read it -- from Judge Sack.  It's actually

9    from Dean Prosser.  This is from Sack's defamation treatise,

10   "Choice of law in defamation cases," said Dean Prosser, "is a

11   dismal swamp and filled with quaking quagmires and inhabited by

12   learned but eccentric professors who theorize about mysterious

13   matters in a strange and incomprehensible jargon."

14         I just thought that would be a good --

15         MR. LEVINE:  I couldn't agree more.

16         THE COURT:  -- overview of our discussion.  So however

17   you would like to start on that.

18         MR. LEVINE:  We actually do agree on one thing, and

19   that is that if this Court looks to the choice of law rules of

20   the forum, which is New York, that the choice of law rules of

21   New York say that you look for the state with the most

22   significant interests in the issues that are being litigated.

23         Now there are a number of different ways to look at

24   it, and courts in this Court and in the Second Circuit have

25   looked at it in a number of different ways.  Some courts have

1    applied this nine-factor test that Judge Kaufman claimed 50

2    years ago.  Some courts have done kind of balancing of the

3    totality of the circumstances, and some courts -- and I think

4    this is important, and I'm going to end with this point -- but

5    some courts, specifically Judge Winter's decision for the

6    Circuit in the AroChem case looks at it on an issue-by-issue

7    basis.  I think that's a very important point that I will

8    expand on in a few minutes.

9          But let's start -- I will do this in three pieces.

10   First I will talk about the nine factors, then I will talk

11   about the other factors that I think necessarily have to be

12   part of the inquiry, and then I will talk about the AroChem

13   decision.

14         With respect to the nine factors, it seems to me that

15   four of them favor us:  The place of emanation was the District

16   of Columbia, the defendant's main office is in the District of

17   Columbia, the defendant's domicile, two of the three, are in

18   the District of Columbia, and the third one's involvement was

19   done when he was physically present in the District of

20   Columbia.  The last one that I would argue actually favors us

21   is the ninth one, the law of the forum.  Although the forum

22   here is New York, that's very artificial.  It's only New York

23   because the plaintiff decided to sue here even though it's

24   conceded by both sides that neither party has any involvement

25   with the forum.

CCHTADEA

| 1 | THE COURT:  So you think the forum that he chose is

2 not Nevada?

| 3 | MR. LEVINE:  It's definitely not Nevada.

| 4 | THE COURT:  Why isn't it D.C. as opposed to New York?

| 5 | MR. LEVINE:  Because we could have easily moved to

6 transfer this case to D.C.  The Davis v. Costa-Gavras case,

7 which is one the leading cases in this field, actually started

8 in the Eastern District of Virginia and was transferred here

9 because that's where the defendants were.  I think if you look

10 at the Davis case, we easily could have transferred this case

11 to D.C. but decided not to.  It's equally convenient for us to

12 litigate here.  But they can't deprive us of getting the

13 benefit of one of the factors by suing in a jurisdiction that

14 is an entire stranger to the proceeding.  I think that's a fair

15 and reasonable way of looking at it.

16 The only factor I think that favors them -- the other

17 factors are all neutral, and I will speak to them in a second,

18 but the only factor is the plaintiff's domicile.  And I argue

19 to your Honor that the strength of that factor is watered down

20 in this case for two reasons.  One, is it is undisputed that

21 Mr. Adelson has an international reputation.  He has

22 international business interests.  He has international

23 political interests in Israel and here that he's constantly

24 involved in, and all of that is undisputed.  So the fact that

25 he happens to have his principal residence in Nevada I think is

CCHTADEA

 1   a little watered down here in terms of the significance of the

 2   factor.

 3            And the other reason is he chose not to sue there when

 4   he could have.  It's one thing when you have to go to the

 5   jurisdiction in which the defendant lives to file your lawsuit

 6   because otherwise you can't get personal jurisdiction, but

 7   that's not this case.  He could have as easily sued us in

 8   Nevada as in New York.  I assume his argument with respect to

 9   why he has personal jurisdiction over us in New York, which

10   we're not contesting, is because the thing was disseminated

11   here, but that's true of every place in the world.

12            THE COURT:  They say your client has an office here.

13            MR. LEVINE:  And we submitted a declaration from our

14   executive director saying that we don't, and we don't.  There's

15   a mailing address for making contributions that was on our Web

16   site that allows people to make contributions to a New York

17   address that actually belongs to a third party, but we do not

18   have an office here.

19            So the point of all of that is I think that the

20   plaintiff's domicile is not as strong a factor here as it is in

21   a case like the Condit case where the plaintiff was a

22   California congressman, who although he had somewhat of a

23   national reputation at that point, had to run for reelection in

24   California, and that was the important locus of his reputation.

25            THE COURT:  The one thing I will say, I think this is

CCHTADEA

a hard question and there's the nine factors which sort of cut
different ways depending how you argue it, it is true that the
second restatement -- there is kind of this old tort default
rule focusing on the place of injury or the place of tort which
usually ends up being the place of the injury.  And to quote
the second restatement -- I realize there's cases all over the
map and this may be a view that's fading away, but I think it's
the traditional default rule, the restatement says when a
natural person claims he was defamed by an aggregate
communication, the state of most significant relationship will
usually be the state where the person was domiciled at the time
if the matter complained of was published in that state, and it
was nationally published here.

        Here it's funny, you have to have a plaintiff with no
particular connection to D.C. except on one theory, which I
will get to in a second, and then defendants with no connection
to Nevada except they published in all the states.  And
initially I thought well, maybe the presidential campaign and
D.C. makes all the sense in the world, but it's not as though
Mitt Romney's presidential campaign was based in D.C., I think
it was based in Massachusetts.  And there's kind of this
overarching thought about it being about D.C. because it
occurred in the context of obviously the presidential political
campaign advertising, but the alleged defamation is about
activities in Macau, which according to plaintiff were run out

CCHTADEA

1    of Nevada.

2            Isn't that what the defamation is about, right?

3            MR. LEVINE:  Three points I want to make sure that I

4    make before I forget them.  One is the excerpt you read from

5    the restatement is -- the next sentence, I believe, goes on to

6    say that that's true except when another state has a more

7    significant interest.  So it's the rule except when it isn't,

8    and I think it's pretty clear, especially when you look at the

9    cases in this circuit, that when you're dealing with a

10   multistate publication and you're dealing with somebody, a

11   plaintiff, who has a national or international reputation, that

12   it is, if anything, the default rule that the domicile of the

13   place of the defendant, if that happens to also be the place

14   where the alleged defamatory publication emanated from, is the

15   law that you apply.  And I think if you look through the cases,

16   you'll find that.

17           The Machleder case and the La Luna case, two other

18   cases they rely on, very different from this case for two

19   significant reasons; in both of those cases you had plaintiffs

20   who had very local reputations.  The plaintiff in La Luna was a

21   nightclub in Miami.  It had no reputation or interest outside

22   of Florida.  The plaintiff in the Machleder case was a guy who

23   had a business in New Jersey, had no reputation or interests

24   outside of New Jersey.  In both of those cases the defendants

25   traveled to the plaintiff's state in order to do the news

CCHTADEA

1    gathering that led to the defamatory publications.  The CBS

2    crew went down to Miami to film in the nightclub in the La Luna

3    case.  In the Machleder case, Arnold Diaz went over to New

4    Jersey to do an ambush interview with the guy on his property.

5    There's none of that here.  We haven't gone to Nevada to do

6    anything in connection with this.  Our only connection to

7    Nevada is that, like every other state or every other place in

8    the world, someone who had internet access in Nevada could

9    access this.

