UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------

SHELDON G. ADELSON,                    :

                     Plaintiff,         :

                                  :   Case No. 12-Civ-6052-JPO

v.                                   :

                                  :   ECF Case

DAVID A. HARRIS,  MARC R. STANLEY, and    :
NATIONAL JEWISH DEMOCRATIC COUNCIL,      :

                                  :

                   Defendants.      :

                                  :

-------------------------------------------------------------------

## COMBINED SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' SPECIAL MOTION TO DISMISS PURSUANT TO THE NEVADA ANTI-SLAPP STATUTE AND MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)

Lee Levine (*pro hac vice*)
Gayle C. Sproul
Seth D. Berlin
Chad R. Bowman (*pro hac vice*)
Rachel F. Strom
LEVINE SULLIVAN KOCH & SCHULZ, LLP
321 West 44th Street, Suite 1000
New York, New York 10036
Telephone: 212-850-6100
llevine@lskslaw.com
gsproul@lskslaw.com
sberlin@lskslaw.com
cbowman@lskslaw.com
rstrom@lskslaw.com

*Counsel for Defendants*
*David A. Harris, Marc R. Stanley,*
*and National Jewish Democratic Council*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT ............................................................................. 1

ARGUMENT ....................................................................................................... 3

I.   DEFENDANTS ARE IMMUNE FROM LIABILITY UNDER NEVADA'S
     ANTI-SLAPP STATUTE ............................................................................... 3

     A.   The Purpose and Broad Scope of the Nevada Anti-SLAPP Statute ....... 3

     B.   Application of the Statute's Immunity ................................................... 5

     C.   The Challenged Statements Were "in Furtherance of the Right of
          Petition" as Defined by Section 41.637 ................................................ 6

          1.   Communications "aimed at procuring" an "electoral action,
               result or outcome" ........................................................................ 7

          2.   "Written statement" made in "direct connection with an issue
               under consideration" by a governmental body ............................. 8

     D.   The Challenged Communications Were "Truthful or Made Without
          Knowledge of [Their] Falsehood" ......................................................... 9

          1.   The Petition was not made with "knowledge of its falsehood" ...... 10

          2.   The Statement was both "truthful" and "made without
               knowledge of its falsehood" ........................................................ 14

          3.   Plaintiff is properly precluded from contesting "truth" under
               the Nevada statute because his agents lost or destroyed
               evidence critical to a determination of that issue ...................... 17

II.  PLAINTIFF HAS FAILED TO STATE A CLAIM UNDER RULE 12(b)(6) ......... 19

     A.   The Petition and the Statement Constitute Privileged Reports of a
          Judicial Proceeding Under Nevada Law ............................................... 20

          1.   As plaintiff has conceded, the Nevada privilege is "essentially
               the same" as the District of Columbia privilege .......................... 21

          2.   The embedded hyperlink to the AP Article's description of the
               Jacobs Declaration satisfies the fair report privilege's
               attribution requirement ............................................................. 25

    B.     The Other Challenged Statements are Expressions of Opinion
          Protected by the First Amendment ...................................................................28

CONCLUSION...............................................................................................................................29

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Archey v. Nelson*,
    2010 WL 3711513 (Nev. Dist. Ct. Aug. 10, 2010)............................................................7, 15

*AroChem Int'l, Inc. v. Buirkle*,
    968 F.2d 266 (2d Cir. 1992)...................................................................................................4

*Balestra-Leigh v. Balestra*,
    2010 WL 4280424 (D. Nev. Oct. 19, 2010) ......................................................................5, 6

*Beers v. General Motors Corp.*,
    1999 WL 325378 (N.D.N.Y. May 17, 1999).................................................................18, 19

*Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*,
    757 F.2d 523 (2d Cir. 1985).................................................................................................10

*Bensusan Restaurant Corp. v. King*,
    937 F. Supp. 295 (S.D.N.Y. 1996) .......................................................................................26

*Bio/Basics Int'l Corp. v. Ortho Pharm. Corp.*,
    545 F. Supp. 1106 (S.D.N.Y. 1982)........................................................................................4

*Biro v. Condé Nast*,
    883 F. Supp. 2d 441 (S.D.N.Y. 2012)...................................................................................23

*Block v. First Blood Assocs.*,
    691 F. Supp. 685 (S.D.N.Y. 1988) .........................................................................................4

*Brancaccio v. Mitsubishi Motors Co.*,
    1992 WL 189937 (S.D.N.Y. 1992)........................................................................................18

*Buckwalter v. Wey*,
    2010 WL 2609100 (D. Nev. June 24, 2010).............................................................................7

*Carolco Pictures Inc. v. Sirota*,
    700 F. Supp. 169 (S.D.N.Y. 1988) ..........................................................................................4

*Chowdhry v. NLVH, Inc.*,
    851 P.2d 459 (Nev. 1993).......................................................................................................10

*Cianci v. New Times Publ'g Co.*,
    639 F.2d 54 (2d Cir. 1980).....................................................................................................23

*Circus Circus Hotels v. Witherspoon*,
    657 P.2d 101 (Nev. 1983)................................................................................................21, 22

*Citizens United v. Fed. Election Comm'n*,
  558 U.S. 310 (2010)...........................................................................................9

*Clarke v. JPMorgan Chase Bank, N.A.*,
  2010 WL 1379778 (S.D.N.Y. Mar. 26, 2010) ..................................................11

*Coles v. Washington Free Weekly, Inc.*,
  881 F. Supp. 26 (D.D.C. 1995)..........................................................................24

*Collins v. Laborers Int'l Union of N. Am. Local No. 872*,
  2011 U.S. Dist. LEXIS 79853 (D. Nev. July 21, 2011)......................................7

*Contemporary Mission, Inc. v. The New York Times Co.*,
  842 F.2d 612 (2d Cir. 1988)...............................................................................16

*D.R. Horton, Inc. v. Safe Homes Nevada, Inc.*,
  2003 WL 25717726 (Nev. Dist. Ct. May 28, 2003) ........................................7, 8

*Diario El Pais, S.L. v. Nielsen Co. (US)*,
  2008 WL 4833012 (S.D.N.Y. Nov. 6, 2008) .....................................................13

*Edwards v. Nat'l Audubon Soc'y, Inc.*,
  556 F.2d 113 (2d Cir. 1977)...............................................................................16

*Egiazaryan v. Zalmayev*,
  2011 WL 6097136 (S.D.N.Y. Dec. 7, 2011) .....................................................13

*Flamm v. American Ass'n of Univ. Women*,
  201 F.3d 144 (2d Cir. 2000)...............................................................................28

*Franklin v. Dynamic Details, Inc.*,
  116 Cal. App. 4th 375 (Cal. Ct. App. 2004) ......................................................27

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974)............................................................................................24

*Global Telemedia Int'l, Inc. v. Doe 1*,
  132 F. Supp. 2d 1261 (C.D. Cal. 2001) ..............................................................27

*Goforth v. Avemco Life Ins. Co.*,
  368 F.2d 25 (4th Cir. 1966) ................................................................................14

*Goldstein v. Cogswell*,
  1992 WL 131723 (S.D.N.Y. June 1, 1992) ..........................................................4

*Haack v. City of Carson City*,
  2012 WL 3638767 (D. Nev. Aug. 22, 2012) ........................................................6

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
  491 U.S. 657 (1989)...........................................................................................14

*Herbert v. Lando*,
  596 F. Supp. 1178 (S.D.N.Y. 1984)....................................................................23

*Hustler Magazine v. Falwell*,
  485 U.S. 46 (1988)..............................................................................................14

*In re Phila. Newspapers, LLC*,
  690 F.3d 161 (3d Cir. 2012)................................................................................14

*Jankovic v. Int'l Crisis Grp.*,
  593 F.3d 22 (D.C. Cir. 2010)..............................................................................20

*John v. Douglas Cty. Sch. Dist.*,
  219 P.3d 1276 (Nev. 2009)..........................................................................*passim*

*KJR Mgmt. Co. v. First Web Search, LLC*,
  2008 WL 7907954 (Nev. Dist. Ct. Nov. 19, 2008)................................................5

*Klein v. Biben*,
  296 N.Y. 638 (1946)...........................................................................................15

*Law Firm of Daniel P. Foster, P.C. v. Turner Broad. Sys., Inc.*,
  844 F.2d 955 (2d Cit. 1988)................................................................................29

*Liberty Lobby, Inc. v. Dow Jones & Co.*,
  838 F.2d 1287 (D.C. Cir. 1988)..........................................................................11

*Lubin v. Kunin*,
  17 P.3d 422 (Nev. 2001).....................................................................................23

*Makaeff v. Trump University, LLC*,
  --- F.3d ----, 2013 WL 1633097 (9th Cir. Apr. 17, 2013).......................................6

*Masson v. New Yorker Magazine, Inc.*,
  960 F.2d 896 (9th Cir. 1992)..............................................................................17

*Mayfield v. NASCAR, Inc.*,
  674 F.3d 369 (4th Cir. 2012)..............................................................................13

*McCutcheon v. Fed. Election Comm'n*,
  893 F. Supp. 2d 133 (D.D.C. 2012)......................................................................9

*Metabolic Research, Inc. v. Ferrell*,
  693 F.3d 795 (9th Cir. 2012)................................................................................3

*Milkovich v. Lorain Journal Co.*,
    497 U.S. 1 (1990)...........................................................................14, 28

