UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
SHELDON G. ADELSON,                               :
                                                  :
                        Plaintiff,                :
                                                  :          12 Civ. 6052 (JPO)
            -against-                             :
                                                  :          OPINION AND ORDER
DAVID A. HARRIS, MARC R. STANLEY, and             :
NATIONAL JEWISH DEMOCRATIC                         :
COUNCIL,                                           :
                                                  :
                        Defendants.               :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

        This is a defamation action filed by Sheldon G. Adelson arising out of the 2012

presidential campaign.  Adelson has sued David A. Harris, Marc R. Stanley, and the National

Jewish Democratic Council ("NJDC") (together, "Defendants") for libel based on a publication

on NJDC's website.  Defendants have moved to dismiss this lawsuit pursuant to the District of

Columbia Anti-SLAPP Act of 2010, D.C. Code § 16-5501, *et seq.*—or in the alternative the

Nevada Anti-SLAPP Act, Nev. Rev. Stat. § 41.635 *et seq.*—as well as Federal Rule of Civil

Procedure 12(b)(6).

        For the reasons that follow, the Court concludes (1) that Nevada law applies to this case;

(2) that Adelson has failed to state a claim for libel because (a) Defendants' publication is

protected as a fair report of a judicial proceeding, which was properly attributed through its use

of hyperlinks, and (b) the publication otherwise consists of constitutionally protected opinion;

(3) that Defendants' publication was also protected by the Nevada Anti-SLAPP statute, and

accordingly Adelson is ordered to pay Defendants' attorney's fees and costs.

# I.    Background

## A.    Factual Background

The following facts are, unless otherwise indicated, drawn from the allegations in the Complaint (*see* Dkt. No. 1 ("Compl.")), which are presumed true for purpose of this motion.

### 1.    The Parties

#### a.    Sheldon Adelson

Adelson is a successful businessman and a prominent member of the Jewish Community. He is the Chairman and CEO of Las Vegas Sands Corp. ("LVSC"), a Nevada corporation with its principal place of business in Nevada.  LVSC is the owner of, among other things, the Venetian Casino in Las Vegas, Nevada.  LVSC has also built casinos in various other locations, including in the Chinese territory Macau.[1]

During the 2012 election cycle, Adelson became a well-known supporter of Republican candidates.  For much of the Republican Party presidential primary campaign, he was a highly visible financial supporter of Speaker Newt Gingrich.  Later, he became a supporter of Governor Mitt Romney.  Adelson also provided financial support to other Republican candidates during the 2012 election cycle.

#### b.    NJDC, Harris, and Stanley

NJDC is a 501(c)(4) non-profit organization whose mission is to increase Jewish support for Democratic candidates.  NJDC's principal place of business is in the District of Columbia.

---

[1] LVSC's casino in Macau was built by its subsidiary, Sands China Limited.

(Harris Decl. at ¶ 5.)  Harris is the President and CEO of NJDC, and a citizen of the District of Columbia.  (*Id.* at ¶ 2.)  Stanley is NJDC's Chairman and a citizen of Texas.  (*Id.* at ¶ 3.)[2]

### 2.   Jacobs and the *Jacobs* lawsuit

The final individual relevant to this lawsuit is Steven C. Jacobs, a former executive at LVSC's subsidiary Sands China Limited ("SCL"), who was fired for cause in 2010.  After his termination, Jacobs sued LVSC, SCL, and Adelson in District Court, Clark County, Nevada, alleging, *inter alia*, breach of contract.  (*See* Dkt. No. 20 ("Strom Decl."), Ex. 28 ("Jacobs Amend. Compl.").)  On June 27, 2012, the afternoon before a status conference in *Jacobs v. Las Vegas Sands Corp.*, Jacobs filed a declaration, ostensibly identifying gaps in the defendants' production regarding the issue of personal jurisdiction ("the Jacobs Declaration").  In that declaration, Jacobs averred that "LVSC Senior Executives informed me that the prior prostitution strategy had been personally approved by Adelson."  According to Adelson, Jacobs knew this statement was false when he made it.[3]  On July 18, 2012, LVSC and SCL filed with the Nevada court evidence to that effect.  Adelson's denial of the allegations in the Jacobs

---

[2] Subject matter jurisdiction is based on 28 U.S.C. § 1332, as there is diversity of citizenship between the parties and the matter in controversy exceeds $75,000.  One might question whether there is personal jurisdiction over the parties in this case.  The Complaint lists NJDC's address as in New York, not the District of Columbia; this was apparently done by Plaintiff because NJDC's website references (or referenced) a New York address.  According to Harris, this address is of an independent consultant, who is not technically an employee of NJDC.  (Harris Decl. at ¶ 7.)  However, Defendants have not moved to dismiss for lack of personal jurisdiction, so this Court deems the parties to have consented to personal jurisdiction.  *See Wis. Dep't of Corr. v. Schact*, 524 U.S. 381, 394 (1998) (Kennedy, J., concurring) (noting that personal jurisdiction "can be waived and courts need not raise the issue *sua sponte*").

[3] According to the Complaint, on May 11, 2009, Jacobs emailed Michael Leven, LVSC's President and Chief Operating Officer, to ask if Adelson or LVSC "supported the decision" to allow prostitution in the Macau casinos.  Leven replied the next day, stating that he had "investigated the alleged comments" and that "there is not evidence that can be found that anyone here supported in anyway a different policy than we have in las vegas [sic] on these matters."  The Las Vegas policy is one of "no tolerance" for prostitution.

Declaration was covered by the national media. (*See, e.g.*, Compl. Ex. F ("the WSJ Article")) ("In a filing in Nevada District Court in Las Vegas made public Wednesday, attorneys for Mr. Adelson, chief executive of Las Vegas Sands Corp., said that a former top executive of the company's operations in Macau 'had blatantly mischaracterized the facts' when he alleged last month that Mr. Adelson had approved a 'prostitution strategy' at the casino operator's Macau properties.")).

### 3.    The Petition

On July 3, 2012, in the midst of the presidential campaign, NJDC published a statement concerning Adelson on its website ("the Petition"). (*See* Compl. Ex. A ("Petition").)  The Petition, authored by Harris, was entitled "Tell Romney to Reject Adelson's Dirty Money."  It contained a graphic of Adelson and Governor Romney side by side, with the following rhetorical question written across it in large, capital letters: "IF ONE OF YOUR BIGGEST DONORS WAS ACCUSED OF PUTTING 'FOREIGN MONEY' FROM CHINA IN OUR ELECTIONS & REPORTEDLY APPROVED OF PROSTITUTION, WOULD YOU TAKE HIS MONEY?"  Below this was a link to an online NJDC petition "TELL[ING] MITT ROMNEY TO STOP TAKING MONEY FROM SHELDON ADELSON."  Below the graphic, the Petition stated as follows:

> As you saw during the Republican primaries, GOP mega-donor Sheldon Adelson dumped millions of dollars into supporting Newt Gingrich's feckless campaign. **Now he's doing the same for Mitt Romney – with no plans to stop.**  But perhaps the most alarming aspect of Adelson's potentially unlimited contributions is where the money comes from.
>
> It's well known that Adelson makes tremendous sums of money through his casinos in China, which – according to 2008 Republican presidential candidate Senator John McCain (AZ) – means that Chinese **"foreign money"** (to quote McCain) **is flooding our political system**.  But this week, reports surfaced that

4

> in addition to his <u>anti-union</u> and <u>allegedly corrupt business practices</u>, **Adelson "<u>personally approved</u>" of prostitution in his Macau casinos.**
>
> Given these reports, **Romney and the rest of the Republican Party must cease accepting Adelson's tainted money immediately.** Sign NJDC's petition below, and <u>click here to share the image above on Facebook</u> to help spread the work.
>
> Already signed? <u>Click here to enlist your family and friends</u> in an effort to stop the influence of Adelson's tainted money and protect our democracy.

As will be evident to those with experience navigating the Internet, each segment of blue, underlined text contained a hyperlink, which, when clicked, connected the Petition's reader to a particular article. Relevant here is the "**<u>personally approved</u>**" hyperlink, which connected the reader to an Associated Press ("AP") article by Kevin Ritter, entitled "Sheldon Adelson Approved 'Prostitution Strategy': Fired Former Sands Executive," dated June 28, 2012 ("the AP Article"). The AP Article stated in part:

> In the lawsuit, [Jacobs] accuses the company and Adelson of breach of contract and of pushing him into illegal activity in Macau . . . .
>
> In documents revealed Thursday – including a sworn seven-page declaration that Jacobs submitted along with a summary from his attorneys of problems obtaining documents from Sand – Jacobs describes an effort he launched after arriving in Macau in May 2009 to rid the casino floor of "loan sharks and prostitution."
>
> "This project was met with concern as (company) senior executives informed me that the prior prostitution strategy had been personally developed and approved by Adelson," Jacobs said in his declaration.

The AP Article also notes that "Adelson and the company deny wrongdoing," and quotes a statement issued by LVSC spokesman Ron Reese that "Mr. Adelson has always objected to and

maintained a strong policy against prostitution on our properties and any accusation to the contrary represents a blatant and reprehensible attack on Mr. Adelson's character . . . ."

The Petition was on the NJDC website from July 3, 2012 to July 11, 2012. During that period, the Petition was republished on other websites and in the print press. For example, on July 6, 2012, the Jewish Press published an article entitled "NJDC Calls on Romney to Return 'Adelson's Tainted Money Immediately,'" which quoted at length from the Petition. (*See* Compl., Ex B.)

On July 11, 2012, Defendants withdrew the Petition from NJDC's website.

### 4.    The Press Release

On July 11, 2012, NJDC published a press release, authored by Harris and Stanley, entitled "Statement Regarding NJDC's Adelson Petition" ("the Press Release"). (Compl., Ex. C ("PR").) The Press Release was also published on NJDC's website, where it remains visible to this day. *See* http://www.njdc.org/media/entry/adelson071112. The Press Release, only two paragraphs in length, reads as follows:

> National Jewish Democratic Council (NJDC) Chair Marc R. Stanley and President and CEO David A. Harris today jointly released the following statement regarding NJDC's petition campaign concerning Sheldon Adelson:
>
> "Regarding our recent campaign surrounding Sheldon Adelson, we don't believe we engaged in character assassination; we stand by everything we said, which was sourced from current, credible news accounts. Accusations against Mr. Adelson were made not by us, but by others, including Senator John McCain (R-AZ). Nonetheless, we regret the concern that this campaign has caused. And in the interest of *shalom bayit* (peace in our home / community), we are going to take down our petition today. Moving forward, we'll continue to work hard to fight against the unique threat posed by the outsized influence of certain individual megadonors, which rightly concerns most Americans and most American Jews."

5.     **The Fallout**

Shortly after the publication of the Petition, Defendants were informed by Plaintiff's attorney that the Petition was false, and that the Jacobs Declaration contained knowing falsehoods. (Compl. ¶¶ 64, 65; *see also* Compl., Ex E. ("Clayton Ltr.") (noting that "[o]n July 11 . . . [Defendants] were contacted by a representative of Mr. Adelson who told you that your charges are false . . . .").)   Harris was also contacted by Alan Dershowitz, a professor at Harvard Law School and a close friend of Adelson, after the publication of the Petition but before the publication of the Press Release. (Dkt. No. 64 ("Dershowitz Decl.").)   Dershowitz informed Harris that the accusations in the Petition were false and that "the ultimate source of the prostitution allegation, Steve Jacobs, himself did not believe Mr. Adelson had approved of prostitution." (*Id.*)

On July 17, 2012, Lewis R. Clayton, an attorney from the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss"), wrote an email to Stanley and Harris on behalf of Adelson ("the Clayton Letter"). The Clayton Letter "demand[ed] that [Defendants] immediately retract and apologize" for the July 3 and July 11 Articles. (Clayton Ltr.) Defendants declined to comply with Clayton's demand. On August 3, 2012—the day after the Democratic Congressional Campaign Committee ("DCCC") retracted similar statements it had made about Adelson—counsel for Adelson again asked Defendants to retract their statements. Defendants again declined to do so.

B.     **Procedural Background**

Adelson filed this action on August 8, 2012. (Compl.) On September 21, 2012, Defendants filed motions to dismiss pursuant to Federal Rule 12(b)(6) and pursuant to the District of Columbia Anti-SLAPP Act. (Dkt. No. 18 ("Defs.' Mem.").) On November 9, 2012,

Plaintiff opposed the motions to dismiss.  (Dkt. No. 29 ("Pl.'s  Opp'n.").)[4]  Defendants replied

on December 7, 2012.  (Dkt. No. 37 ("Defs.' Rep.").)  On February 4, 2013, the Office of the

Attorney General for the District of Columbia filed an *amicus curiae* brief, arguing that the D.C.

Anti-SLAPP Act does not violate the Seventh Amendment and should apply in federal court

actions.  (Dkt. No. 49.)

On November 9, 2012, Plaintiff filed a motion to strike portions of Defendants'

Memorandum of Law as well as portions of the Declaration of Rachel F. Strom.  (Dkt. No. 28

("Pl.'s Mem.").)  On November 19, 2012, Defendants opposed Plaintiff's motion to strike.  (Dkt.

No. 30. ("Defs.' Opp'n.").)  Plaintiff replied on December 4, 2012.  (Dkt. No. 36 ("Pl.'s Rep.").)

