UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHELDON G. ADELSON,<br>Plaintiff,<br><br>v.<br><br>DAVID A. HARRIS, MARC R. STANLEY, and NATIONAL JEWISH DEMOCRATIC COUNCIL,<br><br>Defendants. | Case No. 12-Civ-6052-JPO<br><br>**ECF Case**<br><br>**DECLARATION OF LEE LEVINE** |

I, **Lee Levine**, declare as follows:

1. I am a founding partner of Levine Sullivan Koch & Schulz, LLP, counsel for defendants David A. Harris, Marc R. Stanley, and the National Jewish Democratic Council ("NJDC") (collectively, "defendants") in this action. I make this Declaration to place before the Court information and materials in support of Defendants' Application for Counsel Fees and Expenses in accordance with this Court's Memorandum and Order dated September 30, 2013. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2. As the Court knows, this litigation stems from the July 5, 2012 posting by NJDC of a petition on its website urging then presidential candidate Mitt Romney to refuse to accept donations from plaintiff Sheldon Adelson (the "Petition"). The Petition referred to "reports" that had "surfaced" which stated, among other things, that Adelson had "'personally approved' of prostitution in his Macau casinos." Compl., Ex. A. The Petition contained at this point, embedded in the quoted words, "personally approved," a hyperlink to an Associated Press article that detailed allegations regarding prostitution and other misconduct contained in a declaration

filed in a Nevada court by Steven Jacobs, who had once run Mr. Adelson's Macau casinos (the "Declaration" or the "Jacobs Declaration"). Compl., Ex. A; Declaration of David Harris ("Harris Dec."), Ex. B. Mr. Jacobs had been terminated and had thereafter instituted a civil action in Las Vegas for wrongful termination. His Declaration was filed in that lawsuit and was the subject of multiple news reports throughout the country and the world. Declaration of Rachel Strom ("Strom Dec."), Dkt. No. 20, ¶ 41.

3. At the time, Mr. Adelson and his representatives announced publicly that any criticism of him based on allegations contained in the Jacobs Declaration would result in costly, protracted litigation. For example, in a news report published by *Forbes* on July 9, 2012, shortly after the Petition had been posted, Mr. Adelson was quoted as promising that, "[w]hen the time comes I'll extract what's due." Strom Dec. ¶ 41 & Ex. 89. On July 17, after the Petition had been taken down, counsel for Mr. Adelson wrote to defendants demanding that they issue a retraction and apology pre-approved by Mr. Adelson and expressly reserving his "rights to seek damages and other relief." Compl., Ex. E. On July 20, Mr. Adelson sued Mr. Jacobs for defamation in Florida state court in connection with the statements in his Declaration. Strom Dec. ¶ 64. And, when the Democratic Congressional Campaign Committee retracted and apologized for its own statements regarding Mr. Adelson and prostitution on Aug. 2, his spokesman told Politico that "this [retraction] should serve notice to those who would attempt to smear Adelson by repeating the false and inflammatory statements of a fired employee - that this is a very slippery slope." Strom Dec. Ex. 100. On August 8, Mr. Adelson filed this lawsuit.

4. Mr. Adelson is well known for mounting aggressive and very expensive litigation against those he claims have injured his reputation. He has described his strategy as a "steadfast refusal to acquiesce when defamed," Mot. to Strike, Dkt. No. 28, at 1, and the "diligent

protection of his right to be free from defamation," Reply in Supp. of Mot. to Strike, Dkt. No. 36, at 3. Indeed, in the years prior to his filing this action, Mr. Adelson prosecuted defamation lawsuits in the United States and abroad against more than a half-dozen individuals and organizations. Mem. in Support of Mot. to Dismiss Under D.C. Anti-SLAPP Statute and Rule 12(b)(6), Dkt. No. 18, at 6-7. During the pendency of this litigation itself, Mr. Adelson instituted a defamation action in Hong Kong against a *Wall Street Journal* reporter who co-authored an article that described him as "foul-mouthed" and then tried unsuccessfully in New York to subpoena the reporter's emails, phone records and notes, ostensibly in connection with his Florida defamation lawsuit against Mr. Jacobs. *See* Sproul Dec. Ex. 154; *In re Wall Street Journal v. Adelson*, 2013 NY Slip Op. 31165(U) (Sup. Ct. N.Y. Cnty. May 31, 2013), attached hereto as Exhibit C.

5. In one such case, a Las Vegas journalist and his publisher were driven into bankruptcy by one of Mr. Adelson's defamation lawsuits. *See In re Smith*, 389 B.R. 902, 924 (Bankr. D. Nev. 2008). That reporter's editor was later quoted as saying, "This whole series of events is nothing more or less than trying to coerce everyone in journalism not to write anything [Adelson] doesn't like." Strom Dec. ¶ 8 & Ex. 11 at 19.

