*Adelson v. Harris, et al.,*
SDNY Case No. 12 Civ 6052 (JPO)

# Declaration of L. Lin Wood

# Exhibit D

## IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | |
|---|---|
| DANIEL M. SNYDER, | |
| **Plaintiff,** | |
| v. | Civil Action No. 2011 CA 003168 B <br> Judge Todd E. Edelman |
| CREATIVE LOAFING, INC., CL WASHINGTON, INC. (d/b/a WASHINGTON CITY PAPER); and DAVE MCKENNA, | Next court date: July 29, 2011 <br> Event:  Initial scheduling conference |
| **Defendants.** | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## SPECIAL MOTION TO DISMISS THE COMPLAINT

Bruce D. Brown (D.C. Bar No. 457317)
Mark I. Bailen (D.C. Bar No. 459623)
BAKER & HOSTETLER, L.L.P.
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5304
Telephone: (202) 861-1660
Facsimile: (202) 861-1783
bbrown@bakerlaw.com;
mbailen@bakerlaw.com

*Counsel for Defendant Dave McKenna*

Seth D. Berlin (D.C. Bar No. 433611)
Jay Ward Brown (D.C. Bar No. 437686)
Alia L. Smith (D.C. Bar No. 992629)
LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.
1050 Seventeenth Street, N.W., Suite 800
Washington, D.C.  20036
Telephone: (202) 508-1100
Facsimile: (202) 861-9888
sberlin@lskslaw.com; jbrown@lskslaw.com,
asmith@lskslaw.com

David M. Snyder (*pro hac vice pending*)
DAVID M. SNYDER, P.A.
1810 S. MacDill Avenue, Suite 4
Tampa, FL  33629-5960
Telephone: (813) 258-4501
Facsimile: (813) 258-4402
dmsnyder@dms-law.com

*Counsel for Defendant CL Washington, Inc.*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

FACTUAL BACKGROUND ....................................................................................... 2

I.   THE PARTIES AND EVENTS LEADING TO
     PUBLICATION OF THE COMMENTARY
     AT ISSUE ............................................................................................... 2

II.  THE COMMENTARY AT ISSUE ........................................................... 4

III. MR. SNYDER'S POST-PUBLICATION CONDUCT ................................ 8

IV.  THE COMPLAINT IN THIS ACTION ...................................................... 11

V.   THE EVENTS UNDERLYING THE PARTICULAR
     PASSAGES OF THE COMMENTARY ALLEGED BY
     MR. SNYDER TO BE FALSE AND DEFAMATORY .............................. 12

     A.   Forgery/Slamming at Snyder Communications .................. 13

     B.   Cutting Protected Trees/"Going All Agent Orange"
          on Protected Land............................................................. 16

     C.   "Tossed Off" The Six Flags Board ...................................... 17

ARGUMENT ............................................................................................................ 19

I.   THE ANTI-SLAPP ACT APPLIES TO THIS SUIT...................................... 19

     A.   Plaintiff's Claims Trigger The Immunity Afforded
          By The Anti-SLAPP Act Because They Arise From
          An Act in Furtherance Of The Right Of Advocacy
          On Issues Of Public Interest ............................................... 22

     B.   To Overcome the Statutory Immunity And Thereby
          Avoid Dismissal Of His Lawsuit, Mr. Snyder Must
          Shoulder The Burden Of Demonstrating That He Is
          Likely To Succeed On The Merits Of His Claims................. 23

II.    MR. SNYDER CANNOT CARRY HIS BURDEN OF
       DEMONSTRATING HE IS LIKELY TO SUCCEED
       ON THE MERITS OF HIS CLAIMS.................................................. 24

       A.    "That's the Dan Snyder Who Got Caught
             Forging Names As A Telemarketer With
             Snyder Communications"................................................ 25

             1.    The passage is non-actionable rhetorical hyperbole .............. 25

             2.    The "forging names" passage also is not actionable
                   because Mr. Snyder cannot carry his burden of
                   proving it *materially* false ........................................ 31

       B.    Mr. Snyder "Made A Great View Of the Potomac River
             For Himself By Going All Agent Orange on Federally
             Protected Lands" and "Cut Down Trees Protected By
             The National Park Service" ............................................ 33

             1.    The "Agent Orange" statement is classic,
                   non-actionable hyperbole ........................................... 33

             2.    Mr. Snyder cannot prove that either the
                   "Agent Orange" or the "protected trees"
                   passage is materially false .......................................... 34

       C.    Mr. Snyder was "Tossed Off" The Six Flags Board ........................... 36

             1.    The "tossed off" comment would be understood
                   by reasonable readers in its hyperbolic sense ........................ 36

             2.    Mr. Snyder cannot prove that the sting of the
                   "tossed off" comment is materially false ..................... 37

             3.    The "tossed off" passage is in any event subject to
                   the common law fair comment privilege ................................. 38

       D.    Even If Any Of The Challenged Passages From The
             Commentary Were Provably And Materially False,
             They Are Nevertheless Non-Actionable Under The
             Subsidiary Meaning Doctrine ............................................ 39

CONCLUSION ............................................................................ 43

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
SPECIAL MOTION TO DISMISS THE COMPLAINT**

In support of their Special Motion to Dismiss filed pursuant to the District of Columbia
Anti-SLAPP Act of 2010, D.C. Code § 16-5502(a), defendants CL Washington, Inc. (d/b/a
*Washington City Paper*) and Dave McKenna respectfully submit the following memorandum of
points and authorities.

## INTRODUCTION

Daniel M. Snyder, a prominent businessman who owns, among other things, the
Washington Redskins football team and a broadcasting company, has filed this defamation
lawsuit in an effort to punish two of his persistent critics, Mr. McKenna and the newspaper for
which he writes, *Washington City Paper*. Mr. Snyder has admitted as much, in his pleading, in
his media appearances, and in public statements by his authorized spokespersons. As
demonstrated below, Mr. Snyder's defamation claims are without merit and would have to be
dismissed in the normal course of litigation in any event. But this is not just any litigation—this
is a SLAPP (Strategic Lawsuit Against Public Participation). The District of Columbia's Anti-
SLAPP Act of 2010, D.C. Code § 16-5501 *et seq.*, was adopted by the Council to ensure that
those who criticize public figures, as Mr. McKenna and *Washington City Paper* did here, are not
intimidated into silence by plaintiffs like Mr. Snyder whose avowed agenda is to stifle their
critics by imposing on them enormous litigation costs, rather than to recover fair compensation
for some actual injury.[1]  Indeed, as the Council's Committee on Public Safety and the Judiciary

---

[1] This is not just *Washington City Paper's* view. As Congressman Steve Cohen, a sponsor of
proposed federal legislation analogous to the D.C. Anti-SLAPP Act, recently explained:

> The City Paper's column was admittedly harsh but well within the bounds of
> free speech, especially about a public figure. Snyder was understandably
> angry, but instead of fighting speech with more speech, he chose to use the
> courts for his personal revenge. Whatever you may think of Snyder and the
> Redskins, the courts are not the appropriate forum for resolving these sort of
> grudges. . . . This is exactly what SLAPPs are all about. They are used to
> silence and harass critics by forcing them to spend countless time and
> resources defending against them. SLAPPs use the courts as a weapon to

explained when it reported the bill, the Anti-SLAPP Act exists to put a swift end to lawsuits such as this one, "the goal of [which] is not to win . . . but punish the opponent and intimidate them into silence," in other words, cases in which "'*litigation itself* is the plaintiff's weapon of choice.'"  Committee Report on Bill 18-893 (Nov. 18, 2010) at 4 (citation omitted) (emphasis in original).[2]

The Anti-SLAPP Act immunizes from liability speech about public figures or otherwise addressing matters of public concern such as the commentary about Mr. Snyder published by *Washington City Paper* that is at issue here.  Precisely in order to prevent plaintiffs like Mr. Snyder from inflicting "revenge" in the form of crippling defense costs and onerous discovery, the Anti-SLAPP Act stays all discovery and requires that the Court promptly dismiss a SLAPP suit such as this one, and it provides for recovery by *Washington City Paper* and Mr. McKenna of their attorneys' fees and costs.  Only if Mr. Snyder were able to carry the heavy burden of demonstrating to this Court that he is "*likely* to succeed on the merits" of his defamation claims could this suit be permitted to proceed.  For the multiple reasons set forth below, Mr. Snyder's claims fail as a matter of law.

## FACTUAL BACKGROUND

## I.   THE PARTIES AND EVENTS LEADING TO PUBLICATION OF THE COMMENTARY AT ISSUE

Daniel M. Snyder has been making headlines, some favorable, some not, in the business, sports, philanthropic and cultural arenas for years.  He is, by his own account, a "prominent member of the community" and a "public figure."  Compl. ¶ 1.  During his career, he has owned

---

stifle participation in government and chill expression about matters of public interest.

S. Cohen, "Cohen: Protect Free Speech by Combating SLAPPs," *Roll Call* (May 23, 2011) (copy attached as Ex. 25 to the accompanying Affidavit of Alia L. Smith, Esq. ("Smith Aff.")).

[2] Copies of the Anti-SLAPP Act and the Committee Report are attached to the Smith Affidavit as Exs. 26 and 27, respectively.  The Act as codified is not yet available in the usual databases.  It can be found as Act 18-701, 2010 D.C. Laws 18-351, available at https://web2.westlaw.com (search "DC LEGIS 18-351 (2010)").

or managed multiple high-profile businesses, including publicly traded companies, some successfully, some not.  Among his current holdings are a private equity fund and a broadcasting company.  *Id.* ¶ 2.  His "most recognized investment," however, was his purchase in 1999 of the Washington Redskins football franchise and its stadium.  *Id.* ¶ 4.  Because of his status as a public figure, and particularly because of his ownership of the Redskins, Mr. Snyder acknowledges that he necessarily "will be the subject of constant attention and scrutiny," and he claims that he "accepts the right of the public and the press to criticize him or to express personal dislike, whether or not such expressions are justified by the facts."  *Id.* ¶¶ 1, 4.

The 30-year-old *Washington City Paper* is a member of that genre of newspapers known as "alternative newsweeklies."  As the website of their trade association explains, although there is a variety in styles among such newspapers, "[w]hat ties them together are a strong focus on local news, culture and the arts; *an informal and sometimes profane style; an emphasis on point-of-view reporting and narrative journalism*; a tolerance for individual freedoms and social differences; and an eagerness to report on issues and communities that many mainstream media outlets ignore."  Affidavit of Alia L. Smith, Esq. ("Smith Aff.") ¶ 5 & Ex. 3 (emphasis added).[3] Wikipedia similarly describes the "alternative newspaper" genre as featuring that "type of newspaper, usually published weekly or every other week, that eschews comprehensive coverage of general news in favor of *stylized reporting, opinionated reviews and columns*, investigations into edgy topics and magazine-style feature stories highlighting local people and culture."  *Id.* ¶ 6 & Ex. 4 (emphasis added).

For his part, *Washington City Paper* columnist Dave McKenna is an experienced journalist whose work has appeared locally and nationally, including in *The New York Times* and *The New Yorker*, and who has been recognized by both his peers and the public as an outstanding columnist.  Smith Aff. ¶¶ 11-12 & Exs. 9-10.  In recent years, Mr. McKenna has become

---

[3] The Smith Affidavit is divided into two parts:  Part I (paragraphs 2 - 81 and Exhibits 1 - 80) places before the Court copies of the exhibits referred to herein.  Part II (paragraphs 82 - 211 and Exhibits 81- 204) places before the Court additional exhibits specifically relevant to the argument set forth in Section II.D *infra*.

especially familiar to local readers as the author of "Cheap Seats," a regular feature column in *Washington City Paper* devoted broadly to the topic of sports in D.C. As the author of "Cheap Seats," Mr. McKenna is particularly known for beating loudly the drums of discontent, having been, for example, described by an editor of *The Atlantic* as simultaneously a "penetrating sports writer" and "crochety." Smith Aff. ¶ 10 & Ex. 8; *see also, e.g.,* Carl Bialik, "Fix Favorites: August," *WSJ.com* (Sept. 2, 2008) (McKenna, author of a string of "verbal grenade[s]," is known for "his signature mix of irony and outrage") (copy attached to Smith Aff. as Ex. 7). Given the cultural importance of the Redskins to the Washington area and the litany of controversial decisions made by Mr. Snyder as the team's owner, Mr. McKenna has written, and *Washington City Paper* has published, quite a lot about Mr. Snyder over the years. *See, e.g.,* Compl. ¶¶ 6, 18-19. Mr. McKenna has a point of view about Mr. Snyder, and it generally is not a favorable one. *See id.* Mr. McKenna is, however, far from the only commentator to have criticized Mr. Snyder in print or over the air.

