# *Adelson v. Harris, et al.,*

SDNY Case No. 12-cv-6052 (JPO)

## Second Supplemental Declaration of Lee Levine

## Exhibit 1

# 13-4173

## United States Court of Appeals
## for the Second Circuit

◆❙◆

SHELDON G. ADELSON,
*Plaintiff-Appellant,*

v.

DAVID A. HARRIS, MARC R. STANLEY,
AND NATIONAL JEWISH DEMOCRATIC COUNCIL,
*Defendants-Appellees*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (OETKEN, J.)

### OPENING BRIEF OF PLAINTIFF-APPELLANT
### SHELDON G. ADELSON

L. Lin Wood
Jonathan D. Grunberg
WOOD, HERNACKI & EVANS, LLC
1180 West Peachtree Street N.W.
Suite 2400
Atlanta, GA 30309
Telephone: (404) 891-1402
Facsimile: (404) 506-9111

James R. Ferguson
Michele L. Odorizzi
Demetrios G. Metropoulos
MAYER BROWN LLP
71 S. Wacker Drive,
Chicago, IL 60606
Telephone: (312) 782-0600
Facsimile: (312) 701-7711

Andrew L. Frey
MAYER BROWN LLP
1675 Broadway
New York, NY 10019
Telephone: (212) 506-2635
Facsimile: (212) 849-5635

*Attorneys for Plaintiff-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellant Sheldon G. Adelson is a natural person. Accordingly, a corporate disclosure statement is not required by Federal Rule of Appellate Procedure 26.1.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF AUTHORITIES ................................................................. iv

JURISDICTIONAL STATEMENT ........................................................ 1

STATEMENT OF ISSUES ................................................................. 1

STATEMENT OF THE CASE .............................................................. 3

    1.   Defendants' Defamatory Petition ................................. 4

    2.   Defendants' Defamatory Press Release ........................ 8

    3.   Procedural History ..................................................... 11

    4.   The District Court's Ruling ........................................ 13

SUMMARY OF ARGUMENT ............................................................. 13

STANDARDS OF REVIEW ............................................................... 17

ARGUMENT ................................................................................. 18

I.    DEFENDANTS' STATEMENTS LINKING PLAINTIFF TO "PROSTITUTION" DO NOT QUALIFY FOR THE "FAIR REPORT" PRIVILEGE ................................................................. 18

   A.   Defendants' Statements Were Not "Fair and Impartial".... 19

   B.   The Petition's Unidentified Hyperlink Did Not Qualify the Petition as a "Report on a Judicial Proceeding." ........... 24

II.   DEFENDANTS' "DIRTY MONEY" STATEMENTS WERE NOT PROTECTED "OPINION." ................................................ 27

III.  THE DISTRICT COURT ERRED IN DISMISSING THE COMPLAINT AND AWARDING ATTORNEYS' FEES UNDER THE NEVADA "ANTI-SLAPP" STATUTE .................. 32

   A.   Nevada's "Special Motion to Dismiss" Procedure is Inapplicable in Federal Court ............................................. 33

   B.   Defendants Failed to Meet the Mandatory Statutory Requirements for Filing Their Motion ................................ 37

## TABLE OF CONTENTS
(continued)

    1.   The District Court Had No Jurisdiction to Entertain the Motion ..................................................... 37

    2.   Defendants Failed to Show "Good Cause" for Their Tactical Decision to Proceed First Under the D.C. Statute .......................................................... 40

C.   The Nevada Statute Applies Only to Statements Directed to a Government Official ...................................... 41

    1.   The District Court's Construction of the Statute is Contrary to the Nevada Supreme Court's Construction .............................................................. 42

    2.   The District Court's Construction of the Statute is Contrary to its Express Terms ............................... 47

D.   The District Court Improperly Decided Defendants' Motion on the Pleadings, Without Drawing Any Inferences in Favor of Plaintiff and Denying Plaintiff's Request to Take Discovery ................................................... 49

CONCLUSION ...................................................................... 55

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*3M Co. v. Boulter,*
    842 F. Supp. 2d 85 (D.D.C. 2012) .............................................................36, 37

*Agora, Inc. v. Axxess, Inc.,*
    90 F. Supp. 2d 697 (D. Md. 2000) ..................................................................27

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) .......................................................................................36, 37

*Archey v. Nelson,*
    No. 35671, 2010 WL 3711513 (Nev. Dist. Ct. Aug. 10, 2010) ..................45, 46

*Baker v. Baker,*
    96 P.2d 200 (Nev. 1939) ................................................................................38

*Buckley v. Valeo,*
    424 U.S. 1 (1976) ..........................................................................................48, 49

*Buckwalter v. Wey,*
    No. 2:10-CV-108-JCM-LRL, 2010 WL 2609100 (D. Nev. June 24, 2010) ......45

*Celle v. Filipino Reporter Enters. Inc.,*
    209 F.3d 163 (2d Cir. 2000) ...........................................................................17

*Chamber of Commerce of the U.S. v. Moore,*
    288 F.3d 187 (5th Cir. 2002) ..........................................................................48

*Clark County Sch. Dist. v. Virtual Educ. Software, Inc.,*
    213 P.3d 496 (Nev. 2009) ...............................................................................17

*Collins v. Laborers Int'l Union of N. Am. Local No. 872,*
    No. 2:11-CV-00524-LDG-LRL, 2011 U.S. Dist. LEXIS 79853
    (D. Nev. July 21, 2011) ...................................................................................45

*Cooper v. Salomon Bros. Inc.,*
    1 F.3d 82 (2d Cir. 1993) .................................................................................1

iv

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Craig v. Harrah*,
195 P.2d 688 (Nev. 1948)............................................................................38, 39

*D.R. Horton, Inc. v. Safe Homes Nevada, Inc.*,
No. A466035, 2003 WL 25717726 (Nev. Dist. Ct. May 28, 2003)..................46

*Dameron v. Washington Magazine, Inc.*,
779 F.2d 736 (D.C. Cir. 1985)..................................................18, 24, 26, 27

*Erie Railroad Co. v. Tompkins*,
304 U.S. 64 (1938)..............................................................................34, 35, 36

*Famous Horse Inc. v. 5th Ave. Photo Inc.*,
624 F.3d 106 (2d Cir. 2010) ....................................................................17, 51

*Federal Election Comm'n v. Christian Action Network*,
894 F. Supp. 946 (W.D. Va. 1995), *aff'd*, 92 F.3d 1178 (4th Cir. 1996)..........48

*Gardner v. Martino*,
563 F.3d 981 (9th Cir. 2009) ..........................................................................17

*Godin v. Schencks*,
629 F.3d 79 (1st Cir. 2010)..............................................................................35

*Henry v. Lake Charles Am. Press, LLC*,
566 F.3d 164 (5th Cir. 2009) ..........................................................................35

*Jankovic v. Int'l Crisis Grp.*,
429 F. Supp. 2d 165 (D.D.C. 2006), *rev'd in part*, 494 F.3d 1080 (D.C.
Cir. 2007) ........................................................................................................27

*John v. Douglas County Sch. Dist.*,
219 P.3d 1276 (en banc) ........................................... 33, 34, 42-45, 49

*Kaelin v. Globe Commc'ns Corp.*,
162 F.3d 1036 (9th Cir. 1998) ..................................................................30, 31

*KJR Management Co. LLC v. First Web Search, LLC*,
2008 WL 7907954 (Nev. Dist. Ct. Nov. 19, 2008) .........................................40

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Krauss v. State,*
998 P.2d 163 (Nev. 2000)...................................................................................39

*Lerner v. Fleet Bank, N.A.,*
459 F.3d 273 (2d Cir. 2006) .............................................................................17

*Liberty Lobby, Inc. v. Dow Jones & Co.,*
838 F.2d 1287 (D.C. Cir. 1988)........................................................................53

*Liberty Synergistics, Inc. v. Microflo, Ltd.,*
718 F.3d 138 (2d Cir. 2013) .............................................................................35

*Lubin v. Kunin,*
17 P.3d 422 (Nev. 2001).............................................................................*passim*

*Makeaeff v. Trump University, LLC,*
715 F.3d 254 (9th Cir. 2010) (Kozinski, J., concurring) ..................................35

*Mayfield v. National Ass'n for Stock Car Auto Racing, Inc.,*
674 F.3d 369 (4th Cir. 2012) ............................................................................53

*Metabolic Research, Inc. v. Ferrell,*
693 F.3d 795 (9th Cir. 2012) ............................................................................34

*Metabolife International Inc. v. Wornick,*
264 F.3d 832 (9th Cir. 2001) ...............................................................35, 36, 52

*Milkovich v. Lorain Journal Co.,*
497 U.S. 1 (1990).......................................................................................*passim*

*Miller v. Jones,*
970 P.2d 571 (Nev. 1998)................................................................................32

*Nev. Ind. Broad. Corp. v. Allen,*
664 P.2d 337 (Nev. 1983)................................................................................32

*Nicosia v. De Rooy,*
72 F. Supp. 2d 1093 (N.D. Cal. 1999)..............................................................27

vi

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Official Committee of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*,
   322 F.3d 147 (2d Cir. 2003) .......................................................................50, 51

*Pacquiao v. Mayweather*,
   No. 2:09-CV-2448-LRH-RJJ, 2010 WL 1439100 (D. Nev. April 9, 2010) ......52

*Pike v. Hester*,
   No. 3:12-CV-00283-RCJVPC, 2013 WL 839784 (D. Nev. March 5, 2013) ........................................................................................................52

*Rebel Commc'ns LLC v. Virgin Valley Water Dist.*,
   No. 2:10-CV-00513-LRH, 2010 WL 2773530
   (D. Nev. July 12, 2010)..........................................................................36, 52

*Rebel Commc'ns LLC v. Virgin Valley Water Dist.*,
   No. 2:10-CV-00513-LRH, 2012 WL 934301
   (D. Nev. March 20, 2012)................................................................................45

*Robertson v. State*,
   863 P.2d 1040 (Nev. 1993) ............................................................................39

*Ryan v. Brooks*,
   634 F.2d 726 (4th Cir. 1980) .........................................................................53

*Sahara Gaming Corp. v. Culinary Workers Union Local 226*,
   984 P.2d 164 (Nev. 1999)...............................................................15, 18, 19

*Schatz v. Republican State Leadership Comm.*,
   669 F.3d 50 (1st Cir. 2012)............................................................................53

*Schiavone Constr. Co. v. Time, Inc*,
   735 F.2d 94 (3d Cir. 1984) .............................................................................23

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
   559 U.S. 393 (2010)........................................................................................35

*Solano v. Playgirl, Inc.*,
   292 F.3d 1078 (9th Cir. 2002) ...............................................................30, 31

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Standing Committee on Discipline v. Yagman,*
    55 F.3d 1430 (9th Cir. 1995) ................................................................29