10          Now your point about Macau is a good one.  I think,

11   fairly read, it seems to me that this publication, this

12   petition is about conduct taking place in two places, D.C. and

13   Macau.  The rest of the publication --

14          THE COURT:  What's the conduct in D.C.?

15          MR. LEVINE:  The part of the petition that says the

16   money -- the conclusion that the money is tainted is based on

17   four things, the Foreign Corrupt Practices Act investigation

18   which take place in D.C. by the S.E.C. and the Department of

19   Justice, the Senator McCain statements which took place --

20          THE COURT:  But those aren't the alleged defamation.

21          MR. LEVINE:  No, but as we talked about before, those

22   are part of the basis for the opinion and part of the

23   publication.

24          And on the Macau point, it is true that in passing,

25   with no factual showing whatsoever, the plaintiff makes the

CCHTADEA

1    statement that Mr. Adelson directed all of the operations of

2    the Macau casinos out of Las Vegas.  In fact, the whole point

3    of the proceedings that are going on in the Jacobs litigation

4    in Nevada is Mr. Adelson's companies have taken the position

5    that the Macau casinos were not run out of Nevada and therefore

6    Mr. Jacobs can't sue whatever it's called, the Chinese -- Sands

7    China in Nevada.

8            THE COURT:  Is that a personal jurisdiction argument?

9            MR. LEVINE:  I believe it's a personal jurisdiction

10   argument with respect to Sands China.  So there's a little bit

11   of situational benefit going on there.

12           Let me move on just briefly to talk about the AroChem

13   decision, because I think that may be the simplest and I think

14   appropriate way out of the whole morras of all the factors that

15   you take into account.  And that is this:  In the AroChem

16   decision Judge Winter says you look at choice of law and

17   defamation cases on an issue-by-issue basis, and if the issue

18   you're talking about is a privilege or immunity, then you apply

19   the law of the state in which the underlying allegedly

20   actionable conduct took place, because privileges and

21   immunities are conduct-regulating laws as opposed to causes of

22   action themselves which regulate distribution of loss and that

23   sort of thing.

24           So if you're talking about a conduct regulating point

25   of law, like a privilege or immunity, then Judge Winter says in

CCHTADEA

```
 1    the AroChem case you look at the law of the jurisdiction in
 2    which the underlying conduct took place.  And you do that
 3    because you want people who are publishing or making statements
 4    in a jurisdiction to know that they can rely on the law of the
 5    jurisdiction that they're in in making those statements.
 6            In the AroChem case, the defendant happened to be in a
 7    meeting in California even though he lived in Connecticut and
 8    the plaintiff lived in New Jersey or something like that when
 9    he made the statement.  Nobody had -- neither the plaintiff nor
10    the defendant lived in California.  But Judge Winter said
11    nevertheless California law applies because the assertion in
12    that case of a judicial proceedings report privilege is
13    governed by the state in which the conduct at issue took place.
14            THE COURT:  It's interesting because at the highest
15    level what the Second Circuit has instructed the courts to
16    consider is which state has the most significant interest in
17    the dispute.  And that's interesting because you might argue
18    let's say D.C. has this stronger protection and Nevada has a
19    weaker protection, you might argue that each state has balanced
20    things as it wants and feels very strongly about that, i.e.,
21    maybe Nevada wants to protect its potential defamation victims
22    more strongly, so why should D.C. win out because it protects
23    defendants?  I guess Judge Winter has given one answer to that.
24            MR. LEVINE:  That's correct.
25            Now just a couple of other things about -- if you're
```

CCHTADEA

1   not going to -- if your Honor decides not to go that way and

2   decides instead to do the more traditional multifactor

3   analysis, it seems to me there are additional factors that need

4   to and ought to properly be taken into account in looking at

5   the totality of the circumstances.  One is the fact that we

6   have virtually no connection with Nevada other than the fact

7   our publication happened to be disseminated there or gathered

8   from there in addition to everywhere else in the world.

9          The second is Mr. Adelson does have substantial

10  connections to D.C.  He is not a stranger.  In connection with

11  our reply brief, we have submitted evidence demonstrating that

12  he has donated tens of millions of dollars to political action

13  committees that are headquartered in the District of Columbia

14  and do their political advertising from D.C.  He engages in

15  lobbyists who lobby on his behalf in D.C.  He sits on boards of

16  organizations in D.C.  All of those things, it seems to me, are

17  fairly considered in the analysis.

18         That is pretty much all I have to say on choice of

19  law.  Would you like me to move on and talk a little bit about

20  the statute or are you OK on that?

21         THE COURT:  One question I will ask before I forget is

22  the D.C. SLAPP statute provision of essentially requiring

23  likelihood of success before discovery except that the judge

24  has discretion to order discovery, sort of like the old 56(f)

25  situation, are other statutes -- I think your brief says

CCHTADEA

 1    California has a similar statute.  Other states' anti-SLAPP

 2    statutes, do they impose a similar standard?

 3           MR. LEVINE:  Many of them do.  The D.C. statute is

 4    modeled on the California statute, and the California statute

 5    is the oldest and has the richest body of case law and

 6    definitely has that provision in it.

 7           THE COURT:  And that's been around for a long time.

 8           MR. LEVINE:  Yes, it has.  And I view that, your

 9    Honor, as no different than, as you said, the old 56(f), which

10    is now 56(e), I think.

11           THE COURT:  Yes.

12           MR. LEVINE:  It really is no different.  And I know

13    you don't want me to wade into Erie and Hanna, but the fact of

14    the matter is there's nothing in the D.C. act that says that in

15    deciding the likelihood of success on the merits prong the

16    Court is supposed to make credibility determinations or resolve

17    disputed issues of material fact or any of those things, it

18    just says that the plaintiff has to show likelihood of success

19    on the merits.

20           And in California specifically, courts have generally

21    ruled that that means you don't decide disputed issues of

22    material fact, you treat it like a summary judgment motion and

23    you credit the undisputed fact that the defendant submits and

24    resolve disputed issues of material fact in favor of the

25    non-moving party.  So in our view there's no necessary

CCHTADEA

1   collision between those two things, and for purposes of the

2   discovery provision, it would be treated just like Rule 56(e)

3   now.  If we had an issue before you that needed discovery in

4   order to be resolved, I would expect Mr. Wood to say:  Excuse

5   me, your Honor, we need targeted discovery to be able to deal

6   with this issue.  And your Honor would probably grant it if it

7   was an issue that dealt with this potentially disputed issue of

8   material fact.

9        But the fact of the matter remains that the issues

10   that we have raised are issues of law that are routinely

11   decided by courts on Rule 12(b)(6) motions and on summary

12   judgment motions without looking to disputed issues of material

13   fact, the opinion doctrine and the fair report privilege,

14   whereas you said at the outset, you can take judicial notice of

15   the fact that the Jacobs declaration exists and that it says

16   what it says.

17        I should say one quick word, your Honor, about the 7th

18   Amendment issue.  I don't know if your Honor is inclined to

19   take that argument seriously, but if you are, there is the

20   issue of Rule 5.1 of the Federal Rules that would require you

21   to certify the issue to the D.C. Attorney General so that he

22   could have an opportunity to weigh in in support of the

23   constitutionality of the statute.

24        For all the reasons I mentioned, I don't think there's

25   a serious --

CCHTADEA

 1              THE COURT:  Tell me about that again.

 2              MR. LEVINE:  Rule 5.1 of the Federal Rules requires

 3    that when a litigant has put into dispute the constitutionality

 4    of a state statute, first, the plaintiff has to give notice to

 5    the Court and to the attorney general of the state that that's

 6    happening, and Mr. Wood has done that here.  And then your

 7    Honor, if you are inclined to take the issue seriously, has to

 8    certify to the attorney general -- you have to certify it to

 9    the attorney general of the state.  And D.C. is a state for

10    this purpose under Rule 81.  You have to give the attorney

11    general the opportunity to intervene and support the

12    constitutionality of the statute.

13              Now we don't think there's a serious 7th Amendment

14    issue here for the very reasons that I just mentioned.  There

15    is no necessary finding here in this case that every

16    application of the D.C. Anti-SLAPP Act statute is

17    unconstitutional because it encroaches on 7th Amendment rights.