*Nevada Indep. Broad. Corp. v. Allen*,
    664 P.2d 337 (Nev. 1983) ..............................................................24

*Official Comm. v. Coopers & Lybrand, LLP*,
    322 F.3d 147 (2d Cir. 2013)............................................................10

*Parisi v. Sinclair*,
    845 F. Supp. 2d 215 (D.D.C. 2012) .................................................13

*Piscatelli v. Van Smith*,
    35 A.3d 1140 (Md. 2012) ...............................................................24

*Rebel Commc'ns, LLC v. Virgin Valley Water Dist.*,
    2012 WL 3135683 (D. Nev. Aug. 1, 2012) .......................................6

*Rebel Commc'ns, LLC v. Virgin Valley Water Dist.*,
    2012 WL 934301 (D. Nev. Mar. 20, 2012) .....................................6, 7

*Rosanova v. Playboy Enters., Inc.*,
    580 F.2d 859 (5th Cir. 1978) .........................................................12

*Rosenfeld v. City of N.Y.*,
    2012 WL 976044 (E.D.N.Y. Mar. 22, 2012) ....................................10

*Ryan v. Brooks*,
    634 F.2d 726 (4th Cir. 1980) .........................................................12

*Sahara Gaming Corp. v. Culinary Workers Union Local 226*,
    984 P.2d 164 (Nev. 1999) .......................................................*passim*

*Salyer v. Southern Poverty Law Ctr.*,
    701 F. Supp. 2d 912 (W.D. Ky. 2009)..............................................15

*Schatz v. Republican State Leadership Comm.*,
    669 F.3d 50 (1st Cir. 2012)...................................................11, 12, 13

*Solaia Tech., LLC v. Specialty Publ'g Co.*,
    221 Ill.2d 558 (Sup. Ct. 2006) ......................................................24

*Synanon Church v. United States*,
    820 F.2d 421 (D.C. Cir. 1987).........................................................19

*U.S. ex rel. Newsham v. Lockheed Missiles*,
    190 F.3d 963 (9th Cir. 1999) .........................................................3, 6

*Wehling v. CBS,*
  608 F.2d 1084 (5th Cir. 1979) ...................................................................................19

*West v. Goodyear Tire & Rubber Co.,*
  167 F.3d 776 (2d Cir. 1999)......................................................................................18

*Westmoreland v. CBS, Inc.,*
  596 F. Supp. 1170 (S.D.N.Y. 1984).........................................................................16

*World Boxing Council v. Cosell,*
  715 F. Supp. 1259 (S.D.N.Y. 1989).........................................................................12

*Wynn v. Smith,*
  16 P.3d 424 (Nev. 2001) ...........................................................................................21

*Zermeno v. Stratosphere Corp.,*
  2010 WL 2265167 (D. Nev. June 2, 2010)..................................................................6

STATUTES

1997 Nev. Stat., ch. 387 ...................................................................................................3, 4, 7

D.C. Code § 16-5502(b)..........................................................................................................2

Nev. Rev. Stat. § 41.635 *et seq.* ......................................................................................1, 3

Nev. Rev. Stat. § 41.637 ................................................................................................ *passim*

Nev. Rev. Stat. § 41.650 ........................................................................................................5

Nev. Rev. Stat. § 41.660 ...............................................................................................1, 2, 5, 6

OTHER AUTHORITIES

1 Robert D. Sack, *Sack on Defamation* § 5:5.2 (4th ed. 2010)....................................12

## PRELIMINARY STATEMENT

On March 6, this Court requested that the parties supplement their briefing on Defendants' Combined Motions to Dismiss to address the application of Nevada law in two respects: its Anti-SLAPP law, Nev. Rev. Stat. § 41.635 *et seq.*, and its law applicable to the other substantive issues addressed in defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Accordingly, defendants National Jewish Democratic Council ("NJDC"), Marc R. Stanley and David Harris respectfully submit this supplemental brief in further support of their Combined Motions.

Defendants' supplemental brief is in two parts. In Part I, we explain why dismissal is warranted under the absolute "immunity from civil liability" afforded by the Nevada Anti-SLAPP statute. Like the D.C. Act, Nevada's Anti-SLAPP statute is expressly designed to deter lawsuits that "abuse the judicial process by chilling, intimidating, and punishing individuals for their involvement in public affairs." *John v. Douglas Cty. Sch. Dist.*, 219 P.3d 1276, 1281 (Nev. 2009). *See* Part I.A. *infra.* The statute applies to any communication that is both (a) about certain matters of public interest, including those directed to "procuring any governmental or electoral action" and/or those involving issues under consideration by a governmental body, and (b) either "truthful or made without knowledge of its falsehood." Nev. Rev. Stat. §§ 41.637, 41.660. The statutory immunity applies in this case because:

- The Petition[1] and the Statement were, on their face, "aimed at procuring [an] electoral action, result or outcome" and made "in direct connection with an issue under consideration by a legislative, executive or judicial body." Nev. Rev. Stat. § 41.660. *See* Part I.C. *infra.*

- Even construing the Petition as plaintiff does, it was, at the very least, "made without knowledge of its falsehood" because it was based, in relevant part, on the Associated

---

[1] Terms defined in defendants' prior briefing – such as the Petition, the Statement, and the Jacobs Declaration – are given the same meaning herein.

Press' description of the Jacobs Declaration, because plaintiff does not even allege that it was published with actual knowledge that the allegations contained in that Declaration were false, and because plaintiff has conceded that the remaining portions of the Petition he has challenged are statements of opinion that cannot be true or false and, by definition, cannot be published with knowledge of their falsity.  *See* Part I.D.1. *infra.*

- The Statement contains no false statement of fact and is therefore "truthful" within the meaning of the Nevada statute and, in any event, was not published with the requisite "knowledge of its falsehood," because the denials of Jacobs' allegations by plaintiff's lawyer, on which plaintiff relies, are insufficient as a matter of law to constitute such knowledge.  *See* Part I.D.2. *infra.*

- Plaintiff is precluded from litigating the "truth" or "falsity" of Jacobs' allegations because electronic evidence within his control, which is critical to the resolution of that issue, has been lost or destroyed.  *See* Part I.D.3. *infra.*[2]

In Part II, we explain why plaintiff has failed to state a viable claim under applicable

Nevada and constitutional law.  Fed. R. Civ. P. 12(b)(6).  Specifically, we demonstrate that:

- The Petition (and the Statement should it be deemed to contain any false statement of fact) constitutes a privileged report of a filed and sworn judicial document under Nevada law.  *See* Part II.A. *infra.*[3]

- The Petition and the Statement otherwise constitute constitutionally protected expressions of opinion under the applicable law of this Circuit.  *See* Part II.B. *infra.*

---

[2] Because the Nevada statute treats an Anti-SLAPP motion as a motion for summary judgment, Nev. Rev. Stat. § 41.660(3), defendants submit herewith a Statement of Undisputed Material Facts ("SUMF") in accordance with this Court's Local Rules.  *See* S.D.N.Y. Rule 56.1.  The SUMF is based solely on the allegations of the Complaint and records that are properly the subject of judicial notice, including certain exhibits to the previously submitted Harris, Strom and Strom Reply Declarations (Dkts. 19, 20, 39).  The motion can and should be decided as a matter of law without resort to additional evidence.  Nevertheless, to the extent the Court deems such evidence to be necessary, defendants also submit herewith declarations executed by each of the individual defendants and incorporate herein by this reference the previously submitted declaration of Steven Jacobs (Dkt. 20 Ex. 29).

[3] Unlike the D.C. Anti-SLAPP Act, pursuant to which a plaintiff may avoid dismissal by showing a "likelihood of success on the merits" of his claims, *see* D.C. Code § 16-5502(b), the Nevada Anti-SLAPP statute provides absolute immunity to the communications it protects.  Accordingly, Part II of defendants' supplemental brief is directed solely to their motion to dismiss under Rule 12(b)(6).  For the same reason, under Nevada law, the Court's determination of either motion is not dependent on its resolution of the other.

# ARGUMENT

## I.   DEFENDANTS ARE IMMUNE FROM LIABILITY UNDER NEVADA'S ANTI-SLAPP STATUTE.

### A.   The Purpose and Broad Scope of the Nevada Anti-SLAPP Statute.

Nevada, like the District of Columbia and now close to thirty other states, has enacted anti-SLAPP legislation.  *See* Nev. Rev. Stat. § 41.635 *et seq.*  Like those other statutes, Nevada's law is expressly designed to curtail SLAPPs, "'meritless suit[s] filed primarily to chill the defendant's exercise of First Amendment rights,'" the "hallmark" of which is "to obtain a financial advantage over one's adversary by increasing litigation costs."  *John*, 219 P.3d at 1280 (citing *U.S. ex rel. Newsham v. Lockheed Missiles*, 190 F.3d 963, 970 (9th Cir. 1999)), *cert. denied*, 130 S. Ct. 3355 (2010).  Like the D.C. Act, "Nevada's anti-SLAPP statute filters unmeritorious claims in an effort to protect citizens from costly retaliatory lawsuits arising from their right to free speech under both the Nevada and Federal Constitutions."  219 P.3d at 1282 (affirming dismissal under statute); *see also Metabolic Research, Inc. v. Ferrell*, 693 F.3d 795, 802 (9th Cir. 2012) (Nevada statute "allows a citizen to obtain a prompt review of potential SLAPP lawsuits and have them dismissed before she is forced to endure the burdens and expense of the normal litigation process").