Oral argument on the pending motions was initially held on December 17, 2012.  On

March 6, 2013, this Court held a telephonic conference, in which the parties were asked to brief

the issue of how, if at all, Nevada's Anti-SLAPP Act should apply to this case should the Court

conclude that the law of Nevada, rather than the law of the District of Columbia, applied.   On

April 23, 2013, Defendants moved in the alternative to dismiss the case under Nevada law, and

submitted their motion and brief on Nevada's Anti-SLAPP Act.  (Dkt. Nos. 56, 57.)  On May 21,

2013, Plaintiff moved for discovery pursuant to Federal Rule of Civil Procedure 56(d) to oppose

Defendants' Nevada Anti-SLAPP motion.  (Dkt. Nos. 62, 66.)  Defendants replied to Plaintiff's

opposition and opposed Plaintiff's motion for discovery on June 25, 2013.  (Dkt. No. 72.)

Plaintiff replied on July 18, 2013.  (Dkt. No. 76.)

## II.    Choice of Law

Defendants have moved to dismiss Adelson's lawsuit pursuant to the District of

Columbia Anti-SLAPP Act and District of Columbia defamation law, or, in the alternative,

---

[4] On October 26, 2012, this Court ordered bifurcated briefing of Defendants' motions, pursuant
to the parties' request. (*See* Dkt. No. 25.)

pursuant to the Nevada Anti-SLAPP Act and Nevada defamation law. Thus, at the outset, it is necessary to determine which state's defamation law applies to this action.

Choice of law analysis in defamation cases remains, as it was in Dean Prosser's time, "a dismal swamp, filled with quaking quagmires, and inhabited by learned but eccentric professors who theorize about mysterious matters in a strange and incomprehensible jargon." William L. Prosser, *Interstate Publications*, 51 Mich. L. Rev. 959, 971 (1953). Multistate defamation cases applying New York choice of law rules are invariably adjudicated in the federal courts, meaning that New York state courts have not had the opportunity to weigh in on how the choice of law analysis should be undertaken. This renders choice of law analysis in cases such as this particularly vexing. *But see Simon v. Philip Morris Inc.*, 124 F. Supp. 2d 46, 69 (E.D.N.Y. 2000) (explaining that where the state courts of New York have not directly spoken on a choice of law issue, the district court "must predict how the New York Court of Appeals would view the matter").

This Court sits in New York and therefore applies New York choice of law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). In tort actions, New York courts apply the substantive law of the jurisdiction that has the most significant interest in "the specific issue raised in the litigation." *Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 196 (1985) (quoting *Babcock v. Jackson*, 12 N.Y.2d 473, 481 (1963)). In determining the interests of a jurisdiction in a particular tort, New York courts assess whether the state laws in conflict are primarily "conduct-regulating" or "loss allocating." *Padula v. Lilarn Props. Corp.*, 84 N.Y.2d 519, 522 (1994). Conduct-regulating rules are those "governing conduct to prevent injuries from occurring," while loss allocating rules "are those which prohibit, assign, or limit liability after the tort occurs . . . ." *Id. Compare Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175, 184

(E.D.N.Y. 2001) (causes of action involving the duty and standard of care applicable to manufacturers, are, for choice of law purposes, conduct-regulating), *with Armstead v. Nat'l R.R. Passenger Corp.*, 954 F. Supp. 111, 113 (S.D.N.Y. 1997) (determination of whether to apply Virginia's contributory negligence or New York's comparative negligence rule is primarily loss allocating, because both "rules significantly encourage plaintiffs to exercise due care" and "the primary difference is in how loss will be allocated after the tort occurs"). If the laws at issue are primarily conduct-regulating, "the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Cooney v. Osgood Mach.*, 81 N.Y.2d 66, 72 (1993). If they are loss allocating, the so-called "*Neumeier* rules" apply. *See Neumeier v. Kuehner*, 31 N.Y.2d 121, 129 (1972); *see also Sheldon v. PHH Corp.*, 135 F.3d 848, 853 (2d Cir. 1998) (applying the *Neumeier* rules).

The Second Circuit has established that "[d]iscouraging defamation is a conduct regulating rule . . . ." *Lee v. Bankers Trust Co.*, 166 F.3d 540, 545 (2d Cir. 1999) (citation omitted). Because "the locus of the tort is where the plaintiff suffered injury, often the Court can resolve the choice of law analysis [in a defamation action] simply by observing the state of plaintiff's domicile and presuming that the publication injured him in that state." *Condit v. Dunne*, 317 F. Supp. 2d 344, 353 (S.D.N.Y. 2004); *see also Lee*, 166 F.3d at 545 ("Under New York choice-of-law rules in defamation cases 'the state of the plaintiff's domicile will usually have the most significant relationship to the case,' and its law will therefore govern." (quoting *Reeves v. Am. Broad. Co.*, 719 F.2d 602, 605 (2d Cir. 1983)). In multistate defamation cases, however, this "locus of the tort factor" arguably "begs, rather than answers, the ultimate choice of law question." *Condit*, 317 F. Supp. 2d at 353. Unlike, say, in a diversity action involving a car accident, it is not immediately apparent how one might identify "the place" where the tort of

defamation occurred.  Thus, in cases where a defamatory statement is published nationally, there is only a "presumptive" rule that the law of plaintiff's domicile applies, which "does not hold true . . . if 'with respect to the particular issue, some other state has a more significant relationship to the issue or the parties.'" *Davis v. Costa-Gavras*, 580 F. Supp. 1082, 1091 (S.D.N.Y. 1984) (quoting Restatement (Second) of Conflict of Laws § 150 cmt. (e) (1977)); *see also* Robert D. Sack, *Sack on Defamation*, at § 15:3.2, 15-51 (4th ed. 2012) (noting that "[t]here is an acknowledgement in the second *Restatement* and in some of the cases that in a multistate defamation, if the plaintiff had substantial relationships outside of his or her domicile, the choice of law analysis may be different").  *But see Hatfill v. Foster*, 401 F. Supp. 2d 320, 324-25 (S.D.N.Y. 2005), *reconsidered on other grounds*, 415 F. Supp. 2d 353 (S.D.N.Y. 2006) (noting that "a survey of recent libel cases between out-of-state plaintiff[s] and New York defendants involving multi-state or nationwide publications indicates a marginal preference for the law of the plaintiff's domicile, at least where there is no other reason to apply New York law").[5] Accordingly, the Court must determine whether some state other than that of Plaintiff's domicile—Nevada—has a more significant relationship to the issue or the parties. *Accord Reeves*, 719 F.2d at 605 (determining that, in multistate defamation cases, "it is proper for a federal court in New York to apply the case-by-case balancing test" to determine which state has the most significant interest).[6] Otherwise, Nevada law should apply.

---

[5] And as explained below, this preference should be more pronounced in cases such as this one, where—in contrast to the cases surveyed in *Hatfill*—the relevant question is whether to apply the law of an out-of-state plaintiff's domicile or the law of an *out-of-state defendant's* domicile.

[6] Some courts have determined which state has the most significant interest in multi-state defamation actions by employing a nine-factor test, first introduced in *Palmisano v. News Syndicate Co., Inc.*, 130 F. Supp. 17 (S.D.N.Y. 1955).  The nine factors enumerated in *Palmisano* are:

Nevada's interest in this case is significant and incontrovertible. Adelson is a Nevada citizen, and the Adelson business empire is based in Nevada. Nevada has an interest in protecting its citizens from tortious conduct. The District of Columbia also has an interest in this case—protecting the First Amendment rights of its citizens. While this interest is important, it is not, without more, sufficient to overcome the presumption that the law of Plaintiff's domicile should apply in this type of case. *See Costa-Gavras*, 580 F. Supp. at 1091; *Hatfill*, 401 F. Supp. 2d at 324-25.

According to Defendants, the Court should follow *Costa-Gavras* and hold that Defendants' domicile, here the District of Columbia, has a "more significant" interest in the case than Plaintiff's domicile, here Nevada. *Costa-Gavras*, 580 F. Supp. at 1091. In *Costa-Gavras*, the plaintiffs, all domiciled outside of New York, brought a libel action against, *inter alia*, a

---

> (1) the state of plaintiff's domicile; (2) the state of plaintiff's principal activity to which the alleged defamation relates; (3) the state where plaintiff in fact suffered greatest harm; (4) the state of the publisher's domicile or incorporation; (5) the state where defendant's main publishing office is located; (6) the state of principal circulation; (7) the place of emanation; (8) the state where the libel was first seen; and (9) the law of the forum.

*Id.* at 19 n.2 (citations omitted); *see also Costa-Gravas*, 580 F. Supp. at 1091-92 (borrowing the *Palmisano* test); *Weinstein v. Friedman*, No. 94 Civ. 6803 (LAP), 1996 WL 137313, at *8-9 (S.D.N.Y. Mar. 26, 1996) (same). This test provides a useful list of the possibly significant contacts in a multi-state defamation action. It is not binding upon this Court, however, as neither the Second Circuit nor the New York Court of Appeals has adopted this nine-factor test. *See Lee*, 166 F.3d at 545 (noting that the *Palmisano* test has been adopted by some district courts, but declining to sanction it). Moreover, as one commentator has noted, the test "seem[s] to have spawned numerous [decisions] which entailed contacts that did not point overwhelmingly towards the law of one state, where the issue was resolved by mechanical contact counting." James R. Pielemeier, *Choice of Law for Multistate Defamation – the State of Affairs as Internet Defamation Beckons*, 35 Ariz. St. L.J. 55, 73 (Spring 2003). Such contact counting is of limited value in determining which jurisdiction has the most significant interest in a tort claim.

book's author and publishers, which were domiciled in New York.[7] The Court held that New

York publishers had a particularly significant interest in having the laws of their domicile

applied:

> The particular issue here is liability of the author and the publisher
> of a book for its subsequent reprinting by another publisher
> pursuant to a contract granting paperback rights, and for
> republication of the alleged defamatory material in movie form
> pursuant to an option agreement with the author. These issues are
> of special concern to the book publishing, news, and film
> industries, to authors and artists, and to the states of their domiciles
> and principal places of business. New York, as the national center
> of the publishing industry, has a significant interest in assuring that
> the risks and liabilities flowing from publishing and related options
> contracts, negotiated and largely performed here, will be uniform.
> Publishers, authors, and film makers consciously attempt to mold
> their conduct to legal norms, with the expectation that the legal
> consequences of their conduct will be predictable. Their justified
> expectation that their conduct will be judged by the rules of
> jurisdictions in which they carry on their activities merits
> protection.

*Id.* at 1092. Courts in this district have followed *Costa-Gavras* in a number of defamation cases,

applying New York law where publishing and media defendants were domiciled in New York,

even where the plaintiff was domiciled in another state. *See, e.g.*, *Weinstein*, 1996 WL 137313,

at *7, 9 (determining that the law of New York, which was both defendants' domicile and the

place the book at issue was written, edited, and published, applied in lawsuit against book author

and publishers because "New York has a strong policy in protecting its media defendants");

---

[7] The facts surrounding *Costa-Gavras* are noteworthy. The plaintiffs were two State Department officials and a naval officer who had been stationed in Chile during the military coup of Salvator Allende. During the coup, United States citizen Charles Harman disappeared, only to reappear—deceased—after the coup was complete. Shortly thereafter, Thomas Hauser wrote a book entitled *The Execution of Charles Harman: An American Sacrifice*, which was later made into a film entitled "Missing," starring Sissy Spacek and Jack Lemon, and directed by Costa-Gavras. The book was then released in two softcover editions. The plaintiffs sued Hauser, Costa-Gavras, the publishers of the hardcover and softcover editions of the book, and the studio that made the film, alleging that both the book and the film "falsely accused the plaintiffs of ordering or approving the order for murder of Charles Harman." *Id.* at 1085.

*Grass v. News Grp. Publ'ns*, 570 F. Supp. 178, 185-86 (S.D.N.Y. 1983) (concluding that New York law applied in a defamation suit brought by former brother-in-law of a New York gubernatorial candidate where plaintiff had a large amount of contacts with New York, where the statements of the defendant publishers were made primarily in New York publications, and where the plaintiff's corporation, though based in Pennsylvania, was arguably more concerned with the plaintiff's reputation in New York). *But see La Luna Enters. v. CBS Corp.*, 74 F. Supp. 2d 384, 389 (S.D.N.Y. 1999) (holding that while "New York has an interest in protecting the free speech rights of publishers," such as the defendant, "within its borders," the home state of the plaintiff, Florida, "has the most significant interest in this litigation").

Defendants have failed to persuade that the District of Columbia's particular interest in this case is analogous to New York's interest in protecting New York's publishers and media industry. Defendants argue that the District of Columbia has a particular interest here, akin to New York's interest in media and publishing, because the publication related to the presidential campaign and federal regulation of political contributions.[8]

But of course, the race for president of the United States occurs in *every* state in the Union, not just in the District of Columbia. It is therefore difficult to see why the fact that the comments relate to Adelson's contributions in a presidential race should give the District of Columbia a particular interest in the resolution of this dispute, except to the extent that defamatory comments made in the context of a presidential campaign may tangentially affect who ultimately moves into 1600 Pennsylvania Avenue.

---

[8] Defendants note that "the Petition and Statement concern Adelson's business dealings as they relate to financial contributions in connection with his efforts to influence the 2012 presidential election, as well as statements by Senator McCain in connection with federal legislative efforts, investigations by the United States Department of Justice and Securities and Exchange Commission, and contributions regulated, if at all, by the Federal Elections Commission – all of which center on the District of Columbia." (Def.'s Mem. at 25.)