6. At the time he filed this lawsuit, Mr. Adelson was, according to *Forbes* magazine, number seven in its rankings of the wealthiest Americans, with a net worth of $24.9 billion. Strom Dec. Ex. 6. (The most recent "Forbes 400 Richest Americans" estimates his fortune at $28.5 billion as of September 2013; available at: http://www.forbes.com/forbes-400/list/.). As a result, he has not hesitated to devote substantial resources to the prosecution of the defamation actions he has instituted, including by retaining highly skilled and experienced counsel to represent him. Thus, at various stages of his dispute with these defendants, Mr. Adelson has

enlisted the assistance of, among others, Harvard Law School Professor Alan Dershowitz and the prestigious New York law firm, Paul Weiss Rifkind Wharton & Garrison. Mr. Adelson's lead counsel in this litigation is L. Lin Wood, perhaps the most prominent plaintiff's defamation attorney in the United States. Among other clients, Mr. Wood has litigated high-profile defamation actions on behalf of Richard Jewell, the security guard falsely suspected of the 1996 Atlanta Olympic Park bombing; former congressman Gary Condit; the parents and brother of slain child beauty queen JonBenét Ramsey; and Howard K. Stern, the agent/paramour of model Anna Nicole Smith.

7. When he filed this lawsuit, Mr. Adelson and his representatives mounted an aggressive publicity campaign for the apparent purposes of generating a climate of public support for his lawsuit and deterring further criticism of Mr. Adelson, including by creating additional pressures on defendants. Strom Dec. ¶ 68. For example, Professor Dershowitz announced publicly that he hoped defendant Harris would "lose his job" as a result of the lawsuit and characterized Harris and NJDC as "a bunch of liars." *Id.*, Ex. 115. In the wake of these efforts, Mr. Adelson's filing of this lawsuit in fact received extensive news media coverage, including articles in the *Washington Post*, *Politico* and *The New York Times*, and a dispatch distributed around the world by The Associated Press. *Id.* ¶ 67.

8. In his Complaint in this action, Mr. Adelson sought at least $10 million in compensatory and $50 million in punitive damages.

9. For all of these reasons, this case was, from the outset, a very serious matter in which the defendants were well advised to retain experienced counsel and to protect themselves vigorously from potentially devastating liability. In short, the litigation was instituted by an enormously wealthy plaintiff with an established track record of engaging in costly and

debilitating defamation litigation, who had both retained highly skilled counsel to represent him and had then filed a complaint in which he sought more than $60 million in damages.

10. Our firm was retained by defendants in August 2012. Levine Sullivan Koch & Schulz ("LSKS") regularly practices in the field of defamation law and has litigated such cases in trial and appellate courts throughout the country. As part of our practice, we have defended clients against SLAPP suits in many states, including California, Illinois, Louisiana, Nevada, New York, Oregon, and Washington, DC.

11. Our firm and its attorneys have earned a national reputation for the quality of the legal services we provide to our clients in defamation actions such as this one. In its 2013 rankings, for example, *Chambers USA* recognized LSKS and eleven of the firm's partners as among the most accomplished media and defamation lawyers in the country. In addition, *U.S. News Media Group* named the firm the national "Law Firm of the Year" for First Amendment litigation in 2013.

12. Our firm, which currently includes 34 lawyers practicing exclusively in the field of media law, is built on a model that features more modest overhead and attorney compensation than its competitors in the field. This enables the firm to charge materially lower fees than other firms of comparable experience in the markets it serves, while maintaining a high standard for its legal work. I am generally familiar with the legal fees charged in the New York market in the area of defamation litigation by law firms with reasonably comparable expertise and practices. Based on that familiarity, I estimate that LSKS's standard hourly rates are lower by approximately 10 to 40 percent from rates charged by firms of comparable quality in this market for this type of litigation.

13. Upon our initial retention, NJDC agreed to pay our standard hourly rates, which are uniform throughout the firm and in 2012 ranged from $575 for a senior partner to $365 for a junior associate to $235 for a paralegal. In September 2012, Travelers Indemnity Company ("Travelers") accepted defendants' tender of the defense of the case and undertook responsibility for paying our fees. Effective October 1, 2012, Travelers negotiated with LSKS to charge a blended hourly rate of $465 for attorneys and $200 for paralegals. It further agreed to pay in full those invoices previously submitted by LSKS to NJDC for services rendered during the months of August and September 2012, billed at LSKS's standard hourly rates.

14. Based on my personal experience, Travelers is a sophisticated consumer of legal services in a wide array of legal matters nationwide. It regularly negotiates hourly billing rates with law firms as it did in this case, and ultimately agrees to pay rates that it deems reasonable under all of the circumstances of each particular case. Travelers, like most insurers, subjects invoices for legal services rendered to its insureds to a thorough review, and did so in this case. Travelers has paid each of the invoices submitted in this matter in full, with the exception of the invoice submitted within the past few days for time and expenses incurred in September 2013.