Apparently wishing to blunt some of the criticisms leveled at him in the press, however, in Fall 2010, numerous media outlets began reporting that Mr. Snyder, his new press spokesperson and other of his representatives were generating a new narrative, suggesting that Mr. Snyder had undergone a transformation in his approach to managing the Redskins and was now a "new man." *See* Smith Aff. ¶¶ 83-85 & Exs. 81-83. In response to this reported "re-birth," Mr. McKenna authored a work of commentary in *Washington City Paper* that reflected "fondly" (from the perspective of a "Cranky Redskins Fan") on the "old" Dan Snyder.

## II.    THE COMMENTARY AT ISSUE

While the content of the Commentary at issue speaks for itself, *see* Smith Aff. Ex. 1 (copy of Commentary as published), a brief description of it is useful. The Commentary is the cover story of the issue of *Washington City Paper* dated November 19, 2011. It also was published on the newspaper's website. The cover includes a headline, "The Cranky Redskins Fan's Guide to DAN SNYDER," Mr. McKenna's byline, and a photograph of Mr. Snyder. Scribbled onto the photo—in the style of a high school "nerd" defacing the quarterback's

yearbook photograph—are horns, a unibrow, a mustache and beard. *Id.* at 1. The same artwork accompanies the web version of the article, which includes an expanded headline, "The Cranky Redskins Fan's Guide to Dan Snyder From A to Z (for Zorn), an encyclopedia of the owner's many failings." Compl. Ex. C. In the newspaper, on the first page of the article itself, a second photo illustration appears, in which more scribbling covers another photo of Mr. Snyder. Smith Aff. Ex. 1 at 16. Except for the fact that a "Tank McNamara" cartoon is reproduced only in the newspaper, the print and online versions of the Commentary are otherwise substantively the same.

The Commentary begins with a four-paragraph introduction, the content of which is sufficiently relevant to quote in full here:

> We've been told a New Dan Snyder walks among us. The line that's been in heavy rotation out of Redskins Park (and Snyder's wholly-owned media empire) all season holds that he's letting football people run the football team. His wife, Tanya Snyder, is out selling the transformation, too. Last week she went on local TV to tell an interviewer that he is now surrounded by "better people," and that he's "grown and he's evolved."
>
> Well, maybe his wife can find evidence of Snyder's growth and evolution. I can't. Sure, some names have changed—Jeff George and Bruce Smith are now Donovan McNabb and Albert Haynesworth—but the ages and the bonuses have a familiar ring. So do the results: The epic humiliation of the Redskins on national television Monday night, coming mere hours after McNabb signed a mega-publicized deal with a dubious dollar value, recalls so many pages in the old Snyder's scrapbook.
>
> So, before we welcome the New Dan Snyder, let's look back at the one we know. That's the Dan Snyder who left his mark, or stain, on more than just a football team. That's the Dan Snyder who got caught forging names as a telemarketer with Snyder Communications, made a great view of the Potomac River for himself by going all Agent Orange on federally protected lands, and lost over $121 million of Bill Gates' money while selling an "official mattress" while in charge of Six Flags. That's the Dan Snyder I've found to be the most fascinating and consistent man on the planet, responsible for the hilarious and/or heinous deeds outlined in the following pages.
>
> If he's really gone, I'm gonna miss that guy.

Smith Aff. Ex. 1 at 17.

What follows in the Commentary is a recounting, essentially in bullet-point format, of an "A to Z" of things about the "old" Dan Snyder that Mr. McKenna finds "hilarious and/or heinous." As the hyperlinks to previously published works—by Mr. McKenna and others—that copiously document the online version of the Commentary make clear, Mr. McKenna in the Commentary is reviewing the past public controversies that have made Mr. Snyder such a controversial figure. These previously reported incidents range from "B" for "Bankrupt Airline Peanuts," involving the sale at FedEx Field of peanuts that had passed their freshness date, *id.*; to "E" for "EWWWWW!," an incident in which vendors at FedEx Field sold beer inside the bathrooms, much to the consternation of the spokeswoman for the American Society of Microbiology, *id.*; through "S" for "Smith, Bruce, Read End Of," which, Mr. McKenna recounts, is the only thing fans who bought certain "premium" seats at FedEx Field "had a great look at," *id.* at 22.

The controversies recounted in the Commentary include less frivolous matters as well. Among them are Mr. McKenna's review of previously published allegations that Mr. Snyder, directly or through his companies:

- sought to "skirt congressional gift limits" by the way he priced and marketed low-cost tickets that afforded access to luxury seats, *id.* at 17;

- attempted to "end-run" television network prohibitions on advertising alcohol in order to increase revenue, *id.* at 17-18;

- repeatedly pressured employees to forfeit valuable compensation they were owed under their contracts, *id.* at 20;

- oversold notes in one of his companies that led Moody's rating service to label the debt "junk," *id.*;

- violated labor laws, once with respect to his family's nanny and also with respect to Redskins ticket office employees, *id.*;

- flouted state smoking regulations by operating a bar and permitting smoking in it, *id.*;

- falsely raised safety concerns to convince two jurisdictions to adopt no-pedestrian laws near his companies' facilities, in connection with which he sharply raised parking charges at those facilities, *id.* at 22; and

- deliberately defaulted on a lease for a training camp in order to hold practice at a location where he could generate greater revenue, *id.*

But of all the humorous and not-so-funny incidents involving Mr. Snyder recounted in the Commentary, Mr. Snyder challenges in this suit only three. The full passages of the Commentary pertaining to the challenged criticisms (some of which context Mr. Snyder omits from his Complaint) are quoted here in full, with ***emphasis*** to indicate the portions Mr. Snyder claims defame him (portions not emphasized are not challenged by Mr. Snyder):

> So, before we welcome the New Dan Snyder, let's look back at the one we know. That's the Dan Snyder who left his mark, or stain, on more than just a football team. ***That's the Dan Snyder who got caught forging names as a telemarketer with Snyder Communications, made a great view of the Potomac River for himself by going all Agent Orange on federally protected lands***, and lost over $121 million of Bill Gates' money while selling an "official mattress" while in charge of Six Flags. That's the Dan Snyder I've found to be the most fascinating and consistent man on the planet, responsible for the hilarious and/or heinous deeds outlined in the following pages.
>
> \* \* \*
>
> **Gates, Bill:** Formerly world's richest man. But he's not as rich as he would be had he not done business with Snyder. One of Six Flags' biggest stockholders, Gates had 10,210,600 shares worth about $122 million in early 2006, when Snyder began putting his marketing team in place. They were worth $0—zilch, zip, nada—by the time ***Snyder was tossed off the board*** last year. "Bill Gates gives away more money than anybody, and his main cause is malaria," said a representative of Resilient Capital Management, a hedge fund and Six Flags investor, which sued to have Snyder removed from the company for fiduciary irresponsibility. "That was money that could have gone to save kids from malaria."
>
> \* \* \*
>
> **Official Mattress of Six Flags:** Anatomic Global. Over time, Snyder had shown his sponsorship mania by inking deals that gave Six Flags an official mayonnaise and the Redskins an official carpet installer. In June 2009, weeks after the theme park chain filed for bankruptcy, Snyder signed a deal for an official mattress. In the few months before his removal from the board, Snyder actually started selling the mattresses at his theme parks ($1,299 for a queen size).
>
> \* \* \*
>
> **Slamming:** The illegal practice of switching a customer's telephone service without authorization. Florida authorities fined Snyder's pre-Redskins outfit, Snyder Communications, $3.1 million in 2001 after

investigators uncovered more slamming in its offices than you'd find
stagefront at a Limp Bizkit show.

* * *

**Unobstructed View:**  What Snyder wanted of the Potomac River from
the back of his Montgomery County home.  To accomplish this, he ___cut
down trees protected by the National Park Service___.  The episode
marked one of the rare times that Snyder got crisis PR help.  He
retained Mike Sitrick, who helped with damage control for the
Michael Jackson family after the pop star's death and Paris Hilton
after one of her arrests.

Smith Aff. Ex. 1 at 17, 18, 20, 22.

## III.   MR. SNYDER'S POST-PUBLICATION CONDUCT

Two weeks after the Commentary was published, the Redskins' General Counsel, David

Donovan, sent a demand letter—not to *Washington City Paper*, not to Mr. McKenna, not even to

*Washington City Paper's* corporate parent, Creative Loafing, Inc., but to Atalaya Capital

Management, LP, a private equity investment firm that is the owner, through the portfolios it

manages, of *Washington City Paper's* corporate parent.  Compl. Ex. D (copy of letter); *see also*

Smith Aff. ¶ 15 & Ex. 13.  In the letter, Mr. Donovan states that he is writing on behalf of

Mr. Snyder and then catalogs numerous supposedly false and defamatory passages in the

Commentary, including that the Commentary "demeaned" Mr. Snyder's wife's breast cancer

awareness campaign; that it charged Mr. Snyder with forgery; that it "accus[ed] . . . Mr. Snyder

[of] caus[ing] herbicides to be used to destroy trees on 'federally protected lands'"; that it

characterized Mr. Snyder's low-price Redskins ticketing scheme as being intended to skirt

congressional gift limits; that it labeled Mr. Snyder as having a "mania" for "official

sponsorship" deals; and that it said that he had been removed from the Six Flags board, that he

profited from sales of a Redskins 9/11 memorial cap, that he cited 9/11 as the reason for adding a

security surcharge to ticket prices, and that he had used safety as an excuse to obtain an off-site

parking ban near a Six Flags amusement park.  *Id.*  (As will appear below, the lion's share of

these purportedly false passages are not actually sued upon by Mr. Snyder and many of them are

not even contained in the Commentary, including the allegations regarding Mr. Snyder's wife.)

Eventually, in his letter, Mr. Donovan gets down to brass tacks:

8

> Mr. Snyder has more than sufficient means to protect his reputation
> and defend himself and his wife against your paper's concerted
> attempt at character assassination. We presume that defending such
> litigation would not be a rational strategy for an investment fund such
> as yours. Indeed, the cost of litigation would presumably quickly
> outstrip the asset value of the Washington City Paper.

Compl. Ex. D at 3; Smith Aff. Ex. 13 at 3.

In response, by letter from its counsel dated December 7, 2010, Atalaya Capital

Management explained why Mr. Snyder's claims regarding the Commentary were legally

unsound, but nevertheless acknowledged Mr. Snyder's "personal outrage and offense" over the

Commentary, offered to meet with him, and suggested that he publish a response to the

Commentary in the pages of *Washington City Paper*. Smith Aff. ¶ 16 & Ex. 14 at 2-3. In that

regard, in a public letter to readers posted online on February 2, 2011, the publisher of

*Washington City Paper* reported that the paper had offered to publish a response by Mr. Snyder

to the Commentary:

> [W]e have offered Snyder the opportunity to publish a guest column
> responding to the article, we proposed that he meet with our editor to
> discuss his concerns, and we invited him to provide information
> demonstrating that what we published was false. If we were to
> conclude we got something wrong, we would correct it. We also
> emphatically reject the suggestion that we stop reporting on Snyder or
> that we pull McKenna, who has written for *Washington City Paper*
> since 1986, from reporting on Snyder and/or the Redskins.

Smith Aff. ¶ 17 & Ex. 15.

On that same day, however, Mr. Snyder filed suit in New York State Court against

Atalaya Capital Management and *Washington City Paper*'s Florida-based parent corporation. *Id.*

¶ 34 & Ex. 28. Neither *Washington City Paper* nor Mr. McKenna were named as defendants in

that suit, which was self-evidently intended to bring pressure on investors in the ultimate

corporate parent of the newspaper company to stifle both the newspaper and Mr. McKenna. In

his New York suit, Mr. Snyder continued to maintain that the Commentary "demean[ed]" his

wife's breast cancer awareness campaign and that the Commentary falsely charged him with

forging names as a telemarketer, said he had been thrown or tossed off a board of directors, that

he used Agent Orange to destroy protected trees, and that he had "'bragged' that his wealth came

by taking advantage of cancer victims." *Id.* His New York complaint also devoted significant attention to the artwork accompanying the Commentary, which Mr. Snyder alleged constituted an anti-Semitic slur. (As will appear, many of these allegations are omitted in the present suit).