*U.S. ex rel. Newsham v. Lockheed Missiles & Space Co.,*
    190 F.3d 963 (9th Cir. 1999) ...............................................................35

*Underwager v. Channel 9 Australia,*
    69 F.3d 361 (9th Cir. 1995) ................................................................28

*Vess v. Ciba-Geigy Corp. USA,*
    317 F.3d 1097 (9th Cir. 2003) ............................................................18

*World Boxing Council v. Cosell,*
    715 F. Supp. 1259 (S.D.N.Y. 1989) ...................................................53

**STATUTES**

28 U.S.C. § 1291 .........................................................................................1

28 U.S.C. § 1332 .........................................................................................1

2013 Nev. Laws ch. 176 (S.B. 286), § 2 .................................................46

D.C. Code § 16-5502(a) ............................................................................41

D.C. Code § 16-5502(b) ............................................................................41

Nev. Rev. Stat. § 41.637 ...........................................................33, 41, 43, 44

Nev. Rev. Stat. § 41.650 ...................................................................46, 49

Nev. Rev. Stat. § 41.660 ...................................................................33, 37

Nev. Rev. Stat. § 41.670 ...........................................................................34

**OTHER AUTHORITIES**

*Black's Law Dictionary* (6th ed. 1990) ...................................................48

*Black's Law Dictionary* (9th ed. 2009) ...................................................47

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Fed. R. Civ. P. 12 ...................................................................................36

Fed. R. Civ. P. 56 .............................................................................34, 36

L. Jay Jackson, *Missing Links: 'References Rot" Is Degrading Legal
Research and Case Cites,* ABA Journal (Dec. 2013)...................................25, 26

*Restatement (Second) of Torts,* § 619 ....................................................23

*Sack on Defamation*, § 7:3:5[B][1].........................................................18

U.S. Const. amend I ..............................................................................42

*Webster's Encyclopedic Unabridged Dictionary of the English Language*
(1996) ..............................................................................................48

## JURISDICTIONAL STATEMENT

Plaintiff-Appellant Sheldon G. Adelson ("Plaintiff") sued Defendants-Appellees David A. Harris ("Harris"), Marc R. Stanley ("Stanley"), and the National Jewish Democratic Council ("NJDC") (collectively, "Defendants") for defamation on August 8, 2012. Joint Appendix ("JA") 21-56. The district court had diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332. Plaintiff is a citizen of Nevada, while Harris and the NJDC are citizens of the District of Columbia and Stanley is a citizen of Texas. JA22-23 ¶¶ 9–12. The amount in controversy exceeds $75,000. JA23 ¶ 13, JA35 ¶ 90.

The district court entered an order granting Defendants' motions to dismiss on September 30, 2013. Special Appendix ("SA") 1-57. Plaintiff filed a timely notice of appeal on October 30, 2013. JA461. This Court has jurisdiction under 28 U.S.C. § 1291. The district court's dismissal is final and reviewable even though the court also decided to award attorneys' fees and has not yet calculated the amount or entered a separate judgment. *Cooper v. Salomon Bros. Inc.*, 1 F.3d 82, 85 (2d Cir. 1993).

## STATEMENT OF ISSUES

The issues in this appeal extend far beyond the immediate facts to encompass important questions of internet defamation law that this Court has not yet addressed. In the proceedings below, the district court made a series of rulings

1

that not only deprived Plaintiff of his day in court, but also awarded attorneys' fees based on purported "admissions" made in Plaintiff's Complaint. In particular, the district court granted Defendants' Rule 12(b)(6) motion on the grounds that parts of Defendants' internet publications were privileged as a "fair report" of a judicial proceeding, while other parts were non-actionable "opinion." SA27-28, SA38. The district court then granted a separate "special motion to dismiss" – and ordered Plaintiff to pay Defendants' attorneys' fees and costs – under Nevada's "anti-SLAPP" statute after finding that Plaintiff's allegations of "reckless disregard for the truth" constituted an affirmative *admission* that Defendants did not have "knowledge" of the falsity of the statements. SA56. This appeal presents the following issues:

1.     Whether the district court erred in concluding as a matter of law that Defendants' statements satisfied the "fair, accurate and impartial" requirement of Nevada's fair report privilege where (a) Defendants emphasized and highlighted the defamatory allegations against Plaintiff, while omitting Plaintiff's denials and (b) Defendants did not report on or even mention any judicial proceeding, referring only indirectly to a court case through two underscored words containing an embedded hyperlink to a news article.

2.     Whether the district court erred in finding that Defendants' publications were non-actionable opinion where a "reasonable factfinder" could

2

conclude that the publications made the defamatory assertion that Plaintiff's political donations were "dirty money" derived from prostitution.

3.    Whether the district court erred in granting dismissal and attorneys' fees under Nevada's anti-SLAPP statute where (a) the statute contains procedural elements that "directly collide" with the Federal Rules of Civil Procedure; (b) Defendants did not file the motion until more than six months after the mandatory statutory deadline and without "good cause"; (c) Defendants' statements were not directed to a government official, as required by the statute; and (d) the district court based its decision on a finding that Plaintiff's allegations of "reckless disregard for the truth" constituted an "admission" that Defendants did not have knowledge of the falsity of the statements.

## STATEMENT OF THE CASE

Plaintiff is the Chairman, CEO, and major shareholder of Las Vegas Sands Corporation ("LVSC").  JA2 ¶ 4.  LVSC owns the Venetian Casino in Las Vegas, and one of its wholly-owned subsidiaries (Sands China Limited or "SCL") owns a casino in Macau.  JA23 ¶ 16.  Plaintiff finds the practice of prostitution "morally abhorrent" (JA53), and he has therefore directed his companies to adopt a "no tolerance" policy toward prostitution in their casinos here and abroad.  JA30 ¶ 63. In addition, Plaintiff and his wife, Dr. Miriam Adelson, have established clinics

3

dedicated to drug-abuse treatment and research to break the cycle of addiction that can lead women into prostitution.  JA23-24 ¶¶ 17–21.

### 1.    Defendants' Defamatory Petition.

On or about July 3, 2012, Defendants Harris, Stanley and the NJDC published a full-page, full-color graphic "Petition" on the NJDC's website.  JA24 ¶ 23.  The Petition, which bore the title "**Tell Romney to Reject Adelson's Dirty Money**" (JA38), is reproduced in its original form below:

## Tell Romney to Reject Adelson's Dirty Money



As you saw during the Republican primaries, GOP mega-donor Sheldon Adelson dumped millions of dollars into supporting Newt Gingrich's feckless campaign. **Now he's doing the same for Mitt Romney – with no plans to stop**. But perhaps the most alarming aspect of Adelson's potentially unlimited contributions is where the money comes from.

It's well known that Adelson makes tremendous sums of money through his casinos in China which – according to 2008 Republican presidential candidate Senator John McCain (AZ) -- means that Chinese **"foreign money" (to quote McCain) is flooding our political system**. But this week, reports surfaced that in addition to his anti-union and allegedly corrupt business practices, **Adelson "personally approved" of prostitution in his Macau casinos**.

Given these reports, **Romney and the rest of the Republican Party must cease accepting Adelson's tainted money immediately**. Sign NJDC's petition below, and click here to share the image above on Facebook to help spread the word.

Already signed? Click here to enlist your family and friends in the effort to stop the influence of Adelson's tainted money and protect our democracy.

As shown above, the Petition featured an image of Plaintiff's face on the left and an image of Mitt Romney's face on the right.  *Id.*  Between the two images was text that read, in part, "IF ONE OF YOUR BIGGEST DONORS . . . REPORTEDLY APPROVED OF **PROSTITUTION**, WOULD YOU TAKE HIS MONEY?"  *Id.* (emphasis in original).  The word "PROSTITUTION" was the focal point of the document.  It appeared in the exact center of the page, displayed in bold white font – the largest font in the document – against the dark background.  *Id.*  By contrast, the qualifier "REPORTEDLY APPROVED OF" appeared in a smaller typeface and gray text.  *Id*.  The Petition's graphic concluded with a directive to "SIGN THE PETITION:  TELL MITT ROMNEY TO STOP TAKING MONEY FROM SHELDON ADELSON."  *Id.*

Beneath the graphic, the Petition contained four paragraphs in black-on-white print, in which Defendants stated that "perhaps the most alarming aspect of Adelson's potentially unlimited contributions is *where the money comes from*."  *Id.* (emphasis added).  The Petition then elaborated that "reports" had just "surfaced that . . . **Adelson 'personally approved' of prostitution in his Macau casinos**."  *Id.*  "Given these reports," Defendants exhorted, "**Romney and the rest of the Republican Party must cease accepting Adelson's tainted money immediately**."  *Id.*  Defendants called on readers to "spread the word" by sharing

the Petition via Facebook and "enlist[ing]" others "in the effort to stop the influence of Plaintiff's tainted money and protect our democracy." *Id.*

Nowhere in the Petition did Defendants identify the source of their prostitution allegations. Instead, two paragraphs below the emblazoned word "PROSTITUTION," Defendants embedded an internet hyperlink in the words "personally approved" when they asserted that Plaintiff "personally approved" of prostitution in his Macau casinos. JA38, JA131. If a reader viewed the Petition on a device with internet access and clicked on the underscored words, the embedded hyperlink would direct the reader to an Associated Press article on AP's website entitled "Sheldon Adelson Approved 'Prostitution Strategy': Fired Former Sands Executive" ("AP Article"). JA131. Because the Petition did not include either a reference to the AP Article or an "URL" that would enable a reader to find the article without clicking on the link Defendants provided (JA38), a reader who was unable or unwilling to click on that link would not have had any idea on what basis Defendants had accused Adelson of personally approving prostitution.

The AP Article described an accusation against Plaintiff in a lawsuit brought by SCL's former CEO, Steven Jacobs, who had been fired in 2010. JA29 ¶ 52. After SCL refused Jacobs' demand for millions of dollars in payments, Jacobs filed suit in Nevada state court against LVSC and SCL, and later Plaintiff as well. ("*Jacobs* litigation"). JA29 ¶¶ 53-55. In June 2012, Jacobs filed a declaration in

7

the lawsuit in which he claimed that unnamed "LVSC Senior Executives informed me that [a] prostitution strategy had been personally approved by Adelson." JA30 ¶¶ 57, 60.[1]

After describing Jacobs' allegations, the AP Article noted that LVSC's counsel had described those allegations as "baseless" and "scurrilous" and stated that Jacobs had filed the allegations "only to sensationalize the case." JA131. LVSC's counsel also noted that Plaintiff "has always objected to and maintained a strong policy against prostitution." JA132.