18    None of the issues that are before the Court on this SLAPP

19    motion at this time implicates 7th Amendment rights.

20              So facial challenges, as your Honor knows, is only

21    well taken when there is no conceivable basis on which the

22    statute could be constitutional, and we happen to have here at

23    this point on this motion a totally constitutional application

24    of the statute because nobody is asking you to resolve disputed

25    issues of material fact.  So I don't think there's a serious

CCHTADEA

1    7th Amendment issue.

2              THE COURT:  And does the Rule 5.1 issue apply only to

3    the 7th Amendment issue or does it also apply to the Hanna,

4    Erie rules issue?

5              MR. LEVINE:  On its face, it only applies to the

6    constitutional issue.  I know in other cases like the Sherrod

7    case in which both issues have been raised, the D.C. Attorney

8    General has in fact intervened and argued both issues.

9              And then I guess the last thing I will say, unless

10   your Honor has any questions, is on your suggestion about

11   effectively staying your ruling on this until the Sherrod

12   decision comes down.  We would have no objection that so long

13   as your Honor recognizes that the issue in Sherrod isn't

14   exactly the same as the one here, it's at issue whether the

15   statute applies retroactively.

16             THE COURT:  Does it necessarily raise this issue, or

17   it might go away without addressing it?

18             MR. LEVINE:  It might go away without addressing the

19   issue.  It's conceivable.

20             THE COURT:  OK.

21             MR. LEVINE:  Thank you, your Honor.

22             THE COURT:  Mr. Wood?

23             MR. WOOD:  Your Honor, if you would indulge me, I

24   would only like to speak for three or four minutes and then

25   Mr. Grunberg will do our argument.

CCHTADEA

1           THE COURT:  That's fine.

2           MR. WOOD:  Once I realized I would be dueling with

3    Mr. Levine and your Honor over issues dealing with <u>Erie</u> and

4    <u>Hanna</u> and <u>Shady Grove</u> about 36 years out of law school, I

5    bailed, and I asked Mr. Grunberg if he would please take over

6    the bulk of this argument, and I appreciate your indulging me

7    only a few minutes.

8           One of the reasons I wanted to speak briefly is

9    because I represented Gary Condit in the <u>Condit v. Dunne</u> case

10   before Judge Peter Leisure.  And Gary Condit was a twelve-term

11   congressman from California serving in Washington D.C.  And

12   prior to the unfortunate tragedy dealing with Chandra Levy,

13   Congressman Condit was speculated as a potential candidate for

14   Vice President of the United States.  He clearly, by the time

15   of Mr. Dunne's comments, not only had a national reputation

16   from his political career, but he had unfortunately a national

17   reputation from the spotlight that was cast upon him in

18   connection with the Chandra Levy investigation.  Mr. Dunne's

19   comments in Washington, D.C. and in New York and in California

20   addressed alleged conduct after Mr. Condit had become a figure

21   of notoriety with respect to the Levy case.

22          Despite the fact that the allegation of defamation

23   addressed conduct that occurred allegedly in Washington, D.C.

24   where it was alleged that Mr. Condit had gone to Middle Eastern

25   embassies and solicited the favors young ladies brought there

1    to satisfy the nocturnal pleasures high-powered folks and

2    politicians, and despite the fact it was alleged that the

3    defamation was Mr. Condit's instructions in Washington, D.C.

4    for someone at the Middle Eastern embassy to kill Chandra Levy,

5    and that the first tale bearer said she was taken from

6    Washington, D.C. in an airplane and her body dropped in the

7    Atlantic Ocean, that the defamation centered on acts in

8    Washington, D.C.  Mr. Dunne was a resident of New York and had

9    in fact broadcast the comments on the Larry King Show having

10   earlier broadcast them on the Laura Ingraham Show in

11   Washington, D.C. and having gone to a couple of cocktail

12   parties, small groups of people, and telling the story again,

13   the horse whisperer story.

14        Judge Leisure correctly ruled that under those

15   circumstances, Gary Condit was entitled -- despite filing suit

16   in New York against a New York resident -- to have the law of

17   California apply for the very reason that the default rule

18   applies.  That is clearly the jurisdiction in a multistate

19   defamation case where the bulk or the greatest amount of damage

20   is done to the person's reputation.

21        And without trying to take away a point Mr. Grunberg

22   may very well make, it is important not to get sidetracked, in

23   my view, on these arguments about politics.  The defamation in

24   this case is not political.  The defamation in this case is

25   personal and it's professional.  The defamatory statement at

CCHTADEA

1   issue in the core of this case is Sheldon Adelson, quote,

2   unquote, "personally approved a pro-prostitution policy with

3   respect to his businesses."  That is a personal attack against

4   his reputation, it is a professional attack on his business

5   reputation.  The National Jewish Democratic Council, for their

6   own reasons, chose to take that personal and professional

7   accusation against Mr. Adelson and use it for their own

8   political purposes to go out and raise money and to perhaps

9   also damper the fund-raising activities of Mr. Romney and other

10  candidates.  They made it political.  It was not a political

11  decision.

12          And because they chose to make it a personal approval,

13  they transformed that person into the person of Sheldon

14  Adelson.  This is not a lawsuit brought by Sands of China with

15  an argument of well, it was business decisions with respect to

16  Macau made by the board of directors in Macau.  It doesn't

17  matter what that relationship is vis-a-vis the Nevada

18  litigation, they said that Sheldon Adelson personally approved

19  it, a man who lives in Nevada, a man who makes his income in

20  Nevada and a man who operates as the CEO of the corporation in

21  Las Vegas that owns Sands Macau.  And given that, as

22  Mr. Grunberg will more articulately state, I believe the choice

23  of law real clearly is the default rule.

24          One last comment, and I do think it's important

25  because there are issues of hyperlinking which I find very

 1    novel, and I would love to have made the comments about fair

 2    comment and opinion, but once I decided to bail on the <u>Erie</u> and

 3    the <u>Hanna</u> and the <u>Shady Grove</u>, I don't think it's fair for me

 4    to try to restore my right to make those arguments.  I will let

 5    Mr. Grunberg do it.  He deserves it, and he will do a fine job.

 6         But I do think that when you look at this issue of

 7    hyperlinking, if you look at the real world, and if you look at

 8    how the doctrine of privilege applies to statements in a

 9    judicial proceeding, the National Jewish Democratic Council

10    made a conscious decision not to attribute it.  If they wanted

11    the privilege, Mr. Levine could have easily told them how to

12    get it, without any doubt about it.  They could have attributed

13    it directly.

14         But they chose to attribute it, I believe it is

15    reasonable to infer, because they didn't really want the

16    readers and the people they wanted to motivate with their

17    political agenda to really realize this was a statement made in

18    litigation by a disgruntled former employee that was adamantly

19    denied as true.  They wanted to blanket it with some element of

20    truth greater than it deserved, so they choice to call it

21    reports, plural; not one, they said reports twice, plural.  And

22    then they hyperlinked it not by giving the link that would

23    have -- as you ordinarily see on the internet, they hyperlinked

24    it by putting quotes around "personally approved" and

25    underlining.  The average reader might have thought that was

CCHTADEA

 1    for emphasis only.  They may not be as internet savvy as some

 2    of us.

 3              And that's the other point I wanted to make.  What

 4    Mr. Levine wants is he wants the ability to have the privilege

 5    that he did not attribute it to bestowed upon them because he

 6    hyperlinked to an article that correctly described with

 7    privilege the false statement of Mr. Jacobs.

 8              THE COURT:  I was going to ask you about that.  So you

 9    concede that the AP article itself, standing by itself, could

10    assert -- if this were a suit against AP, they could assert the

11    privilege.