Originally enacted in 1993 to address lawsuits arising specifically from the act of petitioning government officials, *see* Nev. Rev. Stat. § 41.637(2), the statute's reach was extended in 1997 to include other communications addressing matters of public interest, such as the Petition and Statement at issue here, *id.* § 41.637(1), 41.637(3); *see generally* 1997 Nev. Stat., ch. 387, at 1364-66.  In amending the statute, Nevada's Legislature "explained that SLAPP lawsuits abuse the judicial process by chilling, intimidating, and punishing individuals for their involvement in public affairs" and that "implementation of an anti-SLAPP statute was [therefore]

essential to protect citizens' constitutional rights." *John*, 219 P.3d at 1281 (citing 1997 Nev. Stat., ch. 387, preamble, at 1364); *see also id.* at 1283 (Nevada Act "seeks to promote and protect a citizen's exercise of his or her constitutional rights"); *id.* at 1281 ("representative democracy demands that citizens and public officials have the ability to openly engage in discussions of public concern").[4]

To achieve this goal, the Nevada statute provides an "immunity from civil liability" for "good faith communication[s]" relating to certain categories of speech that address issues of public interest, Nev. Rev. Stat. § 41.650, and directs courts to dismiss suits directed at such expression prior to the commencement of expensive and burdensome discovery, *John*, 219 P.3d at 1284.[5] As defendants have previously demonstrated, *see* Dkt. 18 at 5-22, this action was

---

[4] The Preamble to the 1997 amendment explains, *inter alia*, that: (1) "SLAPPs are an abuse of the judicial process in that they are used to censor, chill, intimidate or punish persons for involving themselves in public affairs"; (2) the "number of SLAPPs has increased significantly over the past 30 years"; (3) the "threat of financial liability, litigation costs and other personal losses from groundless civil actions seriously affects governmental, commercial and individual rights by significantly diminishing public participation in government, in public issues and in voluntary service"; (4) "[a]lthough courts have recognized and discouraged SLAPPs, protection of this important right has not been uniform or comprehensive"; and (5) it therefore "is essential to our form of government that the constitutional rights of citizens to participate fully in the process of government be protected and encouraged." 1997 Nev. Stat., ch. 387, preamble, at 1364.

[5] Regardless of whether the multiple factors that traditionally govern choice of law determinations favor application of D.C. or Nevada law in this case more generally, in the this Circuit, the law of defendants' domicile governs a defendant's invocation of privileges and immunities, such as the Anti-SLAPP immunity and common law privilege at issue in these motions. *See, e.g.*, *AroChem Int'l, Inc. v. Buirkle*, 968 F.2d 266, 270-71 (2d Cir. 1992) (because the "'purpose of a common law or statutory privilege is the regulation of defamatory conduct that occurs within a state's borders,'" privilege "lose[s] its force if weight were given to the domicile of the parties or the place of injury in determining choice of law"); *Goldstein v. Cogswell*, 1992 WL 131723, at *25 n.32 (S.D.N.Y. June 1, 1992) ("Since the letter was apparently written in New York. . . , it is appropriate to apply New York's substantive law regarding privileges"); *Bio/Basics Int'l Corp. v. Ortho Pharm. Corp.*, 545 F. Supp. 1106, 1113-14 (S.D.N.Y. 1982) (the law of the "state where the allegedly defamatory statement was made" may apply to any immunity or privilege); *Block v. First Blood Assocs.*, 691 F. Supp. 685, 698 (S.D.N.Y. 1988) (applying New York privilege to California plaintiff's defamation claim against New York defendant); *Carolco Pictures Inc. v. Sirota*, 700 F. Supp. 169, 171 (S.D.N.Y. 1988) (same); *Restatement (Second) of Conflicts of Laws* § 145 cmt. d.

4

instituted by a notoriously litigious,[6] multi-billionaire and directed at a publication that expressly

referenced and relied on news reports describing a sworn court filing, and did so in the context of

criticizing plaintiff's multi-million dollar donations to candidates in a national presidential

election.  As we demonstrate *infra,* such an action is properly dismissed under Nevada's anti-

SLAPP statute.

### B.      Application of the Statute's Immunity.

Under the Nevada statute, a "person who engages in a good faith communication in

furtherance of the right to petition is immune from civil liability for claims based upon the

communication."  Nev. Rev. Stat. § 41.650.  To assert this statutory immunity, the "person

against whom the action is brought may file a special motion to dismiss" within "60 days after

service of the complaint which period may be extended by the court for good cause shown."  *Id.*

§ 41.660.[7]  To prevail, a defendant filing a special motion to dismiss must make a two-part

showing: (1) that the challenged speech was made "in furtherance of the right to petition," which

the statute defines to include three broad categories of speech, two of which are applicable here,

---

[6] Indeed, since the Court heard argument on defendants' motion in December, plaintiff instituted yet another defamation action, this one in Hong Kong against an individual *Wall Street Journal* reporter simply because she described him in an article as "foul mouthed."  *See* Declaration of Gayle Sproul ("Sproul Decl.") ¶ 7 & Ex. 154.

[7] In this case, defendants properly "invoked the protections" of the Nevada statute within 60 days of the filing of the complaint.  *See* Dkt. 18 at 2 n.2; *see also* Dkt. 37 at 1 n.1 ("Should the Court decide that Nevada law applies, defendants reserve the right to address that state's law, including its anti-SLAPP Act, more fully.");  *id.* at 9 n.11 (addressing application of Nevada statute in federal court).  In an abundance of caution, defendants have also contemporaneously filed a Renewed Notice/Notice of Anti-SLAPP Motion.  Even if that Notice were deemed to constitute defendants' initial invocation of the statute, however, there is – especially given the Court's recent indication that it was inclined to apply Nevada law and its directive to the parties to brief it – ample "good cause" for the extension contemplated by the statute.  *See* Nev. Rev. Stat. § 41.660(3) (providing that time period for special motion "may be extended by the court for good cause shown"); *see also KJR Mgmt. Co. v. First Web Search, LLC*, 2008 WL 7907954, at *2 (Nev. Dist. Ct. Nov. 19, 2008) (finding good cause to extend 60-day period where party "acted with the appropriate diligence and haste" once basis for invoking statute became clear); *Balestra-Leigh v. Balestra*, 2010 WL 4280424, at *3 (D. Nev. Oct. 19, 2010), *aff'd on other grounds*, 471 F. App'x 636 (9th Cir. 2012) (finding SLAPP motion filed within 60 days of amended complaint to be timely).

and (2) that it constituted a "good faith communication," which means that the statement at issue is either "truthful or is made without knowledge of its falsehood."  Nev. Rev. Stat. §§ 41.637, 41.660; *see also John*, 219 P.3d at 1282.

The statute directs the court to "treat the motion as a motion for summary judgment" with respect to these two issues.  Nev. Rev. Stat. § 41.660(3).  In addition, once "the moving party satisfies this threshold showing, then the burden of production shifts to the nonmoving party, who must demonstrate a genuine issue of material fact" or that the movant is not entitled to judgment as a matter of law based upon the undisputed facts.  *John*, 219 P.3d at 1282.  If the plaintiff cannot meet his burden, the "court must dismiss the action, and that dismissal operates as an adjudication on the merits."  *Id.  See also* Nev. Rev. Stat. § 41.660(4); *Rebel Commc'ns, LLC v. Virgin Valley Water Dist.*, 2012 WL 3135683 (D. Nev. Aug. 1, 2012) (confirming that order granting special motion to dismiss under Nevada Anti-SLAPP statute "must be with prejudice as an adjudication on the merits").[8]

### C.     The Challenged Statements Were Made "in Furtherance of the Right of Petition" as Defined by Section 41.637.

The Nevada Anti-SLAPP statute defines "three classes of petitions protected" by its terms, *John*, 219 P.3d at 1286, specifically any:

1.   Communication that is aimed at procuring any governmental or electoral action, result or outcome;

---

[8] The Nevada statute was adopted shortly after California promulgated its own anti-SLAPP statute, and is "similar in purpose" to the California law.  *See John*, 219 P.3d at 1281.  As with the California statute, *see Newsham*, 190 F.3d at 973, the Nevada statute applies in federal court in diversity actions, *see, e.g., Haack v. City of Carson City*, 2012 WL 3638767, at *3 (D. Nev. Aug. 22, 2012); *Rebel Commc'ns, LLC v. Virgin Valley Water Dist.*, 2012 WL 934301, at *2 (D. Nev. Mar. 20, 2012); *Balestra-Leigh*, 2010 WL 4280424, at *4; *Zermeno v. Stratosphere Corp.*, 2010 WL 2265167, at *1 n.1 (D. Nev. June 2, 2010); *see generally* Dkt. 18 at 27 n.20; *but see Makaeff v. Trump University, LLC*, --- F.3d ----, 2013 WL 1633097, at *14-18 (9th Cir. Apr. 17, 2013) (Kozinski and Paez, JJ., concurring) (applying California anti-SLAPP statute in federal court pursuant to binding Circuit precedent, but advocating reconsideration of *Newsham en banc*).