The suggestion that a statement about a presidential contestant particularly affects the District of Columbia is somewhat akin to an argument that a copyright lawsuit about the film *Philadelphia* should apply Pennsylvania law, even though the screenwriter and filmmakers lived in New York City and Los Angeles. Nor does the fact that federal government regulators of campaign contributions are based in the District of Columbia support a dominant interest on the part of that jurisdiction: the publication at issue here was not about government regulation, but about the propriety of a candidate's acceptance of certain contributions in a national campaign. Because the District of Columbia has no particular interest in this action, Defendants have failed to demonstrate that it would be appropriate to apply District of Columbia law under New York's choice of law rules.

*Costa-Gavras* and its progeny are distinguishable from this case in other ways as well. First, in those cases, courts opted to apply the law of the defendants' jurisdiction where it coincided with the law of the forum state. *See Costa-Gavras*, 580 F. Supp. at 1093 (noting that the Court was "particularly" willing to apply the law of the defendants' domicile, "when," as in *Costa-Gavras*, "it is also the forum state"); *see also Hatfill*, 401 F. Supp. 2d at 325 ("In those cases where defendant's domicile trumped plaintiff's, New York had some other significant connection to the case, making use of its law reasonable."). *But see* Larry Kramer, *Interest Analysis and the Presumption of Forum Law*, 56 U. Chi. L. Rev. 1301, 1309 (1989) (criticizing the notion that the law of the forum should play a role in the choice of law analysis, "since its primary effect is to encourage forum shopping"). Here, the parties agree that the forum state has no substantial interest in this case. This militates against applying the law of Defendants' domicile. Indeed, Defendants have cited no cases—nor is the Court aware of any—in which a

federal court based in New York has applied the law of the defendant's domicile over the law of the plaintiff's domicile where that defendant was a citizen of a state other than New York.[9]

Second, the plaintiffs in *Costa-Gavras* were "public servants from different jurisdictions," which diluted each plaintiff's interest in applying the law of their respective home states. *Id.* at 1093; *see also* Sack, *Sack on Defamation*, at §15:3.2, 15-55 (noting that "[t]he result in *Costa-Gavras* becomes less likely where the plaintiff or plaintiffs have a more clearly defined, single domicile whose interests more clearly predominate").[10] Here, there is only one plaintiff, rather than several plaintiffs with different domiciles. If either jurisdiction has a diluted interest in this case, it is the District of Columbia, as only two of the three Defendants are domiciled there.

Third, the circumstances of *Costa-Gavras* made the application of the law of the plaintiff's domicile particularly problematic. *Costa-Gavras* concerned the liability of a book publisher and author for the book's subsequent reprinting by another publisher and in a movie, and the *Costa-Gavras* court was concerned about protecting defendants from being sued under a state law—as it happened, the law of the District of Columbia—to which they had not submitted themselves. *See Costa-Gavras*, 580 F. Supp. at 1092-93 ("Justice in conflicts rules, as in

---

[9] On a related note, federal courts in other states appear to less consistently hold that New York law should apply in defamation cases against New York media defendants, which further suggests that courts are less likely to apply the law of a defendant's domicile where it is different from the law of the forum state. *See, e.g., Franklin Prescriptions, Inc. v. New York Times Co.*, 267 F. Supp. 2d 425, 432 (E.D. Pa. 2003) ("Although New York has an interest in protecting its media defendants and providing an environment for the free exchange of ideas, Pennsylvania's interest in protecting its citizens from harm to their proprietary interests resulting from a defamatory publication, in addition to providing compensation for such injury, outweighs New York's interest on this issue." (citing cases)).

[10] In fact, in *Costa-Gavras*, the plaintiffs were foreign service stationed abroad, with no real domicile in the United States. In conducting his choice of law analysis, Judge Sofaer merely "[a]ssum[ed] for purposes of discussion that the District of Columbia may serve as a proxy for the meaningful domestic domicile lacking here due to plaintiffs' foreign service careers." *Costa-Gavras*, 580 F. Supp. at 1091.

jurisdiction, requires minimal contacts with another forum before subjecting the nondomiciliary to its laws. There is 'a serious question of deprivation of the defendant's due process rights [in] casting him in liability under the law of a state with which he [has] in no way voluntarily associated himself.'" (quoting Harold L. Korn, *The Choice-of-Law Revolution: A Critique*, 83 Colum. L. Rev. 772, 867, 966-67 (1983))); *see also* Eugene F. Scoles *et al.*, *Conflict of Laws* 848 (4th. ed. 2004) (arguing that a foreseeability of the injury in the plaintiff's state can "tip the scales and make[] the application of the law of the injury-state an appropriate solution to these otherwise difficult true conflicts"). Here, Defendants had reason to foresee that their actions would affect a Nevada resident. *Accord Xcentric Ventures, LLC v. Bird*, 683 F. Supp. 2d 1068, 1073 (D. Ariz. 2010) ("Although communities in the United States with little or no internet usage still exist, in general, it is quite foreseeable that the brunt of the reputational harm that results from internet-based defamation is most likely to be felt in the forum where the defamed individual lives, works, and maintains social relationships.") If any relationship is tenuous in this case, it is Plaintiff's relationship with the District of Columbia, not Defendants' relationship with Nevada. *Accord La Luna Enters., Inc.*, 74 F. Supp. 2d at 1369.

In sum, *Costa-Gavras* and its progeny are distinguishable from this case, and Defendants have failed to rebut the presumption that Nevada has the most significant interest in this litigation. It is therefore Nevada's defamation law that will be applied in this action.

## III.   Application of Nevada Law to Plaintiff's Claims

Defendants have moved to dismiss the Complaint pursuant to Rule 12(b)(6) and pursuant to Nevada's Anti-SLAPP statute.[11] Each motion is addressed in turn.

---

[11] As noted above, Defendants also filed a motion to dismiss pursuant to the District of Columbia Anti-SLAPP statute. Because this Court has determined that Nevada law applies to this case, that motion is denied.

A.    **Rule 12(b)(6) Motion**

1.    **Standard of Review**

To survive a motion to dismiss pursuant to Federal Rule 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must accept as true all well-pleaded factual allegations in the complaint, and "draw[ ] all inferences in the plaintiff's favor." *Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir. 2006) (internal quotations omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678; *see also Twombly*, 550 U.S. at 555 (noting that a court is "not bound to accept as true a legal conclusion couched as a factual allegation" (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986))).

Because a defamation suit "may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself," courts should, where possible, resolve defamation actions at the pleading stage. *Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966); *see also Biro v. Conde Nast*, 883 F. Supp. 2d 441, 457 (S.D.N.Y. 2012) (noting that there "is 'particular value' in resolving defamation claims at the pleading stage" (citation omitted)).

## 2.    The Law of Defamation

"Defamation is a publication of a false statement of fact." *Pegasus v. Reno Newspapers, Inc.*, 57 P.3d 82, 87 (Nev. 2002); *see also Idema v. Wager*, 120 F. Supp. 2d 361, 365 (S.D.N.Y. 2000) ("Defamation is the injury to one's reputation either by written expression, which is libel, or by oral expression, which is slander.") (citation omitted). "To establish a prima facie case of defamation, a plaintiff must prove: (1) a false and defamatory statement by defendant concerning the plaintiff; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages." *Wynn v. Smith*, 16 P.3d 424, 427 (Nev. 2001) (citing cases); *see also Flowers v. Carville*, 266 F. Supp. 2d 1245, 1251 (D. Nev. 2003) (same).

Whether a statement is capable of a defamatory construction is a question of law for the court to decide. *Branda v. Sanford*, 637 P.2d 1223, 1225 (Nev. 1981). "A statement is defamatory when, '[u]nder any reasonable definition[,] such charges would tend to lower the subject in the estimation of the community and to excite derogatory opinions against him and to hold him up to contempt.'" *Posadas v. City of Reno*, 851 P.2d 438, 442 (Nev. 1993) (citation omitted).

## 3.    Fair Report Privilege

Defendants argue that the Petition's statements that "reports [had] surfaced" that Adelson "'personally approved' of prostitution in his Macau casinos" and "reportedly approved of prostitution" constitute privileged reports of a judicial proceeding.

Nevada "has long recognized a special privilege of absolute immunity from defamation given to the news media and the general public to report newsworthy events in judicial proceedings." *Sahara Gaming Corp. v. Culinary Workers Union Local 226*, 984 P.2d 164, 166 (Nev. 1999); *see also Circus Circus Hotels v. Witherspoon*, 657 P.2d 101, 104 (Nev. 1983)

19

("[There] is [a] long-standing common law rule that communications uttered or published in the course of judicial proceedings are absolutely privileged so long as they are in some way pertinent to the subject of controversy." (citation omitted)). Indeed, the fair report privilege is grounded not just in common law, but also in constitutional principles. *See* Restatement (Second) of Torts § 611, cmt. b ("If the report of a public official proceeding is accurate or a fair abridgement, an action cannot constitutionally be maintained, either for defamation or for invasion of the right of privacy.").

Although the fair report privilege is most commonly asserted by media defendants, it "extends to any person who makes a republication of a judicial proceeding from material that is available to the general public." *Sahara Gaming Corp.*, 984 P.2d at 166 (citing Restatement (Second) of Torts § 611 cmt. c). In Nevada, if the privilege applies, it is "absolute," meaning it "precludes liability even where the defamatory statements are published with knowledge of their falsity and personal ill will toward the plaintiff." *Circus Circus Hotels*, 657 P.2d at 104; *see also Sahara Gaming Corp.*, 984 P.2d at 165. In order to receive the benefit of the fair report privilege, (1) it must be "apparent either from specific attribution or from the overall context that the article is quoting, paraphrasing, or otherwise drawing upon official documents and proceedings;" and (2) the statement must constitute a "fair and accurate" description of the underlying proceeding. *Dameron v. Washington Magazine, Inc.*, 779 F.2d 736, 739 (D.C. Cir. 1985).[12]

### a.    Attribution of the Source

"As a general matter, in order to enjoy the protection of the privilege, the publication in issue must clearly attribute the statement in question to the official proceeding or document on

---

[12] In *Dameron*, the D.C. Circuit applied District of Columbia law, not Nevada law. The parties agree, however, that Nevada and D.C. law contain essentially the same fair report privilege.

which it is reporting or from which it is quoting." Sack, *Sack on Defamation*, at § 7:3:5[B][1], 7-18. A statement that is not attributed "does not fulfill the function of conveying to the public information about what went on in the courthouse, which is the principal reason for according such a privilege." *Id.*

In determining whether the attribution requirement has been met, the relevant question is whether "the average reader would be []likely to understand the article (or the pertinent section thereof) to be a report on or summary of an official document or proceeding. It must be apparent either from specific attribution or from the overall context that the article is quoting, paraphrasing, or otherwise drawing upon official documents or proceedings." *Dameron*, 779 F.2d at 739; *see also id.* at 740 (holding that an article's reliance of a report did not qualify for the privilege because "[t]he challenged assertion is simply offered as historical fact without any indication of its source").

In the instant action, the Petition quotes from, and hyperlinks to, a news report that accurately describes and quotes from the Jacobs Declaration. (*See* Petition ("**Adelson "personally approved" of prostitution in his Macau casinos.**").) The Petition also repeatedly uses the phrase "reportedly" and "reports" when referring to the accusations in the Jacobs Declaration and puts in quotation marks the words "personally approved," which together make plain that the hyperlink connects to a source suggesting that Adelson "personally approved" prostitution in Macau. The parties disagree as to whether hyperlinking in this manner satisfies the attribution requirement of the fair and accurate report privilege. Here, this question is central to the Court's determination of whether the privilege applies, as Plaintiff has conceded that the underlying AP Article itself is protected by the fair and accurate report privilege. (*See* Dkt. No. 61, Ex. 148 ("Dec. 17, 2012 Tr.") at 34:8-14 ("THE COURT: . . . So you concede that the AP

Article itself, standing by itself, could assert – if this were a suit against AP, they could assert the privilege. [PLAINTIFF'S COUNSEL]: Absolutely. Absolutely. But they want to take advantage of the AP's privilege because this is a hyperlink . . . ."); *see also id.* at 53:9-13 ("[PLAINTIFF'S COUNSEL]: . . . [T]he statements in the AP article are [] false and defamatory. It just so happens that because the AP article has a privilege, that the AP article's utterance of these statements is protected.")).  The Court agrees with Defendants that the Petition's hyperlink to the news report sufficiently attributes the statement to the Jacobs Declaration.

Not so long ago, the Second Circuit could not discuss the hyperlink without defining the innovation for its readers. *See Bebsusan Restaurant Corp. v. King*, 126 F.3d 25, 27 n.1 (2d Cir. 1997) (explaining that "[a] hyperlink is 'highlighted text or images that, when selected by the user, permit him to view another, related Web document'" (citation omitted)).  Nearly two decades later, it is simply assumed that persons navigating the Internet understand hyperlinks as means of connecting one webpage to another. Thus, in *Fteja v. Facebook*, 841 F. Supp. 2d 829, 839 (S.D.N.Y. 2012), Judge Holwell rejected the plaintiff's argument that the Terms of Use were rendered void because they were available only by hyperlink:

> The mechanics of the internet surely remain unfamiliar, even obtuse to many people. But it is not too much to expect that an internet user whose social networking was so prolific that losing Facebook access allegedly caused him mental anguish would understand that the hyperlinked phrase "Terms of Use" is really a sign that says "Click Here for Terms of Use."  So understood, at least for those to whom the internet is in an indispensable part of daily life, clicking the hyperlinked phrase is the twenty-first century equivalent of turning over the cruise ticket.

*Cf.* SEC Release No. 33-7233 (SEC opining that providing hyperlinks on an online offering is akin to including the contents of the second site in the same delivery envelope as the prospectus).