15. I am the senior lawyer in charge of this matter at LSKS and, in that capacity, I have assumed ultimate responsibility for all submissions to the Court; reviewed, substantively edited and finalized all of them; and represented the defendants at the hearing before the Court in December 2012. In addition, my colleagues Seth Berlin and Gayle Sproul assumed primary responsibility for separate aspects of the case. Ms. Sproul was primarily responsible for factual investigation and development, preparation of the statements of fact that accompanied defendants' various submissions to the Court, and drafting defendants' opposition to Mr. Adelson's motion to strike, their Nevada-based motion to dismiss pursuant to Rule 12(b)(6), and

their opposition to Mr. Adelson's motion for discovery. Mr. Berlin was primarily responsible for all anti-SLAPP-related briefing and substantive briefing in support of defendants' DC law-based motion to dismiss. Each of them was assisted by additional lawyers in the firm, as described below.

16. I set forth below my relevant professional qualifications, as well as those of Mr. Berlin, Ms. Sproul, and each of the other LSKS lawyers who have performed legal services in the defense of this case:

> *Lee Levine*: I graduated from Yale Law School in 1979 and served as a law clerk to the Hon. Irving R. Kaufman, then-Chief Judge of the United States Court of Appeals for the Second Circuit. Before co-founding LSKS, I was a partner in the Washington, D.C.-based firm Ross, Dixon & Masback, L.L.P. I have litigated defamation and other First Amendment cases in more than 20 states and the District of Columbia, appeared in most federal courts of appeal, and argued on behalf of media defendants in *Bartnicki v. Vopper* and *Harte-Hanks Communications, Inc. v. Connaughton* in the U.S. Supreme Court. I have been recognized as a "Star Individual" in national First Amendment litigation by *Chambers USA*; a preeminent First Amendment and media lawyer in Washington, D.C., by *Best Lawyers*; and have an AV rating by Martindale-Hubbell. I am the lead author of the treatise *Newsgathering and the Law*, now in its fourth edition, and the co-author of the casebook *Media and the Law*, which is used in law schools throughout the country. I have authored several law review articles on media law generally and the law of defamation specifically. In addition, I have taught media law at several law schools in the United States and abroad and have been an Adjunct Professor at the Georgetown University Law Center since 1989.

> *Seth Berlin* graduated *cum laude* from Harvard Law School in 1991. Since that time, he has represented media defendants in defamation and other litigation in courts across the country, including in a number of significant Anti-SLAPP cases. Mr. Berlin has been recognized as a leading media and entertainment attorney by both *Chambers USA* and *Best Lawyers*. He has been a co-author of *Newsgathering and the Law* since 2005, has written numerous other articles on First Amendment issues, and has testified before the Senate Judiciary Committee on media law issues. He has also served as an Adjunct Professor of Media Law at the Philip Merrill College of Journalism of the University of Maryland.

> *Gayle Sproul* graduated *cum laude* from Villanova Law School in 1983 and served as a law clerk to the Hon. John P. Fullam of the United States District Court for the Eastern District of Pennsylvania. Before joining LSKS, Ms. Sproul practiced law at Dechert LLP and as an in-house attorney at National Broadcasting Company, Inc. Ms. Sproul has been recognized as a leading First Amendment lawyer by both *Chambers USA* and *Best Lawyers*.

*Chad Bowman* graduated *magna cum laude* from Georgetown University Law Center in 2003. Since that time, he has defended media clients in defamation, privacy and related claims in courts across the country. In this case, Mr. Bowman conducted factual and legal research and drafted portions of the briefing regarding discrete issues including spoliation, staying discovery, and application of Nevada's anti-SLAPP statute.

*Celeste Phillips* graduated from the University of California, Hastings College of Law, in 1981. Ms. Phillips has served as newsroom counsel to a number of daily newspapers and other media entities and has participated in the defense of significant defamation actions in a wide array of jurisdictions. Before joining LSKS, Ms. Phillips was a partner in Ross, Dixon & Masback, L.L.P., and of counsel with Pillsbury, Madison & Sutro in San Francisco. In this case, Ms. Phillips undertook portions of defendants' factual investigation, primarily with respect to other, ongoing litigation involving Mr. Adelson in Nevada and Florida.

*Rachel Strom* graduated *cum laude* from the Benjamin N. Cardozo School of Law in 2006. She has defended media clients in defamation and related actions in state and federal courts in New York and across the country and frequently writes articles regarding media law issues. Before joining LSKS, Ms. Strom was a litigation associate at Hogan Lovells. In this case, Ms. Strom conducted legal research and drafted portions of the briefing regarding discrete issues including choice of law, plaintiff's motion to strike, and the applicability of anti-SLAPP statutes in the federal courts. In addition, she attended and monitored a multi-day sanctions hearing in the underlying litigation brought by Mr. Jacobs against Mr. Adelson in Nevada, which hearing took place shortly before the due date of defendants' responsive pleading in this case, for the purpose of gathering timely factual information in support of the spoliation argument made by defendants in the dispositive motions they filed shortly thereafter.