Shortly thereafter, Mr. Snyder withdrew his Complaint in the New York action and embarked on a public relations offensive apparently designed to explain why he had done so and why he had decided to institute litigation in this Court against the newspaper and Mr. McKenna. Mr. Snyder personally made multiple appearances on television and radio in which he gave his side of the story. *See* Smith Aff. ¶¶ 21, 30 (providing hyperlinks to online video/audio of interviews). Redskins Director of Communications Tony Wyllie, whom Mr. Snyder has credited publicly as the man who recommended he sue *Washington City Paper*, *id.* ¶ 20 & Ex. 18, also has spoken on behalf of Mr. Snyder during public appearances and in press interviews, *e.g.,* *id.* ¶¶ 24, 29. At one such appearance, a panel discussion at the University of Maryland entitled "Ethics in Sports Media," Mr. Wyllie bluntly explained the purpose of the lawsuit: "Some people ask, 'Well, are you firing a warning shot to other members of the media? And I'd probably say 'yes.'" *Id.* ¶ 22 & Ex. 19 (a post on *Washington Post*'s Sports Bog blog, which also reported Snyder's comments during Super Bowl week that his decision to sue was based on Wyllie's advice, and that, at panel discussion, Wyllie had added, "'We're not trying to make anyone afraid; we just want people to do what's right.'").

In addition to Mr. Wyllie, Mr. Snyder's various lawyers, including Mr. Donovan and his litigation counsel, Patricia Glaser, have appeared on local broadcasts to present Mr. Snyder's views regarding the Commentary and have conducted press conferences to advance his version of events, resulting in numerous news stories in varied outlets. *See id.* ¶¶ 24, 26 (providing hyperlinks to online audio of interviews) & Exs. 21, 22-23 (copies of print reports of interviews). Mr. Snyder also authored an Op-Ed piece published in the *Washington Post* on April 25, 2011, in which he explained his reasons for filing suit and recounted his objections to the Commentary. Smith Aff. ¶ 19 & Ex. 17.

Mr. Snyder filed the present lawsuit in this Court the next day. Promptly after serving the Complaint, Mr. Snyder also noticed the depositions of Mr. McKenna, the editor and the publisher of *Washington City Paper*, and served on the defendants voluminous requests for production of documents: Quite literally, Mr. Snyder has demanded that each of the defendants produce *every* document in *any* way related to *anything* Mr. McKenna has *ever* written about Mr. Snyder, and anything relating to any communication any of the defendants have ever had with anyone (including other reporters) regarding either Mr. Snyder or his wife. Smith Aff. ¶¶ 37-38 & Exs. 31-32.[4]

## IV.    THE COMPLAINT IN THIS ACTION

At the outset of his Complaint in this action, Mr. Snyder indulges in considerable scene-setting, describing himself and his associates generally in glowing terms, and characterizing Mr. McKenna and *Washington City Paper* in derogatory ones. *See, e.g.*, Compl. ¶¶ 2-3, 6. Laying aside the irony of a defamation plaintiff using his pleading to disparage the defendants, it does not seem useful to recount in detail these throat-clearing allegations. Suffice to say that, before getting to the operative portion of his Complaint, Mr. Snyder concedes that he is a public figure, *id.* ¶ 1, and he acknowledges both that hearty criticism comes with the territory, particularly when the public figure is the owner of an NFL football team, *id.* ¶¶ 1, 4, and that "harsh personal and professional criticism [has often been] leveled against him" ever since he bought the Redskins, *id.* ¶ 5.

Although Mr. Snyder alleges generally that the Commentary contained "numerous" falsehoods about him, *id.* ¶ 20, his actual claims are quite specific—and limited. As indicated in

---

[4] Mr. Snyder also appears intent on using this lawsuit to send a message to at least one other frequent critic, *Washington Post* reporter and blogger Dan Steinberg: Promptly after filing the Complaint, Mr. Snyder served third-party subpoenas on both the *Post* and Mr. Steinberg, noticing his deposition and demanding that both he and his employer produce for inspection *every* document regarding *every* communication Mr. Steinberg has *ever* had with Mr. McKenna about *anything* Mr. McKenna has *ever* written about Mr. Snyder and any other communications they have had about either Mr. Snyder or his wife. Smith Aff. ¶¶ 39-40 & Exs. 33-34. Under the Anti-SLAPP Act, this special motion to dismiss has the effect of staying that discovery. D.C. Code § 16-5502(c)(1).

the emphasized portions of the quotations from the Commentary set out *supra*, Mr. Snyder's

defamation claims are premised on three specific sets of statements in the Commentary:

> 1. that "'Dan Snyder . . . got caught forging names as a telemarketer with Snyder Communications,'"
>
> 2. that Mr. Snyder "'cut down trees protected by the National Park Service,' and 'made a great view of the Potomac river for himself by going all Agent Orange on federally protected lands,'" and
>
> 3. that he "was 'tossed off' the Six Flags' board of directors[.]"

*Id.* ¶ 21.  In his First Cause of Action, Mr. Snyder alleges that each of these three "statements" is

false and defamatory, and that they each constitute defamation *per se* because they accuse him of

crimes of moral turpitude or have a tendency to injure him in his business.  *Id.* ¶ 27.  In his

Second Cause of Action, Mr. Snyder alleges that these same three purportedly false statements,

coupled with the allegedly "anti-Semitic" cover artwork, give rise to the false implication "that

Mr. Snyder is a dishonest, unethical businessman who habitually engages in misconduct and

fraud."  *Id.* ¶ 32.

With respect to each cause of action, Mr. Snyder seeks "general and special" damages in

excess of $1 million, as well as exemplary and punitive damages "to punish" Mr. McKenna and

*Washington City Paper* "and to deter such conduct in the future."  *Id.* ¶¶ 29-30, 35-36.

Mr. Snyder's Complaint emphasizes that any such award is not be used to repair any actual

injury sustained by him, but rather will be contributed "to groups that are devoted to assisting the

homeless."  *Id.* ¶ 1.

## V.   THE EVENTS UNDERLYING THE PARTICULAR PASSAGES OF THE COMMENTARY ALLEGED BY MR. SNYDER TO BE FALSE AND DEFAMATORY

The Commentary did not purport to be an exhaustive report on any of the subjects

addressed.  Indeed, Mr. McKenna expressly stated in its introduction that he was undertaking

only to "outline" the broad range of incidents that made the "old" Dan Snyder, in his view, "the

most fascinating and consistent man on the planet."  Smith Aff. Ex. 1 at 17.  Although the

defendants are not required to make any showing on the merits at this juncture—as that is

Mr. Snyder's burden under the Anti-SLAPP Act if he wishes to attempt to avoid dismissal—a review of the public record underlying the incidents referred to in the three passages he challenges is appropriate to underscore that he cannot satisfy that burden.

### A.    Forgery/Slamming at Snyder Communications

Snyder Communications was owned by Mr. Snyder from 1990 to 2000. *Id.* Exs. 13, 35. In 1997, Snyder Communications was hired by GTE Corporation (now known as Verizon) to market the telephone company's services, including to Snyder Communications' "proprietary database of more than 20 million multi-cultural households." *Id.* ¶ 41, Ex. 35. Mr. Snyder himself emphasized the importance of the GTE contract to his company, announcing in a press release that, "[u]nder this agreement we will build on the tremendous successes we have had using our field sales and database marketing capabilities to help a growing number of leading consumer products and services companies increase their market share." *Id.* As became apparent almost immediately, however, Snyder Communications' "field sales and database marketing capabilities" included heavy reliance on the illegal practice known as "slamming"— that is, the switching of a person's telephone service provider without authorization.

Specifically, shortly after Snyder Communications (and its affiliates Snyder Direct Services, Inc. and Snyder Communications, LP) began performing under the GTE contract, the State of Florida undertook to investigate complaints that the companies were "slamming" prospective GTE customers. *Id.* ¶¶ 42-43 & Exs. 36-37. The Florida Office of the Attorney General in particular investigated conduct at the Snyder companies occurring during 1998 and 1999 (while Mr. Snyder owned and controlled the eponymously named companies). *Id.* Following Mr. Snyder's departure from the Snyder companies, GTE and the companies settled the matter, agreeing to pay the State of Florida a total of $3.1 million, $2.5 million of which was to be paid by Snyder Communications and Verizon collectively "for actions attributable to Snyder representatives" and $600,000 to be paid by Verizon for conduct of GTE's employees. *Id.*

In addition, Snyder Communication agreed not to provide any marketing services for long distance carriers within Florida for ten years, while the specific division of the Snyder companies responsible for the slamming in Florida was required to "shut down and forever cease all operations in Florida." *Id.* ¶ 43 & Ex. 37. As part of the settlement, the new owners of the Snyder companies were further required to represent and warrant that "neither Michele D. Snyder [Mr. Snyder's sister, and President and Chief Operating Officer of Snyder Communications] nor Daniel M. Snyder is a director, employee, partner, or an officer" of the Snyder companies and that "neither Michele D. Snyder nor Daniel M. Snyder currently has any managerial duties or controlling interest with respect to" the Snyder companies. *Id.* Ex. 36 at 3.

In support of the allegations that led to this settlement, the Attorney General stated publicly that, "in the case of Snyder Communications, our investigation revealed thousands of instances in which the marketing agent's representatives *forged customers' signatures* to switch them to GTE long-distance." *Id.* Ex. 37 (emphasis added). Among the evidence gathered by the Attorney General was the testimony, under oath, of Ruben Rios, a District Manager for the Snyder companies. As reflected in the transcript of the Attorney General's interview of Mr. Rios, he admitted that Snyder Communications had closed down its Sarasota and West Palm Beach offices as early as 1998 because of the large number of complaints of slamming attributed to those offices and that "there were problems in all of the offices" in South Florida. *Id.* ¶ 44 & Ex. 38 at 35 (part 1).[5] Mr. Rios testified that he personally terminated approximately three-to-four Snyder sales associates *per week* for *forging signatures*. *Id.* Ex. 44 at 14-15 (part 2). When asked whether Dan Snyder was aware of the slamming going on in Florida, Mr. Rios testified,

---

[5] Indeed, Mr. Rios testified, Snyder Communications hired as telemarketers persons who had previously worked at cemeteries or funeral homes who then used deceased individuals' Social Security numbers that they obtained through their prior employment to achieve their sales quotas by slamming. Smith Aff. ¶ 44 & Ex. 38 at 32 (part 1), 21 (part 2). One news report at the time explained that Snyder Communications personnel so often forged dead peoples' names on service orders that GTE ultimately included "a 'deceased' category on [its] form for handling slamming complaints." Smith Aff. ¶ 59 & Ex. 55.

"I'm sure he knew.  He had to have known."  *Id.* Ex. 38 at 62-63 (part 2).[6]  Indeed, a news report at the time pointed out that the record in one of the government proceedings showed that GTE had not condoned the actions of Snyder Communications: "Just the opposite.  GTE officers met with Snyder repeatedly and imposed new policy after new policy.  By November 1998, GTE told Snyder to stop selling long distance.  The next month, GTE officials notified the state – they turned themselves in."  Smith Aff. ¶ 59 & Ex. 55.[7]

Separately, the Florida Public Service Commission opened its own investigation.  In 1999 (while Mr. Snyder still owned and controlled the Snyder companies), GTE advised the Commission that "substantially all of . . . the slamming complaints" against it "arose from the activity of . . . Snyder Communications, Inc."  *Id.* ¶ 52 & Ex. 48.  When GTE offered to settle the matter for $209,000, the Florida Office of Public Counsel objected, arguing that "the penalty should be higher because Snyder Communications 'was involved in forgery of customer signatures.'"  *Id.* ¶ 53, Ex. 49 (news article quoting Public Counsel).  In its Prehearing Statement before the Commission, the Public Counsel charged that GTE/Verizon had "allowed its agent Snyder Communications, Inc. to forge the signatures of thousands of Floridians during 1998 and to commit other fraudulent acts."  *Id.* ¶ 54 & Ex. 50 at 2-3.  GTE ultimately settled with the Commission for $1.1 million.  *Id.* ¶ 57 & Ex. 53.  The allegations against the Snyder companies by these Florida agencies were widely reported in the press during this period.  *Id.* ¶¶ 48-51, 53, 59-60 & Exs. 42-47, 49, 55-59.

---

[6] In fact, as early as 1998, representatives of GTE met personally with Mr. Snyder's sister to address the high level of customer complaints to regulators, which GTE concluded "create an unacceptable level of exposure for both GTE and Snyder."  Smith Aff. ¶ 46 & Ex. 40.  Ms. Snyder advised she would "solve this issue promptly, even if it means temporarily reducing the sales force in Florida in order to assure ourselves that we are building the business only with high quality management and sales personnel.  If we ultimately conclude that sufficiently high quality cannot be achieved at this time in Florida, we will even consider completely phasing out our sales force in Florida until we can develop a better solution."  Smith Aff. ¶ 45 and Ex. 39.