Unlike the AP Article, the Petition did not disclose that the source of the prostitution allegations was hearsay allegations by a terminated employee who had filed a lawsuit against Plaintiff and LVSC. JA38. Nor did it disclose that Plaintiff had expressly denied the allegations in the press, or that he had not yet filed a response in the litigation. *Id.*

### 2. Defendants' Defamatory Press Release.

Other websites and the print media picked up on Defendants' allegations. JA27 ¶ 40. For example, on July 6, 2012, The Jewish Press published an article entitled "NJDC Calls on Romney to Return Adelson's Tainted Money

---

[1]   The ostensible purpose of the declaration was to support Jacobs' complaints about alleged deficiencies in LVSC's and SCL's responses to discovery requests Jacobs had served to bolster his claim that the Nevada court had personal jurisdiction over SCL. JA210-11.

Immediately," which quoted much of the Petition but did not contain any hyperlink. JA40-41.

Shortly afterwards, Professor Alan Dershowitz, a Harvard Law School professor and a prominent Jewish Democrat, contacted Defendant Harris to "apprise him of the inaccurate, false and potentially defamatory accusation made by Defendants in the Petition." JA444 ¶ 6.[2] In that same conversation, Professor Dershowitz told Harris that Jacobs – the ultimate source of Defendants' allegations – had "written an email stating that he himself did not believe that Mr. Adelson had approved of prostitution." JA444 ¶¶ 6-7.

Notwithstanding Professor Dershowitz's disclosures, Defendants published a "Press Release" on July 11, 2012 on the NJDC website entitled "Statement Regarding NJDC's Sheldon Adelson Petition." JA27-28 ¶¶ 41, 44, JA43. Instead of retracting the Petition, Defendants reaffirmed that "[w]e stand by everything we said" and claimed that their Petition "was sourced from current, credible news accounts":

> Regarding our recent campaign surrounding Sheldon Adelson, we don't believe we engaged in character assassination; *we stand by everything we said*, which was sourced from *current, credible news accounts*. Accusations against Mr. Adelson were made not by us, but by others, including Senator John McCain (R-AZ). Nonetheless, we regret the concern that this campaign has caused. And in the interest

---

[2] Although Professor Dershowitz had represented LVSC in other matters, he was not speaking as Plaintiff's lawyer. JA444 ¶ 10.

9

> of shalom bayit (peace in our home/community), we are going to take
> down our petition today.  Moving forward, we'll continue to work
> hard to fight against the unique threat posed by the outsized influence
> of certain individual megadonors, which rightly concerns most
> Americans and most American Jews.

JA43 (emphasis added).  The Press Release did not identify the "credible news accounts" or cite (even by hyperlink) any other document.  *Id*.  Nor did the Press Release disclose that the source of the prostitution accusations was Jacobs – a terminated employee and litigant who was known to be hostile to Plaintiff – or that Plaintiff had vehemently denied the allegations.  *Id.*  Finally, as with the Petition, the Press Release did not mention the *Jacobs* litigation, or any other legal proceeding.  *Id.*

On July 17, 2012, Plaintiff's counsel demanded a retraction.  JA31 ¶ 68, JA48-50.  The next day, LVSC and SCL filed a formal response to Jacobs' claims in the *Jacobs* litigation, which refuted Jacobs' accusations as "absurd," stating that Plaintiff "regards prostitution as morally abhorrent."  JA31 ¶ 69, JA331.  The response included the actual email chain Jacobs had purported to describe in his 2012 Declaration.  JA337-341.  This evidence showed that (1) Jacobs acknowledged in an email that any corporate approval of prostitution would be "at odds with what I know to be Sheldon [Adelson]'s 'no tolerance' policy"; and (2) an investigation conducted by LVSC's president found "no evidence" that Plaintiff or any other corporate executive had approved or tolerated prostitution.

*Id*.  Although news outlets reported on the response (JA31-32 ¶ 69, JA52-54), Defendants did not modify or retract the Petition.

On August 2, 2012, the Democratic Congressional Campaign Committee ("DCCC"), which had made accusations similar to Defendants' at or about the same time, retracted those statements, declaring that they were "untrue and unfair" and that it had been "wrong" to repeat them.  JA32 ¶¶ 70-71, JA56.  The DCCC also "extend[ed] its sincere apology to Mr. Adelson and his family for any injury we have caused."  *Id*.  Defendants, on the other hand, did not retract or modify their previous statements.  On August 3, 2012, Plaintiff's counsel again contacted Defendants and demanded a retraction and apology in light of the DCCC's disavowals.  JA32 ¶ 72.  Defendants refused.

### 3.    Procedural History.

On August 8, 2012, Plaintiff filed a defamation complaint against Defendants.  JA21-56 (Dkt. 1).  In the Complaint, Plaintiff alleged that Jacobs' "prostitution" accusation was not only "unequivocally false," but demonstrably false in light of Jacobs' own emails.  JA30 ¶¶ 61-63.  The Complaint further alleged that Defendants republished Jacobs' accusations with "reckless disregard" for their truth or falsity because Defendants failed to conduct any independent review of the accusations, refused to provide Plaintiff with an opportunity to respond to the accusations, and failed to retract or correct the statements after they

11

learned the statements were false.  JA33-34 ¶¶ 73-80, 86.  The Complaint also alleged that Defendants republished their defamatory statements in the Press Release by stating that "we stand by everything we said" (JA43), even after Professor Dershowitz informed Defendant Harris that Jacobs' accusations were false (JA31 ¶ 67).  Based on these and other facts, the Complaint alleged that Defendants made the statements with "actual malice" and the "specific intent to cause harm to Mr. Adelson."  JA35 ¶¶ 88-89.

On September 21, 2012, Defendants filed a motion to dismiss under Rule 12(b)(6) and the District of Columbia's "anti-SLAPP" statute.  JA61-66.  Seven months later – on April 23, 2013 – Defendants filed a "special motion" to dismiss based on the *Nevada* "anti-SLAPP" statute (JA425-28) after the district court indicated in a telephone conference that it would likely apply Nevada law (*see* Dkts. 53-56).

After Defendants filed their second motion, Plaintiff filed an opposition maintaining that (1) Defendants' motion was barred because it was filed after the statutory deadline, (2) the Nevada anti-SLAPP statute did not protect Defendants' publications, and (3) Defendants did not satisfy their statutory burden of showing their statements were made in good faith.  Dkts. 62, 64, 68.  In the alternative, Plaintiff asked the district court to permit limited discovery on the issue of Defendants' knowledge regarding the falsity of their statements.  Dkts. 65-67.

### 4. The District Court's Ruling.

On September 30, 2013, the district court granted Defendants' motion to dismiss the Complaint under Rule 12(b)(6). SA56, *Adelson v. Harris,* __ F. Supp. 2d __, 2013 WL 5420973 (S.D.N.Y. Sept 30, 2013). The court found that parts of the Petition were privileged as a "fair report of a judicial proceeding" under Nevada law, even though the Petition did not mention the *Jacobs* suit or any other legal proceeding. SA27-28. The court next found that the other challenged parts of the Petition were constitutionally protected "opinion" and that Defendants' subsequent Press Release was therefore also immune. SA30, 38.

The district court denied Defendants' motion under the D.C. anti-SLAPP statute, but granted their separate motion under the Nevada anti-SLAPP statute. SA56. While acknowledging that Defendants failed to file their motion within the statutory deadline, the court retroactively extended the deadline through a *nunc pro tunc* order, denied Plaintiff's request for limited discovery and granted Defendants' motion on the pleadings, ordering Plaintiff to pay Defendants' attorneys' fees and costs. SA41, SA56. On October 30, 2013, Plaintiff filed a timely notice of appeal. JA461.

### SUMMARY OF ARGUMENT

This appeal raises important issues of internet-related defamation law that transcend both the parties and the underlying dispute. In dismissing Plaintiff's

Complaint – and in ordering Plaintiff to pay Defendants' attorneys' fees and costs – the district court made a number of errors, which improperly expanded the scope of the "fair report" privilege in internet publications, while imposing a higher pleading standard on federal defamation plaintiffs than the standards set forth in the Federal Rules.

**First,** after finding Nevada law applicable, the district court held that Defendants' statements qualified for Nevada's fair report privilege because (1) the statements restated Jacobs' "prostitution" allegations; and (2) Plaintiff had not yet had an opportunity to file a responsive pleading in the *Jacobs* litigation. In reaching this conclusion, the district court ignored virtually all of the facts showing that Defendants' statements did not satisfy Nevada's requirement that reports of judicial proceedings be "fair, accurate and impartial" because the statements were overwhelmingly one-sided. These facts included the content, format and tenor of the Petition, which (among many other things) excluded Plaintiff's emphatic denials of the allegations, emblazoned the words "**Dirty Money**" and "**PROSTITUTION**" in the center of the page, and minimized any qualifying words such as "reportedly." These same facts also showed that Defendants *intended* to convey the false message that Plaintiff's political donations represented "Dirty Money" that came from "Prostitution." Under any standard, such a deliberately "one-sided" presentation does not qualify as a "fair report" under

Nevada law. *See, e.g., Lubin v. Kunin*, 17 P.3d 422, 427 (Nev. 2001); *Sahara Gaming Corp. v. Culinary Workers Union Local 226*, 984 P.2d 164, 166 (Nev. 1999).

**Second,** the district court erroneously held that the Petition could be viewed as a "report" on judicial proceedings, even though the document made no mention of the *Jacobs* litigation or any other legal proceeding. The district court based its conclusion on two underscored words in the small-print section of the Petition – "**personally approved**" – that actually enhanced the Petition's defamatory effect by emphasizing Plaintiff's alleged personal involvement in the promotion of prostitution. The court held that these words transformed the Petition into a report on the *Jacobs* litigation because they contained an unidentified embedded hyperlink to the underlying AP article, without the full URL or any kind of explanatory text. The district court reached this conclusion even though it recognized that such hyperlinks are "ephemeral" because they link to destination pages that often disappear, sometimes almost immediately. SA24 n.13. As a matter of law, the obscure placement of such an uncertain and unreliable "attribution" cannot qualify Defendants' Petition as a "report" of judicial proceedings.

**Third,** the district court erroneously held that Defendants' "dirty" and "tainted" money statements were non-actionable opinion. The Supreme Court has

made clear that "expressions of 'opinion' may often imply an assertion of objective fact," and that the relevant test must focus on how a "reasonable factfinder" would interpret the allegedly defamatory statements in light of the totality of the circumstances. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18, 21 (1990). In this case, the district court disregarded the format, tone and content of the Petition which clearly showed that Defendants' *intended* to make a defamatory factual assertion that Plaintiff's campaign contributions constituted "Dirty Money" derived from "Prostitution" – and that an ordinary reader would understand this message exactly as Defendants intended. Indeed, that is precisely the message conveyed by Defendants' statement that "perhaps the most alarming aspect of Adelson's potentially unlimited contributions is *where the money comes from*." JA38 (emphasis added).