12              MR. WOOD:  Absolutely.  Absolutely.  But they want to

13    now take advantage of the AP's privilege because of this

14    hyperlink, and they're asking you not only to give them the

15    advantage of that, they're asking you to do something very,

16    very important, they're asking to you assume, to assume that

17    the average reader would go to that hyperlink.  That is not an

18    assumption that I believe legally they are entitled for this

19    Court to give them the benefit of.  Some people might do it.

20    Many, I believe in the real world, would not.

21              And without that benefit of that assumption legally

22    they're asking you for, then the hyperlink theory goes away.

23    And this article stands as classic defamation law has stood

24    since I have been involved in it.  Your decision will turn on

25    the four corners of that article, and you will not assume that

CCHTADEA

1    a reader -- to steal Mr. Grunberg's line, you will not assume

2    that a reader -- the average reader is also a researcher.

3            Those are the remarks that I wanted to make, your

4    Honor, and now I will turn it over to the expert.

5            MR. GRUNBERG:  Your Honor, I will start with choice of

6    law rather than follow the road map that defendants did, and

7    then I will turn to the traditional 12(b)(6) issues that we

8    have here starting with fair and accurate report of judicial

9    proceeding, moving to opinion and then fair comment.

10           So as Mr. Lin framed it for us pretty well, when we're

11   talking about choice of law, we're talking about defamation

12   against a Nevada businessman for conduct that he does in Nevada

13   where he earns his living, and we're not talking about conduct

14   of Mr. Adelson that occurred in the District of Columbia.  And

15   that's just clear.  Any of this other ancillary political

16   activity just isn't an issue in this case.  The heart of this

17   case is the defamatory and false statement that Mr. Adelson

18   personally approved.  Indeed, that's the heart of our theory on

19   opinion.  The theory on opinion isn't about an S.E.C.

20   investigation or anti-union activity, the theory on opinion is

21   there is a false basis there, and that false basis is that

22   Mr. Adelson personally approved of prostitution is false and

23   defamatory, and that false and defamatory basis cannot be one

24   of the legs of the stools for their opinion.

25           I will get to that argument later.

CCHTADEA

1        THE COURT:  Of course, the only reason the defendants

2  NJDC were talking about the prostitution issue was because of

3  the political contributions.  Otherwise, presumably they

4  wouldn't have cared.  In other words, it was only a subject of

5  publishable interest to them, I think, because of the campaign,

6  because of his contributions to the campaign, right?

7        MR. GRUNBERG:  You're to speaking to one of the

8  reasons why Sheldon Adelson is well-known, international

9  figure.  But the fact of the matter remains -- and we'll tie

10  this back once I get to the nine-factor test for you -- it's

11  the conduct that's at issue here, and the nine-factor test

12  looks at the conduct of the plaintiff that's at issue.  So when

13  the defendant attacks the plaintiff because of something the

14  plaintiff did, we look at where the plaintiff did that thing.

15        In this case, the accusation is that plaintiff

16  personally approved of prostitution.  And where he would have

17  done that, and the injury, all of this centers in Nevada.  And

18  again, I think as Mr. Wood pointed out, the charge isn't

19  that -- the allegation here in the petition is the defamatory

20  statement isn't that Sands China approved of prostitution, it's

21  that Mr. Adelson personally approved prostitution.  Mr. Adelson

22  lives in Nevada, he works in Nevada, he makes his money in

23  Nevada, he is a Nevada citizen through and through.

24        But to turn, if I can, to the kind of more structured

25  approach to all of this, as I already pointed out, the key here

CCHTADEA

1     is which state has the more significant interest.  There are a

2     multitude of ways to approach this issue.  One is the

3     nine-factor test, the other is looking at the restatement --

4     and in the multistate context, we're talking about restatement

5     Number 150 -- or a kind of ad hoc approach which seems to be

6     more like what the defendants did where you're kind of grabbing

7     for defendants what are favorable factors all over the place

8     and creating new rule out of whole cloth.

9            In terms of the nine-factor test, contrary to what the

10    defendants said, the factors point to Nevada.  We have the

11    plaintiff being -- the first factor, plaintiff is domiciled in

12    Nevada.  The second factor, plaintiff's principal activity is

13    based in Nevada.  Third factor, the plaintiff suffered his

14    greatest harm in Nevada.  That's where he learned his living.

15    That's where he has to get licensed for his casinos.  That's

16    where he built his fortune, that's his personal and business

17    reputation, clearly the area of greatest harm.  Four,

18    publisher's domicile and incorporation.  That's D.C.

19    Defendants' main publishing office is D.C.  Principal

20    circulation, world-wide, place of emanation, D.C. and where

21    liable to be seen, world-wide.

22           What we have here, to really break it down and try to

23    give some meaning to these factors is the only three factors

24    that point to the defendants' state, not really D.C., are

25    publishers domiciled, the main publishing office, and the place

CCHTADEA

of emanation, they're all factors that ask about defendants'

relationship to the case, but none of the factors that would

show some sort of outside conduct, such as where plaintiff

suffered greatest harm.  None of those go to D.C.  All the

factors that basically ask where is defendant located obviously

go to D.C., but none of those other external factors go

anywhere else.

        And when you have that simple conflux of factors, only

those three factors that say the defendant is located in D.C.,

published in D.C., emanated from D.C., that has never been

enough to then subject a plaintiff to the law of defendants'

domicile, with the only close exception -- it's still wasn't

enough, it was Davis v. Gavras, but hasn't been enough.

        The question here is:  Do you let a defendant come and

infiltrate Nevada, attack Mr. Adelson in Nevada, and then drag

Mr. Adelson back to the District of Columbia and make him fight

there?  There is a notion even in Davis v. Gavras that there

has to be justice when determining choice of law, and that is

not justice in choice of law.

        THE COURT:  What about the fact that you did choose to

file -- Mr. Adelson chose to file in a place other than Nevada?

        MR. GRUNBERG:  So Mr. Adelson's choice -- and that is

the ninth factor.  The way that defendants have portrayed this

is that we're somehow manipulating the ninth factor by coming

up here and filing here, but that's just not the case.

CCHTADEA

1    Nevada -- the reason why we didn't file there is there are

2    concerns about getting minimum contacts in jurisdiction over

3    the defendants there.

4           We have internet conduct, and as you can see when

5    we're talking about internet conduct, the law isn't quite

6    robust yet, so there are certain issues, and D.C. is obviously

7    where they're based, and that's not necessarily neutral ground.

8    We're coming up here in New York where their Web site says

9    that -- defendants' Web site said they have they had a New York

10   office and provided an address for that office.  So we figured

11   there would be jurisdiction here.  There's a great body of law

12   here, great judges here, and this would be the place to try the

13   case.

14          THE COURT:  I'm not going to argue with the great

15   judges.

16          MR. GRUNBERG:  Of course, they didn't contest personal

17   jurisdiction, and the time to do that has passed.  They're

18   obviously happy enough to be here, and we certainly are as

19   well.

20          Now the nine-factor test -- so the majority -- at

21   least the three factors go towards it being Nevada, and those

22   three factors are particularly important because it shows where

23   the harm to the plaintiff is, and that's really an overriding

24   concern whether you go with restatement 150 or the nine-factor

25   test, where is the harm to the plaintiff.  That's what we're

CCHTADEA

1    getting at when we say the default rule is you go with the law

2    of the plaintiff's domicile, because that is -- in a sense, the

3    harm makes the locus of the tort the plaintiff's domicile.

4           Even if you turn to, say, an issues-based approach and

5    using restatement 150, nevertheless the law should still be the

6    District of Columbia -- sorry, should still be Nevada.  What

7    they tried to do with this issues-based approach is bring in

8    AroChem.  And AroChem said that when you're looking at an issue

9    of privilege or immunity that you look -- you apply the law of

10   the state of defendant's domicile because that state would have

11   the greater interest.

12          Now first issue with that is that the D.C. act is

13   neither a privilege nor an immunity.  An immunity is basically

14   a protection that is given to a defendant who has otherwise

15   acted tortiously.  So if a defendant defames the plaintiff and

16   would be liable for that defamation, what that privilege or

17   immunity does is say even though all those elements have been

18   fulfilled for liability, for defamation, nevertheless that

19   statement is privileged and the defendant would be immune from

20   liability.