2. Communication of information or a complaint to a Legislator, officer or employee of the Federal Government, this state or a political subdivision of this state, regarding a matter reasonably of concern to the respective governmental entity; or

3. Written or oral statement made in direct connection with an issue under consideration by a legislative, executive or judicial body, or any other official proceeding authorized by law[.]

Nev. Rev. Stat. § 41.637.  The publications at issue in this case plainly fall within both the first and third categories of speech protected by the statute.[9]

### 1. Communications "aimed at procuring" an "electoral action, result or outcome"

The first class of communications protected by the statute includes those "aimed at procuring any . . . *electoral* action, result or outcome." *Id.* (emphasis added).  In the Petition, a political organization favoring Democratic candidates called into question both the extraordinary magnitude of plaintiff's contributions to Republican candidates and the legitimacy of those contributions.  It expressly urged readers to sign an online petition calling on Governor Romney and the Republican party to refuse his donations.  When announcing the removal of the Petition

---

[9] Although, when it amended the statute, the Nevada legislature retained the "right to petition" verbiage from the original 1993 law, which included only prong 2 of the current statutory definition, the statute, as amended, was in fact substantially broadened by the addition of prongs 1 and 3.  As a result, the current definition of that term extends well beyond the direct petitioning of government officials to include the types of communications at issue here.  1997 Nev. Stat., ch. 387, at 1364-66.  *See, e.g., Rebel Commc'ns*, 2012 WL 934301, at *2 ("public statements and other communications" by defendants "engaged in a concerted effort to have a new communications tower built," an issue then pending before the city council, were covered by statutory immunity); *Archey v. Nelson*, 2010 WL 3711513, at *4 (Nev. Dist. Ct. Aug. 10, 2010) (newspaper report describing ongoing school district dispute fell within ambit of statute because "the legislature made it clear that their intent was to also apply the protections afforded by this legislation to news media accounts when they publish an article that directly pertains to a matter under consideration by a governmental body"); *D.R. Horton, Inc. v. Safe Homes Nevada, Inc.*, 2003 WL 25717726, at *6 (Nev. Dist. Ct. May 28, 2003) (interest group's website discussing "construction defects legislation under consideration by the State Legislature," an issue that was also "under consideration by the Construction Liability Insurance Task Force," qualified for protection under statute); *but see Collins v. Laborers Int'l Union of N. Am. Local No. 872*, 2011 U.S. Dist. LEXIS 79853, at *3 (D. Nev. July 21, 2011) (immunity arises only from "good faith communications to a government agency"); *Buckwalter v. Wey*, 2010 WL 2609100, at *3 (D. Nev. June 24, 2010) ("[T]he statute only protects citizens who petition a government agency.").

from the NJDC's website, the Statement promised that defendants would "continue to work hard to fight against the unique threat posed by the outsized influence of certain individual megadonors, which rightly concerns most Americans and most American Jews." It cannot be seriously disputed that the Petition and Statement were self-evidently communications "aimed at procuring" an "electoral action, result or outcome." *See, e.g., John*, 219 P.3d at 1286 (statute applies to good faith communications "to procure government or electoral action"); *D.R. Horton, Inc. v. Safe Homes Nevada, Inc.*, 2003 WL 25717726, at *6 (Nev. Dist. Ct. May 28, 2003) (holding that website of advocacy group was aimed at procuring governmental action under first prong of statute because "its objective was to defeat proposed spending legislation on construction issues"). *See also* Dec. 17, 2012 Tr. (Sproul Decl. Ex. 148) at 36: 1-6 ("COURT: Of course, the only reason the defendants NJDC were talking about the prostitution issue was because of the political contributions. Otherwise, presumably they wouldn't have cared. In other words, it was only a subject of publishable interest to them, I think, because of the campaign, because of his contributions to the campaign. . . .").

### 2. "Written statement" made in "direct connection with an issue under consideration" by a governmental body.

Both the Petition and the Statement also qualify under the third category of communications protected by the statute as a "written or oral statement" made in "direct connection with an issue under consideration by a legislative, executive or judicial body." Nev. Rev. Stat. § 41.637(3). As plaintiff himself alleges, the portion of the Petition at issue here is based on a declaration filed in "a lawsuit in the District Court for Clark County, Nevada, captioned *Steven C. Jacobs v. Las Vegas Sands Corp., et al.*, No. A627691-B." Compl. ¶ 55; *see also id.* at ¶¶ 57, 59. The lawsuit was ongoing at the time the Petition and Statement were published (and remains so today), and thus a communication about it is by definition made in

8

"direct connection with an issue under consideration by a . . . judicial body."  Nev. Rev. Stat. § 41.637(3); *see generally* Dkt. 18 at 10-14 (detailing Nevada judicial proceedings).  More broadly, defendants' criticism of plaintiff's campaign contributions and "the unique threat posed by the outsized influence of certain individual megadonors" is directly connected to judicial consideration in both the United States Supreme Court and several lower federal courts of First Amendment limitations on laws restricting such contributions, *see, e.g.*, *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010), adjudication of which remained ongoing at the time of the challenged communications, *see, e.g.*, *McCutcheon v. Fed. Election Comm'n*, 893 F. Supp. 2d 133 (D.D.C. 2012), *probable jurisdiction noted*, 133 S. Ct. 1242 (2013).

Moreover, the Petition hyperlinked to reports describing ongoing investigations by the U.S. Department of Justice and Securities Exchange Commission ("SEC"), *see* Harris Decl. (Dkt. 19) ¶ 9 & Exs. B-D, and addressed more generally the legitimacy of campaign contributions regulated by the Federal Election Commission.  Accordingly, defendants' communications constitute, in this sense as well, written statements in "direct connection with an issue under consideration by" an "executive . . . body."  Nev. Rev. Stat. § 41.637(3); *see also* Harris Decl. at ¶¶ 8-9.[10]

### D.    The Challenged Communications Were "Truthful or Made Without Knowledge of [Their] Falsehood."

For purposes of the statute, a communication is "made in good faith" if it is "truthful or is made without knowledge of its falsehood."  Nev. Rev. Stat. § 41.637.  The allegations of plaintiff's own complaint confirm that the Petition and Statement satisfy this definition as a

---

[10] Indeed, plaintiff's company has now admitted in public filings with the SEC both that it is a target of investigation, *see* Strom Decl. ¶ 36, and that an internal audit had "reached certain preliminary findings," including that the company had committed "likely violations of the books and records and internal controls provisions" of the Foreign Corrupt Practices Act.  *See* Sproul Decl. ¶ 6 & Ex. 153.

matter of law.  Moreover, plaintiff is properly precluded from litigating the issue of truth given

his companies' sworn admissions that they have lost or destroyed critical evidence relevant to

that issue.  For both of these reasons, the "good faith" requirement for securing the immunity

afforded by the Nevada statute is satisfied as well.

## 1.   The Petition was not made with "knowledge of its falsehood."

In his complaint, plaintiff alleges that the Petition "conveyed to the public" that he had in

fact "personally approved of and profited from prostitution" in his Macau casinos, and that his

political contributions were therefore "tainted" as a result.  Compl. ¶¶ 1, 37; *see also id.* ¶ 25

(Petition "convey[ed] the unmistakable message that Mr. Adelson engaged in the exploitation of

prostitutes and is worthy of public scorn and contempt").[11]  The complaint further alleges that, in

preparing and publishing the Petition, defendants engaged in various conduct "[e]videncing a

reckless disregard for truth or falsity."  Compl. ¶¶ 73-80.  In support of that contention, the

complaint alleges that defendants failed to investigate the truth of Jacobs' charges, ignored

denials reported in the AP Article, relied on an unreliable source in Jacobs, and were animated

by ill will.  *See id.*  The complaint does *not* contend that the alleged defamation was published

with actual knowledge of its falsity.  Plaintiff is bound by these averments of his complaint[12]

---

[11] The Petition itself, however, actually asserted something materially different – *i.e.,* that plaintiff's money had become "tainted" in the wake of widely published *reports* that he had personally approved of his casinos' prostitution strategy, as well as contemporaneous *reports* of allegations about his business affairs then being investigated by the federal government, *see* Compl. Ex. A (Petition stated that "reports surfaced" that Adelson approved prostitution strategy); *id.* (Adelson "reportedly approved" strategy).  Even though the challenged statements are properly "reviewed in their entirety and in context," *Chowdhry v. NLVH, Inc.*, 851 P.2d 459, 463 (Nev. 1993), defendants have nevertheless credited plaintiff's construction of the Petition for purposes of assessing the applicability of the Nevada Anti-SLAPP statute.

[12] *See, e.g., Official Comm. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2013) (allegations of complaint are "'judicial admissions' by which [the plaintiff] was 'bound throughout the course of the proceeding'") (citation omitted); *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir. 1985) (relying on complaint's allegations because a "party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding"); *Rosenfeld*

and, for purposes of the Nevada statute, it is therefore undisputed that the defendants published the Petition "in good faith" as a matter of law.