The hyperlink is not only the "twenty-first century equivalent of turning over the cruise ticket" for purposes of consumer contracts. The hyperlink is the twenty-first century equivalent of the footnote for purposes of attribution in defamation law, because it has become a well-recognized means for an author or the Internet to attribute a source. *See* Lokman Tsui, *The Hyperlink in Newspapers and Blogs*, *in* The Hyperlinked Society: Questioning Connections in the Digital Age 70, 73 (Joseph Turow and Lokman Tsui, Eds. 2008) ("Perhaps the most classic function of the hyperlink is to use it for citation."). Indeed, as a form of attribution, a hyperlink provides benefits that a footnote does not. Unlike a footnote on a piece of paper—which merely provides one with directions to the source—the hyperlink instantaneously permits the reader to verify an electronic article's claims. *See id.* at 70 ("[L]inks can be very useful in their ability to directly link to source material, such as public reports or official transcripts, in providing support for a news article. Considering that trust in what the people hear, see, and read has been steadily declining since the 1980s, the ability of the hyperlink to link a claim to its source can increase transparency of the news and subsequently restore some of the credibility of the mass media. . . . The hyperlink [] is able to support the facticity of news . . . ."); *see also* Anjali Dalai, *Protecting Hyperlinks and Preserving First Amendment Value on the Internet*, 13 U. Pa. J. Const. L. 1017, 1019 (2011) ("Hyperlinks have long been understood to be critical to communication because they facilitate access to information. They provide visitors on one website a way to navigate to internally referenced words, phrases, arguments, and ideas.").

Defendants argue that a footnote constitutes sufficient attribution but a hyperlink does not, because the former "is actually part of the four corners of a publication, and does not require external navigation." (Def.'s Opp'n. at 23.) But this contention is premised on a type of formalism that is misplaced in Internet defamation law. While it is true that one can verify a

hyperlinked source's content only through "external navigation," it takes just as much "external navigation" to verify the content of a footnote or endnote. As compared to a footnote, which can often be verified only via a sojourn to the library, the verification of a hyperlink is far from onerous. *Cf. Jankovic v. Inter'l Crisis Grp.*, 429 F. Supp. 2d 165, 177 n.8 (D.D.C. 2006) (noting that, even if the meaning of the allegedly defamatory statement was unclear, it was clarified by the "two internet links" at the end of the sentence: "What little confusion the sentence could possibly cause is easily dispelled by any reader willing to perform minimal research."). Nor is there any reason to believe that a footnote is read more frequently than a hyperlink is clicked on.[13]

Moreover, protecting defendants who hyperlink to their sources is good public policy, as it fosters the facile dissemination of knowledge on the Internet. It is true, of course, that shielding defendants who hyperlink to their sources makes it more difficult to redress defamation in cyberspace. But this is only so because Internet readers have far easier access to a commentator's sources. It is to be expected, and celebrated, that the increasing access to

---

[13] One limitation of hyperlinks as a tool—and with Internet citations generally—is the sometimes-ephemeral nature of the linked source: Internet sources often go stale after a period of time. This phenomenon, known as "link rot," is discussed in the context of legal-academic journals and Supreme Court opinions in a recent paper by Jonathan Zittrain and Kendra Albert, available—at least for now—at the following web address: http://papers.ssrn.com/abstract=2329161. The authors found that 50 percent of Internet citations in Supreme Court opinions (from 1996, the date of the first such citation) were links that no longer contained the cited material. (The authors propose a solution in the form of a platform for the preservation of archived web material.) Certain courts, including the Second Circuit and the Southern District of New York, have addressed this problem by adopting the practice of docketing PDF copies of Internet sources cited in opinions. This general ephemerality problem, while reflecting a current limitation in the long-term usefulness of hyperlinking, does not undermine the status of hyperlinks as akin to footnotes in the vast and fast-paced world of the Internet. This is particularly so in the context of defamation cases, which typically involve prompt challenges to publications, as reflected in this case (involving a Petition that was posted for a matter of days) and as mandated by the typically brief limitations periods for defamation claims (one year in New York; two years in Nevada).

information should decrease the need for defamation suits. *See* Dalal, *supra*, at 1019 (noting that "[h]yperlinks have long been understood to be critical to communication because they facilitate access to information" and that hyperlinks invite readers "to engage more deeply with the issues raised" (citation omitted)).

In *Nicosia v. De Rooy*, 72 F. Supp. 2d 1093 (N.D. Cal., 1999), Judge Chesney considered the effect of hyperlinks in defamation actions. While *Nicosia* considered the ability of hyperlinks to transform a statement into constitutionally protected opinion, it is nonetheless instructive here. In *Nicosia*, the defendant argued that his posting accusing the plaintiff of committing embezzlement constituted non-defamatory opinion based upon undisclosed facts, where the facts upon which the post relied were in articles to which the posting hyperlinked. The plaintiff, by contrast, argued that "the embezzlement accusation must be read in isolation from [the defendant's] other articles because the . . . posting which contained the allegation did not include any underlying facts." *Id.* at 1103. Judge Chesney rejected the plaintiff's contention that a posting "direct[ing] readers to specific articles . . . and provid[ing] a hyperlink for immediate access to such articles" is based upon undisclosed facts: "These articles were at least as connected to the news group posting as the back page of a newspaper is connected to the front. Thus, the Court considers the articles part of the context of the embezzlement accusation." *Id.*; *see also Franklin v. Dynamic Details, Inc.*, 116 Cal.App.4th 375, 379 (2004) ("The e-mails disclosed the facts upon which the opinions were based by directing the reader to the FCC Web site and (via a Web link on the FCC Web site) to another company's Web site. . . . . A reader of the e-mails could view those Web sites and was free to accept or reject Axton's opinions based on his or her own independent evaluation."); *Agora, Inc. v Axxess, Inc.*, 90 F. Supp. 2d 697, 704-

05 (D. Md. 2000) (dismissing defamation claim based in part on facts disclosed in hyperlinked documents).

In short, by hyperlinking to the AP Article—which quotes from the Jacobs Declaration— and by using the words "reportedly" and "reports" to signal to the reader that the hyperlink connects one to the source of the Petition's claims, Defendants adequately "fulfill[ed] the function of conveying to the public information about what went on in the courthouse."[14]

### b.    Accuracy of the Report

In order for the fair report privilege to apply, "[i]t is not necessary that [a report] be exact in every immaterial detail or that it conform to that precision demanded in technical or scientific reporting. It is enough that it conveys to the persons who read it a substantially correct account of the proceedings." Restatement (Second) of Torts § 611 cmt. f. Nonetheless, where a report of a judicial proceeding goes "beyond fair, accurate, and impartial reporting . . . by presenting a one-sided view of the action," the fair and true report privilege will not save a defendant. *Lubin v. Kunin*, 17 P.3d 422, 427 (Nev. 2001); *see also id.* at 427-28 ("While *Sahara Gaming* allows a

---

[14] Plaintiff argues that, even if hyperlinking can satisfy the attribution requirement, the privilege is nonetheless inapplicable here, because Defendants hyperlinked to an article describing the declaration rather than to the declaration itself. As the Second Circuit has noted, the common law "privilege is available where a reporter who purports to report on an official proceeding does not have personal knowledge of the proceeding but instead relies on an intermediary who does." *Bufalino v. Associated Press*, 692 F.2d 266, 271 (2d Cir. 1982) (citing *Binder v. Triangle Publ'ns*, 442 Pa. 319, 327 (1971); *see also* David A. Elder, *Defamation: A Lawyer's Guide*, at § 3:2 (2012) (noting that "[t]he case law on point" suggests that the privilege applies "where the defendant relies on a responsible, presumably knowledgeable, intermediary of general trustworthiness who was in attendance at the proceeding or a participant therein or an authoritative spokesperson thereof"); Sack, *Sack on Defamation*, at § 7:3:5, 7-41 ("There is authority for, and should be less dispute about, the proposition that indirect reliance on the official proceeding . . . is sufficient to give rise to the privilege."). And indeed, by linking to the AP Article rather than the Jacobs Declaration, the reader was given exposure to multiple statements by Adelson's representatives denying the allegations put forth in the Jacobs Declaration. Arguably, then, hyperlinking to the AP Article provided a reader of the Petition with a more balanced view of the allegations in the Jacobs Declaration.

party to report preliminary judicial proceedings from a fair and neutral stance, a party may not

don itself with the judge's mantle, crack the gavel, and publish a verdict through its 'fair

report.'").

The statements at issue here are the Petition's claims that "reports surfaced that . . .

Adelson 'personally approved 'of prostitution in his Macau casinos'" and that Adelson

"reportedly approved of prostitution." As explained above, the Petition accurately quotes the

AP Article, which in turn accurately quotes the Jacobs Declaration. Moreover, at the time the

Petition was posted, the defendants in the *Jacobs* action had not yet filed their response to the

Jacobs Declaration, so it cannot be seriously maintained that the Petition unfairly presented a

one-sided view of the action. (*See* Strom Decl., Ex. 111 Tabs A-C.)[15]

Accordingly, the Court concludes that the Petition contains a fair and accurate report of

the Jacobs Declaration.[16] Thus, the Petition's statements that "reports [had] surfaced" that

---

[15] Plaintiff's assertion that "by omitting the details about the questionable provenance of the accusation regarding prostitution, the portrayal of the AP article was unfair" misses the mark. (Pl.'s Supp. Opp'n. at 22.) The relevant question is whether the Petition fairly characterized the Jacobs Declaration, which it did. *See Biro*, 883 F. Supp. 2d at 478 (noting that there "is no requirement that the publication report the plaintiff's side of the controversy" in order for the privilege to apply (citations omitted)).

[16] Plaintiff would have it that the fair report privilege has been waived by Defendants, because of the comments in the Petition that Adelson's money is "dirty" and "tainted." In support of this contention, Plaintiff cites several cases in which the Nevada Supreme Court explained that the fair report privilege does not apply where a defendant both summarizes and endorses as accurate a report. As Defendants rightly note, however, there is an important difference between explicitly *endorsing* allegations in a lawsuit and stating an opinion based upon allegations. *Compare Lubin*, 17 P.3d 422, 424 (Nev. 2001) (privilege inapplicable where defendants expressly endorsed the accuracy of a child abuse lawsuit by stating that "[t]**his is not a frivolous law suit**" and that abuse "**DID**" take place") *with Boley v. Atlantic*, No. 13 Civ. 89, 2013 WL 3185154, at *7 (D.D.C. June 25, 2013) (article describing arrest and charging of plaintiff protected by fair report privilege, despite the fact that author opined that it was a "good thing" defendant was being charged with war crimes); *see also Piscatelli v. Van Smith*, 35 A.3d 1140, 1153 (Md. 2012) (explaining that "derogatory opinions based on privileged statements of fact" are protected). Here, Defendants did not endorse the accuracy of the Jacobs Declaration, but rather cited the Declaration in support of their constitutionally protected opinion that Adelson's

Adelson "'personally approved' of prostitution in his Macau casinos" and "reportedly approved of prostitution" are non-actionable as a matter of law.

### 4.    Statements Incapable of Being Proven False

That leaves the comments in the Petition about Adelson's "dirty" and "tainted" money. As explained below, the Court determines that these comments are constitutionally protected statements, as they are incapable of bring proven true or false.

The determination of whether a statement constitutes constitutionally protected opinion or unprotected fact is an issue that must be decided by the Court. *Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 178 (2d Cir. 2000); *see also Potomac Valve & Fitting, Inc. v. Crawford Fitting*, 829 F.2d 1280, 1285 n.12 (1987). Given the importance of the First Amendment principles at stake, "[w]here the question of truth or falsity is a close one, a court should err on the side of non-actionability." *Celle*, 209 F.3d at 188 (quoting *Liberty Lobby, Inc. v. Dow Jones Co.*, 838 F.2d 1287, 1292 (D.C. 1988)).

While there is no "separate constitutional privilege for 'opinion' . . . ," *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990); *see also Flamm v. Am. Assoc. of Univ. Women*, 201 F.3d 144, 147 (2d Cir. 2000), a statement "will receive full constitutional protection" if it "does not contain a provably false factual connotation." *Milkovich*, 497 U.S. at 20; *see also ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 496 (2d Cir. 2013) ("Generally, statements of pure opinion—that is, statements incapable of being proven false—are protected under the First

---

money is "dirty" and "tainted."   Indeed, the Petition asserts that Adelson's money is "dirty" and "tainted" not only because Adelson was reported to have "personally approved" prostitution, but also because Adelson (1) is "anti-union," (2) employs "allegedly corrupt business practices," and (3) is, according to Senator McCain, putting "foreign money" into American elections. Thus, it is not reasonable to read the assertion that Adelson's money is "dirty" and "tainted" as an endorsement of the Jacobs Declaration.

Amendment.").[17] Thus, "loose, figurative, or hyperbolic language" is protected by the First

Amendment, as it cannot reasonably be interpreted as stating actual, provable facts about an

individual. *Milkovich*, 497 U.S. at 21-23. Protecting such speech ensures that "public debate

will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has

traditionally added much to the discourse of our Nation." *Id.* at 20 (quoting *Hustler Magazine,*

*Inc. v. Falwell*, 485 U.S. 46, 53-55 (1988)). Under *Milkovich*, "[a] court may also consider

whether the 'general tenor' of the publication negates the impression that challenged statements

imply defamatory facts about the plaintiff." *Flamm*, 201 F.3d at 150 (citing *Milkovich*, 497 U.S.

at 21). In other words, in determining whether a statement is capable of being proven false, it is

paramount that courts look not just at the allegedly defamatory words themselves, but also at the

---

[17] The Second Circuit has recently noted that, under *Milkovich*, "the line between fact and
opinion is not always a clear one":

> In *Milkovich*, the Supreme Court declined to carve out an absolute
> privilege for statements of opinion and reaffirmed that the test for
> whether a statement is actionable does not simply boil down to
> whether a statement is falsifiable. To illustrate the difficulty, the
> Court provided the example of a statement of fact phrased as a
> statement of opinion: stating that "in my opinion John Jones is a
> liar" is no different from merely asserting that John Jones is a liar.
> Thus, the question of whether a statement is actionable admits of
> few easy distinctions.