*Patrick Kabat* graduated from Yale Law School in 2010 and served as a law clerk to the Hon. James S. Gwin of the U.S. District Court for the Northern District of Ohio. Before joining LSKS, Mr. Kabat was the program director of the Knight Law and Media Program at Yale Law School and an associate at Jones Day. In this case, Mr. Kabat conducted discrete legal research regarding the applicability of the Seventh Amendment to anti-SLAPP statutes, substantive defamation defenses under Nevada law, and in connection with Mr. Adelson's motion to strike.

*Julia Atcherley* received her L.L.M. from Columbia University School of Law in 2011 and graduated with highest honors from the University of Sydney (Australia) Law School in 2007. Before joining LSKS, Ms. Atcherley was a solicitor at the Australian-based law firm of Mallesons Stephen Jaques, where she represented and counseled clients regarding defamation and related issues. In this case, Ms. Atcherley conducted discrete legal research regarding the fair report privilege.

*Matthew Kelley* graduated with high honors from the George Washington University Law School in 2012. In this case, Mr. Kelley conducted discrete legal and factual research and drafted portions of the briefing regarding Nevada defamation law, the Nevada anti-SLAPP statute, and the application of anti-SLAPP statutes in federal courts.

> Several paralegals assisted with this case. *Scott Bailey*, a 1988 graduate of Cornell University, assembled pleadings, declarations and exhibits for filing and e-filed documents with the Court. *Jennifer Pinkerton-Burke*, a 1996 graduate of Bowling Green State University, monitored filings in related cases, reviewed citations and quotations in pleadings and declarations for accuracy, and conducted factual research in connection with those filings. *Sophie Benjamin*, a 2012 graduate of Princeton University, reviewed citations and quotations in pleadings for accuracy and prepared materials for electronic filing. *Kathleen Snyder*, who earned her paralegal certification from Pennsylvania State University in 1996, reviewed exhibits and exhibit lists for accuracy and prepared tables of authorities and tables of contents for pleadings. *Antoinette Kratenstein*, a 1994 graduate of Adelphi University, obtained docket sheets for certain cases cited in defendants' pleadings.

17. As the Court knows, this case raised an extraordinary number of difficult and complex issues of law, arising in significant part from Mr. Adelson's decision to litigate it in a federal court far from his own domicile or that of any of the defendants. Thus, in two rounds of briefing addressing both DC and Nevada law with respect to both defendants' motions to dismiss and anti-SLAPP motions, defendants were obliged to address a wide variety of sophisticated legal issues, including choice of law, the application of state anti-SLAPP statutes in federal court, the constitutionality of state anti-SLAPP statutes, the fair report privilege, the developing case law surrounding hyperlinks, the opinion doctrine, and the law surrounding spoliation and stays, as well as evidentiary and rule-related issues raised by Mr. Adelson's own motions to strike and for discovery. In addition, defendants were required to investigate and master multiple issues of fact concerning other relevant litigation involving Mr. Adelson including, most significantly, the underlying lawsuit instituted by Mr. Jacobs in Nevada, which formed the factual basis for the defendants' legal arguments regarding both the fair report privilege and spoliation, and the Florida defamation action instituted by Mr. Adelson against Mr. Jacobs based on the same statements at issue in this case. And, defendants were obliged to conduct factual investigation with respect to the substantial truth of the defamatory meaning that Mr. Adelson sought to attribute to their publications, specifically the relevant evidence regarding prostitution

at his Macau casinos, as well as the factual predicates required to support their motions under both the D.C. and Nevada anti-SLAPP statutes. Our work can productively be divided into the following substantive categories:

1. Review of the Complaint and formulation of an initial litigation strategy.
2. Factual investigation and collection of potentially relevant documents.
3. Communications with our clients and Travelers involving litigation status and strategy.
4. Communications with plaintiff's counsel and the Court.
5. Monitoring of related litigation in Nevada and Florida.
6. Preparation of initial Motion to Dismiss/SLAPP motion.
   i. Preparation of opening brief and supporting declarations.
   ii. Preparation of reply brief.
7. Preparation of opposition to Motion to Strike.
8. Preparation for/attendance at hearing.
9. Preparation of second Motion to Dismiss/SLAPP motion.
   i. Preparation of opening brief and declarations.
   ii. Preparation of reply brief.
10. Review of Court's decision.[1]

18. Attached hereto as Exhibit A, and incorporated herein by this reference, is a chart that sets forth the legal services that LSKS rendered in the defense of this litigation, broken down by category and by timekeeper over a range of dates. This chart was created at my direction and I have reviewed it and attest to the Court both that it is an accurate description of the services

[1] Additional fees and expenses are currently being incurred in connection with the preparation of this fee application and will necessarily be incurred in connection with any appeal of the Court's decision pursued by Mr. Adelson. Defendants reserve the right to supplement this application for the purpose of securing recovery of those fees as well.