[7] By contrast, the Attorney General's Office wrote to counsel for Snyder Direct Services to complain that "Snyder has been everything but accommodating and cooperative in our investigation."  Smith Aff. ¶ 47 & 41.

**B.      Cutting Protected Trees/"Going All Agent Orange" on Protected Land**

On January 19, 2006, the Office of the Inspector General of the U.S. Department of the
Interior issued a report titled "Investigative Report on Allegations that the National Park Service
Improperly Allowed Daniel Snyder to Cut Trees *on Government Land*."  *See* Smith Aff. ¶ 61 &
Ex. 60 (emphasis added).[8]  As set forth in more detail in the report, in 2004, officials of the
National Park Service improperly permitted Mr. Snyder to clear trees from more than 40,000
square feet of the land between his Potomac estate and the C&O Canal to help clear his view of
the Potomac River.  *Id.* Ex. 60 at 2-5, 11.  The trees were located on land owned by Mr. Snyder
that is subject to an easement running in favor of the National Park Service and the C&O Canal
National Historic Park, a unit of the National Park Service.  *Id.* at 4-5.  That easement grants,
among other things, the Park Service the right to control the cutting of trees on the subject land.
*Id.*

The Inspector General concluded that the National Park Service's decision to grant
Snyder permission to cut the trees—the only instance in which the Park Service has given such
permission to anyone in the 30-year history of the almost 200 such easements in question—was
the product of "undue influence" by a high-ranking official who "inappropriately used his
position to apply pressure and circumvent NPS procedures on Snyder's behalf, through his
personal communications with park officials and Mr. Snyder and his representatives."  *Id.* at 2, 3;
*see also id.* at 12-18.  The official's exertion of influence on Mr. Snyder's behalf included at
least one meeting at Mr. Snyder's home with the Park Service official directly responsible for
approving the agreement.  *Id.* at 13.

The land on which the trees were cut also was subject to state and local forestation laws.
*Id.* at 3.  After his neighbors complained that Mr. Snyder had cleared the land in question,

---

[8] In the online version, the passage in the Commentary referring to this incident contains a
hyperlink to a *Washington Post* article regarding the report, and that article contains a hyperlink to the
report itself, so a reader of the Commentary could, with two clicks of the mouse, read the entire Inspector
General's report if he or she so chooses.  *See* Smith Aff. ¶ 4.

Montgomery County authorities cited Mr. Snyder for violation of local laws, and Mr. Snyder thereafter entered into a settlement agreement with the Maryland-National Capital Park and Planning Commission, pursuant to which he was required to contribute $37,000 to a forest conservation fund, reforest 1.3 acres of the cleared area, and post a $45,000 bond for future maintenance costs, among other things. *Id.* at 3, 11; *see also* Smith Aff. ¶ 69 & Ex. 68 (copy of settlement agreement between Snyders and Commission).  An internal Commission email points out that Mr. Snyder *knowingly* violated the local forestation laws when he cut down the trees because the Park Service permit expressly was conditioned upon his also obtaining approval from the M-NCPPC and that M-NCPPC had officially notified him that it would not permit him to cut down the trees.  Smith Aff. ¶ 67 & Ex. 66; *see also id.* ¶ 65 & Ex. 64 (letter from Commission to counsel for Mr. Snyder indicating that request to cut trees would require Commission approval and that such approval would not likely be granted), ¶ 66 & Ex. 65 (letter from Park Service to Snyders reminding them that, despite Park Service approval for cutting, they would also need Commission approval), ¶ 68 & Ex. 67 (Commission inspection report noting that, despite Park Service permit, Commission had not granted permission to cut trees).

> ### C.   "Tossed Off" The Six Flags Board

Mr. Snyder became the Chairman of the Board of Six Flags, Inc. in late 2005.  Over the course of the next four years, Six Flags' performance plummeted, with amusement park attendance figures dropping by almost 30 percent.  Smith Aff. ¶ 75 & Ex. 74.  In 2008, the company failed to pay a dividend to holders of certain preferred shares for two consecutive quarters.  *Id.* ¶ 73 & Ex. 72.  The company was subsequently de-listed from the New York Stock Exchange.  *Id.*  When Six Flags could no longer pay interest on its debt (in fairness, debt it held when Mr. Snyder assumed the chairmanship), and could not refinance that debt, it declared bankruptcy in June 2009.  *Id.* ¶ 71 & Ex. 70.

In the proposed reorganization plan filed in the Delaware bankruptcy court by Six Flags' existing management on July 22, 2009, and signed by its then-COO, the post-bankruptcy board of directors would consist of eleven members, "three of whom *shall be* the following current

directors of [Six Flags]: Daniel M. Snyder (who *shall be* designated Chairman of the Postconfirmation Board), Mark Jennings and Dwight Schar." Smith Aff. ¶ 76 & Ex. 75 (emphasis added). In connection with the ongoing bankruptcy proceedings, however, one of Six Flags' major shareholders, Resilient Capital Management, sought by motion filed on February 11, 2010, to have Mr. Snyder removed from the board *immediately* because, Resilient asserted, he and other company managers, were "wholly inappropriate parties to supervise Debtors through this reorganization." *Id.* ¶ 77 & Ex. 76 at 2. In support of its motion, Resilient Capital Management argued that it was the Snyder management team's "incompetence and double dealing that led the company into bankruptcy in the first place," and that its "poor decision-making" not only drove the company into bankruptcy, but left "the business community [with] little or no confidence" in Mr. Snyder and his managers. *Id.* The Official Committee of Unsecured Creditors raised analogous objections on March 1, 2010. *Id.* ¶ 78 & Ex. 77 (objecting that, in original reorganization plan, Snyder management team had "reserved for itself millions of dollars in cash and stock bonuses upon the [company's] exit from bankruptcy").

Subsequently, a revised reorganization plan was filed in the bankruptcy court on April 1, 2010, which, with reference to the only proposed open seat on the initial board of directors, specified "that such remaining director *shall not be* Daniel M. Snyder without the consent of the Majority Backstop Purchasers." *Id.* ¶ 77 & Ex. 78 at 41-42 (emphasis added). That plan, including—verbatim—the restriction on Mr. Snyder's participation in the board, was approved by the bankruptcy court on April 29, 2010. *Id.*; *see also* Smith Aff. ¶ 80 & Ex. 79 (Form 8-K filed with SEC on April 15, 2010, describes plan for post-bankruptcy board and specifies that Mr. Snyder cannot be appointed to board without consent of certain new owners).

News reports at the time generally described Mr. Snyder as being barred from serving on the board unless certain of the company's new owners consented.[9] Thus, Mr. McKenna was

---

[9] For example, the *Washington Post* reported that, "[u]nder the reorganization plan, Snyder could not be reappointed to the board without the consent of those junior bondholders." Smith Aff. ¶ 73 & Ex. 72; *see also*, *e.g.*, *id.* Ex. 71 (*AmLaw Daily* reported that "the current reorganization plan in place states that . . . the company cannot appoint Snyder as a director without the consent of Six Flags' new

hardly alone when, in the May 28, 2010, issue of *Washington City Paper* (published six months before the Commentary at issue in this suit), he described in his characteristically pungent way that Mr. Snyder "got booted out as chairman of the board," and that he "got the official heave-ho." Smith Aff. ¶ 81 & Ex. 80.

**ARGUMENT**

The District of Columbia has enacted legislation the express purpose of which is to ensure the prompt dismissal of lawsuits such as this one. D.C. Code § 16-5501 *et seq.* (Smith Aff. Ex. 26). The Anti-SLAPP Act applies to Mr. Snyder's claims because the authorship and publication of the Commentary plainly are "acts in furtherance of the right of advocacy on issues of public interest," as those terms are defined in the statute. Under the Act, this is all that defendants are required to demonstrate and, upon this showing, the Court is required to dismiss the complaint with prejudice. Mr. Snyder can avoid the immunity conferred by the Act *only* by carrying the heavy burden of demonstrating to this Court that he is "*likely* to succeed on the merits" of his claims. Mr. Snyder is unable to meet his burden with respect to any of the three passages from the Commentary he has placed at issue. As a result, the Act requires that the Court dismiss his claims, promptly and with prejudice.

## I.   THE ANTI-SLAPP ACT APPLIES TO THIS SUIT

This appears to be the Superior Court's first opportunity to construe the Anti-SLAPP Act, D.C. Code § 16-5501 *et seq.* The terms of the Act are, however, simple and clear, and their application to the facts of this case is straightforward. The operative provisions of the Anti-SLAPP Act insofar as it relates to this motion are set forth in Section 16-5502, which provides:

> (a) A party may file a special motion to dismiss any claim arising from an act in furtherance of the right of advocacy on issues of public interest within 45 days after service of the claim.

---

owners"); Ex. 73 (Associated Press reported that "reorganization plan states that current CEO and former ESPN executive Mark Shapiro will be among the initial board members and will be entitled to appoint one other director. But it also states that Shapiro cannot appoint Snyder . . . without the consent of the new owners.").

19

> (b) If a party filing a special motion to dismiss under this section
> makes a prima facie showing that the claim at issue arises from an act
> in furtherance of the right of advocacy on issues of public interest,
> *then the motion shall be granted* unless the responding party
> demonstrates that the claim is likely to succeed on the merits, in which
> case the motion shall be denied.

D.C. Code § 16-5502 (emphasis added).  The Act further provides that the "[t]he court shall hold

an expedited hearing on the special motion to dismiss, and issue a ruling as soon as practicable

after the hearing.  If the special motion to dismiss is granted, dismissal shall be with prejudice."

D.C. Code § 16-5502(d).  In other words, *Washington City Paper* and Mr. McKenna bear the

burden on this motion only of showing that Mr. Snyder's claims arise out of the type of advocacy

protected by the Anti-SLAPP Act.  If so, then the Anti-SLAPP Act *requires* that the claims be

dismissed with *prejudice*.  The only exception to the immunity thus conferred is in the

circumstance in which a plaintiff like Mr. Snyder meets the heavy burden of proving that he is

*likely* to succeed on the merits of his claims.

There can be no question that D.C.'s Anti-SLAPP Act applies to Mr. Snyder's claims.

Indeed, in recommending to the Council that it adopt the Anti-SLAPP Act, the Committee on

Public Safety and the Judiciary explained that the legislation is designed to put an end to just

such lawsuits aimed at stifling commentary about matters of public concern:

> Such lawsuits, often referred to as strategic lawsuits against public
> participation—or SLAPPs—have been increasingly utilized over the
> past two decades as a means to muzzle speech or efforts to petition the
> government on issues of public interest.  Such cases are often without
> merit, but achieve their filer's intention of punishing or preventing
> opposing points of view, resulting in a chilling effect on the exercise
> of constitutionally protected rights.

Committee Report on Bill 18-893 (Nov. 18, 2010) at 1 (attached to the Smith Affidavit as

Exhibit 27).  In order to combat this phenomenon, the Anti-SLAPP Act "provides a defendant to

a SLAPP with *substantive* rights to expeditiously and economically dispense of litigation aimed

to prevent their engaging in constitutionally protected actions on matters of public interest."  *Id.*

at 4 (emphasis added).

As Mr. Snyder's and his representatives' public statements make very clear, this lawsuit

is a classic SLAPP.  Mr. Snyder's first step in response to the Commentary was not to complain

to its author or publisher, or to submit a response and request that they publish it but, instead, to have his attorney pressure investors by threatening to file litigation that would be so expensive to defend that the costs would "quickly outstrip the asset value of the Washington City Paper." Compl. Ex. D at 3. The man who Mr. Snyder says encouraged him to pursue this litigation, the Redskins' PR chief, has frankly conceded that the lawsuit is part of a coordinated public relations strategy and intended as "a warning shot to other members of the media." Smith Aff. ¶ 22 & Ex. 19; *see also* Compl. ¶¶ 30, 36 (seeking damages sufficient to "punish" and "deter" defendants' conduct).