**Fourth,** the district court erroneously entered an order dismissing the Complaint and directing Plaintiff to pay Defendants' attorneys' fees and costs under Nevada's "anti-SLAPP" statute based on a finding that Plaintiff failed to plead that Defendants acted with "knowledge of falsehood," and without giving Plaintiff an opportunity to conduct any discovery. This ruling embodied four errors: (1) the Nevada statute contains procedural elements that cannot be enforced in a federal diversity action because they conflict with the Federal Rules; (2) Defendants filed their motion under the Nevada statute more than six months

16

after the mandatory statutory deadline, and the district court's subsequent "*nunc pro tunc*" order purporting to retroactively extend the deadline had no legal effect under Nevada law; (3) the court's substantive ruling was contrary to the Nevada Supreme Court's construction of the Nevada statute, which limited its scope to "petitions to government agencies"; and (4) the district court improperly found that Plaintiff's allegations of "reckless disregard for the truth" constituted an "admission" that Defendants did not have knowledge of the falsity of the statements.

## STANDARDS OF REVIEW

This Court "review[s] the district court's grant of a Rule 12(b)(6) motion to dismiss de novo, accepting all factual claims in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010). Whether an allegedly defamatory statement is privileged is a question of law. *Clark County Sch. Dist. v. Virtual Educ. Software, Inc.*, 213 P.3d 496, 502 (Nev. 2009). Likewise, dismissal on the ground that an allegedly defamatory statement is non-actionable opinion presents a question of law subject to *de novo* review. *See Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 178 (2d Cir. 2000); *Gardner v. Martino*, 563 F.3d 981, 986 (9th Cir. 2009). An appellate court reviews *de novo* the district court's interpretation of state law, *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 283 (2d Cir. 2006), and its

dismissal of a complaint under a state anti-SLAPP statute, *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1102 (9th Cir. 2003).

## ARGUMENT

## I.   DEFENDANTS' STATEMENTS LINKING PLAINTIFF TO "PROSTITUTION" DO NOT QUALIFY FOR THE "FAIR REPORT" PRIVILEGE.

The district court held that Defendants' statements that Plaintiff "reportedly approved of prostitution" were privileged as a matter of law under the "fair report" privilege that Nevada courts apply to certain reports of judicial proceedings. SA19-20, SA27-28. *See generally Sahara Gaming,* 984 P.2d at 166. The privilege reflects the Nevada courts' recognition that "Nevada citizens have a right to know what transpires in public and official legal proceedings." *Lubin,* 17 P.3d at 427.

To qualify for the privilege, a publication must (1) provide a "fair, accurate and impartial" description of the underlying proceeding, *Lubin*, 17 P.3d at 427; and (2) clearly convey (either through a specific attribution or through overall context) that it is "quoting, paraphrasing or otherwise drawing upon official documents and proceedings." *Dameron v. Washington Magazine, Inc.*, 779 F.2d 736, 739 (D.C. Cir. 1985).[3]

---

[3]   As the district court recognized, the requirement of attribution "fulfill[s] the function of conveying to the public information about what went on in the courthouse, which is the principal reason for according such a privilege." SA21 (quoting *Sack on Defamation*, § 7:3:5[B][1]). Nevada's privilege is based on the same policy. Quoting Judge Sack's treatise, the district court found the attribution

In this case, Defendants' statements do not meet either requirement.

## A.  Defendants' Statements Were Not "Fair and Impartial."

Nevada courts have repeatedly held that the fair report privilege applies only if the underlying report is "fair, accurate, *and* impartial." *See, e.g., Lubin*, 17 P.3d at 427 (emphasis added); *Sahara Gaming*, 984 P.2d at 166.  Consistent with this rule, a report on judicial proceedings will not qualify for the fair report privilege if it presents a "one-sided" view of the litigation.  *Lubin,* 17 P.3d at 427.

For example, in *Lubin*, the Nevada Supreme Court reversed the dismissal of a defamation action after finding that the defendants' statements had gone beyond a "fair, accurate and impartial" reporting of a judicial proceeding.  *Id*.  In that case, the defendants circulated a publication stating that a lawsuit filed against the plaintiff was not "frivolous," and that an "abundance of evidence as well as eyewitnesses" supported the allegations.  *Id.* at 424.  On these facts, the Nevada Supreme Court held that the fair report privilege did not support dismissal of the complaint because the defendants' publication was not a "fair and impartial" report of a judicial proceeding.  *Id*. at 427.  The court stressed that the privilege did not apply to statements presenting only a "one-sided view of the action."  *Id.*

In this case, the district court found Defendants' statements to be "fair" based on the novel grounds that the statements "fairly" restated Jacobs' allegations,

---

requirement applicable "[a]s a general matter."  SA20.  Defendants did not argue, and the court did not find, that Nevada would depart from this general rule.

19

and that Defendants published the statements *before* Plaintiff had an opportunity to
file a responsive pleading in the *Jacobs* litigation:

> As explained above, the Petition accurately quotes the AP Article,
> which in turn *accurately quotes the Jacobs Declaration*. Moreover, at
> the time the petition was posted the defendants in the *Jacobs* litigation
> had not yet filed their response to the Jacobs Declaration, *so it cannot
> be seriously maintained that the Petition unfairly presented a one-
> sided view of the action.*

JA27 (emphasis added). Based on this analysis, the district court concluded that
the only "relevant" question was *"whether the Petition fairly characterized the
Jacobs Declaration, which it did."* SA27 n.15 (emphasis added).

Thus, contrary to *Lubin*, the district court made no attempt to determine if
Defendants' statements provided only a "one-sided version of the action." *Lubin*,
17 P.3d at 427. Nor did the court make any other finding that Defendants'
statements were "impartial." Instead, the court effectively excused Defendants
from the "impartiality" requirement simply because Defendants republished
Jacobs' defamatory allegations before Plaintiff had yet filed a responsive pleading
in the underlying litigation. SA27.

As a result, the district court ignored virtually all the facts showing that the
Petition was overwhelmingly "one-sided" – and thus overwhelmingly "unfair."
For example, the court ignored Defendants' omission of Plaintiff's denials of the
prostitution allegations, even though those denials were an integral part of the very
same AP article that the Petition obliquely referenced as its source. JA131. In

20

particular, the AP article quoted Plaintiff's representatives as stating that the Jacobs declaration was "baseless" and "scurrilous," while stressing that Jacobs had filed the declaration "only to sensationalize the case." *Id*.

Yet none of this appeared in either Defendants' Petition or their subsequent Press Release in which they expressly reaffirmed that "[w]e stand by everything we said." JA43. The mere fact that the Petition contained a two-word embedded hyperlink to the AP story containing the denials – after emblazoning the word "PROSTITUTION" and highlighting Plaintiff's purportedly "Dirty Money" in the title of the document – is plainly insufficient under any definition of "fair and impartial." Indeed, the overall format and presentation of the Petition make clear that Defendants *intended* to convey the message that Plaintiff's political donations were "Dirty Money" that came from "Prostitution" – and that Defendants therefore deliberately excluded Plaintiff's denials and any other information that contradicted that message.

Even more telling with respect to the lack of fairness and impartiality of the defamatory Petition is its design. The district court erred in looking at the two phrases regarding "reports" of prostitution in isolation, while ignoring the remaining content and presentation of the Petition, which strikingly demonstrated the one-sided nature of the "report." The Petition began with the bold – and unqualified – headline "**Tell Romney To Reject Adelson's Dirty Money**." JA38.

21

The Petition then made the word "**PROSTITUTION**" the dominant focal point by placing it in the center of the page – by itself – in the largest typeface of the document, using stark white print against a dark background, while placing the qualifier "reportedly approved" in washed-out gray and a much smaller typeface. *Id*. To introduce its allegations, the Petition stated that "perhaps the most alarming aspect of Adelson's potentially unlimited contributions is *where the money comes from*." *Id.* (emphasis added).

The obvious intent of this artful presentation – and its undeniable effect – was to convey the defamatory message that Plaintiff's political contributions constituted "Dirty Money" derived from "Prostitution" that he "personally approved." *Id*. Defendants later reinforced this message by issuing a Press Release stating that "[w]e stand by everything we said," even *after* Professor Dershowitz had apprised Defendants of the falsity of the charge. Furthermore, in the same Press Release, Plaintiffs claimed that their conclusions came "from current, credible news accounts," thus creating the impression that the allegations resulted from the investigations of a neutral journalist, rather than the obviously partisan claims of a biased litigant based on rank hearsay. JA43.

Notwithstanding these facts, the district court found that the Petition was "fair" because it did not explicitly *endorse* Jacobs' allegations. SA27 n.16. Under this theory, the Petition operated in much the same way as the AP Article itself by

22

providing an accurate rendition of Jacobs' allegations without adopting them. But unlike the Petition, the AP Article set forth Plaintiff's emphatic denials, identified Jacobs as the source of the allegations, and disclosed key information bearing on Jacobs' credibility. These facts underscore the critical difference between the goal of the AP Article and the agenda of Defendants: While the AP Article sought to impartially and accurately report both sides of the judicial proceeding, Defendants highlighted (and thereby "endorsed") the "Prostitution" allegations as the basis for their call to action, telling readers that "perhaps the most alarming aspects" of Plaintiff's contributions was "where the money comes from." JA38.

At a minimum, then, the format and one-sided content of the Petition, and its deliberate exclusion of Plaintiff's denials, create a question of fact as to the "fairness" of the Petition. *Restatement (Second) of Torts,* § 619(2), cmt. b (abuse of the fair report privilege is normally a jury question); *Schiavone Constr. Co. v. Time, Inc*, 735 F.2d 94, 97 (3d Cir. 1984) (fairness issue must be decided by jury unless "no rational jury . . . could consider the summary unfair"). Accordingly, the district court's finding that the Petition was privileged as a matter of law should be reversed.

**B. The Petition's Unidentified Hyperlink Did Not Qualify the Petition as a "Report on a Judicial Proceeding."**

The fair report privilege requires not only that the publication be "fair and impartial," but also that it constitute a "report on a judicial proceeding," either through a specific attribution or through the overall context of the publication. *Dameron*, 779 F.2d at 739.

In this case, Defendants did not report or even mention either the *Jacobs* litigation or any other legal proceeding. Nor did Defendants provide any other information about "what transpires in public and official legal proceedings." *Lubin,* 17 P.3d at 427. Instead, as noted above, Defendants sought simply to attack Plaintiff by conveying the false message that Plaintiff's political donations represented "Dirty Money" derived from "Prostitution" at his casinos that he "personally approved." JA38. As a result, the Petition did not serve any of the purposes underlying Nevada's fair report privilege. *See, e.g., Lubin,* 17 P.3d at 427.