21          The Anti-SLAPP doesn't do that.  The Anti-SLAPP never

22   removes the duty of the defendant to cease from defaming.  The

23   Anti-SLAPP simply rewrites the procedures for adjudicating

24   pretrial whether there's been defamation but never takes away

25   that duty from the defendants.  The defendants always have that

CCHTADEA

1    duty to cease from defaming.  The defendant will be liable for

2    his defamation if indeed he defamed the plaintiff.

3           In fact, 3M Co., which you're greatly familiar with,

4    noted at the end of the case that the defendants in that case

5    tried to masquerade the D.C. act as a substitute immunity, and

6    the court wasn't buying it.  It's simply not.  So AroChem and

7    its progeny, Goldstein and Bio/Basics, all of these cases don't

8    even apply because this isn't a privileged immunity.  And

9    second, AroChem actually says that for a loss allocating rule,

10   which is an immunity-type of rule, that you don't need to go

11   with the law of the defendant's domicile.

12          Let me make this clear for you.  Part of where this

13   idea of that you -- for an immunity and privilege you go with

14   the law of the defendant's domicile, that comes from Schultz v.

15   Boy Scouts of America.  In Schultz, the court draws a

16   distinction between conduct-based rules and loss-allocating

17   rules.  And the court says that in the instance of

18   conduct-based rules that maybe the defendant's domicile has a

19   greater interest because the defendant's domicile has an

20   interest in regulating the conduct of its citizens.  And then

21   for loss-allocating rule, that interest is no longer present.

22   And when AroChem enumerates the different types of rules that

23   would fall under loss-allocating rules, specifically the court

24   says immunities.

25          Now for some reason, courts have since really lost the

CCHTADEA

1    seed of that law, and this privilege and immunities notion has

2    been taken elsewhere, but even when these other courts have

3    done it, for instance in Bio/Basics, Bio/Basics basically

4    acknowledged it had very little authority for doing what it was

5    doing in applying the law of the defendant's domicile to

6    initial privileges and immunity.  And at any rate, ultimately

7    Bio/Basics went with the plaintiff and applied the law of the

8    plaintiff's domicile despite some potential interest that D.C.

9    had in applying its laws to conduct that occurred in D.C.

10           Indeed, it's interesting, as for other cases that are

11   in defendant's reply brief on this issue of privileges and

12   immunities, such as Block and Carolco which come out of the

13   Ninth Circuit, those courts were applying California standards

14   for choice of law, not even applying New York standards, and

15   the California standard is very different.

16           Now returning to this notion of the restatement -- and

17   we're still here talking about issues -- what the restatement

18   says is the state with the most significant relationship with

19   plaintiffs -- with the most significant relationship to the

20   issues and the parties should have its law applied.  In this

21   case, D.C. doesn't have a relationship to all the parties.

22   D.C. has a relationship to one party, defendant.  But in terms

23   of the relevant conduct at issue here, D.C. has no relationship

24   to Mr. Adelson.  But D.C. -- sorry, Nevada has a significant

25   relationship with both Mr. Adelson and with defendants.

CCHTADEA

1    Defendants affirmatively chose to publish their defamatory

2    petition online knowing that that information would infiltrate

3    into Nevada as if they were handing out pass bills on the

4    street in Nevada.  They were present there.

5               THE COURT:  Does Nevada have an interest of law?

6               MR. GRUNBERG:  They do.  Nevada's Anti-SLAPP law is

7    more geared to towards the right to petition.

8               THE COURT:  Like New York.

9               MR. GRUNBERG:  Like New York.  It's not nearly as

10   broad as the law here.  What you pointed to, and I thought this

11   was a great point, say if we return to this interest issue,

12   Nevada has an Anti-SLAPP and D.C. has an Anti-SLAPP, and both

13   states have an interest in enforcing their own laws on these

14   issues of Anti-SLAPP.  Obviously Nevada chose to draw a line in

15   a very different place because they found value in preventing

16   certain defendants from freely defaming a certain class of

17   plaintiffs and chose to draw the line in a different place than

18   D.C. did.

19          Now there's no reason to give D.C. some sort of

20   primacy over Nevada's Anti-SLAPP.  Those interests essentially

21   cancel out, which is <u>Condit</u> did something very similar in that

22   when deciding whose law to choice.  <u>Condit</u> basically canceled

23   out the interest of New York and canceled out the interest of

24   California in the court and said really we're not going to look

25   at that.

CCHTADEA

 1          Now that pretty much highlights -- let me double-check

 2     here to see if there's anything else I had.

 3          I want to make clear that in defendants' relying on

 4     Machleder and La Luna, defendants are trying to make a point;

 5     Machleder v. Diaz and La Luna Enterprises v. CBS Corp.  In

 6     those cases the courts didn't set a floor as to when it would

 7     be necessary to apply the law of defendant's domicile.  They

 8     didn't say that if you have factors five through nine you must

 9     apply defendant's domicile.  So even though all the factors

10     that were present in Machleder and La Luna might not be present

11     here that would favor Nevada, nothing in those cases say that

12     the fact that one or two of those factors are present is

13     sufficient go with D.C.

14          Just review my notes to make sure that we're good on

15     choice of law.

16          THE COURT:  I guess this isn't a choice of law

17     question, but the other question to make sure I don't forget is

18     the fair and true report of a judicial proceeding privilege

19     essentially applies equally whether it's D.C. law or Nevada

20     law.  Do you agree with that?

21          MR. GRUNBERG:  Nevada law has a fair report of

22     judicial privilege.  I don't want to make any sort of

23     representations right now as to the scope of that law.  It's

24     not at issue yet in the case, and it indeed might end up being

25     in issue.  It looks like now we're dealing with what they

CCHTADEA

1    briefed, which is the law in the District of Columbia.  But I

2    certainly would be happy to get back to you about the scope of

3    the fair report of comment privilege in Nevada.

4            THE COURT:  Well, if I decide that Nevada law

5    applies -- I'm trying to also understand procedurally what was

6    bifurcated.  If I decide Nevada law applies, the issue of the

7    fair report of judicial proceeding has been briefed, right?

8            MR. GRUNBERG:  It essentially has, and it is

9    essentially the same.  The issue of fair report of judicial

10   proceeding is essentially the same in Nevada.

11           THE COURT:  So what has been put on the second part of

12   the bifurcation?

13           MR. GRUNBERG:  So the second part of the bifurcation

14   is in the D.C. Anti-SLAPP the plaintiff ends up having the

15   burden of showing likelihood of success on merits on the

16   plaintiff's claim.  So what that would mean is we would have to

17   go through each individual element.  So we would have to prove

18   that it's defamatory, that it's false, without privilege,

19   actual malice, damages.  And we have carved that out for a

20   later time and agreed that right now what we're dealing with in

21   terms of merits of the claim are the three 12(b)(6) issues.

22           THE COURT:  Thank you for reminding me.  I think

23   you've made your position clear on the choice of law issue.

24   I'm still not sure how I'm going rule on that, but I will

25   obviously spend some more time with the cases.  But maybe you

CCHTADEA

1   could turn to I guess the fair and accurate report of a

2   judicial proceeding issue.  And I guess one question I have for

3   you is this:  I'm still interested in this hyperlink issue, and

4   since you agree that the AP article to which the challenged

5   article was linked is OK -- I mean it's not challengeable by

6   virtue of the fair report privilege, but you said that there's

7   enough of a difference between the linked article and the

8   petition that it doesn't get the pass through of the benefit of

9   the fair report privilege.

10          I guess what if the article -- what if the petition

11   were printed on a Web site and then said see below, there's an

12   asterisk instead of a hyperlink, and then at the bottom of the

13   page was a reprinting of the AP article, if the AP article were

14   simply printed below, how would that change the analysis?  Do

15   you think there would still be a defamation claim on the

16   petition, or would that be a closer nexus than a hyperlink and

17   therefore a different conclusion?