Plaintiff's failure to plead the requisite knowledge of falsity is no accident – the facts otherwise alleged in his complaint conclusively demonstrate that defendants did not publish the Petition with such knowledge as a matter of law.  Specifically, the complaint alleges (and defendants do not dispute) that their sole sources of information regarding the statements made in the Petition about prostitution were the AP Article and the declaration, sworn to under penalty of perjury by Jacobs, which the article described in detail.  *See also* Dec. 17, 2012 Tr. (Sproul Decl. Ex. 148) at 50:3-6 ("COURT: [S]o it's sworn, it's effectively sworn, a sworn statement, and therefore more than an allegation, it's under penalt[y] of perjury.  So in that sense it's evidence, unlike an allegation in a complaint.").  The complaint emphasizes that defendants based the statements at issue "solely" on these sources and did not conduct any "independent review" of their accuracy.  *See* SUMF ¶¶ 1-8, 11.  Under such undisputed circumstances, where they relied exclusively on a sworn declaration and an account of it published by a responsible news organization, defendants cannot be held to have had actual knowledge that Jacobs' allegations were false as a matter of law.

Indeed, even under the more lenient "reckless disregard of the truth" standard that would support a finding of "actual malice," such reliance on a report disseminated by a reputable news organization and a sworn declaration would be insufficient to establish liability as a matter of law.  *See, e.g.*, *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 57-58 (1st Cir. 2012) (no plausible claim of actual malice where challenged statement was based on previously

---

*v. City of N.Y.*, 2012 WL 976044, at *5 (E.D.N.Y. Mar. 22, 2012) (relying on allegation in plaintiff's complaint in granting summary judgment motion); *Clarke v. JPMorgan Chase Bank, N.A.*, 2010 WL 1379778, at *14 (S.D.N.Y. Mar. 26, 2010) (same).

published newspaper reports); *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1297 (D.C. Cir. 1988) ("good faith reliance on previously published news reports in reputable" publications "precludes a finding of actual malice as a matter of law"); *Ryan v. Brooks*, 634 F.2d 726, 729, 732-34 (4th Cir. 1980) (no actual malice as a matter of law where defendant merely summarized two prior news accounts); *Rosanova v. Playboy Enters., Inc.*, 580 F.2d 859, 862 (5th Cir. 1978) ("The subjective awareness of probable falsity required by [the Supreme Court] cannot be found where, as here, the publisher's allegations are supported by a multitude of previous reports upon which the publisher reasonably relied."); *World Boxing Council v. Cosell*, 715 F. Supp. 1259, 1265 (S.D.N.Y. 1989) (not actual malice to rely on previously published articles that "appeared in respected publications, and were authored by reputable journalists, whose allegations were not so improbable that a prudent author would have questioned their accuracy"); *see generally* 1 Robert D. Sack, *Sack on Defamation* ("Sack") § 5:5.2 (4th ed. 2010) ("An author or publisher may rely on previously published accounts in reasonably reliable [news] sources.").

In *Schatz v. Republican State Leadership Committee*, the First Circuit reached precisely this conclusion in a case that bears a striking resemblance to this one.  Affirming a trial court's decision granting a motion to dismiss addressed to the allegations of the complaint, the court of appeals in *Schatz* held that a plaintiff could not maintain a defamation action arising from statements made in a campaign advertisement (in that case by the Republican State Leadership Committee ("RSLC")) expressly sourced to underlying news reports because, after comparing the challenged advertisement and the underlying reports, the defendant could not as a matter of law be deemed to have published with knowledge of falsity.  669 F.3d at 57-58.  In so holding, the First Circuit explained that it

12

> is plain that what the RSLC said synced up with or at least was not
> out of line with what the stories said.  Most importantly for present
> purposes, none of Schatz's allegations – singly or together –
> plausibly suggest that, given the articles' reporting, the RSLC
> either knew that its statements were false or had serious doubts
> about their truth and dove recklessly ahead anyway.

*Id.* at 58.  *See also Mayfield v. NASCAR, Inc.*, 674 F.3d 369, 378 (4th Cir. 2012) (dismissing on

the pleadings defamation action arising from statement reporting allegations of drug use because

plaintiffs "admit in their recitation of the facts" in their complaint details about "the context in

which the allegedly slanderous statements are made" which themselves preclude finding of

actual malice as a matter of law); *see also, e.g.*, *Parisi v. Sinclair*, 845 F. Supp. 2d 215, 218-19

(D.D.C. 2012) (dismissing claim with prejudice where challenged report on its face showed "the

opposite" of actual malice).[13]

Similarly, in this case, there is no dispute that plaintiff was accused in a sworn

declaration of "personally approving" a "prostitution strategy," that responsible news

organizations recounted that declaration in published reports, and that one such report was the

sole source of the challenged statements in the Petition, which hyperlinked to it.  There is also no

dispute that defendants undertook no additional investigation of the accuracy of these reports and

were therefore presented with no information demonstrating that Jacobs' sworn allegations were

false.  Under such circumstances, the defendants' communications were made "without

knowledge of their falsehood" as required by the Nevada Anti-SLAPP statute.[14]

---

[13] Where, as here, the facts alleged in the complaint themselves affirmatively demonstrate an
absence of constitutional malice, this Court has similarly granted motions to dismiss.  *See, e.g.*,
*Egiazaryan v. Zalmayev*, 2011 WL 6097136, at *8 (S.D.N.Y. Dec. 7, 2011) (granting motion to dismiss
claims by public figure who alleged facts indicating hostility, but not awareness of falsity); *Diario El
Pais, S.L. v. Nielsen Co. (US)*, 2008 WL 4833012, *6-7 (S.D.N.Y. Nov. 6, 2008) (granting motion to
dismiss trade libel claim with prejudice because complaint itself detailed defendant's efforts to assure
accuracy of its methodology).

[14] This is all the more so where, as here, the Petition merely recounts that such "reports [have]
surfaced" and does not in fact assert that plaintiff personally approved of prostitution.  *See note 11 supra*;

13

Finally, plaintiff has conceded that the other portions of the Petition he challenges are expressions of opinion. *See, e.g.*, Dkt. 29 at 27 n.17 (conceding that "the tainted money statements are opinion" and challenging only whether such statements are entitled to protection). As a matter of law, a statement of opinion is not capable of being proven true or false. *See, e.g.*, *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-21 (1990).  By definition, therefore, defendants could not have published these statements with knowledge of falsity.  *Hustler Magazine v. Falwell*, 485 U.S. 46, 57 (1988) (ad parody not actionable because it "'could not "reasonably be understood as describing actual facts about [respondent] or actual events in which [he] participated"'") (citation omitted).

### 2.     The Statement was both "truthful" and "made without knowledge of its falsehood."

For purposes of the Nevada statute, the Statement was made in "good faith" because it was "truthful" – *i.e.,* it simply does not contain any false statement of fact about the plaintiff, whether with respect to the prostitution allegation or otherwise.  Compl. Ex. C.  Plaintiff alleges that the Statement constituted a "republication" of the Petition  and is therefore actionable in defamation because it "endorsed, republished and affirmed" those "prior defamatory statements." Dkt. 29 at 8.  But, as defendants have previously explained, *see* Dkt. 37 at 20 n.26, "[u]nder traditional principles of republication, a mere reference to an article, regardless how favorable it is as long as it does not restate the defamatory material, does not republish the material."  *In re Phila. Newspapers, LLC*, 690 F.3d 161, 175 (3d Cir. 2012); *see also Goforth v. Avemco Life Ins.*

---

*see also, e.g.*, *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 695 (1989) (Blackmun, J., concurring) (noting that "this Court's decisions dealing with actual malice have placed considerable emphasis on the manner in which the allegedly false content was presented by the publisher.  Under our precedents, I find significant the fact that the article in this case accurately portrayed Thompson's allegations *as* allegations, and also printed Connaughton's partial denial of their truth.") (citations omitted).  In this case, the hyperlinked AP Article reported denials of Jacobs' allegations made by plaintiff's representatives.  *See* Harris Decl. ¶ 9 & Ex. E.

*Co.*, 368 F.2d 25, 28 n.7 (4th Cir. 1966) ("a mere reference to another writing which contains defamatory matter does not constitute an actionable repetition or republication of that libelous material"); *Salyer v. Southern Poverty Law Ctr.*, 701 F. Supp. 2d 912, 916 (W.D. Ky. 2009) (reference to previously published article not republication because, "[w]hile it may call the *existence* of the article to the attention of a new audience, it does not present the *defamatory contents* of the article to that audience"); *Klein v. Biben*, 296 N.Y. 638 (1946) (same). As a result, defendants cannot be deemed to have "republished" in the Statement any of the false assertions allegedly made in the Petition, and the Statement otherwise contains no false statements of its own. The absence of any legally cognizable falsity in the Statement brings it squarely within the Nevada statute's protections for "truthful" publications. *See Archey*, 2010 WL 3711513, at *4 (applying anti-SLAPP immunity where plaintiff failed to show that publication at issue contained any false statements about plaintiff).

Even if the Statement were somehow deemed to be a republication of the comments regarding prostitution contained in the Petition, it would nevertheless qualify for protection under the Nevada statute because it too was not published with the requisite "knowledge of its falsity" as a matter of law. Plaintiff's only additional allegation of actual malice with respect to the Statement is his contention that, after the Petition was published, his lawyer (although not named in the Complaint, subsequently identified to the Court as Alan Dershowitz) advised defendants that "written evidence existed" demonstrating that "Jacobs knew his accusations were false." SUMF ¶¶ 9-10. This averment is insufficient to establish "reckless disregard of the truth" – much less the more stringent requirement of "knowledge of falsity" contemplated by the Nevada Anti-SLAPP statute – for two reasons.