*ONY, Inc.*, 720 F.3d at 496 (citations omitted). In any event, while the *Milkovich* court purported
to walk back dicta in *Gertz v. Robert Welch, Inc.* suggesting that all opinion is constitutionally
protected, *compare Gertz*, 418 U.S. 323, 339-40 (1974) *with Milkovich*, 497 U.S. at 17-19, the
protections afforded by *Milkovich* are, as Judge Sweet recognized shortly after that opinion was
handed down, "considerably broader than might be imagined from a reading of popular reports
of the opinion privilege's demise." *Don King Prods., Inc. v. Douglas*, 742 F. Supp. 778, 782
(S.D.N.Y. 1990); *see also* Robert D. Sack, *Protection of Opinion under the First Amendment:*
*Reflections on Alfred Hill, "Defamation and Privacy under the First Amendment,"* 100 Colum.
L. Rev. 294, 322 (2000) (noting, a decade after *Milkovich*, that the opinion "had little impact on
the law. . . . Most courts considering opinion since *Milkovich* have [] reached the result that they
likely would have before the Supreme Court decided the case"). *But see* Sack, *Sack on*
*Defamation*, at § 4:2:4, 4-16 (noting that "[c]ourts are more likely now than before *Milkovich* to
examine closely what is ostensibly an opinion to discern whether it implies provable facts").

context in which they were stated.  *See Knievel v. ESPN*, 393 F.3d 1068, 1075 (9th Cir. 2005)

("The context in which the statement appears is paramount in our analysis, and in some cases it

can be dispositive." (citing cases)); *Mashburn v. Collins*, 355 So. 2d 879, 885 (La. 1977)

("Words which, taken by themselves, would appear to be a positive allegation of fact, may be

shown by the context to be a mere expression of opinion or argumentative influence."); *see also*

*Towne v. Eisner*, 245 U.S. 418, 425 (1918) (Holmes, J.) ("A word is not a crystal, transparent

and unchanged, it is the skin of a living thought and may vary greatly in color and content

according to the circumstances and the time in which it is used.").

     In the wake of *Milkovich*, some courts have continued to use multifactor balancing tests

to determine whether a statement is a constitutionally protected.  *See Phantom Touring, Inc. v.*

*Affiliated Publ'ns*, 953 F.2d 724, 727 (1st Cir. 1992) ("[W]hile eschewing the fact/opinion

terminology, *Milkovich* did not depart from the multi-factored analysis that had been employed

for some time by lower courts seeking to distinguish between actionable fact and non-actionable

opinion.")  The Ninth Circuit's test, while not binding on this court, is instructive:

> To determine whether a statement implies a factual assertion, we
> examine the totality of the circumstances in which it was made.
> First, we look at the statement in its broad context, which includes
> the general tenor of the entire work, the subject of the statements,
> the setting, and the format of the work.  Next we turn to the
> specific context and content of the statements, analyzing the extent
> of figurative or hyperbolic language used and the reasonable
> expectations of the audience in that particular situation.   Finally,
> we inquire whether the statement itself is sufficiently factual to be
> susceptible of being proved true or false.

*Underwager v. Channel 9 Australia*, 69 F.3d 361, 366 (9th Cir. 1995) (citing cases).  Employing

that test here, the Court concludes that the Petition's statements that Adelson's money is "dirty"

or "tainted" constitute constitutionally protected opinion.

a.    **Broad Context**

In assessing whether a statement constitutes opinion or fact, "courts look to . . . the broader social context of the statement, and evaluate the impact that the statements would have on a reasonable reader." *Levin v. McPhee*, 119 F.3d 189, 197 (2d Cir. 1997) (citations omitted). *Compare Letter Carriers v. Austin*, 418 U.S. 264, 284-87 (1974) (use of the word "traitor" in a newsletter was constitutionally protected hyperbole, as no reasonable reader could believe the word was used literally in the context of a labor dispute), *with Flamm*, 201 F.3d at 152 ("Exaggerated rhetoric may be commonplace in labor disputes, but a reasonable reader would not expect similar hyperbole in a straightforward directory of attorneys and other professionals. Indeed, the opposite is true.").

While "often decr[ied]" by the media and others, "[t]he 'low level' of campaign tactics or rhetoric" in this nation's national campaigns is, now more than ever, a generally accepted fact of American life. *Secrist v. Harkin*, 874 F.2d 1244, 1249 (8th Cir. 1989) (citation omitted); *see also id.* ("There may be no public context more contentious than a political campaign.") Thus, courts "shelter strong, even outrageous political speech," on the ground that "the ordinary reader or listener will, in the context of political debate, assume that vituperation is some form of political opinion neither demonstrably true nor demonstrably false." Sack, *Sack on Defamation*, at § 4:3:1[B], 4-43; *see also id.*, at § 4:3:1[A], 4-31 ("Potentially defamatory statements in the guise of statements of fact uttered during a bitter political debate are particularly likely to be understood as rhetorical opinion."); *Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 244 F.3d 1007, 1019 (9th Cir. 2001) (acknowledging the "well-recognized principle that political statements are inherently prone to exaggeration and hyperbole." (citing *Watts v. United States*, 394 U.S. 705, 708 (1969))); *Lynch v. New Jersey Educ. Ass'n*, 735 A.2d

31

1129, 1136 (N.J. 1999) ("Readers know that statements by one side in a political contest are often exaggerated, emotional, and even misleading."); *Koch v. Goldway*, 817 F.2d 507, 509 (9th Cir. 1987) (noting that where the "circumstances of a statement are those of a heated political debate, [] certain remarks are necessarily understood as ridicule or vituperation, or both, but not as descriptive of factual matters"); *accord Gilbrook v. City of Westminster*, 177 F.3d 839, 863 (9th Cir. 1999) ("In the final analysis, [City Council member's reference to a union leader as a "Jimmy Hoffa"] was the type of rhetorical hyperbole or caustic attack that a reasonable person would expect to hear in a rancorous public debate involving money, unions, and politics. Therefore, the statement could not give rise to a cognizable claim of defamation."); *Welch v. Am. Publ'g Co.*, 3 S.W.3d 724, 730 (Ky. 1999) (dismissing defamation suit based on accusation that a mayor "squandered" money, as "generalized rhetoric bandied about in a political campaign is not the language upon which a defamation lawsuit should be based").[18]

Here, the speech at issue was patently partisan and political. Indeed, the Petition was published by a self-proclaimed "Democratic" organization, targeting Democratic-leaning voters, with the express purpose of eroding Governor Romney's campaign coffers. (*See* Petition (bemoaning that Adelson is donating large amounts to "Mitt Romney – with no plans to stop.") Stated differently, the Petition was plainly the product of a "statement[] by one side in a political

---

[18] Irrespective of its effect on the ordinary reader, political speech is worthy of particularly robust First Amendment protection, as it is absolutely central to the preservation of a free society. *Lynch*, 735 A.2d at 1136 ("A statement made in the heat of an election contest supplies the paradigm for that commitment to free debate."); *see also Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 339-40 (2010) ("The First Amendment 'has its fullest and most urgent application to speech uttered during a campaign for political office.' (quoting *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 223 (1989) (internal citation omitted)). As the Ninth Circuit has noted in the context of a defamation suit, "[i]f political discourse is to rally public opinion and challenge conventional thinking, it cannot be subdued." *Planned Parenthood of the Columbia/Willamette, Inc*, 244 F.3d at 1019.

contest," unsurprisingly filled with "exaggerated" and "emotional" rhetoric.  *Lynch*, 735 A.2d at 1136.

### b.    Specific Context

In determining whether a statement constitutes constitutionally protected opinion, courts also look to the specific context of the statement.  When looking at a statement's specific context, "[o]f particular importance is the princip[le] that 'when an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment.'"  *Nicosia*, 72 F. Supp. 2d at 1102 (quoting *Partington v. Bugliosi*, 56 F.3d 1147, 1156-57 (9th Cir. 1995)); *see also Moldea v. New York Times Co.*, 22 F.3d 310, 317 (D.C. Cir. 1994).  In other words, "[a] simple expression of opinion based on disclosed . . . nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is."  Restatement (Second) of Torts § 566, cmt. c. "The rationale behind this rule is straightforward: When the facts underlying a statement of opinion are disclosed, readers will understand they are getting the author's interpretation of the facts presented; they are therefore unlikely to construe the statement as insinuating the existence of additional, undisclosed facts." *Standing Committee on Discipline v. Yagman*, 55 F.3d 1430, 1439 (9th Cir. 1995) (citation omitted).

The Petition stated that "Romney and the rest of the Republican Party must cease accepting Adelson's tainted money immediately" and urged readers to "enlist [their] family and friends in an effort to stop the influence of Adelson's tainted money . . . ."  Reading the Petition in its entirety, it is apparent that Defendants' contention that Adelson's money is "tainted" and

33

"dirty" is based upon fully disclosed facts.[19]  Indeed, the graphic at the top of the Petition makes

clear upon what facts the Petition's presumption that the money is "dirty" or "tainted" is based:

It asks, "If one of your biggest donors was accused of putting 'foreign money' from China in our

elections & reportedly approved of prostitution, would you take his money?"  The implication is

that Adelson's money should not be taken because he is "accused" of using foreign money in the

election and because he "reportedly" approved of prostitution.  Below, the text of the Petition

also plainly intimates that Adelson's money is "tainted" because of the foreign money and

prostitution accusations.  The Petition stated that "[i]t is well known" that Adelson makes money

off his Chinese casinos and that this money is coming into American elections.  "But this week,"

the Petition continued, "reports surfaced that in addition to his anti-union and allegedly corrupt

business practices, Adelson 'personally approved' of prostitution in Macau."  The Petition then

opined that, "*[g]iven these reports*, Romney and the rest of the Republican Party must cease

accepting Adelson's tainted money immediately."  (emphasis added.)

     Thus, no reader of the Petition could reasonably believe that its assertions that Adelson's

money is "tainted" or "dirty" are based upon anything other than the fully disclosed facts.

Because the general and specific contexts in which the statement was made negate any

suggestion that the Petition's use of the words "tainted" and "dirty" was itself meant to imply an

expression of fact, the use of those terms is constitutionally protected.

---

[19] Again, the underlying facts were fully disclosed both in the Petition itself and via hyperlink.
*See Nicosia*, 72 F. Supp. 2d at 1103 (considering the provision of a hyperlink akin to the
inclusion of "underlying facts"); *accord Moldea*, 22 F.3d at 316 (D.C. Cir. 1994) (holding that
statements in a book review are constitutionally protected opinion when they are accompanied
by "references to the written work").

###### c.    The Statement Itself

Finally, the Court looks to the statements themselves to determine whether, irrespective

of the context in which they were made, the statements at issue are capable of being proven true

or false. They are not. *Accord Partington*, 56 F.3d at 1157 (holding that where the context in

which the statement at issue was made is sufficient to demonstrate that the statement is

constitutionally protected, the fact that the statement itself cannot be proven true or false is an

additional basis for dismissing the defamation action).

While most money in circulation is literally quite dirty,[20] the terms "dirty money" and

"tainted money" are obviously used as metaphors. And like most metaphors, their meaning is

imprecise. Undoubtedly, an assertion that certain money is "tainted" or "dirty" carries a strongly

negative connotation, but, without context, one could not say what specifically these adjectives

connote. *Accord McCabe v. Rattiner*, 814 F.2d 839, 842 (1st Cir. 1987) ("The lack of precision

[in the meaning of the word 'scam'] makes the assertion 'X is a scam' incapable of being

proven true or false."); *Phantom Touring*, 953 F.2d at 728 ("Whether appellant's 'Phantom' is

'fake' or 'phony' is [] unprovable, since those adjectives admit of numerous interpretations.");

*Buckley v. Littel*, 539 F.2d 882, 893 (2d Cir. 1976) ("[T]he use of 'fascist,' 'fellow traveler' and

'radical right' as political labels in Wild Tongues cannot be regarded as having been proved to be

statements of fact, among other reasons, because of the tremendous imprecision of the meaning

and usage of these terms . . . ."). In the legal context, money is generally referred to as "dirty" or

"tainted" to signify that it has been acquired illicitly. *See, e.g., European Cmty. v. Japan

Tobacco, Inc.*, 186 F. Supp. 2d 231, 232 (E.D.N.Y. 2000) ("[I]n the process of smuggling

cigarettes, Defendants engaged the business and services of narcotics traffickers and money

---

[20] *See* Georgia McCafferty, *Dirty Money? Check Your Wallet*, CNN.com (March 28, 2013), http://edition.cnn.com/2013/03/28/business/dirty-money.

launderers, and in so doing facilitated or engaged in the laundering of tainted money."); *United States v. Maher*, 108 F.3d 1513, 1527 (2d Cir. 1997) ("Section 1956 creates the crime of money laundering, and it takes dead aim at the attempt to launder dirty money.").