rendered, the date ranges during which those services were performed, and the hours for which LSKS has billed and that it is drawn from the contemporaneous billing records maintained by the firm. In those records, time is recorded in 0.1 hour increments. The chart does not include 258.9 hours of attorney and paralegal time that was written off by the firm and not included in its statements for services rendered. Those hours, the dollar value of which was $90,963, include hours devoted to travel in connection with the case, for which LSKS does not typically charge its clients, as well as those that I, as the senior lawyer responsible for this representation, wrote off in the exercise of my billing judgment so that the invoices included only those charges that were, in my experience, entirely appropriate. The following is a summary of the information contained in Exhibit A, which also includes the dollar value of the services rendered in each category, which amounts were in fact billed to and, with one exception,[2] paid by Travelers on behalf of its insured:

a. For review of the Complaint and formulation of initial litigation strategy, LSKS attorneys billed 15.8 hours for a total of $7,347.

b. For factual investigation and collection of potentially relevant documents, LSKS attorneys billed 55.6 hours for a total of $25,854.

c. For communications with clients and their insurance carrier, LSKS attorneys billed 90.3 hours for a total of $41,989.50.

d. For communications with plaintiff's counsel and the Court, LSKS attorneys billed 72.6 hours for a total of $33,759.

e. For monitoring of related litigation in Nevada and Florida, LSKS attorneys billed 91.3 hours and LSKS paralegals billed 9.7 hours for a total of $44,394.50.

f. For preparation of the initial Motion to Dismiss/SLAPP motion, the billing has been further broken down into two subcategories. For preparation of the opening

[2] Although Travelers in fact has paid LSKS for the services rendered and billed at the firm's standard hourly rates for August and September 2012, it has agreed, for purposes of this fee application, to value those services instead at the reduced, blended hourly rates it subsequently negotiated with LSKS and which the firm has charged for services rendered starting in October 2012. Accordingly, the amounts set out in paragraph 18 reflect the lower amounts calculated at those rates, rather than the higher amount that Travelers actually paid for those two months.

brief and accompanying declarations, LSKS attorneys billed 446.7 hours and LSKS paralegals billed 58.0 hours for a total of $219,315.50. For preparation of the reply brief in support of those motions, LSKS attorneys billed 417.9 hours and LSKS paralegals billed 32.0 hours for a total of $200,723.50.

g. For preparation of the opposition to Plaintiff's Motion to Strike, LSKS attorneys billed 85.0 hours and LSKS paralegals billed 3.5 hours for a total of $40,225.

h. For preparation for and attendance at the hearing in this matter, LSKS attorneys billed 97.4 hours for a total of $45,291.

i. For preparation of the second Motion to Dismiss/SLAPP motion, the billing has been further broken down into two subcategories. For preparation of the opening brief and accompanying declarations, LSKS attorneys billed 378.5 hours and LSKS paralegals billed 24.6 hours for a total of $180,922.50. For preparation of the reply brief in support of those motions, LSKS attorneys billed 313.0 hours and LSKS paralegals billed 1.7 hours for a total of $145,885.

j. For review of Court's decision, LSKS attorneys billed 7.2 hours for a total of $3,348.

**CURRENT TOTAL: Hours: 2,200.8 Fees: $989,054.50.**

19. Attached hereto as Exhibit B, and incorporated herein by this reference, is a chart that sets forth the out-of-pocket expenses and costs incurred by LSKS in the defense of this litigation and actually billed to defendants and their carrier. This chart was also created at my direction and I have reviewed it and attest to the Court that it is an accurate description of the out-of-pocket expenses actually incurred and billed. As the chart indicates (albeit by omission), LSKS does not charge its clients for most of the out-of-pocket expenses it in fact incurs, including routine copying, postage, telephone and fax charges, or computerized legal research. The following is a summary of those additional expenses that LSKS incurred and billed in this case. All of the referenced charges were billed at the actual cost incurred by LSKS.

a. Court fees: $412

b. Court document retrieval fees: $3,156.95

c. Litigation support vendors: $15,745.89

d. Research materials: $31.83

e. Transcript fees: $1,576.60

f. Travel: $4,082.71

g. Client meals: $126.70

**CURRENT TOTAL: $25,153.43**

20. All of the fees and expenses itemized in Exhibits A and B were submitted to defendants and to Travelers and have been deemed reasonable and have been paid, with the exception of our most recent invoice for services rendered for fees and costs incurred during September 2013, which has not yet been reviewed by Travelers. Based on my more than 30 years' experience litigating defamation actions in state and federal courts throughout the country, I believe that the fees charged by LSKS in this case are reasonable and appropriate for all of the reasons stated herein.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 15th day of October 2013.