The Anti-SLAPP Act proceeds from the premise that the litigation process may not be used as a "weapon" in this manner. Committee Report on Bill 18-893 at 4. It reserves access to the courts of the District of Columbia to those plaintiffs who have sustained and therefore require compensation for actual injury, not those—like Mr. Snyder—who seek to employ it as part of a public relations strategy and even announce, in their own complaint, that a monetary recovery is not necessary to recompense them for any injury at all. The Act requires a public figure such as Mr. Snyder, who not only owns but otherwise enjoys virtually unlimited access to the media, to use those fora, and not this Court, to "tell his side of the story." The fact that Mr. Snyder has availed himself of just such access, and thereby placed his views of *Washington City Paper*, Mr. McKenna, and the Commentary before a far larger audience than the one to which it was originally disseminated, underscores the central thesis of the Anti-SLAPP Act itself—*i.e.*, there is no legitimate reason to make the courts available to public figures who ostensibly seek to use defamation litigation to "set the record straight," especially when, more often than not, such litigation is in fact designed to silence their critics. In this case, where Mr. Snyder has unabashedly conceded that the latter is in fact his goal, the Anti-SLAPP Act quite rightly denies him the ability to achieve it.

A.      **Plaintiff's Claims Trigger The Immunity Afforded By The Anti-SLAPP Act Because They Arise From An Act In Furtherance Of The Right Of Advocacy On Issues Of Public Interest**

To avail themselves of the immunity afforded by the Anti-SLAPP Act, the defendants need only make "a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest." D.C. Code § 16-5502(b). This statutory formulation contemplates a two-part judicial inquiry: The Court must first decide whether the "act" sued upon is of the type encompassed by the Anti-SLAPP Act in the first instance, *i.e.*, an act in furtherance of the right of advocacy, and, if so, the Court must then determine whether that act addresses "an issue of public interest." It would be surprising, if not frivolous, were Mr. Snyder actually to contend that publication of the Commentary somehow fails to qualify as "an act in furtherance of the right of advocacy on issues of public interest."

**First**, insofar as relevant here, the Anti-SLAPP Act defines an "[a]ct in furtherance of the right of advocacy on issues of public interest" as "expression or expressive conduct that involves . . . communicating views to members of the public in connection with an issue of public interest." D.C. Code § 16-5501(1). Simply put, if publishing commentary in a newspaper is not "expressive conduct that involves communicating views to members of the public," it is difficult to imagine what conduct would qualify under this prong of the Anti-SLAPP Act. The plain language of the Act compels the conclusion that publication of the Commentary necessarily qualifies as an "act in furtherance of the right of advocacy" pursuant to D.C. Code § 16-5501(1)(B), satisfying the first prong of defendants' prima facie burden.

**Second**, with regard to what constitutes an "[i]ssue of public interest," the Anti-SLAPP Act defines the term in relevant part to mean "an issue related to . . . a public figure." D.C. Code § 16-5501(3). Mr. Snyder expressly concedes that he "is a public figure." Compl. ¶ 1. Indeed, it would be absurd for him to contend otherwise, given the prominent role he has played in business, sport and culture in our community. *See, e.g.*, Compl. ¶¶ 1-4. All of the statements in the Commentary on which Mr. Snyder's claims are based are, by definition, about him, and it

requires no further analysis for the Court to conclude that this second prong of the defendants' prima facie burden is satisfied as well.[10]

### B. To Overcome The Statutory Immunity And Thereby Avoid Dismissal Of His Lawsuit, Mr. Snyder Must Shoulder The Burden Of Demonstrating That He Is Likely To Succeed On The Merits Of His Claims

Having satisfied their burden of showing that Mr. Snyder's claims "arise from an act in furtherance of the right of advocacy on issues of public interest," defendants' special motion to dismiss "shall be granted," and with prejudice.  D.C. Code §§ 16-5502(b), 16-5502(d). Defendants need do nothing more to obtain the requested relief.  Indeed, Mr. Snyder may avoid that result only by carrying the heavy burden imposed on him by the Anti-SLAPP Act of successfully demonstrating that his claims are "*likely* to succeed on the merits."  D.C. Code § 16-5502(b).

In this respect, the D.C. Council chose to impose on plaintiffs like Mr. Snyder a burden unique among anti-SLAPP statutes.  To defendants' knowledge, no other state employs in its statute a standard requiring a plaintiff to demonstrate that he or she is "*likely* to succeed on the merits."  In doing so, the Council intended to impose a meaningful burden on SLAPP plaintiffs, as the common definition of the term "likely" illustrates.  *See, e.g.*, *Merriam-Webster Dictionary* (online ed. 2011) ("likely" defined as "having a high probability of occurring or being true") (*available at* http://www.merriam-webster.com/dictionary/likely); *Oxford English Dictionary* (2d ed. 1989; online ed. Mar. 2011) ("likely" defined as "(h)aving an appearance of truth or fact; that looks as if it would happen, be realized, or prove to be what is alleged or suggested; probable" and as "[p]robably, in all probability") (*available at* www.oed.com).[11]  Particularly given the

---

[10] Because the Act defines the term "issue of public interest" to include communications related to a "public figure," and Mr. Snyder concededly is one, this Court need venture no further.  The Act, however, further defines "issues of public interest" to include issues "related to health or safety; environmental, economic or community well-being; . . . or a good, product or service in the market place."  D.C. Code § 16-5501(3).  The alleged libels upon which Mr. Snyder has brought suit each relate to one or more of these specific issues, and the second prong of the prima facie showing required of defendants is satisfied for this additional reason as well.

[11] Reliance on such dictionaries to establish the meaning of a common word in a statutory provision is routine.  *See, e.g.*, *Bd. of Trs. of Leland Stanford Jr. Univ. v. Roche Molecular Sys. Inc.*,

stated intent of the Council to vest "substantive rights" in defendants like *Washington City Paper* and Mr. McKenna that will enable them "to expeditiously and economically dispense of litigation aimed to prevent their engaging in constitutionally protected actions on matters of public interest," Smith Aff. Ex. 27 at 3, the statutory term must, at the very least, be construed in accordance with its plain meaning. *See, e.g., Hutchison Bros. Excavation Co. v. Dist. of Columbia*, 278 A.2d 318, 321 (D.C. 1971) ("in construing an act with broad remedial purposes, a court should give a liberal interpretation to protective provisions while narrowly interpreting exceptions from such provisions"); *McCree v. McCree*, 464 A.2d 922, 928 (D.C. 1983) (following "the general rule of statutory construction, which dictates that a remedial statute should be construed liberally in order to effectuate the purposes for which it was enacted").

For the reasons set forth *infra*, Mr. Snyder is unable to carry his burden as a matter of law. Consequently, *Washington City Paper* and Mr. McKenna are fully entitled to shelter under the immunity conferred by the Anti-SLAPP Act.

## II.   MR. SNYDER CANNOT CARRY HIS BURDEN OF DEMONSTRATING HE IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS

"To prevail in a defamation suit, Plaintiff must prove that the statements complained of are i) defamatory; ii) capable of being proven true or false; iii) 'of and concerning' the Plaintiff; iv) false and v) made with the requisite degree of intent or fault." *Coles v. Wash. Free Weekly, Inc.*, 881 F. Supp. 26, 30 (D.D.C. 1995), *aff'd,* 319 U.S. App. D.C. 215, 88 F.3d 1278 (1996). Under the Anti-SLAPP Act, it is Mr. Snyder's burden to prove that he is likely to succeed on *each* of these elements and, if he is unable to do so with respect to any one of them, his claims must be dismissed. As the defendants explain below, Mr. Snyder cannot carry his burden as a matter of law for at least two principal reasons:  (a) none of the statements about which he complains is actionable in defamation as a matter of law and, (b) even if they were, the subsidiary meaning doctrine precludes a finding of liability given their placement in the context

---

No. 09-1149, ___ S. Ct. ___, 20011 WL 2175210, at *8-9 (June 6, 2011) (relying on dictionary definitions of the word "of").

of the Commentary considered in its entirety.  In the sections that follow, defendants first address each of the three specific statements about which Mr. Snyder complains individually and then consider them in the context of the Commentary as a whole.

### A.     "That's The Dan Snyder Who Got Caught Forging Names As A Telemarketer With Snyder Communications"

Mr. Snyder alleges that this statement would be understood by readers as an allegation that he personally committed the crime of forgery.  Compl. ¶¶ 1, 21.a.  This passage is, however, non-actionable as a matter of law for at least two reasons:  (1) reasonable readers would not have understood it that way and, (2) even if a reasonable reader would have taken it literally, it is substantially true.

### 1.     The passage is non-actionable rhetorical hyperbole

The "First Amendment provides protection for 'statements that cannot "reasonably [be] interpreted as stating actual facts" about an individual.'"  *Weyrich v. New Republic, Inc.*, 344 U.S. App. D.C. 245, 252, 235 F.3d 617, 624 (2001) (citation omitted); *see also, e.g., Washington v. Smith*, 317 U.S. App. D.C. 79, 80-81, 80 F.3d 555, 556-57 (1996) (same).  This principle "'provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation.'"  *Coles*, 881 F. Supp. at 32 (citations omitted).  In particular, it "is intended to protect the use of 'loose, figurative or hyperbolic language' which would preclude an impression that the author was seriously maintaining a provable fact."  *White v. Fraternal Order of Police*, 285 U.S. App. D.C. 273, 283, 909 F.2d 512, 522 (1990) (citation omitted).

Put differently, there are some statements that, if taken literally, would be actionable assertions of fact, but which, because of the nature of the language used and when viewed in context, would not actually be understood by *reasonable* people as *meant* to be taken *literally*.  Courts have applied this principle time and again to dismiss defamation claims arising from speech that signaled to reasonable members of the audience that they should approach what was being said in other than a purely literal sense.  The question whether a statement is reasonably

25

understood as one of actionable fact is one of law for the Court.  *See Guilford Transp. Indus. v. Wilner*, 760 A.2d 580, 588 (D.C. 2000); *Coles*, 881 F. Supp. at 32.

In one such case, for example, the Supreme Court held that an allegation of "blackmail," although on its face an accusation of criminal conduct provable as true or false, was rendered non-actionable when used in a context that signaled its hyperbolic nature.  *Greenbelt Coop. Publ'g Ass'n v. Bresler,* 398 U.S. 6, 13-14 (1970) (in context of articles reporting on public controversy concerning development plans, "even the most careless reader must have perceived that the word ["blackmail"] was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the real estate developer's] negotiating position extremely unreasonable").  As both the Court of Appeals and the D.C. Circuit have emphasized, in addition to examining the specific language used for signals to the audience that a non-literal interpretation is appropriate, an examination of the context in which the challenged statement appeared is key:  "[I]it is in part the *settings* of the speech in question that makes their hyperbolic nature apparent, and which helps determine the way in which the intended audience will receive them."  *Moldea v. N. Y. Times Co.*, 306 U.S. App. D.C. 1, 5, 22 F.3d 310, 314 (1994) (fact that allegedly defamatory statements were in book review would cause readers to expect subjective criticism of subject, not news reporting); *Guilford Transp.*, 760 A.2d at 588 (where allegedly defamatory statements about corporation appeared in Op/Ed column, context signaled to readers they were likely to encounter opinions, not statements of fact).

Indeed, this principle is one with which Mr. Snyder is intimately familiar:  He successfully invoked it in his own defense in *Jenkins v. Snyder*, a case in the Eastern District of Virginia.  There, Mr. Snyder was sued for defamation by fired Redskins stadium groundskeepers after he was quoted by a reporter as having said that there had been "three guys trying to kill the players with their crappy field."  Smith Aff. ¶ 35 & Ex. 29 at 2.  Mr. Snyder argued— successfully—that this statement, on its face an allegation that the groundskeepers committed the crime of attempted murder, when viewed in context and in light of the "obvious exaggeration" evidenced by his word choice, would not have been understood by reasonable readers of the

article as intended by him in this literal sense, or even as an accusation by him that the plaintiff groundskeepers had in fact endangered players. *Id.* at 7-9; *see also* Ex. 30 at 1 (statement "was so obviously hyperbolic, so obviously imprecise and subjective, that no reasonable reader could understand Snyder as making serious factual allegations of the sort plaintiffs imagine"); *Jenkins v. Snyder*, No. 00CV2125, 2001 WL 755818, at \*5 (E.D. Va. 2001) (holding that, "[o]bviously, the statement . . . cannot be understood in its literal sense").

Notwithstanding his personal familiarity with the relevant First Amendment principles, in his Complaint here, Mr. Snyder has isolated this passage (as well as the other challenged passages) from the Commentary, stripping it of its context when setting it forth in his pleading, even using ellipses to maximize its literal appearance. Compl. ¶ 21.a. When the contextual scrutiny required by the First Amendment is applied, however, it is readily apparent that the passage cannot reasonably be construed as an accusation that Mr. Snyder personally committed the crime of forgery.