The district court nevertheless found that the Petition adequately conveyed information about "judicial proceedings" because it included (in small font near the bottom of the page) two underlined words ("**personally approved**") containing an embedded hyperlink to the AP Article discussing the Jacobs declaration. SA21. The district court reached this conclusion even though the Petition provided only an unidentified hyperlink, rather than a citation to the Article and/or a URL telling

24

the reader where the Article could be located.  That cannot possibly be enough to turn the Petition into a "report of a judicial proceeding."  This type of link provides the reader with no information whatsoever unless the reader (1) recognizes the underlined terms as a hyperlink; (2) takes the initiative to click on the hyperlink; and (3) then spends the time necessary to read the destination page.  A reader who chose not to click on the embedded link or who was not on the internet at the time he or she read the Petition would have no clue as to what the basis was for Defendants' assertions.

Hyperlinks also suffer from another limitation – the destination page has an "ephemeral nature" because it often disappears after a relatively brief period of time. SA24 n.13.  This phenomenon, known as "link rot," means that in many cases a reader using a hyperlink will not be able to locate the destination page.  *Id.* This also means that the required attribution to a "report on judicial proceedings" in this case was of uncertain duration, if it existed at all.

The district court stated that the risks of link rot are reduced in defamation cases because such cases "typically involve prompt challenges" filed within one or two years.  SA24 n.13.  But "[e]ven recent links are vulnerable to rot," particularly links to news media sites, which frequently move articles within 7-30 days to archives that can be accessed only by paid subscribers. L. Jay Jackson, *Missing Links: 'References Rot" Is Degrading Legal Research and Case Cites,* ABA

25

Journal (Dec. 2013) at 17. Not surprisingly, therefore, this Court's rules have expressly rejected hyperlinks as a substitute for proper citation in briefs. 2d Cir. R. 25.1(i) ("A hyperlink to a cited authority does not replace standard citation format.").

These limitations are especially pronounced on the facts of this case, where Defendants buried the hyperlink in two words in the small print section near the bottom of the Petition, while emphasizing the far more dominant graphic highlighting Plaintiff's "Dirty Money" and linking it to "Prostitution." This obscure placement of an "ephemeral" (SA24 n.13) and unidentified attribution is insufficient to justify the fair report privilege, which *requires* attribution sufficient to clearly inform the reader that the report provides information about judicial proceedings. *Dameron*, 779 F.2d at 739.

Accordingly, the Petition's use of an unidentified hyperlink to obliquely "attribute" its defamatory content to the AP article cannot qualify the Petition as a "report on judicial proceedings." This conclusion provides an independent ground for reversing the district court's dismissal of Plaintiff's Complaint. Indeed, no other court has found such an unexplained and unidentified hyperlink sufficient to

satisfy the requirement of attribution under the fair report privilege – let alone a hyperlink as obscure as the one in this case.[4]   This Court should not do so now.

## II.   DEFENDANTS' "DIRTY MONEY" STATEMENTS WERE NOT PROTECTED "OPINION."

The district court also found that Defendants' statements about "dirty" and "tainted" money constituted non-actionable "opinion" as a matter of law.   SA28-38.   The court based this conclusion on its findings that (1) the "general context" of the statements showed that they were "patently partisan and political"; (2) the "specific context" of the statements showed that Defendants based their assertions on "disclosed facts" in the Petition; and (3) the assertions of "dirty" and "tainted" money are "incapable of being proven true or false."   *Id.*

The Supreme Court has refused to recognize a wholesale privilege for opinions because "expressions of 'opinion' may often imply an assertion of objective fact."   *Milkovich*, 497 U.S. at 18, 21.   As a result, the "dispositive question" is whether a "reasonable factfinder could conclude" that the statement

---

[4]   The district court's few citations are off point legally (because they did not address the fair report privilege) and factually (because the defendants there provided full links with explanatory text, rather than embedded hyperlinks). *Jankovic v. Int'l Crisis Grp.*, 429 F. Supp. 2d 165, 177 n.8 (D.D.C. 2006) (defendant's statement was true, and defendant added full Internet addresses that provided further clarification), *rev'd in part*, 494 F.3d 1080 (D.C. Cir. 2007); *Nicosia v. De Rooy*, 72 F. Supp. 2d 1093, 1102-03 (N.D. Cal. 1999) (defendant's statements were protected "opinion," and text explained that links were to supporting news articles); *Agora, Inc. v. Axxess, Inc.*, 90 F. Supp. 2d 697, 705-06 (D. Md. 2000) (defendant's statement was protected opinion, and text provided charts and legends that clearly explained links to published reports).

27

implies an assertion of fact. *Id*. at 21; *see also Lubin*, 17 P.3d at 426-27. This test requires an inquiry into the "general tenor of the entire work, the subject of the statements, the setting and the format of the work," as well as the "totality of the circumstances" in which the statements were made. SA30 (quoting *Underwager v. Channel 9 Australia*, 69 F.3d 361, 366 (9th Cir. 1995)).

The "fact or opinion" issue is generally a question of law, but if the allegedly defamatory statement is ambiguous, the issue must be left to the jury. *Milkovich*, 497 U.S. at 21. In *Milkovich*, for example, the Supreme Court reversed a summary judgment ruling because a "reasonable factfinder" could conclude that the statements implied an assertion of fact, even though they were couched as opinions. *Id*. The Court stressed that the "clear impact" of the challenged statements was the falsifiable message that the plaintiff had lied under oath. *Id*.

In this case, the district court erroneously disregarded the format, tenor and overall content of the Petition in finding the "dirty" and "tainted" money statements to be non-actionable opinions *as a matter of law*. As demonstrated earlier, even a casual reading of the Petition shows that Defendants intentionally designed its format and presentation to *link "dirty money" with "prostitution,"* and thereby convey to the ordinary reader the defamatory message that Plaintiff's political contributions were derived from "prostitution" – and worse, prostitution that he personally approved. This, after all, can be the only reason why Defendants

28

boldly entitled the Petition "**Tell Romney to Reject Adelson's Dirty Money"** and then highlighted the word "**PROSTITUTION**" in the center of the page using the document's largest font, while stating that "perhaps the most alarming aspect" of Plaintiff's political contributions is "where the money comes from."  JA38.

The district court recognized that Defendants based the "Dirty Money" statements on certain "facts," but found that the Petition's disclosure of such "facts" showed that the statements were mere opinions.  SA33-34.  In reaching this result, the court relied on a Ninth Circuit case stating that the disclosure of the underlying facts informs readers that "they are getting the author's interpretation of the facts presented."  SA33 (citing *Standing Committee on Discipline v. Yagman*, 55 F.3d 1430, 1439 (9th Cir. 1995)).  However, this principle applies only when the disclosed facts are themselves *non-defamatory*.  As the Supreme Court has made clear, "[e]ven if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete . . . the statement may still imply a false assertion of fact."  *Milkovich*, 497 U.S. at 18-19.  In this case, the "disclosed" (and indeed highlighted) assertion of "Prostitution" is a false and defamatory assertion of fact.

To be sure, the Petition uses the qualifiers "reportedly" and "reports" in making the "prostitution" allegation.  JA38.  But as shown earlier, the Petition minimizes these qualifiers by placing them in dim grey type (and a much smaller

29

font), while simultaneously magnifying the word "Prostitution." At a minimum, this obviously intentional strategy creates a question of fact as to whether a "reasonable factfinder" would be likely to interpret the Petition in the precise way *intended* by Defendants – *i.e.*, that Plaintiff's political donations were made with "dirty" and "tainted" money because that money supposedly "c[ame] from" prostitution. JA38. This is not an opinion, but an assertion of objective fact.[5]

Indeed, the Petition's deliberate linkage of "Dirty Money" with "Prostitution," while minimizing qualifiers such as "reportedly," is simply a modern "internet" twist on the tabloid trick of using salacious headlines to divert the reader from (or at least color the reader's perception of) a more neutral text. In such cases, the courts have repeatedly held that the headline creates a factual issue as to how a "reasonable reader" would interpret the overall message. *See, e.g., Kaelin v. Globe Commc'ns Corp.*, 162 F.3d 1036, 1040-41 (9th Cir. 1998); *Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1083-84 (9th Cir. 2002) ("innocent and nonsexual" article could not cure the defamatory meaning of picture and

---

[5] The district court also suggested that the Petition linked the "dirty money" allegations to other negative comments in the Petition, such as suggestions about "foreign money" and "corrupt business practices." SA27 n.16. But as shown above, the Petition makes the prostitution allegations its dominant theme and the linchpin of its call to action. Indeed, if anything, the district court's theory reinforces the conclusion that the question of how an ordinary reader would interpret the Petition's message can only be resolved by a jury – and certainly cannot be resolved on a motion to dismiss under Rule 12(b)(6).

suggestive headlines on magazine cover). For example, in *Kaelin*, the Ninth Circuit found that the headline "COPS THINK KATO DID IT" created a factual issue as to whether the "ordinary reader" would conclude that the defendants had made a factual assertion that Kaelin was responsible for the murder of O.J. Simpson's wife, even though the text of the accompanying article stated that the police suspected only that Kaelin had committed perjury. *Id.* The Ninth Circuit stressed that the headline conveyed a false message "to the ordinary reader . . . as well as those who merely glance at the headlines," and a reasonable juror could conclude that the explanatory text was too far removed from the headline to have any curative effect. *Id.* at 1041.

The same logic applies to the "ambiguity" in this case. The format, tenor and content of the Petition create (at a minimum) a factual issue as to whether the ordinary reader could reasonably interpret the Petition to make the factual claim that Plaintiff's "Dirty Money" derived from "Prostitution," notwithstanding the use of qualifiers such as "reportedly." This is particularly true since the same format, tenor and content of the Petition also make clear that Defendants intended to convey this very message.

Ironically, the district court found the Petition to contain *both* a "fair, accurate and impartial" report *and* a non-actionable "opinion." Furthermore, the district court reached these very different conclusions in exactly the same way – by

31

disregarding the overall format, content and design of the Petition. First, the court found the two "prostitution" statements to be a "fair and impartial" report by ignoring the overall context of the Petition showing that its message was decidedly one-sided. Next, the court found the "dirty money" statements to be non-actionable opinion by again ignoring the overall context of the Petition which linked the "dirty money" statements to the "prostitution" allegations and thereby conveyed a defamatory message.

By disregarding the format, content and design of the Petition, the district court resolved on the pleadings all of the critical factual questions underlying the "fact vs. opinion" issue.[6] Under controlling Supreme Court authority, this decision was error that should now be reversed. *Milkovich*, 497 U.S. at 21-22.

## III. THE DISTRICT COURT ERRED IN DISMISSING THE COMPLAINT AND AWARDING ATTORNEYS' FEES UNDER THE NEVADA "ANTI-SLAPP" STATUTE.