18          MR. GRUNBERG:  That would bring the underlying

19   hyperlinked information up into the four corners of the

20   document itself and it would be on the face of the document,

21   and likely that would fulfill the fair and accurate report of

22   judicial proceeding.  You would still have potentially some

23   issues of opinion, there could be certain issues, but you would

24   at least bring it up to the face of the page and put it in the

25   four corners so anyone who reads that document has a fair

CCHTADEA

1    chance to then read the full report of what occurred in the

2    judicial proceeding.

3              That's a very different circumstance than what we have

4    here.  What we have here is by hyperlinking, as Mr. Wood

5    pointed out, it's all together likely that you will have

6    someone open up that Web page, read that petition, and just

7    move on without hyperlinking or not realizing that there's

8    hyperlink, or decide what they wanted to do was print out that

9    Web page to read it later to take with them on the train or

10   print out that Web page and give it to a friend.  So defendants

11   quickly lose control over how the reader would actually

12   interact with the Web page.

13             THE COURT:  One of the cases that you cite in your

14   brief is a D.C. Circuit case of Dameron v. Washington Magazine,

15   and that case sets the standard and describes the standard as

16   the following, "It must be apparent, either from the specific

17   attribution or from the overall context, that the article is

18   quoting, paraphrasing or otherwise drawing upon official

19   documents or proceedings."

20             Why isn't overall context sufficient to something like

21   a hyperlink with respect to an online publication?

22             MR. GRUNBERG:  There has to be a place that you draw

23   the line.  There has to be a kind of realization that there's

24   only so far that the reader is going to go.  So whether or not

25   we want to allow people to make pretty outrageous statements on

CCHTADEA

1    the face of a page and then start clicking on hyperlinks in

2    order to support the statement below is the decision that a

3    court needs to make, but it seems like it's not a safe track

4    for defamation law, because you really allow almost any

5    statement to be made on the face of the page and then simply a

6    series of hyperlinks that would somehow be explicatory for the

7    defendants.

8            And while I could see where you're saying why would

9    you -- why wouldn't that be part of the greater context, it's

10   not part of the greater context because it wouldn't provide

11   sufficient protections for plaintiffs.  Defamation law is there

12   for a reason.  People have hard-earned reputations, and you

13   need to provide a requisite amount of protection.

14           THE COURT:  Then you also complain about the headline

15   and say well, a lot of times they might link to the headline

16   but not read the whole AP article.  But the headline itself of

17   the AP article says, if I'm reading it right:  Sheldon Adelson

18   approved prostitution strategy: fired former Sands executive.

19   It's true that it doesn't talk about litigation, but it does

20   sort of rope into the title the notion of the disgruntled

21   former employee.  It kind of wraps a lot into the title.

22           MR. GRUNBERG:  But it still doesn't speak about a

23   judicial proceeding.  And the privilege isn't for a fair and

24   accurate report of what anybody said, the privilege is a fair

25   and accurate report of a judicial proceeding.  And indeed, this

CCHTADEA

point about the headline, it's more a point about analogy.
It's saying that there's -- you can't really bury the
information that would give you the privilege way under so the
reader doesn't read it.

Indeed, this privilege in a sense, it's society
striking a balance with people who may be defamed.  It's saying
that we value a fair and accurate report of the judicial
proceeding enough that for individuals who give that fair and
accurate report, we're going to give them a privilege to make
those statements.  But part of that deal is that the publisher
then needs to properly attribute those statements to the
judicial proceeding, because that's how the reader knows that
this information came from a judicial proceeding that should be
important to you.  And that's just -- this petition utterly
failed to do that.  It absconded the judicial proceeding
through multiple levels, going from petition to a hyperlink to
the AP report until you finally might get to the notion there
was a judicial proceeding in play.

THE COURT:  Let me ask you about the judicial
proceeding briefly.  The other argument that is sort of in your
papers sort of alongside the hyperlink attenuation kind of
argument is that this was a source -- this was a sketchy
source, you say this was obviously a disgruntled former
employee.  What is the claim -- I gather you don't challenge
that what the AP said is an accurate representation of what

CCHTADEA

1    Jacobs says in an affidavit -- it's an affidavit, right?

2              MR. GRUNBERG:  He says in a declaration.

3              THE COURT:  Declaration, so it's sworn, it's

4    effectively sworn, a sworn statement, and therefore more than

5    an allegation, it's under penalties of perjury.  So in that

6    sense it's evidence, unlike an allegation in a complaint.  I

7    guess is there anything more within what's before me properly

8    that undermines -- kind of makes obviously incredible the

9    statement that is linked to the challenged declaration or the

10   challenged petition?

11             MR. GRUNBERG:  The article has a slew of exculpatory

12   information that isn't at all at play in the Jacobs -- in the

13   petition here.  First of all, the article says that Jacobs is a

14   disgruntled former employee who isn't necessarily reliability,

15   and talks about the scenario leading into the time the inquiry

16   was false when he made the statement about the approval of

17   prostitution.  But beyond that, I want to touch upon the

18   defendants' reading of Jankovic, because Jankovic does not

19   stand for what the defendant believes it stands for.

20             In Jankovic, the issue was whether a report which was

21   the defendant's publication sufficiently attributed and gave a

22   fair and accurate account to hyperlinked material.  And in that

23   case, the court obviously, as defendants pointed out, found

24   that defendant didn't give a fair and accurate account.  But

25   once again, as you acknowledge, the very analysis of trying to

CCHTADEA

1   understand whether the report gave a fair and accurate account

2   of hyperlinked material would be an unreasonable thing to do

3   if, as defendants are advocating, the hyperlinked material is

4   part and parcel of the defendant's publication itself.  It

5   would be like analyzing yourself.

6          The Jankovic court didn't do that.  The Jankovic court

7   treated the hyperlinked material as a discrete publication that

8   had to be analyzed to understand whether defendant's

9   publication attributed to the hyperlinked material and then

10  gave a fair and accurate report of the hyperlinked material.

11  Those two, the hyperlinked material and the defendant's

12  publication in that case, are not one and the same, as

13  defendants would have you believe here.

14          THE COURT:  OK.  Anything more on fair and accurate

15  report or anything that you want to say about the opinion and

16  fair comment issues?

17          MR. GRUNBERG:  Yes, I would love to touch upon both

18  issues, please.

19          THE COURT:  Sure.

20          MR. GRUNBERG:  Now as your Honor has pointed out,

21  there's an issue here with whether hyperlinked material can be

22  pointed -- can be relied upon in the realm of opinion, and

23  indeed, defendants have tried to blur line between those cases

24  that may have held that you can use hyperlinked materials as

25  the basis for your opinion and try to blur the line between

CCHTADEA

1    those cases, and the argument that you can use hyperlinked

2    material for attribution in the fair report of judicial

3    proceeding.

4            Now the first really important thing to point out

5    about these opinion cases that may have looked to the

6    hyperlinked material as the basis, such as Sandals Resorts v.

7    Google, is that those cases are in the context of New York's

8    protection for opinion.  New York's constitutional protections

9    for opinion are beyond those of the United States Constitution.

10   And so if the New York State courts had made the decision to

11   blur the line between a defendant's published material and

12   subsequent hyperlinked material, that may make sense in the

13   context of New York's robust protections for opinion, but it

14   does not make sense in the context of your Milkovich U.S.

15   Constitution branch of opinion, which doesn't have the same

16   sort of protection.

17           Now indeed -- and this goes to defendants'

18   unsubstantiated argument about the legs of the stool for an

19   opinion.  Defendants, without giving you any support -- and

20   indeed, this is not stated in their brief -- defendants are

21   arguing when you have an opinion that has multiple bases that

22   even if you take out one of those bases because it's false and

23   defamatory, that the opinion still gets to stand as protected

24   opinion as long as those other legs are still solid.