First, it is undisputed that such "written evidence," even assuming *arguendo* that it would have demonstrated the falsity of Jacobs' accusations, was not provided to defendants or otherwise made public until July 18, 2013, well after the Petition had been removed from and the Statement posted on the NJDC website. *Id.*; Compl. ¶ 69 (describing filing of emails on July 18, 2012, and subsequent news reports concerning them); *see also* Dec. 17, 2012 Tr. (Sproul Decl. Ex. 148) at 63:13-20 ("MR. WOOD:  Mr. Dershowitz did not – as I understand it, did not give the actual e-mails to the NJDC because they had not yet been filed of record in the court. . . . They were subsequently filed in the court.").  Simply put, defendants cannot be charged with knowledge that the sworn statements made in the Jacobs Declaration were false based on the contents of documents that plaintiff's counsel did not share with them.

Second, as a matter of law, bare denials – like those offered by plaintiff's lawyer on his behalf – "are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error." *Edwards v. Nat'l Audubon Soc'y, Inc.*, 556 F.2d 113, 121 (2d Cir. 1977); *see also Contemporary Mission, Inc. v. The New York Times Co.*, 842 F.2d 612, 624 (2d Cir. 1988) (although plaintiff had "specifically informed [reporter] prior to publication of the article that . . . the alleged accusations [were] false," and pointed to written support for such an assertion, such "denials prior to publication . . . are insufficient to establish actual malice"); *Westmoreland v. CBS, Inc.*, 596 F. Supp. 1170, 1174 (S.D.N.Y. 1984) (reporter not "required to accept denials of wrongdoing as conclusive, or to prefer them over apparently creditable accusations").  As these cases demonstrate, such evidence is insufficient as a matter of law to establish even a reckless

disregard for the truth.[15]  It is plainly insufficient to serve as proof of the actual "knowledge of

falsity" required by the Nevada statute.

>    **3.     Plaintiff is properly precluded from contesting "truth" under the
>            Nevada statute because his agents lost or destroyed evidence critical to
>            a determination of that issue.**

As defendants have explained, *see* Dkt. 18 at 42-25, Dkt. 37 at 23-25; Strom Decl.

(Dkt. 20) ¶ 47, sworn testimony by representatives of plaintiff's companies has confirmed that

they have either lost or destroyed electronic evidence critical to any evaluation of the truth of the

allegedly defamatory statements he seeks to place at issue in this action – namely, whether or not

he personally approved a prostitution strategy in his Macau casinos.  In the absence of such

evidence, which went missing while in the custody of plaintiff's agents, he cannot fairly be

permitted to litigate the issue of whether the Petition's statements were "truthful" within the

meaning of the Nevada Anti-SLAPP statute.

Specifically, in the *Jacobs* Action, plaintiff's agents have conceded, under oath, that

original electronic evidence, including one of Jacobs' computer hard drives that remained in their

custody in Macau, has been either lost or destroyed.  Dkt. 18 at 42.  In the wake of that

testimony, plaintiff's company was sanctioned for related discovery violations in November,

Strom Decl. Ex. 104, and ordered to produce all of the Macau-related documents that remain in

---

[15] That is especially so where, as here, another news report hyperlinked to in the Petition reported
that the "Venetian-Macao, a casino owned by the Las Vegas Sands Corporation, was also the subject of a
reported 'sex-trade crackdown' that occurred in 2010 on the same day Adelson arrived on the island for
meetings with government leaders in Macau, according to published accounts in 2010.  Chinese press
reported that authorities found more than 100 prostitutes inside the casino."  Harris Decl. Ex. C (Dkt. 19-
4).  Defendants' knowledge of this report, coupled with the fact that prostitution is legal in Macau,
precludes any reasonable contention, even in the face of his lawyer's protestations, that statements made
in the Jacobs Declaration and recounted in the AP Article were so inherently improbable that the failure
to investigate them further constituted a "reckless disregard" for the truth, much less actual knowledge of
their falsity.  *See, e.g.*, *Masson v. New Yorker Magazine, Inc.*, 960 F.2d 896, 901 (9th Cir. 1992) ("a
publisher who does not already have 'obvious reasons to doubt' the accuracy of a story is not required to
initiate an investigation").

its possession, Sproul Decl. Ex. 149.  It has apparently failed to do so.  Jacobs has now filed a

renewed motion for sanctions, in which he again asserts that plaintiff's agents "conveniently

'lost' the originals of Jacobs' electronically stored information and hard drives from Macau," and

have otherwise failed to produce those documents that remain in their possession.  *Id.* Ex. 150 at

2.  At a hearing on February 28, the Nevada court concluded that its prior order had indeed been

"violated," *id.* Ex. 151 at 35:21; *see also id.* Ex. 152 at 2 ("Sands China violated this Court's

September 14, 2012 order"), and ordered yet another sanctions hearing, *see* Ex. 151 at 52:4-53:8

("And if I make a determination that there has been prejudice, then I'm going to talk about an

appropriate sanction.").

      It cannot be seriously disputed that the electronic evidence at issue is critical to

establishing the truth or falsity of the challenged statements – and therefore to defendants'

immunity under the Nevada anti-SLAPP statute.  *See* Dkt. 18 at 14-17, 42-45; Dkt. 37 at 23-25

(explaining relevance of lost evidence).  Accordingly, under the law of this Circuit and

elsewhere, plaintiff is properly estopped from contesting the truth of those statements and, by

necessary extension, defendants' entitlement to invoke the immunity provided by the Nevada

Anti-SLAPP statute.  *See, e.g., West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir.

1999) (because "[i]t has long been the rule that spoliators should not benefit from their

wrongdoing," courts have "broad discretion in crafting a proper sanction" when evidence is lost,

including the sanction of dismissal); *Beers v. General Motors Corp.*, 1999 WL 325378, at *4

(N.D.N.Y. May 17, 1999) (dismissing case in light of plaintiff's loss of "crucial evidence");

*Brancaccio v. Mitsubishi Motors Co.*, 1992 WL 189937, at *2 (S.D.N.Y. 1992) (same).

      In *Beers v. General Motors Corp.*, for example, a plaintiff had been injured by an

allegedly defective engine fan, but repeatedly failed to produce the fan in discovery and finally

admitted that it "has been lost, and can not be found."  1999 WL 325378, at *2.  The court

concluded that, even though there had been no allegation of *intentional* destruction, dismissal

was nevertheless appropriate because the loss of "crucial evidence" was "extremely prejudicial

to the opposing party, who otherwise has no effective remedy."  *Id.* at *4-5.  *See also Synanon*

*Church v. United States*, 820 F.2d 421, 427 (D.C. Cir. 1987) (dismissing case because plaintiff

had destroyed relevant evidence in different court in different case).  Similarly, in this case,

defendants have no effective remedy for the prejudice to them that has inevitably resulted from

the loss of the evidence contained on Jacobs' computer hard drive.  Without it, defendants are

necessarily deprived of a body of proof that reasonably would be expected to contain email and

other documents relevant to assessing the veracity of the allegations made in the Jacobs

Declaration.  As a result, plaintiff is appropriately precluded from contesting the truth of those

allegations, a sanction that, for the reasons stated herein, would require dismissal of this action

under the Nevada Anti-SLAPP statute.[16]

## II.     PLAINTIFF HAS FAILED TO STATE A CLAIM UNDER RULE 12(b)(6).

In its March 6 conference with the parties, the Court asked to be apprised of any material

distinctions between the law of Nevada and the District of Columbia that would impact its

decision on defendants' motion to dismiss.  As we explain further below, the law of fair report is

essentially the same in both jurisdictions, and plaintiff's counsel has conceded as much.  *See*

(Sproul Decl. Ex. 148) at 45:9-10 ("The issue of fair report of judicial proceeding is essentially

the same in Nevada.").  Indeed, there are no conflicts in the law as it has developed in the two

---

[16] In the alternative, should the Court conclude that further factual development is necessary with respect to the spoliation of critical evidence and the consequences thereof, both judicial economy and the speech-protective interests that undergird the Nevada Anti-SLAPP statute are best served by allowing the Nevada sanctions proceedings to run their course, *see Wehling v. CBS*, 608 F.2d 1084, 1088 (5th Cir. 1979) (approving stay), and, if necessary thereafter, authorizing limited discovery in this case with respect to any spoliation-related issues that remain following the conclusion of the Nevada proceedings.

jurisdictions and no reason to believe that Nevada would not apply the privilege in the same manner as courts construing the privilege under D.C. law.  Accordingly, under the law of either jurisdiction, the statements in the Petition regarding the allegations contained in the Jacobs Declaration, specifically, the quotations from the hyperlinked AP Article that fully and fairly describes those allegations, are protected by the fair report privilege under Nevada law.  And, to the extent that the Statement can be construed as a republication of the Petition, it is likewise protected by Nevada's fair report privilege.

In addition, regardless of whether Nevada or D.C. law otherwise governs this action, defendants' opinions regarding the impact of  reports of Jacobs' allegations – *i.e.,* that they, along with the others referenced in and hyperlinked to the Petition, have served to "taint" plaintiff's political contributions – are protected by the First Amendment, an issue governed by federal law as construed in this Circuit, not by the law of any state.  The First Amendment, as defendants have previously explained, fully protects the opinions expressed in the Petition and allegedly republished in the Statement. *See*  Dkt. 18 at 36-40; Dkt. 37 at 20-22.