Money might also be called "dirty" or "tainted," however, simply to signify that it has been obtained by immoral means. *See, e.g.*, Jennifer E. Stellar & Robb Willer, *The Corruption of Value: Negative Moral Associations Diminish the Value of Money*, Soc. Psychol. & Personality Sci. 1 (Apr. 2013) (explaining their findings that "morally tainted money will generally be perceived by others as less desirable") ; *see also id.* at 5 ("Commonly heard metaphors such as *dirty money* . . . suggest that individuals view ethical concerns as relevant to the value and desirability of money." (emphasis in original)); Derek Bok, *Beyond the Ivory Tower: Social Responsibility of the Modern University* 270 (1982) ("Difficult issues arise when gifts arrive from donors who have allegedly earned their money by immoral means or acted in ways that conflict with strongly held values in the community. Many critics would urge the rejection of these 'tainted' funds."); *accord McCabe*, 814 F.2d at 842 (holding that the word "scam" has no precise meaning because "[w]hile some connotations of the word may encompass criminal behavior, others do not"). Unlike an accusation that one committed criminal conduct, which can be proven true of false, an accusation that one has acted immorally is generally a matter of opinion. *See Wait v. Beck's N. Am., Inc.*, 241 F. Supp. 2d 172, 183 (N.D.N.Y. 2003) ("[A s]tatement[] that someone has acted . . . unethically generally [is] constitutionally protected statements of opinion."); *Biro*, 883 F. Supp. 2d at 463 ("[T]he use of the terms 'shyster,' 'con man,' and finding an 'easy mark' is the type of 'rhetorical hyperbole' and 'imaginative expression' that is typically understood as a statement of opinion." (quoting *Milkovich*, 497 U.S. at 20)).

Additionally, money is also at times referred to as "dirty" or "tainted" not because of its

method of acquisition, but because of its use.  Indeed, during the campaign at issue in this case,

MSNBC's daily news show *Hardball* had a recurring segment entitled "Dirty, Angry Money,"

which *Hardball*'s host, Chris Matthews, described as follows:

> Tonight, we're kicking off a new series, "Dirty, Angry Money,"
> and we mean it, looking at the influence of super PAC money on
> our electoral system, especially this year. Someday people may
> look back on 2012 as the year of the super PAC. A few guys with
> billions of dollars are able to throw huge sums of money into
> political races.

4/30/12 MSNBC News, 2012 WLNR 9098461; *see also* 8/23/12 MSNBC News, 2012 WLNR

18013378 (wherein Matthews notes that his assessment of what money is "dirty . . . might be

subjective . . . .").  Notably, in his "Dirty, Angry Money" segment, Matthews repeatedly took

aim at Adelson's contributions to Republican candidates.  *See, e.g.*, 6/17/12 MSNBC News,

2012 WLNR 11965366 ("Sheldon Adelson, the casino magnate, Diane Hendricks, another

wealthy donor, each more than half a million, just regular people trying to do their bit, right?

Regular people who hate the president and can't wait for any chance to throw some money

behind any attack ad they find.  Well, thanks to the right-leaning Supreme Court and its Citizen

United ruling, they can spend all they want. And now they know they can get results.  This

election in Wisconsin, this week, whatever you think, could have a huge impact in November.

It's going to teach all that dirty, angry money, all those people who love influencing America

and American politics, all the while keeping themselves shy of the search light that they can get

away with it.").

In short, "dirty money" and "tainted money" are "concepts whose content is so debatable,

loose and varying, that they are insusceptible to proof of truth or falsity." *Buckley*, 539 F.2d at

894. Thus, an assertion that money is "dirty" and "tainted" may not be susceptible of being proven true or false, and that is the case here.

### d.   Conclusion

Considering the broad and specific contexts of the challenged statements, and the language of the statements themselves, the Petition's assertions that Adelson's money was "tainted" and "dirty" are constitutionally protected expressions of opinion.

### 5.   The Press Release

The Complaint alleges that the Press Release constituted a republication of the Petition. (*See* Compl. at ¶¶ 46-52)  However, "a mere reference to another writing that contains defamatory matter does not constitute an actionable repetition or republication." *Goforth v. Avemco Life Ins. Co.*, 368 F.2d 25, 28 n.7 (4th Cir. 1966).  Moreover, even if the Press Release constituted a republication, this would render it defamatory only to the extent that the Petition itself was defamatory.  (*See* Compl. at ¶ 46 ("The gist of the [Press Release] is false and defamatory because the accusations contained in the [Petition] are false and defamatory.").)  Thus, for the reasons explained *supra*, the Press Release is not defamatory as a matter of law.

### B.   The Nevada Anti-SLAPP Statute

Defendants have also moved to dismiss pursuant to Nevada's Anti-SLAPP statute. Although the Court has determined that this action must be dismissed under Rule 12(b)(6), that determination does not necessarily render moot Defendants' motion under the Anti-SLAPP statute, because that statute provides for certain relief in the event of dismissal, including the recovery of attorney's fees.

38

1.     **The Contours of the Statute**

"Nevada's anti-SLAPP statute was enacted in 1993, shortly after California adopted its statute, and both statutes are similar in purpose and language." *John v. Douglas Cnty. Sch. Dist.*, 219 P.3d 1276, 1281 (Nev. 2009). The statute was designed to thwart Strategic Lawsuits Against Public Participation, or "SLAPP lawsuits," which "abuse the judicial process by chilling, intimidating, and punishing individuals for their involvement in public affairs." *Id.* (citing 1997 Nev. Stat., ch. 387, preamble, at 1364). To achieve this end, it provides immunity for "any good faith communication" made "in furtherance of the right to petition." N.R.S. § 41.650. In applicable cases, defendants may file a "special motion to dismiss," which must be "[t]reat[ed] . . . as a motion for summary judgment." N.R.S. § 41.660(1)(a), (3)(a). The statute also provides that the court shall stay discovery pending a ruling on the special motion to dismiss and the disposition of any appeal from such a ruling. N.R.S. § 41.660(3)(b). Any dismissal pursuant to such motion "operates as an adjudication on the merits." N.R.S. § 41.660(4).[21] If the motion is

---

[21] Plaintiff argues that application of Nevada's Anti-SLAPP statute in this case would violate the *Erie* doctrine. Nevada federal district courts, following the Ninth Circuit's decision in *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 971 (9th Cir. 1999), have applied the statute in diversity actions. *See, e.g., Haack v. City of Carson City*, 2012 WL 3638767, at *3 (D. Nev. Aug. 22, 2012); *Rebel Commc'ns, LLC v. Virgin Valley Water Dist.*, 2012 WL 934301, at *2 (D. Nev. Mar. 20, 2012); *Zermeno v. Stratosphere Corp.*, 2010 WL 2265167, at *1 n.1 (D. Nev. June 2, 2010). Numerous other federal courts have concluded that state anti-SLAPP laws are applicable in diversity actions. *See, e.g., Godin v. Schencks*, 629 F.3d 79, 81 (1st Cir. 2010); *Henry v. Lake Charles Am. Press, LLC*, 566 F.3d 164 (5th Cir. 2009); *Sherrod v. Breitbart*, 843 F. Supp. 2d 83, 85 (D.D.C. 2012).

Plaintiff relies upon a concurring opinion by Chief Judge Kozinski of the Ninth Circuit in *Makaeff v. Trump Univ., LLC*, 715 F.3d 254 (9th Cir. 2013) (Kozinski, C.J., concurring), in which the Chief Judge and Judge Paez urged the court to reconsider its decision in *Newsham*. *Makaeff* is distinguishable from this case because it analyzed California's anti-SLAPP statute, which—unlike Nevada's—does not provide defendants with a separate cause of action. *See* N.R.S. § 41.670(2) (describing separate cause of action); *cf. Makaeff*, 715 F.3d at 273 (Kozinski, C.J., concurring) (arguing that *Newsham*'s *Erie* analysis was wrong because the court failed to first determine whether California's anti-SLAPP statute was substantive, and explaining that the

granted, the person against whom the action is brought is awarded attorney's fees and may

"bring a separate action to recover: (a) Compensatory damages; (b) Punitive damages; and (c) Attorney's fees and costs of bringing the separate action." N.R.S. § 41.760.

### 2. The Timeliness of Defendants' Motion

The Nevada Anti-SLAPP statute provides that "[a] special motion to dismiss must be filed within 60 days after service of the complaint, which period may be extended by the court for good cause shown." N.R.S. § 41.660. As a federal court applying Nevada law, this Court is obliged to apply the Nevada Anti-SLAPP statute's filing deadline as it would be applied in the Nevada state courts. *See, e.g., Balestra-Leigh v. Balestra*, 2010 WL 4280424, at *3 (D. Nev. Oct. 19, 2010) (assessing whether Nevada Anti-SLAPP claim brought in federal court was

---

statute is "merely . . . a procedural mechanism" because, *inter alia*, "it creates no rights independent of existing litigation").

Chief Judge Kozinski also apparently believed it to be of no consequence that California's statute—like Nevada's—authorizes an award of attorney's fees if the defendant prevails. *See id.* at 274. However, the traditional rule is that state statutes authorizing attorney's fees are substantive in nature when they embody a substantial policy of the state. *See, e.g., Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 259 n.31 (1975) (noting that in diversity cases, "state law denying the right to attorney's fees or giving a right thereto, which reflects a substantial policy of the state, should be followed); *Cotton v. Slone*, 4 F.3d 176, 180 (2d Cir. 1993) ("Attorney's fees mandated by state statute are available" in diversity cases) (citing *Alyeska*, 421 U.S. at 259 n.31). The Nevada Anti-SLAPP statute "reflects a substantial policy of the state" to protect its citizens' constitutional rights to petition the government and to free speech. *See John*, 219 P.3d at 1281-82. Application of the Anti-SLAPP statute would also fulfill the dual aims of *Erie*: discouraging forum-shopping and preventing the inequitable administration of the law. *See, e.g., Godin*, 629 F.3d at 91-92.

The legal impact of the Nevada Anti-SLAPP statute—at least as applied to this case—is substantive rather than procedural for purposes of *Erie*. The Nevada statute does not establish a "reasonable probability of success" standard that must be met without discovery, like the California Anti-SLAPP law. *See, e.g., Makaeff*, 715 F.3d at 274. Rather, as explained below, the Nevada statute immunizes "good faith communication[s]"—defined as communications that are "truthful or . . . made without knowledge of . . . falsity"—thereby effectively raising the *substantive* standard that applies to a defamation claim. Thus, even if the *procedural* elements of certain Anti-SLAPP statutes present problems under *Erie, see, e.g., 3M Co. v. Boulter*, 842 F. Supp. 2d 85, 101-03 (D.D.C. 2012), those problems are not presented in this case, where the effects of the Anti-SLAPP law (fee-shifting and a heightened substantive legal standard) are substantive.

timely); *cf. Sherrod v. Breitbart*, 2013 WL 3185062, at *4 (D.C. Cir. June 25, 2013) (motion under the D.C. Anti-SLAPP statute not filed within 45-day time period was untimely, as time limits provided for by state Anti-SLAPP statutes are substantive and may not be extended by federal courts under Federal Rule of Civil Procedure 6(b)).

Here, the Complaint was served on Defendants on August 8 and 9, 2012, giving Defendants until October 8, 2012 to file their motion in a timely manner. (Dkt. Nos. 9 & 10). On September 21, 2012, Defendants concurrently moved to dismiss pursuant to the D.C. Anti-SLAPP statute and Rule 12(b)(6), but chose not to move under the Nevada statute until April 23, 2013, after the Court informed the parties that it was inclined to apply Nevada, rather than District of Columbia, law. (Dkt. Nos. 16 & 17).

Defendants argue that they nevertheless invoked the Nevada statute's protection in a timely manner through the inclusion of the following footnote in their Memorandum of Law in Support of their Motion to Dismiss under the D.C. Anti-SLAPP statute:

> As explained *infra* in Part I of the Argument, D.C. law applies in this case because it is the place with the most significant connection to the events at issue. If the Court were instead to decide to apply the law of any of the other potentially applicable jurisdictions – New York, where the action was filed; Nevada, where plaintiff has one of his many residences; or Texas, where one of the defendants resides – they all have also enacted anti-SLAPP statutes, and defendants reserve the right to invoke the protections of each of those statutes pursuant to its terms.

(Defs.' Mem. at 2 n.2.) However, the inclusion of a footnote in a brief informing the court that one *might* file a motion at a later date is not tantamount to actually filing the motion, nor could Defendants "reserve the right" to file a motion after the filing deadline.

Notwithstanding Defendants' failure to file their motion within the statutorily prescribed time frame, the Court finds good cause to extend the deadline *nunc pro tunc*. While Defendants'

footnote did not constitute the filing of a motion, it still served a purpose of the Anti-SLAPP statute's filing deadline by notifying the Court and Plaintiff of Defendants' intent to rely upon the Nevada Anti-SLAPP statute in the event that the Court concluded that Nevada law would apply.

Moreover, this case presented a difficult choice-of-law question, where the Court could conceivably have concluded that District of Columbia, Nevada, New York, or Texas law applied. Defendants made a good-faith—though ultimately unpersuasive—argument that D.C. law ought to apply, and simultaneously informed the Court and Plaintiff that they would seek the protections of whichever state's anti-SLAPP statute applied. Perhaps, in an abundance of caution, Defendants could have filed motions and supporting memoranda of law under each state's statute. (Plaintiff, in turn, would have submitted opposing memoranda for each motion, and Defendants presumably would have submitted reply memoranda). But this would hardly have served the Nevada Anti-SLAPP statute's purposes of preventing the imposition of burdensome litigation expenses and promptly resolving Anti-SLAPP motions. *See, e.g., Metabolic Research, Inc. v. Ferrell*, 693 F.3d 795, 802 (9th Cir. 2012) (noting that the Nevada Anti-SLAPP statute "allows a citizen to obtain a prompt review of potential SLAPP lawsuits and have them dismissed before she is forced to endure the burdens and expense of the normal litigation process"). Nor would it have been a reasonable allocation of this Court's limited resources.