Lee Levine

# *Adelson v. Harris, et al.,*

SDNY Case No. 12 Civ. 6052 (JPO)

## Declaration of Lee Levine

## Exhibit A

**EXHIBIT A**

**Attorney Time By Category**
Through September 30, 2013

| Attorney/paralegal | Hours |
|---|---|
| Review of Complaint and formulation of initial litigation strategy: Aug. 7, 2012 – Sept. 19, 2012 | |
| L. Levine | 8.2 |
| G. Sproul | 2.2 |
| S. Berlin | 5.4 |
| Factual investigation and collection of potentially relevant documents: Aug. 2, 2012 – June 3, 2013 | |
| L. Levine | 6.1 |
| G. Sproul | 3.9 |
| C. Bowman | 21.2 |
| C. Phillips | 9.0 |
| R. Strom | 12.0 |
| M. Kelley | 3.4 |
| Communications with clients, carrier: Aug. 2, 2012 – Sept. 30, 2013 | |
| L. Levine | 36.9 |
| S. Berlin | 41.4 |
| R. Strom | 12.0 |
| Communications with plaintiff's counsel, Court: Aug. 3, 2012 – July 10, 2013 | |
| L. Levine | 15.9 |
| G. Sproul | 15.5 |
| S. Berlin | 34.5 |
| R. Strom | 6.7 |

**EXHIBIT A**

| | |
|---|---|
| Monitoring of related litigation in Nevada, Florida: Aug. 28, 2012 – Sept. 30, 2013 | |
| L. Levine | 13.7 |
| G. Sproul | 15.1 |
| C. Bowman | 23.5 |
| C. Phillips | 7.5 |
| R. Strom | 31.5 |
| Paralegals | 9.7 |
| Preparation of initial Motion to Dismiss/SLAPP motion | |
| a. Preparation of opening brief and declarations: Aug. 8, 2012 – Sept. 21, 2012 | |
| L. Levine | 48.1 |
| G. Sproul | 130.7 |
| S. Berlin | 101.1 |
| C. Bowman | 53.8 |
| R. Strom | 113.0 |
| Paralegals | 58.0 |
| b. Preparation of reply brief: Sept. 27, 2012 – Mar. 5, 2013 | |
| L. Levine | 40.6 |
| G. Sproul | 82.1 |
| S. Berlin | 123.8 |
| C. Bowman | 32.6 |
| R. Strom | 83.8 |
| P. Kabat | 55.0 |
| Paralegals | 32.0 |
| Preparation of opposition to Motion to Strike: Nov. 9, 2012 – Dec. 4, 2012 | |
| L. Levine | 9.6 |
| G. Sproul | 14.3 |
| C. Bowman | 36.2 |
| P. Kabat | 24.9 |
| Paralegals | 3.5 |

**EXHIBIT A**

| | |
|---|---|
| Preparation for/attendance at hearing: Oct. 1, 2012 – Dec. 28, 2012 | |
| L. Levine | 40.6 |
| G. Sproul | 13.2 |
| S. Berlin | 12.1 |
| C. Bowman (preparation only) | 14.7 |
| R. Strom (preparation only) | 16.8 |
| Preparation of supplemental Motion to Dismiss/SLAPP motion | |
| a. Preparation of opening brief and declarations: Mar. 6, 2013 – May 13, 2013 | |
| L. Levine | 27.6 |
| G. Sproul | 83.5 |
| S. Berlin | 95.8 |
| C. Bowman | 85.0 |
| R. Strom | 25.4 |
| J. Atcherley | 20.6 |
| P. Kabat | 40.6 |
| Paralegals | 24.6 |
| b. Preparation of reply brief: May 3, 2013 – Sept. 23, 2013 | |
| L. Levine | 43.2 |
| G. Sproul | 37.4 |
| S. Berlin | 93.0 |
| C. Bowman | 73.0 |
| R. Strom | 24.1 |
| M. Kelley | 42.3 |
| Paralegals | 1.7 |
| Review of Court's decision and preparation of attorneys' fees application: Sept. 30, 2013 | |
| L. Levine | 3.5 |
| G. Sproul | 2.4 |
| S. Berlin | 1.3 |

# *Adelson v. Harris, et al.,*

SDNY Case No. 12 Civ. 6052 (JPO)

## Declaration of Lee Levine

## Exhibit B

**EXHIBIT B**

**Expenses billed in *Adelson v. Harris***

| **Cost Type** | **Description** | **Amount** |
|---|---|---|
| Court Fees | Pro Hac Vice application for L. Levine | $200.00 |
| | Certificates of Good Standing for C. Bowman | $12.00 |
| | Pro Hac Vice application for C. Bowman | $200.00 |
| Court Document Fees | Multiple documents obtained from LexisNexis CourtLink from *Jacobs* and *Suen* litigations in Nevada | $1,080.94 |
| | Documents obtained from LexisNexis CourtLink from *Adelson v. Jacobs* action in Florida | $169.07 |
| | Documents obtained from LexisNexis CourtLink from *Jacobs* litigation in Nevada | $74.20 |
| | Documents obtained from LexisNexis CourtLink from *Jacobs* litigation in Florida | $759.49 |
| | Documents obtained from LexisNexis CourtLink from *Jacobs* litigations in Nevada and Florida | $871.85 |
| | Documents obtained from LexisNexis CourtLink from *Jacobs* litigation in Nevada | $201.40 |
| Litigation Support Vendors | N.Y. State Library – Bill Jacket, 1992 Chapter 767 | $50.00 |
| | Electronic database search regarding S. Adelson, LexisNexis Risk Solutions | $50.30 |
| | Printing and binding of originals and courtesy copies of motion to dismiss and accompanying declarations and exhibits, The Darcel Group | $9,730.81 |