As an initial matter, the passage must be considered in the larger context in which it appears: A commentary in *Washington City Paper* by Dave McKenna—a publication and an author both known generally for a stylized and opinionated approach to subjects of public concern generally and to Mr. Snyder specifically. *See supra* at 3-4. Thus, even without more, prospective readers of the Commentary who knew only the publication and the author would have expected provocative prose. *See Weyrich*, 344 U.S. App. D.C. at 253-54, 235 F.3d at 625-26 (where article critical of political figure was published in *The New Republic*, "well-known to be a magazine of political commentary, a self-described 'Weekly Journal of Opinion,'" the alleged defamation was "[p]resented in such a loose manner, in such a well-understood context," that it simply would not have been understood literally); *Moldea*, 306 U.S. App. D.C. at 6, 22 F.3d at 315 (readers of *The New York Times Review of Books* expect to encounter subjective assertions, not news reports, within its pages).

But in this case, there *was* more: It would be hard to imagine a cover or headline that could more clearly signal to readers the nature of the specific content to be found within the

publication: Juvenile-style scribbling over a photograph of Mr. Snyder accompanied by the title,

"The Cranky Redskins Fan's Guide to Dan Snyder" would suggest to any reasonable reader that

something other than a straight news report would be found within. And when readers turned to

the Commentary itself, they found still more scribbling on a photograph of Mr. Snyder,[12] a

reiteration of the "Cranky" title, and a four-paragraph introduction, "signed" by the original

Cranky Redskins Fan himself, in which Mr. McKenna expressly informs readers that he is about

to flip through the "pages in the old Snyder's scrapbook" for a "look back" at "the hilarious

and/or heinous deeds" for which Mr. McKenna holds Mr. Snyder "responsible." Smith Aff. Ex.

1 at 17. It is in this broadly hyperbolic context that the Court properly turns to examine the

specific passage at issue to determine whether it would be understood by reasonable readers as

an assertion that Mr. Snyder had personally committed the crime of forgery.

 Beyond the general context in which the Commentary appeared, this particular passage

was published in a specific context—part of the four-paragraph introduction to the Commentary

that expressly sets up the nature of this exercise as a "Cranky Fan's" homage to the "old" Dan

Snyder:

---

 [12] Despite their prominent presence in the initial lawsuit he filed and then abandoned in New York, and the continued reference to them in his current Complaint, any first-year law student knows that the scribbled depictions of Mr. Snyder are not themselves actionable in defamation, or otherwise. *Weyrich*, 344 U.S. App. D.C. at 253-54, 235 F.3d at 625-26 ("caricatures, though biting, are not actionable") (citing *Falwell v. Hustler Magazine*, 485 U.S. 46, 53-54 (1988) (emphasizing value of political cartoons to a free society)). In that regard, both *Washington City Paper* and Mr. McKenna emphatically reject Mr. Snyder's accusation that the scribbling of facial hair and horns on his photograph was intended by them or reasonably understood by readers as an anti-Semitic slur. To the contrary, it represents a common (if arguably adolescent) way of poking fun at someone. That, however, has not stopped Mr. Snyder from making the spurious charge, both in his complaints and in his various public relations initiatives, that the scribblings are evidence of the defendants' anti-Semitism, notwithstanding Mr. Snyder's knowledge that his religion is never mentioned in the Commentary and that responsible editors of *Washington City Paper* are themselves Jewish. *See* Smith Aff. ¶ 7 & Ex. 5 (managing editor observing in blog post that "we at *Washington City Paper* take accusations of anti-Semitism seriously—in part because many of us are Jewish, including staffers who edited the story and designed the cover. So let us know, Mr. Snyder, when you want to fight the *real* anti-Semites"); *id.* ¶ 8 & Ex. 6 (Huffington Post report observing that "Washington City Paper managing editor Mike Madden, who has taken it upon himself to address this matter specifically, was bar mitzvahed in August of 1989").

> So, before we welcome the New Dan Snyder, let's look back at the one we know. That's the Dan Snyder who left his mark, or stain, on more than just a football team. ***That's the Dan Snyder who got caught forging names as a telemarketer with Snyder Communications,*** made a great view of the Potomac River for himself by going all Agent Orange on federally protected lands, and lost over $121 million of Bill Gates' money while selling an "official mattress" while in charge of Six Flags. That's the Dan Snyder I've found to be the most fascinating and consistent man on the planet, responsible for the hilarious and/or heinous deeds outlined in the following pages.

Smith Aff. Ex. 1 at 17. In addition, in the course of the A to Z rundown that follows the introduction, the challenged fragment is put in further context:

> **Slamming:** The illegal practice of switching a customer's telephone service without authorization. Florida authorities fined Snyder's pre-Redskins outfit, Snyder Communications, $3.1 million in 2001 after investigators uncovered more slamming in its offices than you'd find stagefront at a Limp Bizkit show.

*Id.* at 22.

    Mr. Snyder does not deny that, during the period he owned it, Snyder Communications, the company he founded and that bore his name, engaged in "slamming"—that is, switching a long distance telephone customer from one carrier to another without the customer's consent by forging the customer's signature on an order form. Indeed, he could not deny this, or that the company agreed to pay a fine to Florida as a result. Nor could he deny that, as a condition of settling the slamming charges, the new owners of Snyder Communications were required to represent and warrant that Mr. Snyder no longer had any personal connection whatsoever with the company or its affiliates. All of this is undeniably true.

    Precisely for this reason, Mr. Snyder is left to contend that reasonable readers of the Commentary would think that Mr. McKenna was stating *as fact*, first, that Mr. Snyder personally worked as a "telemarketer"—rather than owning a telemarketing company—and second that, with his own hand, Mr. Snyder forged the signatures of a large number of customers (more customers, that is, than one would find "stagefront at a Limp Bizkit show"). This is simply not a reasonable interpretation of the words used when viewed in their general and specific contexts. Indeed, a reader who interpreted the passage this way would also have to conclude, based on the rest of the very same sentence, that Mr. McKenna was saying that Mr. Snyder had worked as a

mattress sales clerk while he was CEO of Six Flags.  To the contrary, *reasonable* readers would necessarily understand that Mr. McKenna was cataloging events for which he felt Mr. Snyder was *responsible*, not deeds that he personally performed—indeed, the last sentence of the very paragraph from which the challenged fragment has been extracted says precisely that: Mr. McKenna views Mr. Snyder as "*responsible* for the[se] hilarious and/or heinous deeds."

And, the specific item about "slamming" that followed this introduction explains that the *company*, not Mr. Snyder, was fined and that the extensive slamming took place in the company's "offices."  No less an authority than the Redskins' General Counsel, acting on Mr. Snyder's behalf, expressly has taken the position that *any reasonable person* would know that the CEO of a company like Snyder Communications is not personally involved in day-to-day tasks, such as the processing of customer orders, properly or improperly.  *See* Compl. Ex. D at 3 (attorney acting for Mr. Snyder observes that Commentary references various "matters that no owner/CEO/Chairman of a multi-national/billion-dollar/public company (respectively) would ever be personally involved in" and person "could not reasonably have believed" that Snyder actually did such things himself).[13]

---

[13] This also explains why Mr. Snyder's characterization of a statement by *Washington City Paper's* publisher posted on the paper's website on February 23, 2011, as an "admission" of knowing or reckless falsity, Compl. ¶ 8, is silly.  In that statement, the publisher observed:

> [T]he lawsuit implies that our story accused Snyder of personally committing the crime of forgery.  In fact, we have no reason to believe he personally did any such thing—and our story never says he did. . . .  We remain baffled that anyone could read McKenna's piece and imagine that a billionaire telecommunications CEO was personally on the phone talking customers into switching long distance carriers, or filling out the necessary forms with forged signatures.  Indeed, in the characteristically colorful language of a columnist, McKenna's piece goes on to say that the fine was imposed on the company after "investigators uncovered more slamming *in its offices* than you'd find stagefront at a Limp Bizkit show."

Smith Aff. ¶ 18 & Ex. 16.

> **2.      The "forging names" passage also is not actionable because**
> **Mr. Snyder cannot carry his burden of proving it *materially* false**

A defamation plaintiff—and particularly one who, like Mr. Snyder, sues a media

defendant over a publication addressing a matter of public concern—is required as a matter of

constitutional law to bear the burden of proving that the alleged defamatory statement is false.

*Klayman v. Segal*, 783 A.2d 607, 612-13 (D.C. 2001); *see also, e.g., Wells v. Liddy*, 186 F.3d

505, 532 n.21 (4th Cir. 1999) ("[A]ll plaintiffs (i.e., both public and private figures) bear the

burden of proving falsity when the allegedly defamatory statement touches upon a matter of

public concern.").  In this regard, the burden that Mr. Snyder bears is to prove *material* falsity.

"Put another way," an alleged defamation is "not considered false unless it 'would have a

different effect on the mind of the reader from that which the pleaded truth would have

produced.'"  *Masson v. New Yorker Magazine*, 501 U.S. 496, 517 (1991) (citation omitted); *see

also, e.g., Paul v. News World Commc'ns*, No. 01CA917, 2003 WL 23899002 at *11, 32 Media

L. Rep. (BNA) 2391, 2400 (D.C. Super. 2003) (where news article was literally untrue in that it

contained false statements of fact regarding the plaintiff's educational credentials or lack thereof,

article nevertheless was not actionable because its gist, that plaintiff had misrepresented her

credentials, was substantially true, albeit not in every respect stated in article).  Indeed, as the

D.C. Circuit has emphasized, under the First Amendment, if an allegedly defamatory statement

is "substantially true," it cannot give rise to liability:

> "Slight inaccuracies of expression are immaterial provided that the
> defamatory charge is true in substance."  The Supreme Court
> explained this defense in *Masson* by noting that: "Minor inaccuracies
> do not amount to falsity so long as the substance, the gist, the sting, of
> the libelous charge be justified."  501 U.S. at 517, 111 S. Ct. at 2433;
> *accord Liberty Lobby v. Dow Jones*, 838 F.2d at 1296 (statement is
> nonactionable if "[t]he sting of the charge ... is substantially true.)."

*Moldea*, 306 U.S. App. D.C. at 9, 22 F.3d at 318 (some internal citations omitted); *see also, e.g.,*

*Weyrich*, 344 U.S. App. D.C. at 255, 235 F.3d at 627 ("We emphasize again that, to be

actionable, the story must be materially false.").  And, as the courts repeatedly have observed,

"'[w]here the question of truth or falsity is a close one, a court should err on the side of

nonactionability.'" *Paul*, 2003 WL 23899002 at *11, 32 Media L. Rep. (BNA) at 2400 (quoting

*Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1292 (1988)).

It bears emphasis that it is Mr. Snyder's burden to prove material falsity (not the

defendants' burden to prove truth) and that, under the Anti-SLAPP Act, he bears the burden at

this juncture of proving that he is "likely" to succeed in doing so. Not only is Mr. Snyder

"unlikely" to carry these burdens, the public record reveals that he cannot, as a matter of law,

prove false the gist of this passage's sting, *i.e.*, that Snyder Communications engaged in

widespread forgery during Mr. Snyder's stewardship and that, as the head and namesake of the

company, he is "responsible" for this misconduct. Without repeating that record in full here,

suffice to say, it reveals that:

- During Mr. Snyder's tenure at Snyder Communications, it and its affiliated companies' employees engaged in massive forgery of customer signatures as a routine part of business—indeed, the scale of the forgeries was so breathtaking that one of Snyder Communications' telephone company clients faced so many consumer complaints that the names and Social Security numbers of dead persons (obtained by Snyder employees from funeral homes and cemeteries) had been used to slam their accounts, that the Snyder customer had to add to its complaint form a category for "deceased" as the nature of the problem. Smith Aff. ¶ 59 & Ex. 55.

- After Mr. Snyder's departure from Snyder Communications, the company and one of its telephone carrier clients settled slamming charges brought by two different agencies of the State of Florida by paying a total of $3.1 million for misconduct specifically attributable to Snyder employees. In addition, the Snyder companies agreed not to provide any marketing services for long distance carriers within Florida for ten years, and the specific division of the Snyder companies responsible for the slamming in Florida was required to "shut down and forever cease all operations in Florida." *Id.* ¶¶ 42, 57 & Exs. 36, 53.

- As a further condition of settlement of the claims against the Snyder companies, the new owners were required to represent and warrant that "neither Michele D. Snyder nor Daniel M. Snyder is a director, employee, partner, or an officer" of the Snyder companies and that "neither Michele D. Snyder nor Daniel M. Snyder currently has any managerial duties or controlling interest with respect to" the Snyder companies. *Id.* ¶ 42 & Ex. 36. This followed on the heels of testimony by one Snyder company manager that Dan Snyder "had to have known" of the slamming. *Id.* ¶ 44 & Ex. 38. Indeed, one of Snyder's principal telephone company clients had multiple meetings with Snyder management in an effort to get the company to stop forging customer names, but when it became clear how entrenched the practice was, the client terminated such telemarketing altogether and turned itself in to authorities. *Id.* ¶ 59 & Ex. 55.