The district court also relied on Nevada's anti-SLAPP statute as a basis for dismissing the Complaint and ordering Plaintiff to pay Defendants' attorneys' fees and costs. This ruling was incorrect for four independent reasons: (1) the Nevada statute's "special motion to dismiss" procedure is inapplicable in federal diversity

---

[6] Nor are Defendants protected by the fact that they issued their false statements in the context of a political campaign. SA31-32. False assertions of fact are actionable whenever they are made, including in political campaigns. *See Miller v. Jones*, 970 P.2d 571, 575 (Nev. 1998); *Nev. Ind. Broad. Corp. v. Allen*, 664 P.2d 337, 341-43 (Nev. 1983).

actions; (2) Defendants failed to meet the mandatory statutory deadline for filing the motion and also failed to show "good cause" for this failure; (3) the statute applies only to communications directed to government agencies, and not to Defendants' general public discourse about political issues; and (4) the district court improperly decided the issue of Defendants' "good faith" on the pleadings.

### A. Nevada's "Special Motion to Dismiss" Procedure is Inapplicable in Federal Court.

Before turning to the merits, the Court must first determine to what extent (if at all) the procedures set forth in Nevada's anti-SLAPP statute should be applied in federal diversity actions. When Plaintiff filed his Complaint, the Nevada statute provided that a complaint can be dismissed and fees imposed if the defendant files a "special motion to dismiss" showing that (1) the challenged speech was made "in furtherance of the right to petition"; and (2) the statement constituted a "good faith communication," meaning that it was either truthful or made without knowledge of falsity. SA58, 59 (Nev. Rev. Stat. §§ 41.637 & 41.660, eff. 1997-2013); *see also John v. Douglas County Sch. Dist.*, 219 P.3d 1276, 1282, 1286 (en banc).[7]

The statute directed the trial court to treat the "special motion" as a motion for summary judgment on these two issues. SA60 (Nev. Rev. Stat. § 41.660(3)). The statute also directed the trial court to issue a stay of discovery during the

---

[7] As discussed in Section III.C.1 below, after the complaint was filed, the Nevada legislature amended the statute to expand its scope. The district court's order applied the statute as it stood before the amendment, when the complaint was filed.

pendency of the motion. *Id*. § 41.660(3)(b). If the movant made the required threshold showing, the burden shifted to the non-moving party to demonstrate a genuine issue of material fact or otherwise show that the movant is not entitled to relief as a matter of law. *John*, 219 P.3d at 1282. If the plaintiff could not meet this burden, the court had to dismiss the action, and the dismissal operated as an adjudication with prejudice on the merits. *Id.* In such a case, the court may also award attorneys' fees and costs to the movant. SA62 (Nev. Rev. Stat. § 41.670(1).

Here, the district court applied the Nevada statute to dismiss the Complaint and award attorneys' fees based on the Complaint's purported failure to adequately allege Defendant's knowledge of the falsity of the challenged statements, all without allowing discovery. Such action is contrary to the Federal Rules of Civil Procedure, including Rule 56, which grants the parties the right to discovery in advance of briefing and decision on a motion for summary judgment. Fed. R. Civ. P. 56. The question thus arises in this diversity case whether the Nevada statute's procedures are substantive or procedural for purposes of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938). No Circuit has yet decided this question, *see, e.g., Metabolic Research, Inc. v. Ferrell,* 693 F.3d 795, 798 n.4 (9th Cir. 2012), although three Circuits have found other state anti-SLAPP statutes to be

substantive under *Erie*.[8]  More recently, however, those decisions have been criticized on the ground that the anti-SLAPP statutes contain "exotic state procedural rules" that "disrupt the comprehensive scheme embodied in the Federal Rules, our jurisdictional statutes and Supreme Court interpretations thereof." *Makeaeff v. Trump University, LLC*, 715 F.3d 254, 275 (9th Cir. 2010) (Kozinski, J., concurring).

Relying on this reasoning, several courts have held that even if the anti-SLAPP statutes constitute "substantive" law for some purposes, they also contain certain *procedural* elements that are inapplicable in federal diversity actions because they "directly collide" with the Federal Rules.  *See generally Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010) (a valid Federal Rule controls if it "answers" the question in dispute).  For example, in *Metabolife International Inc. v. Wornick*, 264 F.3d 832, 845-46 (9th Cir. 2001), the Ninth Circuit held that a district court could not apply a provision of California's statute staying all discovery during the pendency of the anti-SLAPP motion.  The

---

[8]  *Godin v. Schencks*, 629 F.3d 79, 81 (1st Cir. 2010); *Henry v. Lake Charles Am. Press, LLC*, 566 F.3d 164, 168-69 (5th Cir. 2009); *U.S. ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 973 (9th Cir. 1999).  In *Liberty Synergistics, Inc. v. Microflo, Ltd.*, 718 F.3d 138, 148, 152-159 (2d Cir. 2013), this Court found that California's anti-SLAPP statute reflected a "substantive policy," but it did not hold that the statute was "substantive" for purposes of the *Erie* doctrine, as that issue was not before the Court.  Instead, the Court found that the statute was "procedural" for choice-of-law purposes.  *Id.*

Ninth Circuit found that this "discovery-limiting" provision collided with Federal Rule of Civil Procedure 56(f) which "*requir[es]* . . . discovery 'where the non-moving party has not had the opportunity to discover information that is essential to its opposition.'" *Id.* at 846 (*quoting Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 n.5 (1986)) (emphasis added); *see also Rebel Commc'ns LLC v. Virgin Valley Water Dist.*, No. 2:10-CV-00513-LRH, 2010 WL 2773530, at *2 (D. Nev. July 12, 2010) (applying *Metabolife* to the discovery bar in the Nevada statute).

Likewise, in *3M Co. v. Boulter,* 842 F. Supp. 2d 85, 97-101 (D.D.C. 2012), the district court found that the "special motion to dismiss" procedure in the D.C. anti-SLAPP statute could not be applied in federal diversity cases because it conflicted with Federal Rules 12 and 56. The court stressed that under Rule 12 the presentation of any matters outside the pleadings converts the motion to a Rule 56 motion for summary judgment, which generally requires discovery. *Id.* at 97-99. The court then held that the "special motion" procedure disrupted this federal procedure by allowing a defendant to deal a "deathly blow to a plaintiff's claim on the merits based either on the pleadings or on matters outside the pleadings." *Id.* at 102.

The same reasoning applies here. Even if Nevada's anti-SLAPP statute could be viewed as "substantive" for purposes of *Erie*, the statute sets forth procedures that "directly collide' with the Federal Rules. In particular, the Nevada

36

statute permits the dismissal of a complaint, the award of attorney's fees and the entry of summary judgment based on the pleadings, while barring all discovery. SA60 (Nev. Rev. Stat. § 41.660(3)). These provisions "directly collide" with Rules 12 and 56 by altering the procedures for determining a challenge to the merits of a plaintiff's claim and imposing a higher standard upon the plaintiff to avoid dismissal. *3M Co.*, 842 F. Supp. 2 at 102; *see also Anderson,* 477 U.S. at 250 n.5. For these reasons, the district court's rulings under the anti-SLAPP statute should be reversed.

### B. Defendants Failed to Meet the Mandatory Statutory Requirements for Filing Their Motion.

#### 1. The District Court Had No Jurisdiction to Entertain the Motion.

Even if the Nevada anti-SLAPP procedures could be applied in federal diversity actions, the district court had no authority to grant Defendants' "special motion" in this case because Defendants did not file the motion until long after the mandatory deadline had passed. The statute expressly provides that a "special motion to dismiss must be filed within 60 days after service of the complaint" and that this period can be extended by the court only "for good cause shown." Nev. Rev. Stat. § 41.660(2); SA60.

In this case, Defendants effected "service of the complaint" on August 8 and 9, 2012, and the statutory period therefore expired on October 8, 2012. SA41. In

37

the interim, Defendants made the tactical decision to move for dismissal under
Rule 12(b)(6) and the *District of Columbia* anti-SLAPP statute, which had far more
expansive (and pro-defendant) language than the Nevada statute then in effect.
Only after the district court indicated that it was leaning to Nevada law (Dkts. 53-
56) did Defendants file their "special motion" on April 23, 2013 – more than *six
months* after the expiration of the deadline mandated by the Nevada statute.
JA425-428.

The district court acknowledged "Defendants' failure to file their motion
within the statutorily prescribed time frame"[9] but nevertheless decided to extend
the deadline *retroactively*, *after* the deadline had passed.  SA41.  This was clear
error under Nevada law.  The Nevada Supreme Court has squarely held that trial
courts have "no jurisdiction" to grant retroactive extensions of deadlines fixed by
statutes in mandatory terms.  *Craig v. Harrah*, 195 P.2d 688, 690 (Nev. 1948); *see
also Baker v. Baker*, 96 P.2d 200, 200 (Nev. 1939) (setting aside extension of time
that had been granted after expiration of statutory deadline).  Thus, even if a trial

---

[9]  The district court correctly held that Defendants did not satisfy the Nevada
deadline by dropping a footnote in their initial dismissal brief that purported to
"reserve the right" to file a motion under the Nevada statute at some later date.
SA41.  As the court explained, "the inclusion of a footnote in a brief informing the
court that one *might* file a motion at a later date is not tantamount to actually filing
the motion, nor could Defendants 'reserve the right' to file a motion after the filing
deadline." *Id*.

38

court has jurisdiction to grant an extension "*while there [is] yet time remaining*," it cannot do so after the statutory deadline has passed "because of the mandatory provision of the said statute fixing the time." *Craig*, 195 P.2d at 691 (emphasis added). This rule applies to statutes that (like the anti-SLAPP statute) do "not provide for the *creation of a new period of time* . . . but merely *the enlargement or extension of existing time*." *Id*. (emphasis in original). Thus, if the statutorily-mandated period for an extension expires, it can no longer serve as the "basis of extension or enlargement." *Id*.

The district court's use of the phrase "*nunc pro tunc*" (SA41) does not change this result. Under Nevada law, an "order *nunc pro tunc* cannot be made use of nor resorted to, to supply omitted action." *Robertson v. State*, 863 P.2d 1040, 1041 n.1 (Nev. 1993) (quotation omitted), *overruled on other grounds by Krauss v. State*, 998 P.2d 163 (Nev. 2000). Rather, as the Nevada Supreme Court has made clear, the doctrine applies only to the correction of a "clerical error." *Id*.

Thus, the district court had no jurisdiction to retroactively extend the statutory deadline of Nevada's anti-SLAPP statute. On this ground as well, the district court's order dismissing the complaint and awarding attorneys' fees under the Nevada statute should be reversed.