25   Defendants simply didn't give any support for that statement.

CCHTADEA

1          Now in this case, we have one of the bases being for

2     this opinion about dirty tainted money being that Mr. Adelson

3     personally approved for prostitution.  Now even if you include

4     the hyperlinked material, one of the legs here, there would be

5     four legs essentially, one of them is still this statement that

6     Mr. Adelson personally approved of prostitution.  It's false

7     and it's defamatory.  And in fact, even if you go to the

8     hyperlinked material to the AP report to see if the basis would

9     be sufficient to support the opinion, well, the statements in

10    the AP article are also false and defamatory.  It just so

11    happens that because the AP article has a privilege, the fair

12    report of a judicial proceeding privilege, that the AP

13    article's utterance of these statements is protected.

14         But the defendants are trying to stand in the shoes of

15    the AP and use the material from that AP article, which as to

16    defendants, isn't privileged.  So their opinion about dirty

17    tainted money has a false and defamatory basis on the face of

18    the petition, i.e., Mr. Adelson personally approved of

19    prostitution has a false and defamatory basis when you go to

20    the hyperlinked material, the statement that Mr. Adelson

21    personally approved of prostitution, and they had no privilege

22    for that statement in the AP article.  So that argument about

23    hyperlinked material, even if you buy it, still doesn't account

24    for the false and defamatory basis that's on the face of the

25    petition.

CCHTADEA

1        I'm just reviewing your questions with defendants to

2   make sure I cover certain points.

3        THE COURT:  Sure.

4        MR. GRUNBERG:  Your Honor, I will move on to fair

5   comment.

6        THE COURT:  OK.

7        MR. GRUNBERG:  Now here what we need to keep sight of

8   for fair comment is there is no protection for fair comment if

9   the defendant misstates the facts.  So while the defendant may

10  be correct that fair comment doesn't always require that the

11  underlying facts be disclosed in the publication, the

12  publication cannot be based on a misstatement of facts.

13  Indeed, the opinions set forth that's protected by the fair

14  comment privilege has to be an honest opinion.  So if the

15  defendant is misstating facts, if the defendant's opinion isn't

16  in fact an honest portrayal and based on an honest assessment

17  of the basis for the opinion, there is no protection under fair

18  comment.

19        And that's precisely what we have here.  The opinion

20  or the fair comment of dirty tainted money is based on the

21  misstatement of fact that Mr. Adelson personally approved of

22  prostitution.  That is simply not the case.  That is a

23  misstatement of fact.  Indeed, it is not an honest opinion

24  because defendants know that Mr. Adelson did not personally

25  approve of prostitution, as we alleged in our complaint.

CCHTADEA

 1          THE COURT:  OK.

 2          MR. GRUNBERG:  If I may, defendants did venture into

 3     the realm of Anti-SLAPP just a little bit.

 4          THE COURT:  If there's anything that you would like to

 5     respond to, you can.  You don't really need to address that

 6     right now.  But if there's anything -- you don't need to

 7     address any of the Anti-SLAPP.  I think I have enough

 8     materials.  I actually have the briefs and the case before the

 9     D.C. Circuit, and there are a lot of issues there that I

10     haven't worked out, but first I need to decide the choice of

11     law.

12          MR. WOOD:  I know you need to work them out, but two

13     procedural points.  Number one, with respect to the question of

14     the stay, if your Honor concludes that D.C. law applies, then I

15     would concede that judicial economy would probably be best

16     served until we get a decision in hand, if your Honor is

17     inclined to stay the case pending that.

18          Because the second procedural issue, if your Honor

19     decides that D.C. law applies and that the Anti-SLAPP provision

20     applies, what Mr. Grunberg said is true, we would then ask --

21     which we did not need for this proceeding for the purposes of

22     issues raised, we would ask your Honor for discovery on the

23     issue of falsity, on the issue of actual malice, on the issue

24     of whatever necessity we had to do to prove damages.  I'm not

25     sure that we have that because it's presumed damages because

CCHTADEA

1   it's libel per se, but also within the context of the

2   Anti-SLAPP issue on the likelihood of success, we would also

3   then for the first time address the issue that was raised by

4   Mr. Levine in his argument but is not before your Honor in

5   these two motions, and that is the liability for what we

6   contend is a republication in the second article.

7        That issue has not been briefed, and it would be part

8   of the Anti-SLAPP motion; not necessarily one subject to

9   discovery, but your Honor would look at it and decide whether

10   we had a likelihood of success on the issue of falsity with

11   respect to article number two.  We haven't briefed that before

12   the Court at this point in time.  Their comments on

13   republication were only contained in their reply brief.  They

14   did not move to dismiss under 12(b)(6), contending that article

15   two is not capable of a defamatory meaning.

16        THE COURT:  I thought they moved to dismiss the entire

17   complaint.

18        MR. WOOD:  Only on arguably three grounds, the

19   judicial proceedings privilege, opinion, and fair comment.

20   They did not move -- I think Mr. Levine will acknowledge this,

21   they did not move on the issue of whether the second article is

22   capable of a false and defamatory meaning in the true sense of

23   it being either a republication or in the sense of whether we

24   need to brief it as an independent allegation of defamation on

25   the face of it without it being a republication.  That's not

CCHTADEA

1    part of the motion as I understand it and as it was briefed.

2            THE COURT:  OK.  Well, I will let them respond on that

3    point, and if there's anything else you would like to reply --

4    we should finish up.  If there's anything else that you would

5    like to reply to briefly, you may.

6            MR. LEVINE:  First on the last point, as your Honor

7    pointed out, and I think Mr. Wood agrees with this, we have

8    moved to dismiss as to what they call the republication and we

9    call the statement on the grounds that if the petition itself

10   is privileged and opinion, then there is no cause of action

11   with respect to the statement/republication.

12           On the separate issue whether it is a republication in

13   the first place, they took that position in their opposition to

14   our motion, and we responded to it in the reply brief.  I think

15   that issue is fairly before the Court.  It may subsume the

16   issue of whether the statement is independently capable of

17   defamatory meaning, or it may not, but I don't think -- our

18   point is that it's not a republication.  So that's our position

19   on that.

20           I just want to clear up a few things Mr. Grunberg said

21   that are worth clearing up.  One is Mr. Grunberg is wrong about

22   the AroChem case on two grounds.  First, in the AroChem case

23   the Court applied the law of neither plaintiff's nor

24   defendant's domicile, it applied the law of the place where the

25   defamatory statements were made, which in that case was

CCHTADEA

1   California.

2         He's also wrong that the D.C. Anti-SLAPP statute does

3   not provide immunity.  It is very clear from the legislative

4   history of the D.C. Anti-SLAPP statute that that is exactly

5   what the D.C. counsel was up to in providing an immunity to

6   people who speak about matters of public concern, and I call

7   the Court's attention to the <u>Farah</u> case and the <u>Sherrod</u> case

8   which both make that point very clear.

9         Clarification on the Nevada Anti-SLAPP statute.  I

10  know your Honor is familiar with the New York statute.  The

11  Nevada statute is not like the New York statute, it's much

12  broader.  And if we did -- if the Court did determine that the

13  D.C. Anti-SLAPP statute didn't apply, we have reserved it, our

14  rights in our briefs, in both briefs, to argue that the Nevada

15  Anti-SLAPP statute is different, not at all like the New York

16  statute.

17        On the issue of hyperlinking, I want to make a couple

18  of points in response to what Mr. Grunberg said.  Mr. Grunberg

19  is not crediting all of the cases we cited in our briefs with

20  respect to the use of hyperlinks in opinion cases.  It's true

21  that a couple of them are New York cases, but several of them

22  are cases from other jurisdictions.  The <u>Agora</u> case is a

23  Maryland case, the <u>Nicosia</u> case is a Florida case -- sorry, a

24  California case, and the <u>Redmond</u> case is a California case.

25        And with respect to their overarching point that your

CCHTADEA

1    Honor should not credit the hyperlink because you can't assume

2    that people will go to the link, and that in fact most people

3    won't, that is not what these courts are holding, your Honor.