### A.    The Petition and the Statement Constitute Privileged Reports of a Judicial Proceeding Under Nevada Law.

At oral argument on the Combined Motions, plaintiff's counsel made several significant concessions regarding Nevada law with respect to the fair report privilege.  First, he correctly conceded that the privilege in Nevada "essentially" mirrors the privilege as recognized in the District of Columbia.  *See* Dec. 17, 2012 Tr. at 45:9-10 ("The issue of fair report of judicial proceeding is essentially the same in Nevada.").  Second, plaintiff's counsel conceded that the AP Article that is hyperlinked to the Petition constitutes a fair report of the Jacobs Declaration. *Id*. at 34:8-12 (THE COURT:  So you concede that the AP article itself, standing by itself, could assert – if this were a suit against AP, they could assert the privilege.  MR. WOOD:  Absolutely.

Absolutely."); *see also id.* at 53:11-13 (MR. GRUNBERG: "because the AP article has a privilege, the fair report of a judicial proceeding privilege, . . . the AP article's utterance of these statements is protected.").  As a result, the only dispute between the parties is whether, by quoting from and hyperlinking to the concededly privileged AP Article, defendants' publication is itself privileged.  No Nevada court has addressed that issue, but there is no reason to believe that it would adjudicate it differently than those few courts, including one applying D.C. law, that have addressed it.  *See* Dkt. 18 at 33-35, 38-39; Dkt. 37 at 17-19, 21-22; *Jankovic v. Int'l Crisis Grp.*, 593 F.3d 22, 26 (D.C. Cir. 2010) (hyperlinked material satisfies attribution requirement of fair report privilege).

> 1.    **As plaintiff has conceded, the Nevada privilege is "essentially the same" as the District of Columbia privilege.**

Nevada, like the District of Columbia, recognizes the fair report privilege.  *See Sahara Gaming Corp. v. Culinary Workers Union Local 226*, 984 P.2d 164, 168 (Nev. 1999) ("It is the news media and public's right to know what transpires in the legal proceedings of this state and that is paramount to the fact someone may occasionally make false and malicious statements.").  Indeed, Nevada, like D.C., "has long recognized a special privilege of absolute immunity from defamation given to the news media and the general public to report newsworthy events in judicial proceedings."  *Id.* at 166 (citing *Restatement (Second) of Torts* § 611).  As the Nevada Supreme Court explained in *Wynn v. Smith*, 16 P.3d 424, 429 (Nev. 2001):

> The fair report privilege is premised on the theory that members of the public have a manifest interest in observing and being made aware of public proceedings and actions. . . .  If accurate reports of official actions were subject to defamation actions, reporters would be wrongly discouraged from publishing accounts of public proceedings.

*Id. See also Circus Circus Hotels v. Witherspoon*, 657 P.2d 101, 104 (Nev. 1983) ("The policy underlying the privilege is that in certain situations the public interest in having people speak

freely outweighs the risk that individuals will occasionally abuse the privilege by making false and malicious statements.") (citations omitted).

Thus, for example, in *Sahara Gaming*, the Nevada Supreme Court applied the privilege to a letter that was itself overtly critical of the plaintiff company and, in that context, quoted an excerpt of a complaint that had been filed against it in civil litigation. Specifically, *Sahara Gaming* involved a "contentious labor dispute" between the plaintiff (Sahara) and the defendant labor union. 984 P.2d at 165. At the time, Sahara was also in the midst of negotiating a contract for the sale of land and provision of management services to a third party, Players International. *Id*. The union wrote a letter to Players International urging the cancellation of the deal and warning that, if it went forward, Players International would place itself "in the middle of the dispute" between Sahara and the union. Among other things, the union's letter referred to and quoted from a complaint filed in a civil lawsuit against Sahara, which charged that the company had committed fraud in connection with a previous transaction. *Id*.

After receiving the Union's letter, Players International cancelled its agreement with Sahara, which then sued the union for defamation, among other things. *Id*. The Nevada Supreme Court affirmed the trial court's determination that the letter's references to the lawsuit and the allegations of the complaint constituted a privileged fair report and therefore dismissed the defamation claim. *Id*. Specifically, the court explained that a fair and accurate report of a filing in a judicial proceeding is privileged "'even where the defamatory statements are published with knowledge of their falsity and personal ill will toward the plaintiff.'" *Id*. (quoting *Circus Circus Hotels*, 657 P.2d at 104); *see also id*. at 168 (same).[17]

---

[17] In *Sahara Gaming*, there was no dispute that the letter fairly and accurately quoted the allegations of the complaint, or that it attributed those allegations to the complaint, but Sahara charged that the privilege was defeated by the union's "malice and intent to harm." 984 P.2d at 166.

22

By the same token, the Nevada courts – like the courts of other jurisdictions – have held that the fair report privilege will not protect a publication that *both* recounts the allegations made in a judicial proceeding *and* independently endorses the accuracy of those allegations.  *See, e.g., Cianci v. New Times Publ'g Co.*, 639 F.2d 54, 69 (2d Cir. 1980) (finding fair report privilege not applicable where article espoused or concurred in charges); *Herbert v. Lando*, 596 F. Supp. 1178, 1227 n.4 (S.D.N.Y. 1984), *reversed in part on other grounds,* 781 F.2d 298 (2d Cir. 1986) ("the common law privilege of fair report" is "not available where the news media 'did not simply report the charges but espoused or concurred in them'") (citing *Cianci*); *see also  Biro v. Condé Nast*, 883 F. Supp. 2d 441, 478 (S.D.N.Y. 2012) ("[c]omments that essentially summarize or restate the allegations of a pleading filed in an action are the type of statements that fall within [the] privilege.").  Thus, in *Lubin v. Kunin*, 17 P.3d 422 (Nev. 2001) (*per curiam*), for example, the Nevada Supreme Court concluded that the defendants, a group of parents, "arguably went beyond fair, accurate, and impartial reporting" when their publication endorsed the accuracy of the allegations contained in a complaint filed in a lawsuit against the director of a school charging her with child abuse, assault and other torts.  *Id.* at 427-28.  In the publication at issue, the parents claimed, after recounting the complaint's allegations:

> **This is not a frivolous lawsuit [as] there is an abundance of evidence as well as eye-witnesses**.  These parents never envisioned that anything of this nature could or would happen to their child.  **IT DID!**  It is time to protect our children.

*Id.* at 414 (emphasis in original communication).  The court held that such a publication cannot shelter under the privilege:  "[w]hile *Sahara Gaming* allows a party to report preliminary judicial proceedings from a fair and neutral stance, a party may not don itself with the judge's mantle, crack the gavel, and publish a verdict through its 'fair report.'"  *Id*. at 427.

The courts of other jurisdictions have drawn the same distinction between publications that endorse the accuracy of a judicial document, on the one hand, and publications that fairly and accurately report the contents of such documents and then proffer opinions based on them. In *Piscatelli v. Van Smith*, 35 A.3d 1140 (Md. 2012), for example, that Maryland Court of Appeals, like the Nevada Supreme Court in *Sahara Gaming*, held that certain statements contained in a challenged publication were protected by the fair report privilege (because they were deemed to be "substantially correct, impartial, coherent, and bona fide" accounts of the contents of official documents), *id*. at 1149, while other statements in the same article constituted protected "[s]imple opinions" or "fair comment," *id*. at 1153-54.  All of them, the court explained, were protected from defamation liability:

> Simple opinions, which are protected by the fair comment privilege, include derogatory opinions based on privileged statements of fact. . . .  Respondents' articles include privileged reports on the memorandum and Piscatelli's testimony as bases for its opinions, enabling readers to judge for themselves the quality of the opinions.  [T]herefore, what would otherwise have been an allegation of fact becomes merely a comment, or a simple opinion, which the fair comment privilege declaws of its defamatory expression.

*Id*. (citations and internal quotations omitted).[18]  *See also Coles v. Washington Free Weekly, Inc.*, 881 F. Supp. 26, 30-31 (D.D.C. 1995), *aff'd*, 88 F.3d 1278 (D.C. Cir. 1996) (publication at issue not actionable in defamation because it contained an expression of opinion based on disclosed facts protected by fair report privilege); *Solaia Tech., LLC v. Specialty Publ'g Co*., 221 Ill.2d 558 (Sup. Ct. 2006) (holding that some statements in challenged article protected by fair report privilege and that others describing plaintiffs as "deeply greedy people" constituted protected

---

[18] In Nevada, the privilege of fair comment is subsumed by the constitutional protection for opinion.  *See Nevada Indep. Broad. Corp. v. Allen*, 664 P.2d 337, 343 n.6 (Nev. 1983) ("The fair comment doctrine arose to protect statements of opinion on newsworthy material.  Since *Gertz* now gives first amendment protection to opinion remarks, the fair comment doctrine is no longer necessary.") (citing *Gertz v. Robert Welch, Inc*., 418 U.S. 323 (1974)).

opinion); *Biro*, 883 F. Supp. 2d at 472, 478-81 (statements in article about prior lawsuits against plaintiff protected by fair report privilege, while article's description of plaintiff's demeanor protected as author's opinion).