In light of the purposes of the statute, it is doubtful that the Nevada legislature would want to bar a defendant from bringing an Anti-SLAPP motion simply because he failed to anticipate how the Court would rule on a difficult choice-of-law question, and chose not—or perhaps lacked the resources—to file alternative motions to dismiss under each potentially

applicable anti-SLAPP statute. Indeed, a Nevada state court has found good cause to extend the Anti-SLAPP motion deadline in a case where, as here, it "was not readily apparent" at the outset that the Nevada Anti-SLAPP statute would apply, and the defendant "acted with the appropriate diligence and haste" once the statute's application became clear. *KJR Mgmt. Co., LLC v. First Web Search, LLC*, 2008 WL 7907954 (Nev. Dist. Ct. Nov. 19, 2008). The Court sees no reason to punish Defendants based on timeliness alone, given the complexities of this case, the purposes of Nevada's Anti-SLAPP statute, and Defendants' prompt filing of their motion after the Court concluded that Nevada law would apply.

### 3.    Defendants' Communications

The Nevada Anti-SLAPP statute protects "good faith communication in furtherance of the right to petition," which it defines as "any:

> (1) Communication that is aimed at procuring any governmental or electoral action, result or outcome;
> (2) Communication of information or a complaint to a Legislator, officer or employee of the Federal Government, this state or a political subdivision of this state, regarding a matter reasonably of concern to the respective governmental entity; or
> (3) Written or oral statement made in direct connection with an issue under consideration by a legislative, executive or judicial body, or any other official proceeding authorized by law,

which is truthful or is made without knowledge of its falsehood." N.R.S. § 41.637. Defendants contend that the Petition and Press Release fall within the first and third prongs of the statute, and were either truthful or made without knowledge of their falsehood.

### a.    Communication Aimed at Procuring Electoral Action

Under the plain language of the first prong, the Petition and Press Release are protected as "[c]ommunication[s] . . . aimed at procuring an[] . . . electoral action, result or outcome." "Electoral" simply means "pertaining to electors or elections." Black's Law Dictionary 520 (6th

ed. 1990); *see also* Merriam-Webster Dictionary ((1) "of or relating to an elector;" (2) "of or relating to an election"); Oxford English Dictionary ("of or relating to elections or electors"). As noted *supra*, the Petition and Press Release were patently partisan statements made by a Democratic organization to Democratic-leaning voters in an effort to undermine Republican candidates' financial support. It strains credulity to argue that such communications are not aimed at procuring an action, result, or outcome relating to an election. *Cf. Smith v. United States*, 508 U.S. 223, 237 (1993) ("The phrase 'in relation to' is expansive.").

Plaintiff nevertheless argues, citing Merriam-Webster's second definition, that the statute protects only communications aimed at procuring an action, result, or outcome related to a vote in an election. Plaintiff provides no justification, however, for making the jump from the broader "of or relating to an election" to the much narrower "of or relating to *a vote in* an election." It is therefore of no consequence that Defendants' communications related to campaign funding—a matter undoubtedly related to the election—rather than a particular vote. *See, e.g., Citizens United*, 558 U.S. 310. Moreover, in any event, a common-sense reading of the Petition, viewed in context, supports the conclusion that it was ultimately aimed at influencing an electoral outcome—and thus *votes*—both indirectly through its ostensible call for reduced financial support to Republicans, and more directly by highlighting issues for voters and activists. *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) ("'[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense'") (quoting *Iqbal*, 556 U.S. at 1950).

Plaintiff also argues that the phrase "right to petition" is a legal term of art denoting "[t]he constitutional right—guaranteed by the First Amendment—of the people *to make formal requests to the government*, as by lobbying or writing letters to public officials." Black's Law

Dictionary (9th ed. 2009) (emphasis added). Plaintiff therefore reads "good faith communication in furtherance of the right to petition" to restrict the scope of the statute to communications made to a government agency. The first problem with this argument is that it is undermined by the express language of the statute: the phrase is a *defined term* in the statute; it does not invoke a general legal term of art. *See* N.R.S. § 41.637 ("Good faith communication in furtherance of the right to petition *means* . . . .") (emphasis added). However, even if "right to petition" is understood as a term of art, the statute protects "communications made *in furtherance of* the right to petition," itself a statutory term of art defined in the three prongs. Plaintiff would have the Court ignore the provision's definitional structure, as well as the broad language in the first prong.

Plaintiff's interpretation would also render "electoral action" mere surplusage, as making a formal request to the government to take *any* action would necessarily require the government to take "governmental" action. *Cf.* Sutherland Statutes and Statutory Construction § 47:37 (2012) (stating the requirement for courts "to accord meaning, if possible, to every word in a statute"). Put another way, it is difficult to imagine what the Nevada legislature could have meant by "communication[s] . . . aimed at procuring any . . . *electoral* action, result or outcome" other than communications to the electorate and regarding elections—communications that by their nature are *not* made to government agencies.

Plaintiff's final, and most persuasive, argument is that application of Nevada's Anti-SLAPP statute in this case is foreclosed by the Nevada Supreme Court's decision in *John. John* was an employment discrimination action by a former school security officer against the school district and several district employees based upon statements made by the employees to the district during the course of an official investigation into the plaintiff's workplace conduct.

*John*, 219 P.3d at 1279-80. The defendants sought to dismiss the action under the Nevada Anti-SLAPP statute on the ground that the statements were protected under the second prong as communications to the school district regarding a matter of reasonable concern—an employee's misconduct. *Id.* The Nevada Supreme Court agreed and dismissed the action. *Id.* at 1286-87.

Plaintiff points to several statements in the court's opinion that could be read to restrict the scope of the statute to communications made to a government agency, including the court's remark in dicta that "the anti-SLAPP statute only protects citizens who petition the government from civil liability arising from *good-faith communications made to a government agency.*" *John*, 219 P.3d at 1281 (emphasis in original). This Court is, of course, obliged to follow the Nevada Supreme Court's interpretation of Nevada law. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Were Plaintiff's reading of *John* correct, the Court's analysis would end. But *John* is far from the model of clarity Plaintiff makes it out to be.

As an initial matter, the factual context of the case casts doubt upon the notion that the court was interpreting all three prongs of the Anti-SLAPP statute. Rather, because only the second prong was at issue, and because the second prong expressly references communications to a government entity, the more natural reading of the case is that the court was simply expounding upon the second prong, and was unconcerned with the first and third prongs. *See John*, 219 P.3d at 760-62.

The specific context of the court's statement also undermines Plaintiff's interpretation. In the paragraph preceding the quoted language, the court compared the Nevada Anti-SLAPP statute's purpose to that of the federal *Noerr-Pennington* doctrine:

> [T]he purpose of Nevada's anti-SLAPP statute is similar to the purpose behind the *Noerr-Pennington* immunity doctrine. According to this doctrine, "those who petition all departments of the government for redress are generally immune from liability."

> The basis of this doctrine is that representative democracy demands that citizens and public officials have the ability to openly engage in discussions of public concern. . . . *Noerr-Pennington* immunity does not apply to 'sham' cases where a person abuses the government process in order to achieve some benefit. . . .
>
> Similarly, Nevada's anti-SLAPP statute is predicated on protecting "well-meaning citizens who petition [the] government and then find themselves hit with retaliatory suits known as SLAPP[ ] [suits]. More importantly, the anti-SLAPP statute only protects citizens who petition the government from civil liability arising from *good-faith communications to a government agency*. Thus, Nevada's anti-SLAPP statute is not an absolute bar against federal substantive claims; rather, it bars claims from persons who seek to abuse other citizens' rights to petition their government, and it allows meritorious claims against citizens who do not petition the government in good faith.

*John*, 219 P.3d at 1281 (emphasis in original) (citations omitted). The court's emphasis on "good-faith communications to a government agency" admits of two possible readings: (1) the anti-SLAPP statute, like *Noerr-Pennington*, protects only *good-faith communications*; or (2) the anti-SLAPP statute, like *Noerr-Pennington*, protects only good-faith communications *to a government agency*. The first is more plausible, for two reasons.

First, it is the more natural reading when the second paragraph is read in light of the first. Both paragraphs contain language regarding the good faith requirement: in the first paragraph's last sentence—where the court speaks of "sham" cases—and in the second paragraph's last two sentences—where the court speaks of "good-faith communications" and the inapplicability of the statute to "citizens who do not petition the government in good faith." In contrast, while the second paragraph's second sentence speaks of "communications to a government agency," the only potentially parallel language in the first paragraph appears in the second sentence—"those who petition all departments of the government." The departments of the government, however, include not merely government agencies, but also the legislature and judiciary. The absence of

parallel language in the first paragraph suggests that the court's emphasis was intended to highlight that the Nevada Anti-SLAPP statute, like *Noerr-Pennington*, protects only good-faith communications.

Second, there is good reason to assume that the Nevada Supreme Court was not saying that *Noerr-Pennington* requires communication to a government agency: it does not. As the Ninth Circuit recognized in *Sosa v. DIRECTV, Inc.*:

> *Noerr* itself . . . extended immunity not only to the railroads' direct communications with legislators but also to its public relations campaign, finding that the latter's aim was to influence the passage of favorable legislation. Building on this aspect of *Noerr*, the Supreme Court, in *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, held that "private action . . . cannot form the basis for antitrust liability if it is 'incidental' to a valid effort to influence governmental action."

437 F.3d 923, 934 (9th Cir. 2006); *see also id.* at 935 ("Accordingly . . . communications between private parties are sufficiently within the protection of the Petition Clause to trigger the *Noerr-Pennington* doctrine, so long as they are sufficiently related to petitioning activity"); *Murguia v. Palmer*, 2013 U.S. Dist. LEXIS 43369, at *6-7 (D. Nev. Mar. 27, 2013) (noting that "encouraging the public to vote in a particular way" is protected under *Noerr-Pennington*) (citing *Affordable Hous. Dev. Corp. v. City of Fresno*, 433 F.3d 1182, 1189-90 (9th Cir. 2006)). The Court is reluctant to adopt Plaintiff's interpretation, which would ascribe to the Nevada Supreme Court an untenable interpretation of federal law where another reasonable interpretation is available.

*John*'s ambiguity is reflected in the divergent interpretations it has spawned in the lower courts. While Plaintiff cites two federal district court cases in support of his interpretation, *see Collins v. Laborers Int'l Union of N. Am. Local No. 872*, 2011 U.S. Dist. LEXIS 79853, at *3 (D. Nev. July 21, 2011) (finding no protection under third prong for communications made

between plaintiffs, defendants, union employers, and union clients, because they were not made

to a government agency, citing *John*); *Buckwalter v. Wey*, 2010 WL 2609100, at *3 (D. Nev.

June 24, 2010) (concluding that comments in newspaper related to legal proceedings were not

protected under the third prong because they were not made to a government agency, citing

*John*),[22] Defendants cite decisions in support of their view, *see Rebel Commc'ns*, 2012 WL

934301, at *2 (concluding that statements made outside of a public meeting regarding an issue

before the city council were protected under the third prong of the statute, even though they were

not made to any government entity); *Archey v. Nelson*, 2010 WL 3711513, at *4 (Nev. Dist. Ct.

Aug. 10, 2010) (finding statements in a newspaper related to a school investigation were

protected under the third prong, although there was no finding that the statements constituted

communication to a government agency); *cf. Stubbs v. Strickland*, 297 P.3d 326, 328 (Nev. 2013)

(affirming denial of attorney's fees under Anti-SLAPP statute based upon an Internet posting

without suggesting that such a posting, not directed to any government agency, could not serve

as the basis for an anti-SLAPP motion); *D.R. Horton, Inc. v. Safe Homes Nevada, Inc.*, 2003 WL

---

[22] Plaintiff additionally cites *Moonin v. Nevada ex rel. Dep't of Public Safety Highway Patrol*, 2013 WL 1628389 (D. Nev. Apr. 15, 2013), and *Murguia*, 2013 U.S. Dist. LEXIS 43369. Neither of these cases stands for the proposition offered by Plaintiff. *Moonin* simply states that "'[c]ommunications in furtherance of the right to petition' include communications to an officer of a governmental entity that reasonably concern the governmental entity." 2013 WL 1628389, at *13 (citing *John*, 219 P.3d at 1286). The term "include"—which does not suggest exclusivity—is entirely consistent with an interpretation of the statute that only requires communications to a government agency with respect to the second prong, which was at issue in *John* and *Moonin*. *Murguia* merely quoted *John*'s "good faith communications to a government agency" language, along with numerous other statements, and did not uphold or dismiss the motion to dismiss on this basis. 2013 U.S. Dist. LEXIS 43369, at *7-8. The court in *Murguia* also cited "encouraging the public to vote in a particular way" as the kind of activity that would be protected under *Noerr-Pennington* as "protected petitioning activity" and, by implication, the Nevada Anti-SLAPP statute. *See id.* at *6, 9 (analyzing the anti-SLAPP motion under a similar standard as the *Noerr-Pennington* claim, and concluding "as explained above, Defendants have not persuaded the Court that their conduct can be considered petitioning activity").

25717726, at *6 (holding that political organization's listing of homebuilders who did not repair homes on its website was protected under the first and third prongs, despite being directed toward the public rather than any government agency).