| | | |
|---|---|---|
| | Reproduction of DVDs attached as exhibits to motion to dismiss, The Darcel Group | $1,469.81 |
| | Retrieval of transcripts of S. Adelson testimony in *Suen* litigation, Legal Wings Inc. | $168.75 |
| | Printing and binding of originals and courtesy copies of reply in support of motion to dismiss and accompanying declaration and exhibits, The Darcel Group | $1,960.65 |
| | Printing and binding of copies of exhibits for use at oral argument, The Darcel Group | $1,300.95 |
| | Reproduction of DVDs of trial testimony in *Suen* litigation, Courtroom Connect | $823.13 |
| | Printing and binding of originals and courtesy copies of special motion to dismiss and accompanying declarations and exhibits, The Darcel Group | $87.01 |
| | Printing and binding of originals and courtesy copies of combined reply and opposition and accompanying declarations and exhibits, The Darcel Group | $104.48 |
| Research Materials | Reproduction of Forbes Magazine article, N.Y. Bar Association | $5.44 |
| | Book purchase: *Crowded Airwaves: Campaign Advertising in Elections*, Thurber, et. al., eds. | $20.95 |
| | Reproduction of opinion in *Sharpton v. Giuliani*, N.Y. Bar Association | $5.44 |

| | | |
|---|---|---|
| Transcript Fees | Transcript of sanctions hearing, *Jacobs v. Las Vegas Sands*, for use as exhibit to motion to dismiss | $810.00 |
| | Transcripts of Kostrinsky and Singh hearing testimony, *Jacobs v. Las Vegas Sands*, for use as exhibits to motion to dismiss | $428.20 |
| | Transcript of hearing, *Adelson v. Harris*, for use as exhibit to motion to dismiss | $274.56 |
| | Transcript of hearing, *Adelson v. Harris*, for use as exhibit to motion to dismiss | $63.84 |
| Travel | Travel to Las Vegas to attend multi-day sanctions hearing in *Jacobs v. Las Vegas Sands*, including airfare, local transportation, hotel and meals | $3,229.61 |
| | Travel to New York for hearing | $398.00 |
| | Travel to New York for hearing | $455.10 |
| Client Meals | Meeting with clients | $126.70 |
| **Total:** | | $25,153.43 |

# *Adelson v. Harris, et al.,*

SDNY Case No. 12 Civ. 6052 (JPO)

## Declaration of Lee Levine

## Exhibit C

SCANNED ON 5/31/2013



**SUPREME COURT OF THE STATE OF NEW YORK— NEW YORK COUNTY**

**PRESENT : DONNA M. MILLS** **PART 58**

***Justice***

---

*In the Matter of the Motion to Quash Subpoena/Subpoena Duces Tecum served upon WALL STREET JOURNAL,*

Index No. 100270/13

Petitioner,

-against-

SHELDON ADELSON,

Respondent.

MOTION DATE ______

MOTION SEQ. NO. 001

MOTION CAL NO. ______

FILED
MAY 31 2013
NEW YORK
COUNTY CLERK'S OFFICE

---

The following papers, numbered 1 to ____ were read on this motion ______.

| | PAPERS NUMBERED |
|---|---|
| Notice of Motion/Order to Show Cause-Affidavits– Exhibits.... | 1, 2 |
| Answering Affidavits– Exhibits | 3, 4 |
| Replying Affidavits | 5, 6 |

CROSS-MOTION: ____ YES ✓ NO

Upon the foregoing papers, it is ordered that this motion is:

DECIDED IN ACCORDANCE WITH ATTACHED ORDER.

**Dated:** 5/28/13

[signature]
**DONNA M. MILLS, J.S.C.**

Check one: ✓ FINAL DISPOSITION ____ NON-FINAL DISPOSITION

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

**INDEX NO. 100270/13**

**In the Matter of a Motion to Quash Subpoena Duces Tecum served upon Wall Street Journal,**

**Petitioner,**

**- against -**

**SHELDON G. ADELSON,**

**Respondent.**

**DECISION/ORDER**

FILED
MAY 31 2013
NEW YORK
COUNTY CLERK'S OFFICE

**Donna M. Mills, J.:**

In this proceeding, Dow Jones & Company, Inc. ("Dow Jones"), publisher of the Wall Street Journal, brings this action for an order pursuant to CPLR § 2304 quashing the subpoena/subpoena duces tecum, issued to the Wall Street Journal pursuant to the Uniform Interstate Deposition and Discovery Act and CPLR § 3119, seeking deposition testimony and documents in underlying civil litigation brought by plaintiff Sheldon G. Adelson against defendant Steven C. Jacobs in the State of Florida for defamation. Dow Jones also seeks a protective order, pursuant to CPLR § 3103, preventing the deposition from going forward.