Simply put, in the face of the public record of proceedings against Snyder

Communications in Florida, including the restrictions on his ongoing personal involvement,

Mr. Snyder cannot conceivably demonstrate to this Court that he "likely" can prove that it was materially false for *Washington City Paper* to have said that Snyder "got caught forging names as a telemarketer," *i.e.*, that he was "responsible" for the forgeries committed at his eponymously-named telemarketing business.

### B.   Mr. Snyder "Made A Great View Of The Potomac River For Himself By Going All Agent Orange On Federally Protected Lands" and "Cut Down Trees Protected By The National Park Service"

The same analysis applies to Mr. Snyder's allegation that these two passages defamed him.  The "Agent Orange" passage is both classic rhetorical hyperbole and, in any event, its sting is substantially true, while the "protected trees" statement is absolutely, literally true.

### 1.   The "Agent Orange" statement is classic, non-actionable hyperbole

With regard to the passage of the Commentary that says he went "all Agent Orange" in clearing trees, Mr. Snyder claims that reasonable readers would have understood it as an allegation by the defendants that he somehow obtained quantities of a herbicide made notorious during the Vietnam War and sprayed that herbicide on trees in his backyard to clear his view of the Potomac.  *See* Compl. Ex. D at 2 (11/24/10 letter from D. Donovan, Esq.).  This contention stretches credulity beyond the breaking point.

Recalling the general context in which this fragment appears—a commentary by Mr. McKenna (known for a particular style of writing) published in *Washington City Paper* (an alternative newsweekly known for its pointed commentary generally), this fragment appears in the same paragraph of the introduction in which Mr. McKenna establishes the nature of his exercise: a "look back" at the "scrapbook" of the "old Dan Snyder," and the "hilarious and/or heinous deeds" for which he is responsible.  In the general and specific contexts in which this fragment appears, any *reasonable* reader would understand Mr. McKenna to be using the central metaphor of the 20th Century for the deforestation of land by a powerful entity, and thereby to register in colorful and strong images his disapproval of Mr. Snyder's heavy-handed tactics in clearing land that, it is indisputably true, was under the protection of a federal conservation easement.  Indeed, the National Park Service's Inspector General concluded in his official report

on the incident that Mr. Snyder had obtained approval to cut the trees by leveraging influence through government officials who acted improperly on his behalf (a report which a reader of the online version of the article could easily find by clicking through two hyperlinks, the first of which was embedded in the Commentary in the relevant paragraph). Smith Aff. ¶ 61 & Ex. 60.

Although the Supreme Court's decision in *Bresler* ("blackmail") itself compels the conclusion that this vivid metaphor is non-actionable hyperbole, the Court of Appeals' decision in *Kreuzer v. George Washington University*, 896 A.2d 238 (D.C. 2006), punctuates the point. There, the University was in the midst of a real estate dispute and its president was quoted in a news report as saying of the opposing party, "the $10 million in damages sought . . . by Kreuzer [is] 'too much,'" and then adding, "'I think he's inhaling.'" *Id.* at 248. The plaintiff sued for defamation, contending that readers would have understood this as an allegation of illegal drug use. As the Court of Appeals explained, however:

> The trial judge found that the "inhaling" comment was not actionable because it was "clearly [an] opinion" and "rhetorical hyperbole, and any reader would have been able to tell that no actual accusation of crime was intended." Rather, "it is manifest that [the president] meant that [Dr. Kreuzer] was seeking an outlandish sum of money," not that he was "smoking marijuana." This conclusion was correct.

*Id.* The same reasoning applies equally to Mr. McKenna's reference to Mr. Snyder's tree-clearing as "going all Agent Orange"—no reasonable reader would construe it as an assertion that Mr. Snyder had used a toxic chemical to deforest land, directly adjacent to his residence, that obstructed his view of the Potomac.

### 2.  Mr. Snyder cannot prove that either the "Agent Orange" or the "protected trees" passage is materially false

Setting aside the plainly hyperbolic use of the phrase "going all Agent Orange," Mr. Snyder apparently argues that the remainder of the passage—that he "made a great view of the Potomac for himself" by clearing "federally protected lands"—is defamatory. But Mr. Snyder cannot prove this aspect of the passage materially false, nor can he prove it materially false for the defendants to have said that he "cut down trees protected by the National Park Service." Both of these statements are indisputably true.

Mr. Snyder cannot in good faith deny (much less prove materially false) the facts that (1) he did actually cut down trees *located on* land that is *protected by the federal government* (in this case, by virtue of a permanent easement running with the land in favor the National Park Service), and (2) that the easement in question gives the National Park Service the right to *protect*, by prohibiting their cutting without its permission, the trees on that land that he cut down. This is precisely what the Commentary said about this well-publicized incident, and these facts are amply documented in the report of the Department of Interior's Inspector General. In short, both of these challenged passages are literally true in this regard.[14]

If Mr. Snyder means to say these statements give rise to the false implication that he unlawfully cut down the trees, that is of no help to him either. All apart from the Inspector General's conclusion that the National Park Service's approval to cut the trees was the product of improper conduct by a department official who was in direct personal contact with Mr. Snyder at the time of the impropriety, Smith Aff. ¶ 60 & Ex. 61 at 10-16, the cutting of the trees indisputably *was* unlawful: Montgomery County authorities cited and fined Mr. Snyder for violation of local forestation laws, and Mr. Snyder thereafter entered into a settlement agreement with the Maryland-National Capital Park and Planning Commission, pursuant to which he was required, among other things, to contribute $37,000 to a forest conservation fund, reforest 1.3 acres of the cleared area, and post a $45,000 bond for future maintenance costs. *Id.* at 3, 11.

---

[14] Mr. Snyder alleges that this purported libel was "compounded" when *Washington City Paper* later published a statement regarding its intended meaning, and referred to the trees being "on 'park service land.'" Compl. ¶ 21.b. The literal truth is that the trees were on land the title to which is held by Mr. Snyder, but which is subject to a conservation easement running in favor of the Park Service. Smith Aff. Ex. 60. Concededly, it might therefore have been more technically correct for *Washington City Paper* to have said in its clarifying statement that the trees were "on land in which the park service holds a legal interest." But Mr. Snyder cannot seriously contend that it produced a different effect in the minds of *Washington City Paper* readers to be told that he had "cut down trees on park service land" rather than that he had "cut down trees on land in which, pursuant to an easement, the park service holds a legal interest." This is precisely the sort of nitpicking that the doctrine of substantial truth forecloses. *Moldea*, 306 U.S. App. D.C. at 9, 22 F.3d at 318; *Weyrich*, 344 U.S. App. D.C. at 255, 235 F.3d at 627.

In the face of this record, Mr. Snyder cannot carry his burden of demonstrating to this Court that he is "likely" to be able to prove that *Washington City Paper*'s statements regarding his tree-cutting are materially false.

## C.    Mr. Snyder Was "Tossed Off" The Six Flags Board

Finally, Mr. Snyder complains that he was defamed by the comment that he was "tossed off" the Six Flags' board of directors.  Compl. ¶ 21.c.  The passage in which that fragment appears reads in full:

> **Gates, Bill:** Formerly world's richest man.  But he's not as rich as he would be had he not done business with Snyder.  One of Six Flags' biggest stockholders, Gates had 10,210,600 shares worth about $122 million in early 2006, when Snyder began putting his marketing team in place.  They were worth $0—zilch, zip, nada—by the time ***Snyder was tossed off the board*** last year.  "Bill Gates gives away more money than anybody, and his main cause is malaria," said a representative of Resilient Capital Management, a hedge fund and Six Flags investor, which sued to have Snyder removed from the company for fiduciary irresponsibility.  "That was money that could have gone to save kids from malaria."

Smith Aff. Ex. 1 at 18.  Once again, Mr. Snyder cannot carry his burden of proving that the passage constitutes a materially false statement of fact.

### 1.    The "tossed off" comment would be understood by reasonable readers in its hyperbolic sense

Mr. Snyder alleges that a reasonable reader would understand this passage to be an allegation by *Washington City Paper* as literal fact "that he was fired from the board of directors of a public company."  Compl. ¶ 22.  Of course, nowhere does the Commentary use the term "fired."  Indeed, given the context and the loose, hyperbolic nature of the phrase "tossed off," all that reasonably can be implied from it is that Mr. Snyder's departure from the board (a fact he does not deny) was not entirely amicable.  Given the crash in the company's stock price, its delisting from the Stock Exchange, and its entry into bankruptcy—all on Mr. Snyder's watch as its chairman—Mr. Snyder cannot seriously maintain that his departure was actually a long-planned and honorable retirement.  Indeed, one major shareholder sought during the bankruptcy proceedings to have Mr. Snyder and other managers dismissed immediately for incompetence

and "double-dealing," while the ultimate bankruptcy reorganization plan *expressly* stated that Mr. Snyder would *not be permitted* to continue on the board unless the special consent of particular bond-holders was obtained.  Smith Aff. ¶ 79 & Ex. 78.  "Tossed" is a common, colorful metaphor for describing an unhappy parting, and that is how reasonable readers would (correctly) have interpreted the phrase here.

In this regard, the Court of Appeals' decision in *Guilford Transportation* is particularly instructive.  There, the author of the unflattering commentary had described the plaintiff transportation company as "bolting" from a particular labor negotiation process.  The company, arguing that it had merely declined to participate in the process in the first instance, not that it had started the process and then suddenly left it, sued for defamation claiming this "falsity" made it appear anti-labor.  In affirming summary judgment for the author, the Court of Appeals observed:

> Even assuming that Wilner's use of the verb "bolted" reflects lack of precision, and treats the plaintiffs with undeserved asperity, the challenged language surely pales in comparison to "blackmail," or "traitor" or "scab."  If we were to adopt a rule of law which sustains the plaintiffs' position on this issue, then authors of every sort would be forced to provide only dry, colorless descriptions of facts, bereft of analysis or insight.  There would be little difference between the editorial page and the front page, between commentary and reporting, and the robust debate among people with different viewpoints that is a vital part of our democracy would surely be hampered.

*Guilford*, 760 A.2d at 598-99 (internal citations omitted).  It is possible that, in describing Mr. Snyder as having been "tossed off" the Six Flags board, Mr. McKenna treated him with the kind of "asperity" that the Court of Appeals found harmless in *Guilford*.  What Mr. McKenna did not do, however, is defame Mr. Snyder by making a materially false statement of fact about his departure.

### 2.   Mr. Snyder cannot prove that the sting of the "tossed off" comment is materially false

Given his burden under the Anti-SLAPP Act, Mr. Snyder must demonstrate to this Court that he "likely" can prove that it was materially false for the defendants to have characterized his unhappy departure from the Six Flags board in the manner it did.  Whatever the term "tossed off"

might mean exactly (and its vagueness is precisely why, as explained *supra*, it constitutes non-actionable rhetorical hyperbole), if a factfinder were asked to determine its truth or falsity, among the facts he or she would have to consider are the following:

- In the four years after Mr. Snyder's assumption of the chairmanship of Six Flags' board, amusement park attendance fell by nearly one third, the company's stock price plummeted, the company failed twice to pay a dividend to holders of certain preferred shares, it was de-listed from the New York Stock Exchange, and it was forced into bankruptcy, *see supra* at 17-19;

- In connection with the company's transfer to new ownership and its reorganization in bankruptcy, the existing management team's proposed reorganization plan keeping Mr. Snyder in place was rejected, one major shareholder sued to have Mr. Snyder and his team removed immediately on grounds of incompetence and double-dealing, and the reorganization plan ultimately approved barred him—and *only* him—from the new board absent the consent of certain new bond-holders, *id.*; and

- Mr. Snyder was not and has never been re-appointed to the board in the wake of that reorganization, *id.*

In short, although it is Mr. Snyder's burden to prove the material falsity of the "tossed off" passage and not that of the defendants to prove its truth, Mr. Snyder cannot conceivably persuade this Court that he "likely" can prove that his departure from the board was entirely voluntary. In the absence of such a showing, the gist or sting of the statement that he was "tossed off" is substantially true.