39

### 2. Defendants Failed to Show "Good Cause" for Their Tactical Decision to Proceed First Under the D.C. Statute.

Even if the district court had jurisdiction to retroactively extend the deadline, Defendants did not show "good cause" for their failure to timely file their motion. The district court based its holding to the contrary on its refusal to fault Defendants for their failure to "anticipate how the Court would rule on a difficult choice of law." JA42. But this failure resulted from Defendants' tactical decision to file their anti-SLAPP motion under the D.C. statute, which had broader language than the Nevada statute. *Id.*

The only case cited by the district court on this point involved a defendant that did not learn of the factual basis for an anti-SLAPP claim until conducting discovery. *KJR Management Co. LLC v. First Web Search, LLC*, 2008 WL 7907954 (Nev. Dist. Ct. Nov. 19, 2008). By contrast, in this case, Defendants were well aware of all the facts necessary to make a timely motion under the Nevada statute, but chose not do so for reasons of tactical advantage. This is true, moreover, even though Defendants could have easily filed *alternative* motions under the two statutes and then briefed the choice-of-law question before proceeding on the merits – a fact the district court candidly acknowledged. JA42-43. Or Defendants could have filed a motion under the D.C. statute and moved for an extension under the Nevada statute while the district court decided which law to

apply. Instead, Defendants elected to proceed solely under D.C. law. This decision cannot constitute "good cause" under any definition of the term.

### C. The Nevada Statute Applies Only to Statements Directed to a Government Official.

Even if the district court properly excused Defendants' untimely filing, the court erred on the merits in construing the Nevada anti-SLAPP statute to apply to speech directed to the general public. At the time of the Complaint, the Nevada statute protected "[g]ood faith communication *in furtherance of the right to petition*," which the statute defined as "any

1.  Communication that is aimed at procuring any governmental or electoral action, result or outcome;

2.  Communication of information or a complaint to a Legislator, officer or employee of the Federal Government, this state or a political subdivision of this state, regarding a matter reasonably of concern to the respective governmental entity; and

3.  Written or oral statement made in direct connection with an issue under consideration by a legislative, executive or judicial body, or any other official proceeding authorized by law.

which is truthful or is made without any knowledge of its falsehood." SA58 (Nev. Rev. Stat. § 41.637) (emphasis added).

Thus, unlike the D.C. statute, which applies to any "act in furtherance of *the right of advocacy* on issues of public interest," D.C. Code § 16-5502(a), (b) (emphasis added), the Nevada statute applies only to "good faith communication in furtherance of *the right to petition*," SA58 (Nev. Rev. Stat. § 41.637) (emphasis

41

added).[10]  Yet, notwithstanding this clear difference in statutory terms, the district court held that (1) Defendants' publications fell within the first prong of communications aimed at procuring "electoral action" and (2) the "electoral action" prong encompassed the entire range of partisan political statements." SA43-44.  In so doing, the court disregarded the statutory construction adopted by both the Nevada Supreme Court and the Nevada legislature.

### 1. The District Court's Construction of the Statute is Contrary to the Nevada Supreme Court's Construction.

The district court's statutory construction is flatly at odds with the Nevada Supreme Court's holding that the Nevada anti-SLAPP statute applies only to communications in furtherance of the right to petition government agencies. *John*, 219 P.3d at 1281, 1282, 1284.  The Court in *John* conducted a thorough examination of the statute's purpose to determine that it was "neutral and limited in its application." *Id*. at 1284.  The Court quoted the relevant legislative history showing that the statute seeks to protect "well-meaning citizens who petition [the] government and then find themselves hit with retaliatory suits known as SLAPP [suits]." *Id*. at 1281.  Based on this history, as well as the statute's express language referencing "the right to petition," the Nevada Supreme Court concluded

---

[10]  Under the First Amendment, the right "to petition the government" is clearly distinct from the "freedom of speech."  U.S. Const. amend I.

42

that the statute has a limited scope and protects *only* communications relating to

the citizens' exercise of their "rights to petition their government":

> The anti-SLAPP statute *only protects citizens who petition the government from civil liability arising from good-faith communications to a government agency*. Nev. Rev. Stat. § 41.637. Thus, Nevada's anti-SLAPP statute is not an absolute bar against federal substantive claims; rather, it bars claims from persons who seek to abuse other citizens' rights to *petition their government*, and it allows meritorious claims against *citizens who do not petition the government in good faith.*

*Id.* (emphasis added).

In addressing *John*, the district court recognized that it was required to

follow the Nevada Supreme Court's interpretation of Nevada law, but concluded

that the *John* opinion was not a "model of clarity." SA46. Yet, on the issue of the

statute's scope, the opinion could not have been clearer: On no fewer than five

occasions, *John* described the statute's scope as limited to "communications in

furtherance of the right to petition." 219 P.3d at 1281, 1282, 1284.[11]

Notwithstanding these clear statements, the district court concluded that

(1) *John* limited its holding to only one of the three classes of "petitions" specified

in the statute (*i.e.*, petitions to a government agency); and (2) *John* therefore did

---

[11] In addition to the statements quoted above, the Court stated that "the moving party must first make a threshold showing that the lawsuit is based on 'good faith communication in furtherance of the right to *petition*' the government," *id.* at 1282 (emphasis added), and "the statute only applies in those cases involving '[g]ood faith communication in furtherance of the right to *petition*' the government," *id.* at 1284 (emphasis added).

43

not apply to the other two classes of petitions (petitions "to procure government or electoral action" and petitions addressing matters before a "legislative, executive or judicial body").  SA46.

Yet the *John* opinion contains no such limitation, nor would any such limitation be consistent with the structure of the statute.  As noted, the Nevada Supreme Court repeatedly stated in *John* that the anti-SLAPP *statute* applied only to petitions to government agencies, and the court nowhere limited its statements to only one class of petitions.  219 P.3d at 1281, 1282, 1284.  In so doing, the court based its repeated statements on the general "right to petition" language in the preface, not on the ensuing elaboration of the three specific classes of petitions.  *Id.* at 1281-84; *see* SA58 (Nev. Rev. Stat. § 41.637(1)-(3)).

The district court also found that *John*'s holding limiting the scope of the statute to "good-faith communications to a government agency" set forth a requirement of good faith, not a requirement of petitioning government agencies. SA47-48.  But this interpretation finds no support in the actual language of *John*, which did not state that the statute protects only "good-faith communications." Instead, the court held that the statute protects only "good-faith communications *to a government agency*" – thus emphasizing *both* the good faith *and* the government agency requirements.  219 P.3d at 1281.  Indeed, earlier in the very same sentence,

the Court made clear that the statute "only protects citizens *who petition the government*." *Id*. (emphasis added).

The district court stated that *John* has spawned "divergent interpretations" in the lower courts. SA48. This view was also mistaken. Nevada's federal district court has followed *John's* construction in the only cases to address the issue by limiting the anti-SLAPP statute to communications directed to government agencies. *Collins v. Laborers Int'l Union of N. Am. Local No. 872*, No. 2:11-CV-00524-LDG-LRL, 2011 U.S. Dist. LEXIS 79853, at *4 (D. Nev. July 20, 2011) (statute does not apply to communications between union and employers); *Buckwalter v. Wey*, No. 2:10-CV-108-JCM-LRL, 2010 WL 2609100, at *3 (D. Nev. June 24, 2010) (statute does not apply to statements to a newspaper).

By contrast, the "divergent" cases cited by the district court do not affect the scope of the anti-SLAPP statute. None of the decisions disputed *John*'s holding that the statute applies only to "citizens who petition the government" (219 P3d at 1281), and none of the decisions applied the statute to communications that were not ultimately directed to government officials.[12]

---

[12] In *Rebel Communications, LLC v. Virgin Valley Water Dist.*, the statements at issue were made by or to city council members in "a concerted effort to have a new communications tower built, which Rebel concedes was an issue before the Mesquite City Council." No. 2:10-CV-0513-LRH-PAL, 2012 WL 934301, at *2 (D. Nev. Mar. 20, 2012), *reconsideration denied*, No. 2:10-CV-0513-LRH-GWF, 2012 WL 3135683 (D. Nev. Aug. 1, 2012). *Archey v. Nelson* applied the statute to an article in a school newspaper, but only after finding that the paper "serves to

45

Finally, the district court's statutory construction is also contrary to the Nevada legislature's amendments of the statute, which occurred after the parties completed their briefing on Defendants' motion to dismiss.[13]  In the amendments, the Nevada legislature added a separate clause protecting good faith communications in furtherance of "the right to *free speech*."  2013 Nev. Laws ch. 176 (S.B. 286), § 2 (amendment to Nev. Rev. Stat. § 41.650; emphasis added). The amendments also expanded the definitions of covered communications to include communications "made in direct connection with an issue of public interest in a place open to the public or in a public forum."  *Id*. § 1 (amendment to Nev. Rev. Stat. § 41.637(4)).  The accompanying Legislative Counsel's Digest explained that the legislature added the language to "expand" the scope of immunity under the statute beyond the "right to petition" protected by "[e]xisting law."  2013 Nev. Laws ch. 176 (S.B. 286), Legislative Counsel's Digest, ¶ 3.

---

communicate this information directly to [school district] administrators."  No. 35671, 2010 WL 3711513, at 8 (Nev. Dist. Ct. Aug. 10, 2010).  And *D.R. Horton, Inc. v. Safe Homes Nevada, Inc.* – which was decided six years before *John* and could not possibly have construed *John* – concerned the republication of a government task force report, in which an organization urged readers to contact state officials who were deliberating potential legislation.  No. A466035, 2003 WL 25717726, at 2-3 (Nev. Dist. Ct. May 28, 2003).

[13]  Plaintiff advised the district court of the amendment, and of its relevance to the construction of the pre-amendment statute, in a supplemental authority submission on July 24, 2013.  Dkt. 78.

These amendments demonstrate that the Nevada legislature – like the Nevada Supreme Court – understood the pre-amendment statute to protect only the right to petition the government, not a right to "public speech," as the district court held. Obviously, if the district court's construction were correct, there would have been no need to enact the amendments because the statute would already have encompassed both "petitions" directed to the government and "speech" directed to the public.

Thus, both the Nevada legislature and the Nevada Supreme Court construed the Nevada statute in effect at the time of Defendants' defamatory publication and also at the time of the Complaint to apply only to communications relating to "petitions to government agencies." The district court's ruling to the contrary was therefore clearly incorrect.

**2. The District Court's Construction of the Statute is Contrary to its Express Terms.**

The district court's construction of the "electoral action" prong to include virtually the entire arena of political speech also disregards the plain terms of the statute. Indeed, the district court's construction simply cannot be squared with the prefactory statutory language requiring that the relevant communication be "in furtherance of *the right to petition*" – *i.e.*, the "right of the people to make formal requests to the government, as by lobbying or writing letters to public officials." *Black's Law Dictionary* (9th ed. 2009). There is not the slightest ambiguity in this

47

critical limitation:  It clearly means that each of the three categories of petitions enumerated in the statute – including the "electoral action" prong – are limited to communications either made directly to public officials or agencies, or made to others with the intent to be conveyed to public officials or agencies.