4    I call your attention specifically to the court in the <u>Nicosia</u>

5    case, and that involved an internet posting that directed

6    readers to specific articles and provided a hyperlink for

7    immediate access to those articles.  The Court said, "These

8    articles were at least as connected to the posting as the back

9    page of a newspaper is connected to the front."

10             THE COURT:  What case is that?

11             MR. LEVINE:  <u>Nicosia</u>, N-I-C-O-S-I-A, 72 F.Supp.2d

12   1093.

13             And then two other very quick points.  One is on the

14   question that you asked about Mr. Jacobs and whether there was

15   anything in the record that would show that Mr. Jacobs' bone

16   fides were in question, it's important to point out I think two

17   things.  One is at the time that the petition and the statement

18   were both posted on our Web site, the only thing in the

19   judicial record in the Nevada litigation relating to these

20   issues was the Jacobs declaration.  There was nothing in there

21   suggesting that what he said was false or that he didn't have

22   bone fides.

23             In fact -- and this is a very important point that we

24   didn't touch on -- there have been, as your Honor knows from

25   our brief, lots of proceedings in the Nevada litigation about

CCHTADEA

1   the issue of whether documents that should be available to

2   Mr. Jacobs to show these prostitution allegations were in fact

3   accurate have been withheld -- improperly withheld from the

4   Nevada court, and in fact whether they have been destroyed.

5   And that speaks not so much to Mr. Jacobs' bone fides but

6   Mr. Adelson's bone fides.

7          And if we get to the point -- this is the point

8   Mr. Wood just made -- if we get to point where we are talking

9   about the second phase of this, if your Honor doesn't grant our

10  motion on one or another of the grounds currently before you,

11  we do think the proper course would be to stay further

12  proceedings on what they're calling the second phase of the

13  Anti-SLAPP motion, specifically with regards to falsity, until

14  these proceedings in Nevada with respect to the document

15  instruction issues have run their course.  Because if in fact

16  it turns out, as it appears to be the case, based on the sworn

17  testimony and the evidentiary hearing already held in Nevada,

18  that Mr. Adelson's companies lost, or perhaps worst, the hard

19  drive of Mr. Jacobs' computer so that the evidence that he

20  claimed was there that would substantiate the prostitution

21  allegations no longer exists, then there should be a real

22  question in the Court's mind about whether at the very least

23  they can carry their burden of proving falsity, and depending

24  on what turns up in the Nevada litigation, whether or not they

25  have engaged in the kind of willful misconduct that would

CCHTADEA

1     constitute a fraud upon the Court.

2             THE COURT:  I don't know that it would be fraud on

3     this Court.  I see the issue as possibly going to the other

4     point you raised about whether there would be an evidentiary

5     basis to show falsity.  In any event, has Jacobs in that case

6     or in the Florida case retracted that statement --

7             MR. LEVINE:  He has not.

8             THE COURT:  -- about prostitution?

9             MR. LEVINE:  He has not.  And we cited at some length

10    in our brief the answer that Mr. Jacobs filed in the Florida

11    case in which he responds to these two e-mails that magically

12    appeared some time later showing that -- purportedly showing

13    that Mr. Adelson did not approve of prostitution.

14            THE COURT:  The documents that led -- that

15    Mr. Dershowitz showed to defendants and the documents that led

16    the DCCC to recant and apologize, those were those e-mails that

17    supposedly said -- supposedly provided evidence that what

18    Jacobs said was untrue?

19            MR. LEVINE:  So glad you raised that issue, your

20    Honor, because I wasn't going to volunteer them, but since you

21    raised them, number one, Mr. Dershowitz never showed us any

22    documents ever.  That is absolutely false, never happened.

23            Second of all, the DCCC statements that were

24    retracted, it's very interesting that in their briefs they talk

25    about the fact that the DCCC retracted but they never tell you

CCHTADEA

1    what the DCCC said in the first place.  The DCCC didn't purport

2    to report on allegations that were made in the lawsuit and

3    claim that because these allegations have been made the funds

4    had been tainted, they made flat-out affirmative statements

5    that Mr. Adelson approved prostitution with no qualifications,

6    no hyperlinks, no cites to anything else to point out -- to say

7    they were reporting on a judicial proceeding.  Totally

8    different situation and not analogous to this one.

9            But to get back to your other question, your Honor, I

10   am assuming that what they are referring to are these two

11   emails that magically appeared down the road after the petition

12   was online, after the statement was put up, and only later

13   submitted of record in the Nevada proceeding.

14           Just one quick point.  If your Honor does see fit at

15   the end of the day to hold that D.C. law applies and to hold

16   that we are entitled to prevail under the D.C. Anti-SLAPP

17   statute, I would like to point out to the Court that the D.C.

18   Anti-SLAPP statute provides for discretionary award of

19   attorneys' fees to the defendant.

20           This is a -- and we tried to submit evidence in this

21   regard in support of this aspect of our application under the

22   SLAPP statute.  This is a case brought by an extremely wealthy

23   individual of unlimited resources against a small nonprofit

24   organization.  It is a case in which the plaintiff has a

25   reputation for engaging in burdensome and abusive litigation,

CCHTADEA

1    and it is a case in which he is seeking or purports to seek not

2    less then $10 million in compensatory damages and not less than

3    $50 million in punitive damages.  This is exactly the kind of

4    case for which the D.C. Anti-SLAPP statute was enacted, and we

5    think if the Court grants the motion we would be entitled to

6    the award of attorneys' fees.

7              MR. WOOD:  May I briefly have a comment?

8              THE COURT:  Sure.

9              MR. WOOD:  I just think it's wrong to impugn Alan

10   Dershowitz without the facts.  Alan Dershowitz is one of the

11   most respected attorneys on constitutional law in this country

12   and fought for the cause of Jewish rights and protection of

13   Jewish American citizens and abroad.  Mr. Dershowitz did not --

14   as I understand it, did not give the actual e-mails to the NJDC

15   because they had not yet been filed of record in the court.

16   But he, with his standing, told these gentleman they existed

17   and he had seen them, and we contend they were entitled to

18   believe Alan Dershowitz and had no reason to believe that

19   Mr. Dershowitz would misrepresent the truth to them.

20             They were subsequently filed in the court.  They did

21   not magically appear.  They were not given for precise reasons.

22   They were then filed by the attorneys in Nevada to substantiate

23   that in fact Mr. Jacobs knew years ago when this issue came up

24   that it had been quickly investigated and he was told that it

25   was absolutely false, that there was no change whatsoever in

CCHTADEA

1    the no tolerance policy that existed in the Las Vegas casinos.

2              The only other point I make, your Honor, is on this

3    issue of republication, they raised it in a footnote contrary

4    to the body of their motions where they listed the grounds upon

5    which they were moving.  And they concede in their footnote

6    that even if it constitutes a republication, the privileges

7    that protect the petition that they did assert would give it

8    protection.  I don't disagree with the latter, but what I would

9    ask is if the Court feels that it does want to address the

10   issue of whether article two is a republication, given that we

11   did not address that in our response papers but did only do

12   what we had done before and referred to it as a republication

13   without arguing the merits, that we would be given an

14   opportunity to supplementally brief that in some short order,

15   concise fashion so we have the right to get our positions of

16   record with respect to whether article two is actionable as a

17   republication or otherwise.

18             THE COURT:  OK.  Thank you all very much.  This has

19   been helpful.  I appreciate your arguments today and your

20   excellent briefing of these issues, and I am going to get to

21   work and I will be ruling as soon as I can.

22             MR. WOOD:  Happy holidays.

23             MR. LEVINE:  Thank you, your Honor.

24             THE COURT:  Thank you.

25                              o0o