In this case, the Petition, like the letter at issue in *Sahara Gaming*, fairly and accurately quoted from (and hyperlinked to a news report describing) the contents of a sworn document filed in civil litigation – *i.e.,* the Jacobs Declaration.  Unlike the publication at issue in *Lubin*, however, it did not purport to endorse the accuracy of the allegations contained in that document. Rather, in the same manner as the letter in *Sahara Gaming* cited the allegations of the fraud complaint against Sahara to support its suggestion that Players International should consider canceling their agreement, the Petition cited the allegations of the Jacobs Declaration to support its contention that the widespread reports of those allegations, as well as the others recounted in the Petition, served to "taint" plaintiff's contributions to political candidates sufficiently that they should not be accepted.  Accordingly, under the law of Nevada, just as under the law of the other jurisdictions that have adopted it, the fair report privilege serves to protect defendants' publications from defamation liability assuming, as defendants contend, the Petition's hyperlink to the AP Article, and its description of the allegations contained in the Jacobs Declaration, constitute sufficient attribution to that judicial document to invoke the privilege.

> ### 2. The embedded hyperlink to the AP Article's description of the Jacobs Declaration satisfies the fair report privilege's attribution requirement.

There is no case law in Nevada addressing the scope of the privilege's attribution requirement, either generally or in the specific context of hyperlinks.  There is, moreover, nothing in the law of Nevada suggesting that the courts of that state would not, as defendants have contended, recognize that a hyperlink can provide the attribution to a judicial proceeding necessary to support invocation of the privilege.  Indeed, the logic of defendants' contention is

reflected in an exchange between plaintiff's counsel and the Court at oral argument on

defendants' motion:

> THE COURT: . . . [W]hat if the petition were printed on a Web site and then said
> see below, there's an asterisk instead of a hyperlink, and then at the bottom of the
> page was a reprinting of the AP article, if the AP article were simply printed
> below, how would that change the analysis?  Do you think there would still be a
> defamation claim on the petition, or would that be a closer nexus than a hyperlink
> and therefore a different conclusion?
>
> MR. GRUNBERG:  That would bring the underlying hyperlinked information up
> into the four corners of the document itself and it would be on the face of the
> document and likely that would fulfill the fair and accurate report of judicial
> proceeding. . . . [S]o anyone who reads that document has a fair chance to then
> read the full report of what occurred in the judicial proceeding.

Dec. 17, 2012 Tr. (Sproul Decl. Ex. 148) at 46:10-47:2.  When the Court then asked, "[w]hy isn't

overall context sufficient [in] something like a hyperlink with respect to an online publication?,"

*id*. at 47:20-21, plaintiff's counsel candidly responded that "[t]here has to be a place that you

draw the line" and that "it seems like it's not a safe track for defamation law" to consider a

hyperlink as the functional equivalent of the Court's hypothetical asterisk because doing so

"wouldn't provide sufficient protections for plaintiffs."  *Id*. at 47:22-48:11.

Defendants respectfully disagree and, more importantly, submit that the courts of Nevada

would as well.  As a host of courts have recognized, in a variety of contexts, *see* Dkt. 18 at 33-

34, 38-39; Dkt. 37 at 17-18, 21-22 (citing cases), a hyperlink is, for all intents and purposes, an

electronic footnote that both cites and links to the referenced material and thereby allows a

reader not only to divine the attribution for a published statement but also to access the cited

material itself.  For purposes of the fair report privilege's attribution requirement, which is

designed to ensure that a publication seeking to invoke the privilege has adequately disclosed

that it is reporting the contents of a judicial or other official document, a hyperlink is, if anything,

a more robust form of attribution than a footnote citation.  *See generally Bensusan Restaurant*

*Corp. v. King*, 937 F. Supp. 295, 298 n.2 (S.D.N.Y. 1996) (noting that, with the use of

hyperlinks, "a user can move seamlessly between documents, regardless of their location; when a

user viewing the document located on one server selects a link to a document located elsewhere,

the browser will automatically contact the second server and display the document").

      Plaintiff's counsel contended at oral argument that a hyperlink is an ineffective form of

attribution because readers may "move on without hyperlinking or not realizing that there's a

hyperlink . . . .  So defendants quickly lose control over how the reader would actually interact

with the Web page."  Sproul Decl. Ex. 148 at 47:7-12.  But counsel's attempt to characterize

hyperlinking – now so much a fact of life that it is accepted as a verb by dictionaries and by

plaintiff's counsel (*see* http://www.thefreedictionary.com/hyperlinking; Dec. 17, 2012 Tr.

(Sproul Decl. Ex. 148) at 33:21-34:2, 47:3-10 & 22-24 (quoting both of plaintiff's counsel, who

asked the Court not to assume that readers will "hyperlink" to the AP Article)) – as a novel or

unusual phenomenon is both unconvincing and inconsistent with a wealth of judicial authority.

*See* Dkt. 18 at 39, Dkt. 37 at 17-19 (citing cases); *see also Franklin v. Dynamic Details, Inc.*, 116

Cal. App. 4th 375, 378 (Cal. Ct. App. 2004) (holding that use of links constituted a disclosure of

facts reported at those linked sites because "[a] reader of the e-mails could view those Web sites

and was free to accept or reject Axton's opinions based on his or her own independent

evaluation"); *Global Telemedia Int'l, Inc. v. Doe 1*, 132 F. Supp. 2d 1261, 1268 (C.D. Cal. 2001)

(holding that, in an online posting, linking to another website was sufficient to demonstrate that

the defendant's statement "is clearly based on a public document which he *provides* for the

readers.  Thus, any reader may look at the same document and determine what they think of the

information.  By *supplying* the underlying document which supports his views, Reader has set

forth an opinion, not fact.") (emphases added).

27

In this day and age, it is no more or less likely that an Internet reader will click on a hyperlink than it is that the reader of a law review article will look down to the bottom of the page and examine a footnote, or that the reader of a book will consult the endnotes at the back of the volume.  Yet, defendants are aware of no case holding that a footnote or endnote citing to a judicial or other official document constitutes insufficient attribution for purposes of the fair report privilege.  For the same reason, there is no basis to conclude that a Nevada court would hold that a hyperlink that takes the reader directly to a document that provides the necessary attribution to a judicial document is insufficient to satisfy the requirements of the privilege.

## B.    The Other Challenged Statements are Expressions of Opinion Protected by the First Amendment.

As defendants have explained, the other statements in the Petition that plaintiff has placed at issue – *e.g.,* that "Romney and the Rest of the Republican Party must cease accepting Adelson's tainted money immediately," and that readers should "enlist your family and friends in the effort to stop the influence of Adelson's tainted money and protect our democracy" – constitute nonverifiable and hyperbolic expressions of opinion protected by the First Amendment.  *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-21 (1990); *Flamm v. American Ass'n of Univ. Women*, 201 F.3d 144, 150 (2d Cir. 2000) ("liability may not be based on 'statements that cannot reasonably be interpreted as stating actual facts about an individual,' including statements of 'imaginative expression' or 'rhetorical hyperbole'") (quoting *Milkovich*).  Plaintiff has conceded as much.  *See, e.g.*, Opp. (Dkt. 29) at 37 n.17 (conceding that "the tainted money statements are opinion" and that their "political context" is relevant in "show[ing] that the statements are opinion").  It is well settled that federal law construing the scope of the First Amendment, as articulated by the U.S. Supreme Court and the decisions of this Court, controls the resolution of this issue, regardless of which state law the Court deems is applicable to other

aspects of the case. *See* Dkt. 18 at 37 n.30 (citing *Law Firm of Daniel P. Foster, P.C. v. Turner Broad. Sys., Inc.*, 844 F.2d 955, 961 n.12 (2d Cir. 1988) (in applying constitutional protection applicable to opinion, court must apply the law of the Circuit in which it sits)).  Accordingly, a decision by this Court that the substantive law of  Nevada otherwise applies would have no bearing on its resolution of this issue.  And, for the reasons set forth in defendants' prior briefing, the remaining statements are not actionable under the First Amendment as a matter of law.  *See* Dkt. 18 at 36-40; Dkt. 37 at 20-22 (citing cases).

## CONCLUSION

As the foregoing analysis demonstrates, a decision by this Court to apply the substantive law of Nevada, rather than the law of the District of Columbia, to this case does not affect the outcome of defendants' pending motions.  Under the law of either jurisdiction, plaintiff has failed to state a claim for defamation under Fed. R. Civ. P. 12(b)(6) and the litigation he instituted against these defendants constitutes a classic SLAPP – in this case, an attempt by one of the world's wealthiest men and perhaps the largest political donor in history to use his overwhelming financial resources to silence his critics.  Accordingly, for all of the reasons set forth herein and in defendants' prior submissions, plaintiff's complaint should be dismissed with prejudice.

Dated:    April 23, 2013                    Respectfully submitted,

                                            LEVINE SULLIVAN KOCH & SCHULZ, LLP

                                            By:    /s/ Seth D. Berlin
                                                Lee Levine (*pro hac vice*)
                                                Gayle C. Sproul
                                                Seth D. Berlin
                                                Chad R. Bowman (*pro hac vice*)
                                                Rachel F. Strom

                                            321 West 44th Street, Suite 1000
                                            New York, New York 10036
                                            Telephone: 212-850-6100
                                            llevine@lskslaw.com
                                            gsproul@lskslaw.com
                                            sberlin@lskslaw.com
                                            cbowman@lskslaw.com
                                            rstrom@lskslaw.com

                                            *Counsel for Defendants David A. Harris, Marc R.*
                                            *Stanley and National Jewish Democratic Council*