In light of *John*'s ambiguity, it is appropriate to extend the analysis to the statute's legislative history. *See, e.g., Nwozuzu v. Holder*, 2013 WL 4046273, at *3 (2d Cir. Aug. 12, 2013) ("If . . . the terms are ambiguous or unclear, we may consider legislative history and other tools of statutory interpretation.") (citations omitted).

Prior to 1997, the Nevada Anti-SLAPP statute protected just one class of communications, providing:

> A person who in good faith communicates a complaint information to an officer or employee of this state or of a political subdivision or to an officer or employee of the Federal Government regarding a matter reasonably of concern to the respective governmental agency is immune from civil liability on claims based upon the communication.

*Archey*, 2010 WL 3711513, at *3 (quoting S.B. 405, section 3). This language closely mirrors the language of the second prong in the current version. In 1997, the Nevada legislature amended and expanded the scope of the statute to add the first and third prong. In amending the statute, the legislature explained that "implementation of an anti-SLAPP statute was essential to protect citizens' constitutional rights." *John*, 219 P.3d at 1281 (citing 1997 Nev. Stat., ch. 387, preamble, at 1364). Although the 1997 statute retained the original version's "right to petition" language, the two new prongs omitted the restrictive language—found in the second prong— referencing communications to a government agency.

To explain the purpose of the amendment, the bill's sponsor placed in the legislative record newspaper reports indicating the types of SLAPP suits it was designed to prevent. (*See* Dkt No. 74 ("Sproul Decl."), Ex. 156 ("History of AB485"), at 12-29.) These articles described,

*inter alia*, lawsuits brought by the Church of Scientology against Internet-based publications critical of the Church, (*id.* at 27-28), as well as *Immuno A.G. v. Moor-Jankowski*, 77 N.Y.2d 235 (1991), a defamation action based on articles published in scientific journals, (History of AB485, at 23-24.). The Judiciary Committee's Vice-Chair also explained the legislative intent that "the information provided in Exhibit C [provides] good examples of the types of actions that should be stopped." (*Id.* at 9.)

This legislative history strongly suggests an intent on the part of the Nevada legislature to expand the Anti-SLAPP statute to reach beyond communications made to a government agency. Accordingly, the Court concludes, in light of the statute's text, structure, legislative history, and a reasonable construction of *John*, that the Petition and Press Release in this case are protected under the Nevada Anti-SLAPP statute's first prong.

**b.    Communication in Direct Connection with an Issue Under Consideration by a Judicial or Executive Body**

In contrast, the Petition and Press Release are not protected under the third prong as "[w]ritten . . . statement[s] made in direct connection with an issue under consideration by a . . . judicial body." *Jacobs* was an action for breach of contract, and the Jacobs Declaration was related to the issue of personal jurisdiction. The source of Adelson's fortune was not at issue in the case. Any connection between the Petition and Press Release and the issues in *Jacobs* is tenuous at best. *Cf. Gilman v. Spitzer*, No. 11 Civ. 5843 (JPO), 902 F. Supp. 2d 389, 398-99 (S.D.N.Y. 2012) (finding any connection between Spitzer's commentary and Gilman's application for an insurance license to be too tenuous for New York's Anti-SLAPP statute to apply), *aff'd*, 2013 WL 5226275 (2d Cir. Sept. 18, 2013).

Defendants alternatively argue that the statements were made in direct connection with legal restrictions on campaign contributions, at issue in *Citizens United*. That case, however,

51

was decided two years prior to the publication of the Petition, and therefore no longer constituted a "judicial proceeding." Defendants also cite *McCutcheon v. Fed. Election Comm'n*, 893 F. Supp. 2d 133 (D.D.C. 2012). While *McCutcheon* was at least under consideration when Defendants' published their statement, it addressed aggregate limitations on campaign contributions by individual donors. As Plaintiff observes, the Petition and Press Release—which are addressed to the issue of whether Adelson's money was "dirty" or "tainted"—are insufficiently related to (and certainly not "in direct connection with") the issues in *McCutcheon*. Finally, Defendants claim that their communications were directly connected to ongoing investigations by the Department of Justice and the Securities Exchange Commission. However, the Petition's statement regarding allegedly corrupt business practices is ancillary to the primary statements at issue—whether Adelson approved of prostitution—and in any event, the Court finds the Petition and Press Release too tenuously connected to the investigations to be protected under this prong.

### c. Good Faith

Having determined that Defendants' communications are protected under the first prong of Nevada's Anti-SLAPP statute, the Court now turns to whether the communications were made in good faith—*i.e.*, whether they were (i) truthful, or (ii) made without knowledge of their falsehood. N.R.S. § 41.637. The Court concludes as a matter of law that Defendants' communications were made without knowledge of falsehood because Plaintiff failed to plead that Defendants acted with knowledge of falsehood. *See, e.g.*, *Official Comm. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2013) ("[T]he allegations in the . . . Complaint are 'judicial admission[s]' by which the [Plaintiff is] 'bound throughout the course of the

proceeding.") (citation omitted).[23]  With respect to the Petition, Plaintiff merely alleges that

Defendants engaged in conduct "[e]videncing a reckless disregard for truth or falsity," and

makes various factual allegations in support of this legal conclusion.  *See* Compl. ¶¶ 73-80

(alleging, *inter alia*, that Defendants failed to investigate the truth of Jacobs' charges, ignored

denials reported in the AP Article, and relied on an unreliable source in Jacobs).  Indeed,

Defendants do not dispute Plaintiff's contention that Defendants relied solely on the Jacobs

Declaration and the AP Article. (*See* Dkt. No. 68 ("Pl.'s SUMF"), at ¶¶ 1-8, 11) (stating

Defendants relied "solely" on the AP Article and Jacobs Declaration and did not conduct any

"independent review" of their accuracy).[24]

      Even under the more lenient reckless disregard standard, reliance upon a report

disseminated by a reputable news organization and a sworn declaration would be insufficient to

establish liability as a matter of law.  *See, e.g.*, *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d

1287, 1297 (D.C. Cir. 1988) ("good faith reliance on previously published news reports in

reputable" publications "precludes a finding of actual malice as a matter of law"); *Ryan v.*

*Brooks*, 634 F.2d 726, 729, 732-34 (4th Cir. 1980) (no actual malice as a matter of law where

defendant merely summarized two prior news accounts); *World Boxing Council v. Cosell*, 715 F.

Supp. 1259, 1265 (S.D.N.Y. 1989) (no actual malice where author relied upon published articles

that "appeared in respected publications, and were authored by reputable journalists, whose

allegations were not so improbable that a prudent author would have questioned their accuracy");

*see generally* Sack, *Sack on Defamation*, at § 5:5.2[C], 5-106 ("There is no obligation to verify

---

[23] The Court therefore need not reach Defendants' alternative arguments that the Petition and
Press Release were "truthful," or that Plaintiff is precluded from contesting truth due to the loss
or destruction of material evidence in the *Jacobs* action.

[24] Those portions of the Petition which constitute opinion are, as noted *supra*, incapable of being
true or false and therefore incapable of being published with knowledge of falsity.

the accuracy of a wire service story before publishing it, at least absent actual knowledge of its

falsity or such facial improbability as to alert the publisher of its falsity.  Such reliance cannot

constitute negligent behavior, let alone actual malice.").

In a case bearing facts similar to this one, the First Circuit affirmed a motion to dismiss

where the plaintiff failed to allege facts sufficient to plausibly suggest actual malice.  *Schatz v.*

*Republican State Leadership Comm.*, 669 F.3d 50, 57-58 (1st Cir. 2012) (finding no actual

malice as a matter of law in action based on statements in campaign advertisement by

Republican State Leadership Committee expressly sourced to underlying news reports, because

the advertisement "synced up with or at least was not out of line with what the stories said" in

the underlying reports, and none of plaintiff's suggestions plausibly suggested that defendant

acted with actual malice); *see also Mayfield v. NASCAR, Inc.*, 674 F.3d 369, 378 (4th Cir. 2012)

(dismissing defamation action based on the pleadings).  This conclusion is buttressed where, as

here, the allegedly defamatory statements clearly acknowledge that they are based upon

allegations.  *See, e.g., Harte-Hanks Comms., Inc. v. Connaughton*, 491 U.S. 657, 695 (1989)

(Blackmun, J., concurring) ("[T]his Court's decisions dealing with actual malice have placed

considerable emphasis on the manner in which the allegedly false content was presented by the

publisher.  Under our precedents, I find significant the fact that the article in this case accurately

portrayed Thompson's allegations *as* allegations, and also printed Connaughton's partial denial

of their truth.") (citations omitted).

Here, Plaintiff has not even alleged knowledge of falsity, much less facts to support such

a conclusion.[25]  As this Court explained in *Biro*, the pleading standards under *Iqbal* and *Twombly*

---

[25] The Complaint does allege that at some point *after* publication of the July 3 Petition, Harris "was informed" that the statements in the Jacobs affidavit were false—and that at that point he "knew that Jacobs was an unreliable, biased witness with his own personal agenda to harm Mr.

require courts to dismiss defamation actions where the allegations in the complaint do not

plausibly suggest actual malice and are merely conclusory. 2013 WL 3948394, at *18-19

(dismissing action where plaintiff failed to sufficiently allege reckless disregard). *A fortiori*, the

failure to allege *knowledge* of falsity—as required under the Nevada Anti-SLAPP statute—is

grounds for dismissal. *See John*, 219 P.3d at 1282 (requiring dismissal under the anti-SLAPP

statute if plaintiff fails to demonstrate a genuine issue of material fact on the issue of good

faith).[26]

## V.   Motion to Strike

Finally, Plaintiff has moved to strike portions of (1) Defendants' Combined

Memorandum of Law in Support of Defendants' Special Motion to Dismiss Pursuant to the D.C.

---

Adelson, and that written evidence established that his accusations against Mr. Adelson
concerning prostitution were false." *See* Compl. ¶¶ 64, 65. However, even if one assumes that
these allegations are sufficient to plausibly allege "knowledge of falsity," the communication
that Defendants published after that point—the July 11 Press Release—did not contain any false
statement of fact, and was not a "republication" of the allegedly defamatory statements in the
Petition. *See Goforth*, 368 F.2d at 28 n.7; *In re Phila. Newspapers, LLC*, 690 F.3d 161, 175 (3d
Cir. 2012). Nor are these allegations sufficient to plead defamation by implication in this case
claiming libel *per se*. *See Nevada Indep. Broad. Corp. v. Allen*, 664 P.2d 337, 342 (Nev. 1983);
*Ornatek v. Nevada State Bank*, 558 P.2d 1145, 1147 (Nev. 1977).

[26] Plaintiff's motion for limited discovery is accordingly denied. Some federal courts have
declined to enforce the Nevada Anti-SLAPP statute's discovery bar. *See, e.g., Rebel Commc'ns*,
2010 WL 2773530, at *2. However, discovery is not appropriate where it is demonstrably
unnecessary. *See, e.g., Contemporary Mission, Inc. v. U.S. Postal Serv.*, 648 F.2d 97, 105 (2d
Cir. 1981) (affirming summary judgment prior to discovery where plaintiff had "not come
forward with a scintilla of evidence that would tend to prove its allegation"); *Sec. Pac. v.
Canadian Land Co.*, 690 F. Supp. 1214, 1255 (S.D.N.Y. 1988) (granting summary judgment
because "no amount of discovery could establish a valid defense on any of the grounds
asserted"); *Haack*, 2012 WL 3638767, at *6, 12 (granting Nevada Anti-SLAPP motion without
discovery). This rule follows from *Twombly* and *Iqbal*, which require courts to scrutinize a
plaintiff's allegations before proceeding to discovery. Here, Plaintiff has not alleged knowledge
of falsity, facts supporting such a finding, or a reasonable, non-conclusory basis for believing
that discovery will create a genuine issue of material fact, and discovery is therefore
unwarranted. *See, e.g., Hoffman v. Airquip Heating & Air Conditioning*, 480 Fed. App'x 110,
111-12 (2d Cir. 2012) (upholding denial of Rule 56(d) motion where affidavit "lacked any
particularity as to how the facts sought would create an issue of material fact").

Anti-SLAPP Statute and Motion to Dismiss Pursuant to Rule 12(b)(6); (2) various paragraphs of the Strom Declaration; and (3) various exhibits appended to the Strom Declaration. Neither the relevant exhibits, paragraphs of the Strom Declaration, or portions of Defendants' brief were relied on by the Court in its adjudication of this matter. Accordingly, Plaintiff's motion is denied as moot.

## VI.    Conclusion

For the foregoing reasons, it is hereby ordered that:

Defendants' motion to dismiss pursuant to Federal Rule 12(b)(6) is GRANTED;

Defendants' special motion to dismiss pursuant to the Nevada Anti-SLAPP statute is GRANTED;

Defendants' special motion to dismiss pursuant to the District of Columbia Anti-SLAPP statute is DENIED;

Plaintiff's motion to strike is DENIED as moot; and

Plaintiff's motion for discovery is DENIED;

Pursuant to N.R.S. § 41.670(1), Defendants' request for reasonable attorney's fees and costs is GRANTED. Defendants shall file a statement of their reasonable fees and costs on or before October 15, 2013, to which Plaintiff may respond on or before October 29, 2013.

The Clerk of Court is directed to terminate the motions at docket numbers 16, 17, 26, 27,

56, 65, and 77.


SO ORDERED.

Dated: New York, New York
       September 30, 2013

                                                    J. PAUL OETKEN
                                       United States District Judge