BACKGROUND

Mr. Adelson is the plaintiff in a defamation action brought in the Florida state court system against a Florida resident, Steven Jacobs. The Florida action arises out of an alleged defamatory statement made by Mr. Jacobs concerning a supposed prostitution promotion strategy that Mr. Jacobs purportedly claimed that Mr. Adelson condoned. Mr. Jacobs published this statement in an affidavit concerning discovery issues in a pending Nevada employment action he brought against Las Vegas Sands

Corporation ("LVSC"), a company headed by Mr. Adelson, for alleged wrongful termination. The alleged defamatory statement was republished by various media outlets, including in Florida and New York.

The Wall Street Journal soon published, under a reporter named Kate O'Keefe's by-line, an article entitled "Sands Suit Claims 'Prostitution Strategy,'" emphasizing the assertions that Mr. Jacobs made regarding Mr. Adelson's alleged support of prostitution. At his deposition in the Florida defamation action, Mr. Jacobs testified that he considered Ms. O'Keefe to be his friend and that he had met with her for lunch meetings. Additionally, document production by Mr. Jacobs revealed, that he retained dozens of email communication from Ms. O'Keefe in which she was seeking quotes and tips from Mr. Jacobs regarding Mr. Adelson and his business. Counsel for Mr. Adelson contends that Ms. O'Keefe is not an impartial reporter with respect to Mr. Adelson and his companies, and claims that Ms. O'Keefe has engaged in her own independent defaming of Mr. Adelson.

On January 14, 2013, Mr. Adelson, through his New York attorneys, served upon Dow Jones a subpoena/subpoena duces tecum in the Florida action under the authority of the Supreme Court of New York, New York County pursuant to the Uniform Interstate Deposition and Discovery Act and CPLR § 3119. The Subpoena seeks to depose in New York the corporate representative of the Wall Street Journal with the most knowledge regarding communications between Mr. Jacobs and any agent, employee, representative, officer, or director of the Wall Street Journal. The Subpoena also seeks three categories of document: (1) emails, letters, and other written communications between Mr. Jacobs and the Wall Street Journal, dating from January 1, 2010 to the

present; (2) any documents that Mr. Jacobs provided to the Wall Street Journal, dating from January 1, 2010 to the present; and (3) phone records of the Wall Street Journal and its employees reflecting any calls with Mr. Jacobs, dating from July 1, 2010 to the present.

Mr. Adelson further contends that prior to and immediately following the termination of Mr. Jacobs's employment, he suspects that Mr. Jacobs began leaking false and inflammatory information to the news media relating to Jacobs's employment with the company. These leaks then led to a succession of new stories regarding Mr. Adelson and LVSC many of which were published by the Wall Street Journal, and which culminated with Jacobs's publication of the alleged defamatory statement that is the subject of the Florida action.

LEGAL DISCUSSION

In New York, a news reporter's qualified privilege regarding non-confidential news gathering materials derives from New York State Constitution Article 1, Section 8, as well as New York Civil Rights Law § 79–h, based on a tripartite test "more demanding than the requirements of CPLR 3101(a)" ( O'Neill v. Oakgrove Constr., 71 N.Y.2d 521, 527, 528 N.Y.S.2d 1, 523 N.E.2d 277 [1988]).

Under the tripartite test, discovery may be ordered only if the litigant demonstrates, clearly and specifically, that the items sought are (1) highly material, (2) critical to the litigant's claim, and (3) not otherwise available. Accordingly, if the material sought is pertinent merely to an ancillary issue in the litigation, not essential to the maintenance of the litigant's claim, or obtainable through an alternative source, disclosure may not be compelled .... Id. These requirements subsequently were

incorporated into an amended Civil Rights Law § 79–h, which affords an absolute privilege for confidential news gathering materials, N.Y. Civ. Rights Law § 79–h(b), and a qualified privilege for non-confidential news gathering materials. N.Y. Civ. Rights Law § 79–h ( c). To overcome the privilege for non-confidential materials, the party seeking the evidence still must meet the statute's three-pronged test formulated by the Court of Appeals (see CBS Inc. v. Vacco, 232 A.D.2d 291, 292, 648 N.Y.S.2d 443 (1st Dept. 1996). Respondent, Sheldon Adelson has not shown why he is entitled to the material sought, nor the deposition he seeks under any of these criteria.

Under the factual circumstances presented in this case, it is the finding of the Court that Mr. Adelson has failed to overcome the qualified privilege for non-confidential news gathering material. This Court does not find that the material sought is highly material and critical to Mr. Adelson's Florida defamation action. Even assuming that Mr. Adelson has met the first two prongs of the tripartite test for disclosure of unpublished nonconfidential news under the Shield Law ("highly material and relevant" and "critical or necessary to the maintenance" of the Florida action), he fails to demonstrate that such information is "not obtainable from any alternative source," to wit, Mr. Jacobs himself.

FILED

MAY [illegible] 2013

NEW YORK
COUNTY CLERK'S OFFICE

Accordingly, it is

ORDERED that petitioner's motion to quash the subpoena and a protective order to prevent the deposition that respondent seeks is granted.

Dated: 5/28/13

So Ordered

Donna M. Mills, J.S.C.

DONNA M. MILLS, J.S.C.