### 3. The "tossed off" passage is in any event subject to the common law fair comment privilege

The comment that Snyder was "tossed off the board" is also protected from defamation liability for the additional reason that it is subject to the "fair comment" privilege recognized at common law in the District of Columbia. "The common law privilege of fair comment applies where the reader is aware of the factual foundation for a comment and can therefore judge independently whether the comment is reasonable." *Lane v. Random House, Inc.*, 985 F. Supp. 141, 150 (D.D.C. 1995). "Fair comments are not actionable in defamation '[b]ecause the reader understands that such supported opinions represent the writer's interpretation of the facts presented, and because the reader is free to draw his or her own conclusions based upon those

facts.'"  *Id.* (quoting *Moldea v. N.Y. Times. Co.*, 304 U.S. App. D.C. 406, 414, 15 F.3d 1137, 1144 (1994)).

The privilege "'afford[s] legal immunity for the honest expression of opinion on matters of legitimate public interest when based upon a true or privileged statement of fact.'"  *Coles*, 881 F. Supp. at 32 (citation omitted).  Moreover, "the fair comment privilege is applicable 'even if the facts upon which [the opinion] is based are not included along with the opinion.'"  *Id.* (quoting *Fisher v. Wash. Post Co.,* 212 A.2d 335, 338 (D.C.1965)); *see also Lane*, 985 F. Supp. at 150 ("In the District of Columbia, the fair comment privilege can be invoked even if the underlying facts are not included with the comment.").

Here, Mr. McKenna's "conclusion" that Mr. Snyder was "tossed off" the board is based on true facts in the public record as set forth more fully *supra* at 17-19, including facts recounted in the Commentary itself.  It is, therefore, protected from defamation liability as privileged "fair comment."

> **D.  Even If Any Of The Challenged Passages From The Commentary Were Provably And Materially False, They Are Nevertheless Non-Actionable Under The Subsidiary Meaning Doctrine**

In his Complaint, Mr. Snyder alleges that the three allegedly false and defamatory passages in the Commentary (together with the cover artwork) communicate the following overarching meanings or "stings" about him:

- that he "has engaged in acts of treachery, deceit and duplicity," Compl. ¶ 7;

- that he "has engaged in 'heinous deeds' and acts of treachery, disloyalty, and deceit," *id.* ¶ 21; and

- that he "is a dishonest, unethical businessman who habitually engaged in misconduct and fraud in his business dealings and personal life," *id.* ¶ 32.

In assessing such contentions, the Court is obliged to consider what is said about Mr. Snyder in the portions of the Commentary that he does *not* challenge, which include Mr. McKenna's recounting of the previously and widely reported allegations that Mr. Snyder, directly or through his companies, had:

- sought to "skirt congressional gift limits" by the way he priced and marketed low-cost tickets that afforded access to luxury seats, Smith Aff. Ex. 1 at 17;

- attempted to "end-run" television network prohibitions on advertising alcohol in order to increase revenue for the Redskins, *id.* at 17-18;

- repeatedly pressured employees to give up valuable compensation they were owed under their contracts, *id.* at 20;

- oversold notes in one of his companies that led Moody's rating service to label the debt "junk," *id.*;

- twice violated labor laws, once with respect to his family's nanny and also with respect to Redskins ticket office employees, *id.*;

- flouted state smoking regulations by operating a bar and unlawfully permitting smoking in it, *id.*;

- falsely raised safety concerns to induce two jurisdictions to adopt laws to discourage foot traffic near his facilities, in connection with which he sharply raised parking charges at those facilities, *id.* at 22; and

- deliberately defaulted on a lease for a training camp in order to hold practice at locations where he could generate greater revenue, *id.*[15]

The problem for Mr. Snyder is that, even if one were to excise from the Commentary all or any of the three passages on which he actually has sued, the remainder of the Commentary, which he has not challenged, would still communicate to readers the same overarching meaning or gist: that the public record of Mr. Snyder's very public life demonstrates a track record of unsavory conduct—"deceit," "duplicity," "disloyalty," "dishonesty," as he himself has variously described the "sting" to which he objects.

The defendants should be clear about what they are *not* saying: Plainly, an author cannot shield a false and defamatory statement from liability by wrapping it in dozens of other false statements, thereby daring the plaintiff to take on the burden of proving each and every one false. But, where, as here, (1) the plaintiff alleges that a publication communicates a particular

---

[15] In Part II of the Smith Affidavit (paragraphs 82-211), defendants separately recite each of the passages from the Commentary not challenged by Mr. Snyder and place before the Court examples of prior press coverage and other materials relevant to the subject matter of each quotation.  As reflected therein, Mr. Snyder's public statements to the contrary notwithstanding, Mr. McKenna routinely sought and included comments from Mr. Snyder or his representatives in his own reporting.  *See, e.g.*, Smith Aff. Exs. 102, 103, 129, 152, 159, 162, 186, 191, 192, 196.

overarching defamatory sting, (2) the publication includes multiple statements that support and contribute to this sting, and (3) the lion's share of those statements are either non-actionable (because ruled so by the Court) or not in suit (because not challenged by the plaintiff), then the falsity of one or a handful of those statements that merely echo the same overarching sting cannot be used by the plaintiff as the basis for a defamation action.  To so permit would be to let the tail wag the dog, and courts confronted with analogous circumstances have firmly declined, under the rubric of the "subsidiary meaning" doctrine, to permit such gamesmanship.  *See, e.g.*, *Herbert v. Lando*, 781 F.2d 298, 310-12 (2d Cir. 1986) (statements "should not be actionable if they merely imply the same view, and are simply an outgrowth of and subsidiary to those claims upon which . . . there can be no recovery"); *Hatfill v. N.Y. Times Co.*, 488 F. Supp. 2d 522, 532 (E.D. Va. 2007) (same), *aff'd*, 532 F.3d 312 (4th Cir. 2008); *Church of Scientology Int'l v. Time Warner, Inc.*, 932 F. Supp. 589, 594 (S.D.N.Y. 1996) ("The subsidiary meaning doctrine reasons that where a maliciously false statement implies the same ultimate conclusion as that of the remainder of the publication," and the remainder is not actionable, "a plaintiff cannot 'base his defamation action solely on inaccuracies contained within statements subsidiary to these larger views'") (citation omitted), *aff'd sub nom. Church of Scientology Int'l v. Behar*, 238 F.3d 168 (2d Cir. 2001).

The D.C. Circuit had occasion to apply the doctrine in *Tavoulareas v. Piro*, 260 U.S. App. D.C. 39, 817 F.2d 762 (1987).  That case arose from a series of *Washington Post* articles about the then-president of an oil company and his alleged "nepotism" in structuring business deals for the benefit of his son.  *Id.* at 43, 817 F.2d at 766.  The "central thrust" of the articles— that plaintiff's "personal, continual, and active involvement in . . . matters in ways that uncontestably redounded directly to [his son's] benefit"—was found to be substantially true.  *Id.* at 64-65, 817 F.2d at 787-88.  As a result, the Court held that the separate, specific "potentially defamatory inference that . . . [plaintiff] had not recused himself . . . despite a possible conflict of interest" with respect to issues involving his son was not actionable, even if false and published with actual malice, since it was subsidiary to the non-actionable "central thrust" of the story.  *Id.*

Similarly, in *Herbert v. Lando*, the Second Circuit addressed a contention that statements in a *60 Minutes* report conveyed the twin defamatory implications that plaintiff had lied to his superiors about reporting war crimes and invented a story to explain why he had been relieved of his command. *See* 781 F.2d at 308 n.5. The plaintiff's inability to demonstrate that the "overall" meaning he attributed to the broadcast was actionable precluded him from pursuing claims based on specific, allegedly false statements contained in the broadcast that communicated essentially the same defamatory meaning. "Examining each of the specific statements" on which Herbert sued, the court ruled, "we do not find a distinction between the defamatory meaning a viewer would derive from the particular statements, and the supposedly larger defamatory 'impact' Herbert insists is conveyed by the publication as a whole." *Id.* at 307-08. In other words, because the specific statements alleged to be false were "merely a subsidiary matter to the primary, non-actionable issue—whether [plaintiff] lied about reporting war crimes"—such statements were not themselves actionable. *Id.* at 311-12.

And in *Church of Scientology International v. Time Warner, Inc.*, the plaintiff challenged numerous statements published in a lengthy *Time* magazine story that were highly critical of the organization. *See* 932 F. Supp. 589. The gist of the story—as conveyed by those portions of it that were not challenged in the lawsuit or were otherwise held to be nonactionable—was that:

> Scientology, rather than being a *bona fide* religion, is in fact organized for the purpose of making money by means legitimate and illegitimate. The Article details various alleged schemes that the church allegedly uses to increase its revenues, including charging ever-increasing fees to its members, deceiving non-members through the use of front groups, manipulating securities and currency markets through the use of inside information, and evading taxes.

*Id.* at 595. Given this non-actionable gist, the court held that the specific challenged statement—that one source of the Church's funds was "the notorious, self-regulated stock exchange in Vancouver . . ., often called the scam capital of the world"—merely "impl[ied] the same view" and was therefore not actionable as a matter of law, even if it was itself false and published with constitutional malice. *Id.* at 592, 595; *see also, e.g., Nicholson v. Promotors on Listings*, 159

F.R.D. 343, 355 (D. Mass 1994) (if the "bulk of the assertions" and the "general thrust" of an article are not actionable, then "inaccuracies with regard to subsidiary matters will not support recovery").  As the court in *Church of Scientology* pointed out, "[t]his determination need not be based on statements proven, or conceded, to be true, but may be based on statements that are either unchallenged, or nonactionable."  932 F. Supp. at 595 (internal citations omitted).

Here, Mr. Snyder alleges that the Commentary communicates the overarching meaning that he has routinely engaged in disloyal, duplicitous or dishonest conduct.  But the very substantial unchallenged portions of the Commentary collectively communicate that sting regardless of whether any (or even all) of the three passages he in fact purports to place at issue were omitted from it.  The law prohibits Mr. Snyder from premising a defamation action on isolated, alleged inaccuracies that do no more than echo the larger theme communicated by statements that are either non-actionable or not sued upon.  *See id.*; *see also*, *e.g.*, *Tavoulareas*, 260 U.S. App. D.C. at 65, 817 F.2d at 788 ("[t]o hold actionable a 'statement whose ultimate defamatory implications are themselves not actionable, we believe, would be a classic case of the tail wagging the dog'") (citation omitted); *Church of Scientology Int'l*, 238 F.3d at 176 (affirming dismissal because "the district court properly held that the [challenged statement] was subsidiary in meaning to the larger [non-actionable] thrust of the" publication).

## CONCLUSION

Mr. Snyder's lawsuit, which by his own admission was filed by a powerful public figure to punish a journalist and a newspaper publisher for their past speech and to deter them from speaking out about him in future, rather than to obtain compensation for injury to his reputation, is the very archetype of a SLAPP suit.  Indeed, if this lawsuit does not trigger application of the Anti-SLAPP Act, it is difficult to imagine what would.  For the reasons set forth herein, Mr. Snyder is entirely unable to carry his burden of showing that he is likely to succeed on the

merits of his claims.  The Anti-SLAPP Act therefore requires that his lawsuit be dismissed, promptly and with prejudice.[16]

Dated: June 17, 2011

BAKER & HOSTETLER, L.L.P.


By:   /s/ Bruce D. Brown
      Bruce D. Brown (D.C. Bar No. 457317)
      Mark I. Bailen (D.C. Bar No. 459623)
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5304
Telephone: (202) 861-1660
Facsimile: (202) 861-1783
bbrown@bakerlaw.com;
mbailen@bakerlaw.com

*Counsel for Defendant Dave McKenna*

Respectfully submitted,

LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.


By:   /s/ Jay Ward Brown
      Seth D. Berlin (D.C. Bar No. 433611)
      Jay Ward Brown (D.C. Bar No. 437686)
      Alia L. Smith (D.C. Bar No. 992629)
1050 Seventeenth Street, N.W., Suite 800
Washington, D.C.  20036
Telephone: (202) 508-1100
Facsimile: (202) 861-9888
sberlin@lskslaw.com; jbrown@lskslaw.com,
asmith@lskslaw.com

David M. Snyder (*pro hac vice pending*)
DAVID M. SNYDER, P.A.
1810 S. MacDill Avenue, Suite 4
Tampa, FL  33629-5960
Telephone: (813) 258-4501
Facsimile: (813) 258-4402
dmsnyder@dms-law.com

*Counsel for Defendant CL Washington, Inc.*

---

[16] Pursuant to Section 16-5504 of the Anti-SLAPP Act and Rule 54(d)(2)(B), prevailing defendants also are entitled to move for an award of "the costs of litigation, including reasonable attorney fees" within 14 days of the Court's ruling on the special motion to dismiss.