In the case of the "electoral action" prong, the word "electoral" means "pertaining to electors or elections," *Black's Law Dictionary* 520 (6th ed. 1990), while an "election" means "selection of person or persons for office *by vote*" or "a public vote upon a proposition," *Webster's Encyclopedic Unabridged Dictionary of the English Language*, at 627 (1996) (emphasis added).  Federal courts have commonly understood communications aiming to procure "electoral action" to be "'communications that in express terms advocate the election or defeat of a clearly identified candidate.'"  *Chamber of Commerce of the U.S. v. Moore*, 288 F.3d 187, 192, 196, 197 (5th Cir. 2002) (quoting *Buckley v. Valeo*, 424 U.S. 1, 44 (1976)); *see also Federal Election Comm'n v. Christian Action Network*, 894 F. Supp. 946, 953 (W.D. Va. 1995) (while ads clearly took negative view of candidates, they "were devoid of any language that directly exhorted the public to vote" and thus contained no "admonition to take electoral action"), *aff'd*, 92 F.3d 1178 (4th Cir. 1996).  Conversely, regulations that apply more broadly to communications "relative to" a candidate – similar to the district court's view that the anti-SLAPP statute applies to public communications that are in any way "related to" an

48

election – are "unconstitutionally vague" and invade the realm of free speech. *Buckley*, 424 U.S. at 40-44. Accordingly, a communication in furtherance of the "right to petition" that "aims at procuring any . . . electoral action, result or outcome" refers to a communication that expressly seeks a specific "result, action or outcome" in an election – *i.e.*, a petition that expressly advocates a specific vote for or against a candidate for public office.

Here, Defendants' Petition did not expressly advocate the election or defeat of any candidate, nor did it exhort readers to vote one way or another in the election. The district court's expansion of the statute to cover any statements that might indirectly *relate* to an election takes the statute away from its roots in the right to petition the government and into the realm of public speech.

### D. The District Court Improperly Decided Defendants' Motion on the Pleadings, Without Drawing Any Inferences in Favor of Plaintiff and Denying Plaintiff's Request to Take Discovery.

Another limitation of Nevada's anti-SLAPP statute is that its protection applies only to "good-faith communications." *John*, 219 P.3d at 1281. Thus, the party moving for dismissal "must first make a threshold showing that the lawsuit is based on 'good faith communications made in furtherance of the right to petition' the government." *Id*. at 1282 (quoting Nev. Rev. Stat. § 41.650).

Yet, in this case, the district court shifted the burden to Plaintiff by holding that (1) Plaintiff was required to allege in his Complaint that Defendants had actual

knowledge of the falsity of the statement; and (2) Plaintiffs' allegation of "reckless disregard" was an affirmative admission that Defendants acted *without* knowledge. SA52-53. Based on this analysis, the district court concluded that Plaintiff admitted as "a matter of law that Defendants' communications were made without knowledge of falsehood" (SA52), and the court therefore denied Plaintiff's motion for leave to take discovery (SA54-55 & n.26).

These rulings suffer from multiple errors. **First**, the Nevada anti-SLAPP statute is not the source of federal pleading requirements for defamation plaintiffs; it is an affirmative defense that defendants must raise by motion, and on which defendants bear the initial burden of coming forward. Here, Plaintiff alleged that Defendants acted with "reckless disregard" as required by the law of defamation and the federal rules of pleading. Under the Federal Rules, Plaintiff had no pleading obligation to anticipate and rebut potential affirmative defenses that Defendants might subsequently assert under state statutes.

**Second**, even if the Nevada statute could somehow be viewed as the source of a federal pleading requirement, the district court erred in treating the allegation of "reckless disregard" (which, at worst, was silent on the question of Defendants' knowledge) as an affirmative admission on the substantive issue of whether Defendants had actual knowledge. The district court's citation to *Official Committee of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand,*

*LLP*, 322 F.3d 147 (2d Cir. 2003), demonstrates the fallacy of its approach. In *Official Committee*, the complaint contained positive allegations that affirmatively showed company management to be *in pari delicto* with its accountants and major shareholder. These affirmative statements were "judicial admissions" that plaintiffs could not retract. By contrast, the Complaint here does not affirmatively allege that Defendants had no knowledge of falsity; at worst, it is silent on the subject, and the district court improperly fashioned an "admission" out of thin air.

**Third**, even if the question of Defendants' knowledge could be decided on the pleadings alone, the district court had to draw all plausible inferences *against* dismissal. *Famous Horse*, 624 F.3d at 108. The Complaint here alleged sufficient facts to support an inference that Defendants knew their prostitution allegations were false. At the time of the Petition, Defendants knew at a minimum (from the AP Article) that (1) Jacobs based his claims on hearsay, rather than on firsthand knowledge of the relevant facts, (2) Jacobs had an obvious motive to make false claims against Plaintiff, and (3) LVSC categorically denied the claims as "absurd," "baseless" and "scurrilous." JA131.

Nevertheless, Defendants chose to present and highlight Jacobs' allegations without disclosing either the source of the allegations (a biased litigant) or Plaintiff's denials. Defendants then reaffirmed that "[w]e stand by everything we said" (JA43), even after learning from a highly reputable source (Professor

51

Dershowitz) that the allegations were false. By contrast, the DCCC (an organization that had previously published similar accusations against Plaintiff) categorically recanted the accusations as "untrue and unfair." JA56. This evidence is at least sufficient to draw an inference of Defendants' knowledge and preclude dismissal at the pleadings stage.

**Fourth**, the district court erred in granting Defendants' special motion to dismiss and ordering Plaintiff to pay attorneys' fees and costs without giving Plaintiff an opportunity to conduct discovery on the issue of Defendants' knowledge. SA55 n.26. As demonstrated above, the federal courts cannot utilize procedures set forth in anti-SLAPP statutes if the procedures "directly collide" with the Federal Rules. *Metabolife*, 264 F.3d at 846-47. Consistent with this rule, a federal court "may not stay discovery under the state statute at this early [pleadings] stage." *Pike v. Hester*, No. 3:12-CV-00283-RCJVPC, 2013 WL 839784, at *6 (D. Nev. March 5, 2013); *Rebel Commc'ns*, 2010 WL 2773530 at *2. This is particularly true when a plaintiff requests "discovery of probative information solely available from the defendants" as is the case here, where Plaintiff sought discovery regarding Defendants' knowledge. *See Metabolife*, 264 F.3d at 850; *Pacquiao v. Mayweather*, No. 2:09-CV-2448-LRH-RJJ, 2010 WL 1439100, at *1 (D. Nev. April 9, 2010).

**Fifth**, the district court erred in holding as a matter of law that the Defendants acted in good faith because of their purported "reliance upon a report disseminated by a reputable news organization" (the AP Article). SA53-54. As detailed above, Defendants made a one-sided presentation of the information contained in the article by magnifying "Dirty Money" and "Prostitution," while excluding Plaintiff's denials and ignoring or minimizing any other contrary information – all in an effort to convey the false message that Plaintiff's political donations came from the proceeds of prostitution.[14]

These facts provide powerful evidence that Defendants did not act in good faith, and they provide a more than sufficient showing entitling Plaintiff to take limited discovery of information in Defendants' exclusive control. This information includes (*inter alia*): (1) what investigation did Defendants conduct of Jacobs' allegations prior to publishing the Petition? (2) why did Defendants

---

[14] The cases cited by the district court (SA53-54), in which the defendants restated conclusions drawn by reputable sources rather than making conclusions of their own, are inapposite. *Mayfield v. National Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 378 (4th Cir. 2012) (defendant's statement "did no more than report what [two] positive drug tests indicated"); *Ryan v. Brooks*, 634 F.2d 726, 729-30, 732-33 (4th Cir. 1980) (author paraphrased plaintiffs' statements as they were described in two reputable news articles); *World Boxing Council v. Cosell*, 715 F. Supp. 1259, 1265 (S.D.N.Y. 1989) (authors relied on multiple articles that "say virtually the same thing"); *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1296-97 (D.C. Cir. 1988) (author drew same conclusions as "previously published reports in reputable sources" had made); *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 57-58 (1st Cir. 2012) (defendant's account was consistent with news article and plaintiff's own quoted remarks).

exclude Plaintiff's denials? (3) why did Defendants fail to identify the source of the prostitution allegations? (4) what was Defendants' purpose in publishing the allegations? (5) what conversations did Defendants have about Professor Dershowitz' disclosures? and (6) what reports did Defendants make to their corporate board before issuing the Press Release stating that "we stand by everything we said"?[15]

Accordingly, by dismissing the Complaint and ordering Plaintiff to pay Defendants' attorneys' fees based solely on the pleadings – and by refusing to give Plaintiff the opportunity to conduct even limited discovery of information within Defendants' exclusive control – the district court erred as a matter of law.

---

[15] The district court also asserted that Defendants relied on Jacobs' "sworn declaration" (SA53), but cited no authority holding that a party can rely in good faith on even sworn statements made by an obviously biased source. Jacobs' own account stated that the allegations were not based on personal knowledge but on hearsay; the AP Article made clear that the allegations were hotly disputed; and Defendants quickly learned that Jacobs himself did not believe they were true.

54

# CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that this Court reverse the district court's September 30, 2013 dismissal order and direct the district court to reinstate Plaintiff's Complaint.

Dated: January 29, 2014

L. Lin Wood
Jonathan D. Grunberg
WOOD, HERNACKI & EVANS, LLC
1180 West Peachtree Street N.W.
Suite 2400
Atlanta, GA 30309
Telephone: (404) 891-1402
Facsimile: (404) 506-9111

*Attorneys for Plaintiff-Appellant*

Respectfully submitted,

By: /s/ James R. Ferguson

James R. Ferguson
    (jferguson@mayerbrown.com)
Michele L. Odorizzi
    (modorizzi@mayerbrown.com)
Demetrios G. Metropoulos
    (demetro@mayerbrown.com)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 782-0600
Facsimile: (312) 701-7711

Andrew L. Frey
    (afrey@mayerbrown.com)
MAYER BROWN LLP
1675 Broadway
New York, NY 10019
Telephone: (212) 506-2635
Facsimile: (212) 849-5635

*Attorneys for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Opening Brief of Plaintiff-Appellant Sheldon G. Adelson, along with the accompanying Joint Appendix (volumes I and II) and Special Appendix with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the appellate CM/ECF system on January 29, 2014.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ James R. Ferguson
James R. Ferguson
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,643 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirement of Fed. R. App. P. 32(a)(6) because it was prepared in a proportionately spaced typeface using Microsoft Word 2007 in Times New Roman 14-point type for text and footnotes.

Dated:    January 29, 2014

s/James R. Ferguson
James R. Ferguson
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600